**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NORTHERN MICHIGAN HOSPITALS, INC. and GIFFORD MEDICAL CENTER, INC., *for themselves and on behalf of all other similarly situated class members,*<br><br>    Plaintiffs,<br><br>    v.<br><br>HEALTH NET FEDERAL SERVICES, LLC, (f/k/a HEALTH NET FEDERAL SERVICES, INC.),<br><br>    Defendant. | Civil Action No. 07-39 (GMS)<br><br>JURY TRIAL DEMANDED |

## MEMORANDUM IN SUPPORT OF DEFENDANT HEALTH NET FEDERAL SERVICES, LLC'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

OF COUNSEL:

Arthur N. Lerner
Kathleen Taylor Sooy
Christopher Flynn
Tracy A. Roman
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2500 – Telephone
(202) 628-5116 – Facsimile

Dated:  March 15, 2007

Richard L. Horwitz (Del. Bar 2246)
Jennifer Gimler Brady (Del. Bar. 2874)
Jennifer C. Wasson (Del. Bar 4933)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, Delaware 19899-0951
(302) 984-6000 – Telephone
(302) 658-1192 – Facsimile
rhorwitz@potteranderson.com – Email
jbrady@potteranderson.com – Email

*Attorneys for Defendant Health Net Federal Services, LLC*

783804v1 / 31173

## **TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

I.    THE TRICARE PROGRAM ................................................................................. 3

II.   PLAINTIFFS' CLAIMS ....................................................................................... 5

ARGUMENT .................................................................................................................. 7

I.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS FOR LACK OF A
      NECESSARY AND INDISPENSABLE PARTY ................................................. 7

      A.    The United States Is a Necessary Party Under Rule 19(a). ..................... 8

      B.    The United States Is An Indispensable Party Under Rule 19(b) .......... 13

II.   PLAINTIFFS' CLAIMS ARE BARRED BY THE DOCTRINE OF
      SOVEREIGN IMMUNITY. ............................................................................. 17

III.  PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFFS
      HAVE FAILED TO EXHAUST THEIR ADMINISTRATIVE REMEDIES ... 22

      A.    The TRICARE Appeal Process ............................................................ 23

      B.    The Exhaustion Doctrine Supports Dismissal of Plaintiffs' Complaint. ............. 25

      C.    The TMA Has Primary Jurisdiction Over The Plaintiff Hospitals' Claims ......... 29

IV.   PLAINTIFFS HAVE FAILED TO STATE CAUSES OF ACTION FOR
      BREACH OF IMPLIED-IN-FACT CONTRACT OR UNJUST ENRICHMENT .......... 31

      A.    Plaintiffs Fail to State a Claim For Breach of Implied-In-Fact Contract. ........... 31

      B.    Plaintiffs Also Fail To State A Claim For Unjust Enrichment. ........................ 35

CONCLUSION ............................................................................................................. 37

i

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**CASES**

*Acierno v. Preit-Rubin Inc.,*
  199 F.R.D. 157 (D. Del. 2001)...............................................................10, 14, 16, 29

*Adamietz v. Smith,*
  273 F.2d 385 (3d Cir. 1960)...............................................................................10

*Allegheny Gen. Hosp. v. Philip Morris, Inc.,*
  228 F.3d 429 (3d Cir. 2000)...............................................................................35

*Angst v. Royal Maccabees Life Ins.,*
  77 F.3d 701 (3d Cir. 1996)...................................................................................8

*Barber v. SMH (US), Inc.,*
  509 N.W.2d 791 (Mich. Ct. App. 1993) .............................................................35

*Bishop v. Office of Civilian Health and Medical Programs of the*
  *Uniformed Services (CHAMPUS),*
  917 F. Supp. 1469 (E.D. Wash. 1996) ...............................................................21

*Board of Trustees of Bay Med. Ctr. v. Humana Military*
  *Healthcare Servs.,*
  447 F.3d 1370 (Fed. Cir. 2006)..........................................................................20

*Boles v. Greeneville Hous. Auth.,*
  468 F.2d 476 (6th Cir. 1972)......................................................................7, 13, 16

*Borg-Warner Acceptance Corp. v. Dep't of State,*
  426 N.W.2d 717 (Mich. Ct. App. 1988),
  *rev'd on other grounds,* 444 N.W.2d 786 (Mich. 1989) ......................................32

*C. Jack Friedman, Ph.D. & Assocs. v. Pennsylvania Blue Shield,*
  836 F. Supp. 263 (E.D. Pa. 1993),
  *aff'd,* 30 F.3d 1486 (3d Cir. 1994) .....................................................................18

*California v. Arizona,*
  440 U.S. 59 (1979)..............................................................................................13

*Carpet Group Int'l v. Oriental Rug Importers Ass'n,*
  227 F.3d 62 (3d Cir. 2000).................................................................................18

*Chavez v. United States,*
  18 Ct. Cl. 540 (1989)....................................................................................32, 33

*Christman v. Grays,*
  No. 1:05-CV-192, 2005 WL 3088529 (S.D. Ohio Nov. 17, 2005).......................19

*Chrysler Corp. v. Airtemp Corp.*,
    426 A.2d 845 (Del. Super. Ct. 1980) .................................................................. 35

*City of El Centro v. United States*,
    922 F.2d 816 (Fed. Cir. 1990) .......................................................................... 36

*Communications Workers of Am. v. AT & T*,
    40 F.3d 426 (D.C. Cir. 1994) ........................................................................... 28

*Conley v. Gibson*,
    355 U.S. 41 (1957) ........................................................................................... 31

*Cudjoe v. Indep. Sch. Dist. No. 12*,
    297 F.3d 1058 (10th Cir. 2002) ........................................................................ 28

*D.P. Enter. v. Bucks County Cmty. College*,
    725 F.2d 943 (3d Cir. 1984) ............................................................................. 31

*Davel Commc'ns, Inc. v. Qwest Corp.*,
    460 F.3d 1075 (9th Cir. 2006) .......................................................................... 30

*Dawavendewa v. Salt River Project Agric. Improvement and Power Dist. ("SRP")*,
    276 F.3d 1150 (9th Cir. 2002) .............................................................. 12, 15, 16

*DJ Painting, Inc. v. Baraw Enters.*,
    776 A.2d 413 (Vt. 2001) .................................................................................. 35

*Enterprise Mgmt. Consultants v. United States*,
    883 F.2d 890 (10th Cir. 1989) .......................................................................... 15

*Enza, Inc. v. We The People, Inc.*,
    838 F. Supp. 975 (E.D. Pa. 1993) ...................................................................... 8

*Estrada v. Sea-Land Service, Inc.*,
    939 F. Supp. 129 (D.P.R. 1996) ....................................................................... 10

*Far East Conference v. United States*,
    342 U.S. 570 (1952) ......................................................................................... 30

*Feres v. United States*,
    340 U.S. 135 (1950) ......................................................................................... 18

*Feriozzi Co., Inc. v. Ashworks*,
    130 Fed. Appx. 535 (3d Cir. 2005) .................................................................. 14

*First Jersey Sec., Inc. v. Bergen*,
    605 F.2d 690 (3d Cir. 1979) .................................................................. 25, 26, 27

*Fluent v. Salamanca Indian Lease Auth.*,
    928 F.2d 542 (2d Cir. 1991) ............................................................................. 15

*Gardiner v. Virgin Islands Water & Power Auth.*,
145 F.3d 635 (3d Cir. 1998)..........................................................................................14, 33

*Ghana v. Holland*,
226 F.3d 175 (3d Cir. 2000)....................................................................................................27

*Guthrie Clinic v. Travelers' Indem. Co.*,
104 Fed. Appx. 218 (3d Cir. 2004)........................................................................................16

*Harris v. Bayer*,
18 F.R.D. 392 (E.D. Pa. 1955)...........................................................................................10, 17

*Harris v. S.C. Madison*,
No. 97-7532, 1998 WL 518181 (E.D. Pa. July 24, 1998)....................................................7, 8

*Harrow v. Prudential Ins. Co. of Am.*,
279 F.3d 244 (3d Cir. 2002)....................................................................................................29

*Holton v. Blue Cross & Blue Shield of Alabama*,
56 F. Supp. 2d 1347 (M.D. Ala. 1999)..................................................................................26

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)..................................................................................................31

*In re Shelby County Healthcare Servs. of AL, Inc.*,
80 B.R. 555 (Bkrtcy. N.D. Ga. 1987)....................................................................................30

*Jeremy H. by Hunter v. Mount Lebanon School Dist.*,
95 F.3d 272 (3d Cir. 1996)......................................................................................................28

*Jurimex Kommerz Transit G.m.b.H. v. Case Corp.*,
201 F.R.D. 337 (D. Del. 2001), *aff'd in part and rev'd in part on other grounds*,
65 Fed. Appx. 803 (3d Cir. 2003).............................................................................................8

*Koppers Co., Inc. v. Aetna Cas. and Sur. Co.*,
158 F.3d 170 (3d Cir. 1998)......................................................................................................8

*Kramer Assoc. v. Ikam, Ltd.*,
888 A.2d 247 (D.C. Ct. App. 2005).......................................................................................35

*Lannak v. Biden*,
No. 06-180-SLR, 2007 WL 625849 (D. Del. Feb. 27, 2007).................................................31

*Leber v. Canal Zone Cent. Labor Union & Metal Trades*
Council, AFL-CIO, 383 F.2d 110 (5th Cir. 1967).............................................................10, 17

*Leibowitz v. Cornell Univ.*,
445 F.3d 586 (2d Cir. 2006)....................................................................................................32

*Marine Dev. Corp v. Rodak.*,
300 S.E.2d 763 (Va. 1983)......................................................................................................35

*Matranga v. Travelers Ins. Co.,*
   563 F.2d 677 (5th Cir. 1977) ............................................................................................. 18

*McCarthy v. Madigan,*
   503 U.S. 140 (1992) ........................................................................................................... 27

*MCI Commc'ns. Corp. v. AT & T,*
   496 F.2d 214 (3d Cir. 1974) ............................................................................................... 30

*MCI Telecomms. Corp. v. Teleconcepts, Inc.,*
   71 F.3d 1086 (3d Cir. 1995) ........................................................................................ 29, 30

*Morse v. Lower Merion School Dist.,*
   132 F.3d 902 (3d Cir. 1997) ............................................................................................... 31

*Murray v. Northrop Grumman Info. Tech., Inc.,*
   444 F.3d 169 (2d Cir. 2006) ........................................................................................ 34, 35

*Nadel v. Play-By-Play Toys & Novelties, Inc.,*
   208 F.3d 368 (2d Cir. 2000) ............................................................................................... 32

*Nat'l Org. on Disability v. Tartaglione,*
   Civ. No. 01-1923, 2001 WL 1231717 (E.D. Pa. Oct. 11, 2001) ......................................... 7

*Parisi v. Davidson,*
   405 U.S. 34 (1972) ............................................................................................................. 26

*Phone-Tel Commc'ns v. AT&T Corp.,*
   100 F. Supp. 2d 313 (E.D. Pa. 2000) ................................................................................. 27

*Provident Tradesmens Bank & Trust Co. v. Patterson,*
   390 U.S. 102 (1968) ........................................................................................................... 14

*Pulitzer-Polster v. Pulitzer,*
   784 F.2d 1305 (5th Cir. 1986) ............................................................................................. 7

*Quazzo v. Quazzo,*
   386 A.2d 638 (Vt. 1978) ..................................................................................................... 34

*R.B. Ventures, Ltd. v. Shane,*
   112 F.3d 54 (2d Cir. 1997) ................................................................................................. 35

*Ragosta v. Wilder,*
   592 A.2d 367 (Vt. 1991) ..................................................................................................... 34

*Reiter v. Cooper,*
   507 U.S. 258 (1993) ........................................................................................................... 29

*Richards v. United States,*
   176 F.3d 652 (3d Cir. 1999) ............................................................................................... 17

*Richman Bros. Records, Inc. v. U.S. Sprint Communications Co.*,
   953 F.2d 1431 (3d Cir. 1991)...............................................................................................29

*Rittner v. Barber*,
   435 F. Supp. 2d 682 (N.D. Ohio 2006) ...............................................................................28

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989)............................................................................................................26

*Robinson v. Dalton*,
   107 F.3d 1018 (3d Cir. 1997)..............................................................................................22

*Sellers v. Brown*,
   633 F.2d 106 (8th Cir. 1980)...............................................................................................13

*Seneca Nation of Indians v. State of New York*,
   383 F.3d 45 (2d Cir. 2004) .................................................................................................16

*Taylor v. Savage*,
   No. 05-10-0032, 2007 WL 549913 (Del. Ct. Com. Pl. Jan. 2, 2007)....................................35

*Tokarcik v. Forest Hills School Dist.*,
   665 F.2d 443 (3d Cir. 1981)................................................................................................28

*Tomczyscyn v. Teamsters, Local 115 Health & Welfare Fund*,
   590 F. Supp. 211 (E.D. Pa. 1984) ......................................................................................28

*Trauma Serv. Group v. Keating*,
   907 F. Supp. 110 (E.D. Pa. 1995) .................................................................................23, 26

*United States v. Johnson Controls*,
   713 F.2d 1541 (Fed. Cir. 1983)...........................................................................................22

*Walker v. City of Waterbury*,
   235 F.R.D. 34 (D. Conn. 2006)...........................................................................................10

*Wilson v. Globe Specialty Prods.*,
   117 F. Supp. 2d 92 (D. Mass. 2000) ...................................................................................29

*Wilson v. MVM, Inc.*,
   475 F.3d 166 (3d Cir. 2007).........................................................................................28, 29

*Your Home Visiting Nurse Servs. v. Shalala*,
   525 U.S. 449 (1999)............................................................................................................25

**STATUTES**

10 U.S.C. § 1097(a) ...............................................................................................................18

28 U.S.C. § 1346(a)(2)............................................................................................................13

28 U.S.C. § 1491.................................................................................................................13, 17

32 C.F.R. Part 199...................................................................................................................passim

Fed. R. Civ. P. 12(b)(1)......................................................................................................1, 2

Fed. R. Civ. P. 12(b)(6)...................................................................................................passim

Fed. R. Civ. P. 12(b)(7)....................................................................................................1, 2, 7

Fed. R. Civ. P. 19......................................................................................................7, 8, 13, 14

Fed. R. Civ. P. 82.................................................................................................................13

**OTHER AUTHORITIES**

7 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane,
    Federal Practice and Procedure § 1609 (3d. ed 2007)...............................................................7

Restatement (Second) of Contracts § 4 (1981) ............................................................................32

Richard A. Lord, Williston on Contracts, §7.41 (4th ed. 2006).........................................34, 35, 36

Pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6) and 12(b)(7), Defendant Health Net Federal Services, LLC ("Health Net"), by and through counsel, hereby respectfully submits the following memorandum in support of its motion to dismiss both counts of the First Amended Complaint with prejudice.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs, two hospitals located in Michigan and Vermont, have brought this putative class action seeking to collect payment from Health Net for unspecified outpatient hospital services they allegedly provided to beneficiaries of the federal TRICARE program. Stripped to its essence, Plaintiffs' Complaint is a challenge to the manner in which the United States government pays certain TRICARE outpatient hospital claims submitted to Health Net, one of the government contractors that processes those claims.

The TRICARE program is a comprehensive managed care program that coordinates the provision of health care services for active duty and retired uniform service members and their families. While Plaintiffs cloak their allegations against Health Net as common law claims arising under quasi-contractual and unjust enrichment theories of relief, in reality Plaintiffs' causes of action turn on whether Plaintiffs are entitled to additional federal funds based on an interpretation of a federal regulation. Health Net is simply not an appropriate defendant in an action to vindicate Plaintiffs' interpretation of a federal payment regulation because Health Net essentially acts on behalf of the federal government in adjudicating claims under that regulation.

Health Net therefore respectfully requests that the Court dismiss Plaintiffs' Complaint on the following grounds.

1.      The government is a necessary and indispensable party under Rule 19 of the Federal Rules of Civil Procedure based on its own interests regarding the uniform administration and fiscal integrity of the TRICARE program, as well as the interests of Health Net in avoiding multiple inconsistent obligations. Yet, since the government has not waived its sovereign immunity for the claims pled against it by the Plaintiffs in this Court, the Court should dismiss

the Complaint pursuant to Rule 12(b)(7) of the Federal Rules of Civil Procedure for failure to join an indispensable party under Rule 19.

2.      The government is also the real party in interest in this case under Rule 17 of the Federal Rules of Civil Procedure. Payment to non-network participating providers such as Plaintiffs involves the expenditure of federal funds pursuant to the government's obligation to ensure the provision of health care services to TRICARE beneficiaries, making the government the real party in interest. Yet, since the government has not waived its sovereign immunity for the claims pleaded against it by the Plaintiffs in this Court, the Court should dismiss the Complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure because the court lacks subject matter jurisdiction over the real party in interest.

3.      Plaintiffs have not pleaded that they exhausted their administrative remedies under the TRICARE program before seeking redress in this Court. As a result, Plaintiffs' Complaint is, at best, premature and should therefore be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

4.      The TRICARE Management Authority ("TMA"), the office within the Department of Defense ("DoD") responsible for administration of the TRICARE program, has primary jurisdiction over the interpretation of the technical payment regulations at issue in this case. To the extent the Court does not simply dismiss Plaintiffs' Complaint based on their failure to exhaust their administrative remedies, it should, in the alternative, refer the issue of the interpretation of the regulation at issue to the agency empowered to enforce that regulation under the doctrine of primary jurisdiction.

5.      Plaintiffs' common law claims for breach of implied-in-fact contract and unjust enrichment fail to state a claim for which relief can be granted and should be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs cannot maintain an implied-in-fact contract claim against Health Net because the alleged agreement lacks both consideration and mutuality of agreement. Plaintiffs allege that the implied in fact agreement obligates Health Net

to pay Plaintiffs according to the relevant statute, regulation and agency guidance, which is an obligation that arises out of Health Net's contract with TMA rather than out of any relationship with Plaintiffs. An implied-in-fact contract cannot be created between a government contractor and a third party based on the government contractor's contractual obligations to the federal government. Plaintiffs have likewise failed to plead facts supporting a claim for unjust enrichment because they have failed to allege that a recognizable benefit was conferred upon Health Net or that Health Net "accepted" any benefits from Plaintiffs which it would be improper or inequitable for Health Net to retain. Instead, Plaintiffs allege nothing more than a dispute over the interpretation of applicable payment regulations.

For each of the foregoing reasons, Health Net respectfully requests that the Court dismiss Plaintiffs' Complaint in its entirety with prejudice.

## BACKGROUND

### I.    THE TRICARE PROGRAM

Health Net has a contract with the DoD to provide managed care support services to the TRICARE program for the North Region.[1] First Amended Complaint (hereinafter "Compl.") ¶ 20. TRICARE is the program through which the DoD arranges for health care services guaranteed by statute to certain military personnel, their dependents, and other individuals eligible for coverage under the program. The program is authorized pursuant to Title 10, United States Code, Ch. 55, and implementing regulations are found at 32 C.F.R. Part 199. Four detailed manuals govern the operational details of the program, most notably, the TRICARE Operations Manual, 6010.51-M (August 1, 2002) ("TOM").

TRICARE Management Activity ("TMA") is the agency within the DoD that administers the contract. TMA was formerly known as the Office of CHAMPUS, or OCHAMPUS. TMA is

---

[1]    The North Region is comprised of the following states: Connecticut, Delaware, the District of Columbia, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, Vermont, Virginia, West Virginia, Wisconsin, and portions of Tennessee, Missouri and Iowa. Compl. ¶ 20.

a "field activity under the policy guidance and direction" of the Assistant Secretary of Defense for Health Affairs. 32 C.F.R. § 199.1(c)(iv).

In particular, TMA is responsible for promulgating and enforcing the TRICARE rules and regulations; adjudicating disputes regarding claims that arise between contractors and non-network health-care providers; and, ultimately, providing the money to pay for claims. *See* DoD Directive 5136.12 (May 31, 2001) (Appendix p. A1). As relevant to this action, the DoD through the managed care services ("MCS") contract has contractually delegated to Health Net the function to pay health care provider claims for services rendered to TRICARE beneficiaries, for the North Region identified in the MCS Contract. Compl. ¶ 27.

Health Net is required by the MCS Contract to establish a network of civilian health care providers for the provision of care to TRICARE beneficiaries. Compl. ¶ 23; TOM Ch. 5. Health care providers are paid for services furnished to TRICARE beneficiaries according to one of two distinct frameworks that depend on whether the provider is a member of the Health Net TRICARE network. Providers that belong to the network are referred to as "network providers" and Health Net is required to process claims from network providers in accordance with the provider's agreement with Health Net, including the amount of payment that such providers have agreed to accept for their services. Compl. ¶ 25; TRICARE Reimbursement Manual ("TRM"), Ch. 1, § 1, ¶ II.A (Appendix p. A19).

The Plaintiffs in this case, however, are non-network providers, which means that, unlike network providers, Plaintiffs have not entered into a contract with Health Net to provide healthcare services to TRICARE beneficiaries at agreed-upon rates. Compl. ¶¶ 25-27. Non-network providers are divided into two categories – those that are "participating" and those that are "non-participating." A "participating provider" is defined as "a CHAMPUS authorized provider that is required, or has agreed . . . to accept the CHAMPUS-allowable amount as the maximum total charge for a service or item rendered to a CHAMPUS beneficiary, whether the amount is paid for fully by CHAMPUS or requires cost sharing by the CHAMPUS beneficiary."

32 C.F.R. § 199.2(a). A non-participating provider is paid by the beneficiary, who then seeks reimbursement directly from CHAMPUS. *Id.* When a provider accepts the CHAMPUS payment as "payment in full," beneficiaries are protected from being "balance billed" amounts in excess of what is allowed by the program, and the TRICARE program is better able to control costs for a particular item or service through applying its own payment rules.

Non-network providers can become "participating" providers, in one of two ways, either by entering into an agreement (or memorandum of understanding ("MOU")) directly with the DoD or by "indicating 'accept assignment' on each claim form for which participation is elected." 32 C.F.R. § 199.6(a)(8)(ii)(B). In their Complaint, Plaintiffs simply allege that they are "participating providers" under the TRICARE program, Compl. ¶ 7. Non-network participating hospitals that submit claims for payment to the TRICARE program, such as Plaintiffs, are obligated to accept the payment terms established by the CHAMPUS program as the relevant payment amounts. 32 C.F.R. § 199.2(b).

Participating providers have a general "duty to familiarize themselves with, and comply with, the program requirements." 32 C.F.R. § 199.6(a). Plaintiffs acknowledge that participating hospitals must submit claims in accordance with TRICARE's procedural requirements. Compl. ¶ 32. Likewise, when paying TRICARE claims to non-network participating providers such as Plaintiffs, Health Net is required to adhere to the TRICARE payment regulations, as interpreted by the DoD. Compl. ¶ 27. As set forth in guidance materials provided by the TMA, such as the operational manuals, payments to non-network participating providers under the TRICARE program are made using federal funds. *See* TOM Ch. 3, § 6, ¶ 1.0 (TRICARE payments must be made with a statement that: "This payment is made with Federal funds") (Appendix p. A25).

## II.    PLAINTIFFS' CLAIMS

The crux of Plaintiffs' Complaint is the allegation that Health Net has "failed to pay, and continues to fail to pay the Facility Charges for the Subject Claims." Compl. ¶ 54 (Count I – Breach of Implied-In-Fact Contract); ¶ 59 (Count II – Unjust Enrichment). The Plaintiffs'

common law theories of relief rest on Plaintiffs' status as non-network participating providers and

the obligation of Health Net to pay claims submitted by Plaintiffs for Facility Charges (which are

defined below) under the TRICARE program.

As Plaintiffs recognize, the federal regulations provide that "Facility Charges" are "paid

as billed" (Compl. ¶ 29), unlike most other types of outpatient charges, which are paid according

to TRICARE's required allowable charges, regardless of how much a provider bills. *See* 32

C.F.R. § 199.14(a)(5); *see also* 32 C.F.R. § 199.2(b); § 199.14(a)(5)(xi).  The Facility Charge

regulation at issue provides as follows:

> (a) Hospitals. The CHAMPUS-determined allowable cost for reimbursement of a
> hospital shall be determined on the basis of one of the following methodologies.
> . . .
>
>> (5) Hospital outpatient services. This paragraph (a)(5) identifies and
>> clarifies  payment methods for certain outpatient services, including
>> emergency services, provided by hospitals. . . .
>>
>>> (xi)  Facility charges.  TRICARE payments for hospital
>>> outpatient facility charges that would include the overhead costs
>>> of providing the outpatient service would be paid as billed.  For
>>> the definition of facility charges, see § 199.2(b).

32 C.F.R. § 199.14(a)(5)(xi).  "Facility charge" is defined, in turn, to mean:

> . . . the charge, either inpatient or outpatient, made by a hospital or other
> institutional provider to cover the overhead costs of providing the service.  These
> costs would include building costs, *i.e.*, depreciation and interest; staffing costs;
> drugs and supplies; and overhead costs, *i.e.*, utilities, housekeeping, maintenance,
> etc.

32 C.F.R. § 199.2(b).

While not clear from Plaintiffs' Complaint, Plaintiffs appear to contend that the Facility

Charge regulation entitles them to be paid their charges as "billed" for all outpatient hospital

services regardless of the payment maximum established under the TRICARE program for

specific categories of services (e.g., laboratory tests).  Health Net rejects Plaintiffs' apparent

interpretation as contrary to the plain language of the regulation and TMA guidance.

Plaintiffs allege that an "implied-in-fact contract" was created between Plaintiffs and Health Net. Compl. ¶ 52. Plaintiffs claim that the terms of the implied-in-fact contract were, essentially, that Health Net would pay Plaintiffs pursuant to the regulations governing TRICARE as interpreted by TMA. Compl. ¶¶ 52-53. Plaintiffs further allege that Health Net breached this agreement when it allegedly misinterpreted these payment regulations or failed to carry out DoD instructions and underpaid Plaintiffs by not reimbursing them for "Facility Charges." Compl. ¶¶ 52-54. In addition, Plaintiffs allege that Health Net was unjustly enriched when it failed to pay Plaintiffs for their "Facility Charges." Compl. ¶ 60.

## ARGUMENT

## I.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS FOR LACK OF A NECESSARY AND INDISPENSABLE PARTY

Plaintiffs' claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(7) because Plaintiffs have failed to join the United States government, which is an indispensable party to this action under Fed. R. Civ. P. 19. Under Rule 19, which governs the determination of whether failure to join a necessary and indispensable party should result in dismissal of the action, the moving party has the burden of showing why an absent party should be joined. *Nat'l Org. on Disability v. Tartaglione*, Civ. No. 01-1923, 2001 WL 1231717 at 8 (E.D. Pa. Oct. 11, 2001) (Exhibit A hereto). If, after an initial review of the issues, the government appears to be even "arguably indispensable," the burden "devolves" to the plaintiff hospitals "to negate the unjoined party's indispensability to the satisfaction of the court." *Boles v. Greeneville Hous. Auth.*, 468 F.2d 476, 478 (6th Cir. 1972); *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1309 (5th Cir. 1986) (same); 7 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1609 (3d. ed 2007) (same). Accordingly, since the plaintiff hospitals have the burden of establishing jurisdiction, they also have the burden of proving that the government is a dispensable party and that the case may continue without its involvement. *See, e.g., Harris v.*

7

*S.C. Madison*, No. 97-7532, 1998 WL 518181, at *2 (E.D. Pa. July 24, 1998) (citing *Enza, Inc. v. We The People, Inc.*, 838 F. Supp. 975, 978 (E.D. Pa. 1993)) (Exhibit B hereto).

Courts undertake a two-step analysis in applying Rule 19: "first, we must determine whether a party is necessary under 19(a); second, we must determine whether it is indispensable under 19(b)." *Angst v. Royal Maccabees Life Ins.*, 77 F.3d 701, 705 (3d Cir. 1996). Here, the United States is both necessary and indispensable under Rule 19. Because the government cannot be joined as a party, Plaintiffs' claims must be dismissed.

### A.    The United States is a Necessary Party Under Rule 19(a)

Rule 19(a) provides that a person is a necessary party if, in its absence:

> (1) . . . complete relief cannot be accorded among those already parties, *or* (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a). A person is a necessary party if *any* of the factors listed above are present. "If either subsection is satisfied, the absent party is a necessary party . . . ." *Koppers Co., Inc. v. Aetna Cas. and Sur. Co.*, 158 F.3d 170, 175 (3d Cir. 1998).

As the attached Affidavit of Pamela A. Bohall ("Bohall Affidavit") of Health Net makes clear, it is TMA, and not Health Net, that has the ultimate authority under the TRICARE program to determine if reimbursement payments made by Health Net to non-network participating providers such as Plaintiffs are appropriate.[2] *See* Appendix at pp. A15-18. For example, TMA certifies the accuracy of the system that Health Net uses to reimburse claims. Bohall Affidavit ¶ 6. TMA further audits the accuracy of claims paid through the system on a quarterly and annual basis, and if it finds errors, it requires Health Net to adjust the system prospectively, and to retrospectively correct any claims that were incorrectly paid, either through recouping

---

[2] "When making a Rule 19 determination, the Court may consider evidence outside of the pleadings." *Jurimex Kommerz Transit G.m.b.H. v. Case Corp.*, 201 F.R.D. 337, 340 (D. Del. 2001), *aff'd in part and rev'd in part on other grounds*, 65 Fed. Appx. 803 (3d Cir. 2003) (Exhibit C hereto).

overpayments or paying the balance of any higher amount that should have been but was not paid originally. *Id.* at ¶ 7 (Appendix p. A17). Approximately 40% of the claims processed by Health Net are from non-network providers such as the Plaintiffs. *Id.* Health Net believes that, based on the initial and ongoing auditing of its system, it is paying outpatient hospital claims in accordance with TMA's interpretation of the applicable payment methodology, and has received no communication from TMA that leads it to believe otherwise. *Id.* at ¶ ¶ 6-8 (Appendix pp. A17-18).

Thus, notwithstanding the cryptic language in which Plaintiffs couch their claims, the Bohall Affidavit shows that Plaintiffs seek to have this Court interpret the TRICARE payment regulations in a manner that is inconsistent with the interpretation enforced by TMA to date. Plaintiffs' efforts to this end make the United States a necessary party under each of the prongs set forth in Rule 19(a).

First, the United States is a necessary party under Rule 19(a)(1) because, as a practical matter, Health Net does not have complete authority to remedy incorrect payments to non-network providers of services to TRICARE program – only TMA does. Reduced to its essence, Plaintiffs are asking the Court to determine that they were underpaid for services provided to the TRICARE program beneficiaries as a result of Health Net's incorrect interpretation of the payment rules at issue. Health Net must remedy underpayments in the same manner it initially pays claims. TOM, Ch. 3, § 2 ¶ 6.1 (Appendix p. A22). Because most claims are "auto-adjudicated" through an electronic claims adjudication system (Bohall Affidavit ¶ 4) (Appendix p. A16), as a practical matter, any order to provide additional reimbursement for already submitted claims would require Health Net to alter (or re-program) the claims system. Clearly, any requirement that Heath Net correct a "continuing" violation requires a change to the claims adjudication system for TRICARE claims. Bohall Affidavit ¶ 4 (Appendix p. A16).

With respect to the payment of non-network providers such as Plaintiffs, however, Health Net is merely the "conduit" through which the TMA's payment regulations and instructions are

9

applied, not the final arbiter of the amount that will be paid. Bohall Affidavit ¶¶ 3-4 (Appendix p. A16). *See Harris v. Bayer*, 18 F.R.D. 392, 393 (E.D. Pa. 1955) (finding that the Secretary of the Army was an indispensable party where the named defendant, "Commanding General of the Signal Corps Supply Agency in Philadelphia, [was] merely the conduit through which the decision of the Secretary of the Army [was] made effective"). As set forth in the Bohall Affidavit, the system is certified and continually audited for Health Net's accuracy in making payments that conform to TMA's specifications, and any change to the system must ultimately be acceptable to TMA. Bohall Affidavit ¶¶ 6-7 (Appendix pp. A17-18).

Where, as here, full relief depends on further action by a governmental agency or unit, courts have held the governmental entity to be an indispensable party. For instance, in *Acierno v. Preit-Rubin Inc.*, 199 F.R.D. 157 (D. Del. 2001), a county was deemed to be a necessary party where it had the exclusive authority to approve land use changes that plaintiff sought as relief. *See also Adamietz v. Smith*, 273 F.2d 385 (3d Cir. 1960) (fact that agency had exclusive power to grant the remedy sought by appellant made it an indispensable party); *Leber v. Canal Zone Cent. Labor Union & Metal Trades Council, AFL-CIO,* 383 F.2d 110, 114 (5th Cir. 1967) (Secretary of the Army was an indispensable party because "any rights the appellees may have cannot be vindicated without specific action being taken by the Secretary"); *Walker v. City of Waterbury*, 235 F.R.D. 34 (D. Conn. 2006) (oversight board had approval rights over city's collective bargaining agreements and was a necessary party in lawsuit against city based on unilateral changes to employment agreements); *Estrada v. Sea-Land Service, Inc.*, 939 F. Supp. 129 (D.P.R. 1996) (port authority was necessary where it had exclusive authority to reinstate plaintiff as a pilot).

Second, the United States is also a necessary party under Rule 19(a)(2) because it has "an interest relating to the subject of the action," which is the interpretation of regulations that could both retrospectively and prospectively affect the government's liability for the cost of health care services provided to TRICARE beneficiaries by non-network providers. Although TRICARE has

established a process that, *for network providers*, requires contractors such as Health Net to interpret and apply a privately negotiated understanding when it determines the amount of payment, that is not the case for *non-network providers* such as the Plaintiffs. Instead, any prospect for the Plaintiffs to obtain monetary relief hinges on the meaning of federal payment regulations *as construed by the federal agency*. There is no dispute that this is the standard that governs payment to Plaintiffs for whatever outpatient hospital services they might have provided to TRICARE beneficiaries. Compl. ¶ 36.

Exhibit A to the Complaint, which is an April 14, 2006 letter to Health Net from the Office of the Assistant Secretary of Defense, Health Affairs, only underscores the interest of the government in this case. Plaintiffs allege that Exhibit A reflects TMA's "longstanding" policy. (Compl. ¶ 31). What Exhibit A also reflects, however, is that when Health Net was contacted by Plaintiffs regarding reimbursement of their claims, it sought guidance directly from TMA. Exhibit A also definitively demonstrates TMA's recognition that the payment of Plaintiffs' claims is not a matter within Health Net's discretionary authority, or of only limited interest to the agency. Rather, as the letter shows, TMA alone has the authority to determine the proper amount of payment under its regulations, and it sought to direct Health Net accordingly.

As set forth in the Bohall Affidavit, Health Net has paid Plaintiffs is in accordance with TMA's direction. Bohall Affidavit ¶¶ 6-8 (Appendix pp. A17-18). Health Net's belief is based not only on its interpretation of this correspondence, but on the fact that TMA initially tested and certified Health Net's claims adjudication system to determine whether that system was correctly implementing the payment methodology to non-network participating providers. *Id.* Moreover, the government audits that system on a quarterly and annual basis and requires Health Net to correct any perceived deficiencies or inaccuracies both prospectively and retrospectively. *Id.* at ¶ 7. Health Net has never received any correspondence from TMA after testing or an audit to the effect that it is or was incorrectly processing claims in the manner claimed by Plaintiffs. *Id.* at

¶ 8. Finally, the government's interest is evident because, as already noted, payments under the TRICARE program are made using federal funds. *See* TOM Ch. 3, § 6, ¶ 1.0 (Appendix p. A25).

The government also qualifies as a necessary party under Rule 19(a)(2)(ii), as Health Net could potentially be subject to inconsistent obligations as a result of any judgment rendered by this Court. Health Net could be required to take steps as a result of any judgment that are inconsistent with the regulations, and hence, its obligations under the MCS contract. As Plaintiffs recognize, Health Net is *required* to adhere to TMA rules and guidance in paying non-network participating providers. The necessary correlative to that obligation is that Health Net is *prohibited* from paying non-network providers other than according to applicable statutory and regulatory provisions and TMA instructions. Compl. ¶¶ 27 and 32. As the Bohall Affidavit makes clear, Health Net is not merely speculating that Plaintiffs' interpretation is in conflict with TMA's interpretation – to the contrary, Health Net's concern that it could become subject to inconsistent legal obligations is more than merely hypothetical. Bohall Affidavit ¶¶ 6-8 (Appendix pp. A17-18). Health Net might effectively be required to absorb the costs of services as a result of the judgment that are plainly the obligation of the United States – but for the fact that such payments are not paid in conformance with TMA instructions. As a result, Health Net could be required to assume an obligation (the payment of health care services that are not authorized by TMA) that is attributable to its status as a party to the MCS Contract, but for which there is no mutual understanding with the DoD, the other party to the contract.

Under relevant case law, the risk of inconsistent adjudication of a party's legal duties is sufficient to find that an absent party is necessary. For example, in *Dawavendewa v. Salt River Project Agric. Improvement and Power Dist. ("SRP")*, 276 F.3d 1150, 1157-58 (9th Cir. 2002), the Ninth Circuit concluded that the Navajo Nation was a necessary party to a challenge of employment practices that had been adopted by the defendant employer pursuant to a lease with the Navajo Nation, because otherwise, the defendant faced "intractable, mutually exclusive alternatives," including "the substantial risk of facing multiple, inconsistent obligations."

12

In summary, where litigation would materially affect the implementation of a federal program as it would here, the agency with authority over the program should be deemed a necessary party. *See Boles v. Greeneville Hous. Auth.*, 468 F.2d 476 (6th Cir. 1972). Any decision that orders a contractor to materially change the way in which it reimburses a broad class of services payable by a government program has serious implications for the administration and financial integrity of that program. In this case, as Plaintiffs have alleged, the outcome hinges on the agency's interpretation of its own instructions; moreover, there is ample evidence that Plaintiffs' interpretation is in conflict with the agency's interpretation. For these reasons, under Fed. R. Civ. P. 19(a), the failure to join that agency as a party would, "as a practical matter impair or impede" the government's ability to protect its paramount interest in the integrity and administration of the TRICARE program.

**B.    The United States is an Indispensable Party Under Rule 19(b)**

As set forth below, the United States has not consented to be sued in this Court on actions brought by private parties seeking money damages, and hence, is immune from suit and cannot be joined as a party to this litigation.[3] Since the United States is a necessary party under Rule 19(a)(1) and (2) that cannot be made a party to this action, under Fed. R. Civ. P. 19(b), "the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Ultimately, "the interests of the plaintiff, the defendant, the absentee party, the courts and the

---

[3]    The United States has waived its sovereign immunity for claims of breach of implied-in-fact contract, but such claims must be brought exclusively in the Court of Federal Claims if the amount in controversy exceeds $10,000. *See* 28 U.S.C. § 1491(a)(1). Such claims may be brought in a United States District Court but only if the amount in controversy is $10,000 or less. 28 U.S.C. § 1346(a)(2). *See Sellers v. Brown*, 633 F.2d 106, 108 (8th Cir. 1980) (holding that the Court of Claims had exclusive jurisdiction over plaintiff's CHAMPUS claim exceeding $10,000). Rule 19 joinder is a procedural mechanism that does not confer the Court with subject matter jurisdiction over claims against sovereign entities. *See* Fed. R. Civ. P. 82 (providing that "[t]hese rules shall not be construed to extend or limit the jurisdiction of the United States district courts"). In cases where the United States is found to be indispensable and the court lacks jurisdiction because the United States has not waived its immunity, the case must be dismissed. *See California v. Arizona*, 440 U.S. 59, 62-63 (1979).

public should be balanced." *Feriozzi Co., Inc. v. Ashworks*, 130 Fed. Appx. 535, 538 (3d Cir.

2005) (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109-11

(1968)) (Exhibit D hereto).

The Court must balance the four factors articulated in Rule 19(b) in order to determine if

this action should be dismissed:

> [f]irst, to what extent a judgment rendered in the person's absence might be
> prejudicial to the person or those already parties; second, the extent to which, by
> protective provisions in the judgment, by the shaping of relief, or other measures,
> the prejudice can be lessened or avoided; third, whether a judgment rendered in
> the person's absence will be adequate; fourth, whether the plaintiff will have an
> adequate remedy if the action is dismissed for nonjoinder.

Fed. R. Civ. P. 19(b); *see Acierno v. Preit-Rubin Inc.*, 199 F.R.D. at 162 n.13. "The four factors

listed in the Rule are not exhaustive, but they are the most important considerations in deciding

whether to dismiss the action." *Gardiner v. Virgin Islands Water & Power Auth.*, 145 F.3d 635,

640 (3d Cir. 1998).

Each of the Rule 19(b) factors supports dismissal of this case. As explained above, this

case presents nearly every concern that Rule 19 was adopted to avoid. Obstacles to full and just

relief, the potential for duplicate and inconsistent litigation, and the potential harm to an absent

party, the United States, as a real party in interest in the administration of the TRICARE program,

are all present in this litigation.

First, Health Net could be required to comply with *both* Plaintiffs' interpretation of the

TRICARE regulations (if vindicated by the Court) and TMA's potentially contrary interpretation

of the those regulations. Although Plaintiffs purport to be seeking a decision that is consistent

with the payment regulations at issue, as the Bohall Affidavit demonstrates, Plaintiffs' proffered

interpretation is inconsistent with TMA's. Affidavit ¶¶ 6-8 (Appendix pp. A17-18). The fact that

the United States will not be subject to any determination in this case clearly puts Health Net at

risk of multiple inconsistent obligations regarding the payment of health care services covered by

the contract. As in *Dawavendewa v. SRP*, proceeding without the United States, the other

14

signatory to the MCS Contract, will result in a potentially adverse decision to Health Net without conclusively resolving its obligations under the rules and by extension, the contract. These obligations prohibit Health Net from paying non-network providers in excess of the amount allowed by TMA. The potential for prejudice to Health Net as a result is manifest and favors dismissal. *See Dawavendewa*, 276 F.3d at 1162.

With regard to a party with sovereign immunity, such as the United States, as noted in *Dawavendewa*:

> If the necessary party enjoys sovereign immunity from suit, some courts have noted that there may be very little need for balancing Rule 19(b) factors because immunity itself may be viewed as "one of those interests 'compelling by themselves,'" which requires dismissing the suit. *Wichita & Affiliated Tribes v. Hodel,* 788 F.2d 765, 777 (D.C. Cir. 1986) (quoting 3A James W. Moore et al., Moore's Federal Practice 19.15 (1984)).

276 F.3d at 1162. To proceed in an immune party's absence would "effectively abrogate the [party's] sovereign immunity by adjudicating its interest . . . without consent." *Enterprise Mgmt. Consultants v. United States,* 883 F.2d 890, 894 (10th Cir. 1989); *see also Fluent v. Salamanca Indian Lease Auth.,* 928 F.2d 542, 548 (2d Cir. 1991) ("[W]hen an indispensable party is immune from suit, there is very little room for balancing of other factors set out in Rule 19(b), because immunity may be viewed as one of those interests compelling by themselves.") (citations and internal quotations omitted).

Notwithstanding sovereign immunity as a factor in its own right favoring a finding of indispensability and dismissal, the United States could potentially suffer prejudice because of its failure to be present in this litigation. It is not necessary to resolve the potentially complex issue of whether or in what manner the United States could be affected by a judgment of this Court ordering the payment of additional amounts to providers who have furnished services to TRICARE beneficiaries. The very fact that a judgment of this Court will have uncertain effect militates in favor of finding that the United States is an indispensable party. Ultimately, if the decision has no effect on the government's liability, then, as discussed above, the interests of

Health Net are even more clearly prejudiced because of the potential for mutually inconsistent obligations. However, if the government's interests are affected in any fashion by the precedential effect of this litigation, it is manifestly an indispensable party.

In *Guthrie Clinic v. Travelers' Indem. Co.*, 104 Fed. Appx. 218 (3d Cir. 2004) (Exhibit E hereto), the court affirmed a decision holding that a party was indispensable because of the specific allegations made against it in the complaint, and the fact that it would not be present to defend itself even though there was a distinct possibility that any adverse judgment or finding as to liability could potentially bind the party in another forum. Here, in similar fashion to *Guthrie*, the Plaintiffs have alleged the participation of the TMA as a party to the MCS Contract as a "fact" without acknowledging that DoD is the party with the final authority to determine whether claims for the provision of health care services to TRICARE beneficiaries should be paid, or that the agency's interpretation of its own regulations is a potentially significant issue in dispute.

The fact that the use of federal funds and the interpretation of the policies of a governmental agency or unit are potentially affected makes the indispensability of an absent party even more imperative. This is the logic of cases finding that such entities would be harmed under Rule 19 if they are not present to protect their interests. *See Acierno v. Preit-Rubin Inc.*, 199 F.R.D. 157 (D. Del. 2001); *Seneca Nation of Indians v. State of New York*, 383 F.3d 45, 47-48 (2d Cir. 2004); *Dawavendewa v. Salt River Project Agric. Improvement and Power Dist. ("SRP")*, 276 F.3d 1150, 1157-58 (9th Cir. 2002); *Boles v. Greeneville Hous. Auth.*, 468 F.2d 476 (6th Cir. 1972).

The second and third factors of the Rule 19(b) analysis likewise favor dismissal of this action. As to the second factor, whether the court can shape relief to lessen any potential prejudice, the Plaintiffs are seeking monetary relief, and ordering such relief will trigger the potential for the harms that are discussed above. However, adequately protecting Health Net's interest by making relief contingent on TMA's interpretation of the payment rules in question, would simply require Plaintiffs to pursue parallel litigation against the United States should TMA

16

disagree with the judgment of this Court. A judgment that does not determine the rights of the parties is "absolutely worthless." *Harris v. Bayer*, 18 F.R.D. at 393; *see also Leber v. Canal Zone Cent. Labor Union & Metal Trades Council, AFL-CIO*, 383 F.2d 110, 114 (5th Cir. 1967). Thus, regarding the third factor, whether a judgment rendered in the person's absence will be adequate, there is no way for the court to avoid prejudicing Health Net without otherwise rendering inadequate relief.

The fourth and final Rule 19(b) factor asks whether Plaintiffs retain an adequate remedy in the event of dismissal, and here they clearly do. As set forth below, Plaintiffs have not exhausted the administrative remedies that are provided to non-network providers under the TRICARE program. These remedies are (or were) clearly available and if they do not provide a satisfactory resolution to the Plaintiffs' grievances, there is no reason to believe that Plaintiffs could not file suit against the United States in the Court of Federal Claims, where jurisdiction would ostensibly be proper. *See* The Tucker Act, 28 U.S.C. § 1491 ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon . . . regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."). Accordingly, this case should be dismissed for failure to join a necessary and indispensable party.

## II.    PLAINTIFFS' CLAIMS ARE BARRED BY THE DOCTRINE OF SOVEREIGN IMMUNITY

Plaintiffs claims should also be dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) because they are barred by sovereign immunity. *See Richards v. United States*, 176 F.3d 652, 654 (3d Cir. 1999) ("Sovereign immunity not only protects the United States from liability, it deprives a court of subject matter jurisdiction over claims against the United States."). When determining whether it has subject matter jurisdiction over an action, "[t]he Court is free to weigh the evidence and satisfy itself whether it has power to hear the case,"

and "the burden of proving the existence of subject matter jurisdiction lies with the plaintiff." *Carpet Group Int'l v. Oriental Rug Importers Ass'n*, 227 F.3d 62, 69 (3d Cir. 2000).

The sovereign immunity doctrine holds that the United States "is immune from any suit to which it has not consented." *Feres v. United States,* 340 U.S. 135, 139 (1950). Sovereign immunity extends to federal contractors in suits where the government is the "real party in interest." *See Matranga v. Travelers Ins. Co.*, 563 F.2d 677 (5th Cir. 1977); *C. Jack Friedman, Ph.D. & Assocs. v. Pennsylvania Blue Shield,* 836 F. Supp. 263 (E.D. Pa. 1993), *aff'd,* 30 F.3d 1486 (3d Cir. 1994). Because every action can be prosecuted only in the name of the real party in interest under Fed. R. Civ. P. 17(a), and in this case, the DoD is the real party in interest, Plaintiffs' claims are effectively barred by the doctrine of sovereign immunity.

In their Complaint, Plaintiffs conclude that, as a matter of law, Health Net is "financially responsible and legally liable for the payment of claims arising out of the discharge of [its] duty under [its contract with DoD]." Complaint ¶ 17. The relevant regulations and TRICARE policy manual, however, belie Plaintiffs' legal conclusion and make clear that the United States considers funds paid to non-network participating providers to be "federal funds." *See* TOM Ch. 3, § 6 ¶1.0 (Appendix p. A25). Given that it is the express position of the TMA that it is their funds that are being used to pay claims submitted by non-network participating providers such as Plaintiffs, they are the real party in interest.

However, DoD's status as a real party in interest does not hinge solely on whether, ultimately, the United States Treasury will bear the financial risk associated with higher TRICARE program costs. It also hinges on an understanding that Health Net's responsibility with regard to non-network participating providers arises out of its actions as an agent carrying out a government program pursuant to government mandated rules and instructions *for the exclusive benefit of the government* to fulfill the government's commitment to deliver the "health care to which covered beneficiaries are entitled" under federal law. 10 U.S.C. § 1097(a). When a TRICARE beneficiary obtains covered services, the beneficiary's right to be reimbursed arises

18

out of the government's statutory obligation to indemnify the beneficiary for the cost of those services. *See Christman v. Grays*, No. 1:05-CV-192, 2005 WL 3088529 at 2-3 (S.D. Ohio Nov. 17, 2005) (United States was permitted to intervene as the real party in interest when the provider sued the beneficiary on amounts due for TRICARE covered services) (Exhibit F hereto).

Further, when those services are provided by non-network providers, the terms upon which that obligation is fulfilled are determined solely by the government, and those terms run directly from the government to the non-network provider for the benefit of the TRICARE program and TRICARE beneficiaries. In *Christman*, the court held that the TRICARE payment regulations superseded any contrary agreement between a beneficiary and a non-network provider who had furnished emergency services to a TRICARE beneficiary and refused to accept assignment. *Id.* at 4-5. The non-network provider was required by law to accept the TRICARE payment amount as payment in full under applicable TRICARE regulations. *Id.*

It is thus clear from the decision in *Christman* that the TRICARE payment rules have the force of federal law independent of the entity that processes the claim. It would defy logic if the United States were only a real party in interest for non-network providers (such as Dr. Christman) who refuse in advance to abide by TRICARE payment rules, when the MCS contractor has no authority to set or change the terms of the government's obligation to non-network providers. Health Net simply has no authority, duty or relationship with non-network providers such as Plaintiffs independent of the government's underlying obligation to ensure that such providers are paid in order to fulfill the term of the government's own obligation to TRICARE beneficiaries. Nor do Plaintiffs allege any facts or conduct apart from the TRICARE program laws and rules to support the existence of any independent legal duty running from Health Net to non-network providers.

A useful analogy can be made where a cost contractor fails to pay its employees. While it might be the case that the wages will ultimately be borne by the government in the form of higher costs under the contract, there is an independent obligation owed by the employer to pay his

employees irrespective of whether the government can be billed for the cost of their services. However, where a contractor has a government contract to provide payroll services to government employees based on the government's pay scale and other terms, the substantive (or "real") relationship that governs whether or how much the employee should be paid is between the government and its employee.

The fact that non-network providers are not government employees should not cloud the true nature of their status: Plaintiffs provide health care services pursuant to program rules created by the government for the benefit of the government and TRICARE beneficiaries, and their status is cemented through their agreement to abide by such rules. In the case of non-network providers, the MCS contractor operates simply as a conduit for applying standards that have been adopted by TMA and that govern payment as a matter of federal law. *See, e.g.,* Exhibit A to the Complaint. Borrowing from the analogy explained above, Health Net is simply the paymaster. That the government views the satisfaction of its statutory obligation through the payment of non-network participating providers to involve the expenditure of "federal funds" only underscores this relationship.

The decision in *Board of Trustees of Bay Med. Ctr. v. Humana Military Healthcare Servs.*, 447 F.3d 1370 (Fed. Cir. 2006), does not support a contrary outcome. In *Bay Medical*, network providers sued Humana for breach of contract after Humana unilaterally imposed CHAMPUS allowable charges as the contractual payment rate, notwithstanding that the network providers had negotiated a different, higher rate with Humana. The court concluded that the action was not barred by sovereign immunity as an action against the United States:

> The network provider contracts are private agreements between the Hospitals and Humana. The government was not a party to those contracts, and the Hospitals have no direct relationship with the government.

*Id.* at 1375.

As set forth above, there are two distinct processes for adjudicating claims for health care services provided to TRICARE beneficiaries. With respect to network providers, DoD has

specifically agreed to be bound within limits by the terms of the contract between MCS

contractors and network providers. *See* TRM, Ch. 1, § 1, ¶ II.A (Appendix p. A19). The terms of

that contract do not necessarily correspond to the payment rates established by TMA for

comparable services. For instance, the contractor might have negotiated a higher rate in its

private contract than what the DoD will agree to pay, as reflected in the TRICARE

Reimbursement Manual (as apparently occurred in *Bay Medical*). *See id* at ¶ II.C (Appendix p.

A19).

No alternative standard exists in the payment of non-network providers, however,

because no private contract is interposed between what the DoD has agreed to fund and what the

contractor is obligated to pay providers. These standards are one and the same. Moreover, unlike

the hospital's status with respect to the government in *Bay Medical*, the non-network

*participating* provider (as Plaintiffs allege that they are) has an actual obligation to accept those

standards, and that obligation clearly runs from the government to the provider, for the benefit of

the government and TRICARE beneficiaries. *See* 32 C.F.R. § 199.6(a)(8)(ii).

At least one court has held that in applying the CHAMPUS/TRICARE program rules, the

government, not the managed care contractor, is the only necessary party to a challenge by a

TRICARE beneficiary of a contractor's determination. In *Bishop v. Office of Civilian Health and

Medical Programs of the Uniformed Services (CHAMPUS)*, 917 F. Supp. 1469 (E.D. Wash.

1996), the court held that joinder of a TRICARE managed care contractor was not required when

a TRICARE beneficiary sued the CHAMPUS program after the contractor denied coverage for

certain services. The court reasoned that the contractor's decision was based only on CHAMPUS

policy, and no evidence suggested that the contractor exercised independent decision-making

authority regarding the scope of coverage. 917 F. Supp. at 1473-74.

Other program features also militate in favor of finding that the government is the real

party in interest with respect to non-network providers. The presence of appeal rights highlights

the fact that Plaintiffs have a substantive relationship with the agency, not the contractor,

particularly when their appeal rights are juxtaposed against those of the network providers, whose

payment is solely a function of their agreement with the MCS contractor. As discussed in detail

below, the DoD regulations implemented through TMA policy guidance provide for a separate

appeals process for non-network providers for an ultimate determination of coverage and

payment for the provider's services. Network providers, however, have no appeal rights to TMA,

and the terms of their reimbursement are established solely through their contract with the MCS

contractor. TOM, Ch. 13, § 2, ¶ 1.1 (network providers are not proper parties to an appeal, their

"recourse is through the contractual provision for appeal or the state court system") (Appendix p.

A33). *Cf. United States v. Johnson Controls*, 713 F.2d 1541, 1552-53 (Fed. Cir. 1983) (absence

of privity between subcontractor and the United States factored against finding that subcontractor

had any appeal rights to the government with respect to payment under the subcontract).

In summary, a judgment ordering the payment of additional amounts to non-network

providers in conformance with the court's interpretation of TRICARE payment regulations

*necessarily* purports to authorize actions that are direct government obligations under the

regulations to reimburse non-network providers in conformance with agency policies, using

federal funds.[4]

### III.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO EXHAUST THEIR ADMINISTRATIVE REMEDIES

Courts have held that under Fed. R. Civ. P. 12(b)(6) "[a] complaint does not state a claim

upon which relief may be granted" unless the plaintiff has properly exhausted its administrative

remedies. *Robinson v. Dalton*, 107 F.3d 1018, 1022 (3d Cir. 1997) (comparing resolution of

exhaustion question to plaintiffs' burden of establishing suit within statute of limitations)

(citations omitted). Because Plaintiffs' failed to plead exhaustion of the administrative remedies

available to them, the Court should dismiss Plaintiffs' Complaint.

---

[4]    As discussed in Section II above, the effect of such a judgment is not necessarily obvious, given that this Court lacks jurisdiction to order the United States or its agencies to pay money damages.

A.      **The TRICARE Appeal Process**

"The CHAMPUS regulations provide an extensive administrative appeal procedure." *Trauma Serv. Group v. Keating*, 907 F. Supp. 110, 113 (E.D. Pa. 1995).   In particular, the DoD has formulated significant remedies for non-network participating providers who are aggrieved by decisions made by or on behalf of the TRICARE program. As stated in 32 C.F.R. § 199.10(a), "this section sets forth the policies and procedures for appealing decisions made by OCHAMPUS . . . and *CHAMPUS contractors* adversely affecting the rights and liabilities of" among others, "CHAMPUS participating providers." (Emphasis added.)  An appeal under CHAMPUS is an administrative review of program determinations made under the provisions of law and regulation. *Id.*

MCS contractors are required to establish a comprehensive appeal system that ensures that non-network participating providers that furnish services to TRICARE beneficiaries have a full opportunity to appeal adverse determinations.  TOM, Ch. 13, § 5, Preamble (Appendix p. A59); and Ch. 13, § 2, ¶ 1.1 (TRICARE participating providers qualify as proper appealing parties) (Appendix p. A33); *see generally* 32 C.F.R. § 199.10.  The purpose of the appeal system is "to determine whether the initial determination was made in accordance with law, regulation, policies, and guidelines in effect at the time the care was provided." 32 C.F.R. § 199.10(b)(2).

Under the first level of review in the TRICARE appeal procedures, non-network participating providers may request that the TRICARE contractor reconsider an initial determination "which raise[s] a disputed question of fact which, if resolved in favor of the appealing party, would result in an extension of TRICARE benefits . . . ." TOM, Ch. 13, § 2, ¶ 3.2 (Appendix p. A37); 32 C.F.R. § 199.10(a)(8)(i)(A).  If a non-network participating provider continues to be dissatisfied with the decision, the provider can opt for a second level of review, which requires the provider to file a request for formal review by the TMA. 32 C.F.R. § 199.10(a)(8)(i)(B); TOM, Ch. 13, § 3, ¶ 6.8.2 (Appendix p. A54).

The third level of review is conducted by a TMA hearing officer. Any party "may request a hearing" if it "is dissatisfied with the formal review determination," the amount in dispute is more than $300, the issue is appealable, and the party requests a hearing by submitting a written request within 60 days to the Chief, Appeals and Hearings at TMA's offices in Aurora, Colorado. 32 C.F.R. § 199.10(d), (d)(1)(ii)(c)(5), (d)(3). The procedures offer the participating provider the opportunity for discovery, witness examination, evidence presentation, oral argument and the submission of formal briefs. *See id.* § 199.(d)(10)-(11). After an on-the-record hearing, the hearing officer issues a written statement of findings, statement of reasons, and recommended decision. *See id.* § 199(d)(12).

Yet another level of review is afforded by the TMA's Director. He is empowered to adopt or reject the recommended decision of the TMA hearing officer, or he can refer the determination for review by the Assistant Secretary of Defense in cases where the issue "involves the resolution of CHAMPUS policy and issuance of a final decision which may be relied on, used, or cited as precedent in the administration of CHAMPUS." *Id.* § 199.10(e)(1)(ii). The decision of the hearing officer becomes final if adopted, rejected in favor of a decision by the Director, or reviewed by the Assistant Director who, in turn, issues a decision. *Id.* § 199.10(e)(1)(i)-(ii).

The procedures described above are available for resolution of any "appealable issue." Although Plaintiffs have not characterized their grievances in terms of their appealability under 32 C.F.R. § 199.10, an analysis of Plaintiffs' allegations demonstrates that they are appealable under that regulation. Plaintiffs' claim arises out of the fact that Health Net failed to pay for "Facility Charges," although Plaintiffs have not averred that they submitted claims for "Facility Charges." In the Plaintiffs' words, "representatives, and all the members of the Class, have duly billed their claims for *outpatient services* in the manner required by the applicable regulations," and "HNFS has failed to pay Plaintiffs and the Class members the Facility Charges for the Subject Claims." Compl. ¶ 32 (emphasis added). Plaintiffs then assert nothing more than a legal

conclusion, that non-payment of the Facility Charges "is not appealable" without providing any basis for this assertion. Compl. ¶¶ 37-38.

Based on the allegations of their Complaint, Plaintiffs' grievances are appealable. An issue is appealable unless it is specifically determined not to be appealable under one or more grounds listed in 32 C.F.R. § 199.10(a)(6). For example, Plaintiffs have not challenged the validity of the applicable rules or regulations, which would be a non-appealable grievance under 32 C.F.R. § 199.10(a)(6)(i). Rather, Plaintiffs allege that they should have been paid "pursuant to and consistent with the regulations governing TRICARE." Compl. ¶ 52. Plaintiffs' Complaint does not allege that they are contesting the amount of payment allowed for any particular category of service (for instance whether the allowable reimbursement for an x-ray should be $25 or $50), which would not be an appealable issue, under 32 C.F.R. § 199.10(a)(ii), because the allowable amount is established by regulation. Rather, they allege that the payment methodology established under the regulations was incorrectly applied to their claims for payment for outpatient services such that they were not paid for an entire category of services or costs embodied in the term "Facility Charges." Compl. ¶¶ 52-54. In any event, it is within the purview of the agency to determine whether an issue is appealable under its own regulations. *See Your Home Visiting Nurse Servs. v. Shalala*, 525 U.S. 449, 453 (1999) (agency's determination that a refusal to re-open cost reports was not an appealable final determination under regulations was "well within the bounds of reasonable interpretation, and hence entitled to deference.") TMA has been denied that opportunity because Plaintiffs have not plead that they exhausted the administrative remedies available to them.

**B.    The Exhaustion Doctrine Supports Dismissal of Plaintiffs' Complaint**

"[I]t is a long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 695 (3d Cir. 1979) (citing *Meyers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938)). Vindicating the comprehensive

review process established by agencies such as TMA is the precise reason why the exhaustion doctrine exists. "For administrative [appeal] procedure[s] to operate effectively, it is essential that courts refrain from interfering with the process unnecessarily." *First Jersey Sec., Inc.,* 605 F.2d at 696 (citations omitted).

The exhaustion requirement also protects agency autonomy by allowing the agency the opportunity in the first instance to apply its expertise, exercise whatever discretion it may have been granted, and correct its own errors. *See Parisi v. Davidson,* 405 U.S. 34, 37 (1972). The doctrine also recognizes that administrative agencies are in the best position to construe their own regulations (*see, e.g., Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 359 (1989)), and that court involvement prior to the exhaustion of administrative remedies could raise a separation of powers issue. *See First Jersey Sec., Inc.,* 605 F.2d at 695 n.3.

Exhaustion of administrative remedies is especially warranted where, as here, interpretation and application of the governing regulations turn on an understanding of technical issues that are particularly within the expertise of the agency. As courts have recognized, "CHAMPUS provides for a detailed adjudication of . . . claims by a tribunal more familiar with the interworkings and requirements of CHAMPUS." *Keating,* 907 F. Supp. at 113; *see also Holton v. Blue Cross & Blue Shield of Alabama,* 56 F. Supp. 2d 1347 (M.D. Ala. 1999) (CHAMPUS provider was required to exhaust administrative remedies). The *Keating* court also noted in favor of requiring exhaustion that "the CHAMPUS statute traces the Social Security Act, under which courts have held that exhaustion of administrative remedies is required," citing multiple statutory provisions under CHAMPUS that explicitly drew upon the Medicare and Social Security Programs. 907 F. Supp. at 113-14.

Likewise, the potential for exhaustion to aid judicial review by allowing the parties and the agency to develop the facts of the case in an administrative setting is a compelling consideration in a case such as this. As stated above, Plaintiffs have not even averred that they submitted claims for "Facility Charges" to Health Net. Moreover, even if they have submitted

26

such claims, they have not alleged the kinds of services or procedures that are encompassed within those claims. Even a cursory review of the regulations, however, shows that provider compensation is tied to the type of service being rendered.

The TMA's regulations identify twelve categories of services or payment methodologies for outpatient hospital services provided by non-network participating hospitals such as the Plaintiffs. *See* 32 C.F.R. § 199.14(a)(5). Determining whether a claim requests payment for "ambulatory surgery services" or "diagnostic services," for instance, and how those services should be reimbursed, is not an issue that is best resolved by this Court in the first instance. *See Phone-Tel Commc'ns v. AT&T Corp.*, 100 F. Supp. 2d 313, 316 (E.D. Pa. 2000) (finding that the administrative agency should first pass on questions concerning technical and policy issues).

Moreover, Plaintiffs allege that the payment methodologies that apply to outpatient hospital services are subject not only to regulations, but to various guidance documents issued by the TMA to managed care contractors. Compl. ¶¶ 31-34. The TMA is clearly in the best position to determine whether, in fact, contractors are implementing the payment regulations in accordance with the instructions that TMA issued. *Phone-Tel,* 100 F. Supp. 2d at 316.

Finally, exhaustion serves the purpose of promoting judicial economy by avoiding needless repetition of administrative and judicial fact-finding, and by perhaps avoiding the necessity of any judicial involvement at all if the parties successfully vindicate their claims before the agency. *See Ghana v. Holland*, 226 F.3d 175, 184 (3d Cir. 2000); *First Jersey Securities*, 605 F.2d at 695 (internal citations omitted). If, for instance, the agency determined that for one or more categories of services the Plaintiffs were paid appropriately or not, this Court's job would be materially simplified, and its need to engage in second-guessing of administrative decision-making would be minimized.

Under the exhaustion doctrine, "parties [must] exhaust prescribed administrative remedies before seeking relief from the federal courts." *McCarthy v. Madigan*, 503 U.S. 140, 144-45 (1992); see also *Ghana*, 226 F.3d at 184. At the pleading stage, Plaintiffs were required

27

to plead affirmatively that they had exhausted all administrative remedies, or that pursuing administrative remedies would have been futile. *See, e.g., Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1063 (10th Cir. 2002); *Tokarcik v. Forest Hills School Dist.*, 665 F.2d 443, 448 (3d Cir. 1981). Plaintiffs did neither.

Rather, Plaintiffs state only in the most cursory fashion in their Complaint that non-payment of the Facility Charges "is not appealable," and that their "correspondence" with contractors has not resulted in a satisfactory resolution. Compl. ¶¶ 37-38. To invoke an exception to exhaustion, however, the plaintiffs' allegations must demonstrate a "clear and positive *showing* of futility," not mere use of the word "futility." *Wilson v. MVM, Inc.*, 475 F.3d 166, 175 (3d Cir. 2007) (emphasis added); *Jeremy H. by Hunter v. Mount Lebanon School Dist.*, 95 F.3d 272, 283-84 (3d Cir. 1996) (affirming dismissal where court was "not persuaded by plaintiffs' conclusionary [*sic*] averment that their pursuit of administrative remedies would be a futile gesture"); *Communications Workers of Am. v. AT & T*, 40 F.3d 426, 432 (D.C. Cir. 1994) ("The futility exception is ... quite restricted and has been applied only when resort to administrative remedies is clearly useless") (quotations and citations omitted); *Tomczyscyn v. Teamsters, Local 115 Health & Welfare Fund*, 590 F. Supp. 211, 216 (E.D. Pa. 1984) (plaintiffs must demonstrate that a policy is so fixed that an appeal would serve no purpose). Plaintiffs' sweeping and unsupported legal conclusion regarding the appealability of the claims in dispute does not excuse its failure to exhaust.

Likewise, unsatisfactory attempts at "informal resolution" are not an excuse for ignoring the formal procedures that are available under the regulations. *See Rittner v. Barber*, 435 F. Supp. 2d 682, 686-687 (N.D. Ohio 2006) (in order to satisfy the exhaustion requirement, plaintiff must follow processes established by the agency). The obvious rejoinder to Plaintiffs' complaint that Health Net "has been steadfast in its unwillingness to make [the] payment[s]" at issue is that the payments are not due and that Health Net is not the agency with the authority to resolve Plaintiffs' claims. Compl. ¶ 38. Indeed, the Third Circuit recently found similar claims

insufficient. *MVM, Inc.*, 475 F.3d at 176 (affirming dismissal; mere fact that plaintiffs received "poor response to their attempts" to resolve claims does not render such attempts futile); *see also Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 251 (3d Cir. 2002) (affirming summary judgment for defendants and rejecting futility claim where plaintiffs "took no steps beyond an initial telephonic inquiry" regarding denial of claim); *Wilson v. Globe Specialty Prods.*, 117 F. Supp. 2d 92, 99 (D. Mass. 2000) (requiring exhaustion; court refused to "predict" how agency would have decided the claim).

Since Plaintiffs have failed to plead that all administrative remedies have been exhausted, Plaintiffs' Complaint should be dismissed in its entirety. *See, e.g., MVM, Inc.*, 475 F.3d at 173 ("a court need not pass upon the merits of a plaintiff's substantive claim until it satisfies itself that … the plaintiff [has] properly exhausted administrative remedies"); *Acierno v. Mitchell*, 6 F.3d 970, 977 (3d Cir. 1993) (dismissing action for failure to exhaust administrative remedies).

### C.    The TMA has Primary Jurisdiction Over the Plaintiff Hospitals' Claims

In the alternative to dismissing for failure to exhaust administrative remedies, the Court should stay or dismiss the Plaintiffs' claims based on the doctrine of primary jurisdiction. Primary jurisdiction "requires a court to transfer an issue within a case that involves expert administrative discretion to the federal administrative agency charged with exercising that discretion for initial decision." *Richman Bros. Records, Inc. v. U.S. Sprint Communications Co.*, 953 F.2d 1431, 1435 n.3 (3d Cir. 1991) (citation omitted); *MCI Telecomms. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1103 (3d Cir. 1995) (primary jurisdiction "comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.") (citations omitted).

In those cases in which the primary jurisdiction doctrine applies, the district court enables "referral" of the issue to the agency. *Reiter v. Cooper*, 507 U.S. 258, 268 (1993). "Referral" is a term of art that means a court either stays proceedings, or dismisses them without prejudice, so

that the parties may pursue administrative action. *See Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1087 (9th Cir. 2006) (invoking primary jurisdiction of FCC). Even in cases in which the "agency cannot provide ... complete redress to the complaining party," the issue should be referred if it is "better resolved in the first instance by the administrative agency charged with regulating the subject matter of the dispute." *Teleconcepts*, 71 F.3d at 1105.

The primary jurisdiction doctrine promotes respect among the branches by "creat[ing]a workable relationship between the courts and administrative agencies wherein, in appropriate circumstances, the courts can have the benefit of the agency's views on issues within the agency's competence." *Id.* As the Third Circuit has explained, relevant expert agencies "'should not be passed over'" in cases that raise "'issues of fact not within the conventional experience of judges.'" *MCI Commc'ns. Corp. v. AT & T*, 496 F.2d 214, 220 (3d Cir. 1974) (quoting *Far East Conference v. United States*, 342 U.S. 570, 574 (1952)). It also promotes efficiency and uniformity by making the "agency's determination ... binding upon the court and the parties." *Teleconcepts*, 71 F.3d at 1103.

The primary jurisdiction doctrine has been invoked in analogous cases involving the Medicare program. For example, in *See In re Shelby County Healthcare Servs. of AL, Inc.*, 80 B.R. 555, 562 (Bkrtcy. N.D. Ga. 1987), the court referred the underlying payment issue to the Secretary of Health and Human Services ("HHS") because "the Medicare reimbursement issues, the specialized knowledge, experience, and expertise of HHS and the need for uniformity in Medicare matters" rendered this "an appropriate case for application of the doctrine of primary jurisdiction."). For those same reasons, the Court should refer this matter to TMA to resolve this regulatory payment issue in dispute.

The instant case is well-suited for invocation of the primary jurisdiction doctrine. Plaintiffs claim that, under TRICARE's reimbursement regulations, Health Net failed to pay "Facility Charges" as reimbursement for some category of "outpatient services" furnished by Plaintiffs to TRICARE beneficiaries. Compl. ¶ 33. The questions of whether (1) the hospitals

30

have submitted "Facility Charges" to Health Net according to TRICARE regulations; and (2) Health Net is complying with TRICARE regulations and paying the charges appropriately are questions that fall under the direct competence and expertise of the TMA. Moreover, the need for uniformity of payment and enforcement within TRICARE's nationwide regime compels the conclusion that TMA be allowed to speak to the proper construction of its regulations and proper administration of provider claims.

## IV. PLAINTIFFS HAVE FAILED TO STATE CAUSES OF ACTION FOR BREACH OF IMPLIED-IN-FACT CONTRACT OR UNJUST ENRICHMENT

Finally, Plaintiffs' claims should be dismissed under Fed. R. Civ. P. 12(b)(6) because Plaintiffs have failed to state a claim for breach of an implied-in-fact contract (Count I) and unjust enrichment (Count II). Under Rule 12(b)(6), a court must grant a motion to dismiss when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also, D.P. Enter. v. Bucks County Cmty. College*, 725 F.2d 943, 944 (3d Cir. 1984); *Lannak v. Biden*, No. 06-180-SLR, 2007 WL 625849, at *1 (D. Del. Feb. 27, 2007) (Exhibit G hereto). While the Court must view the material allegations of the Complaint in the light most favorable to Plaintiffs, it is nevertheless required to reject unsupported allegations, "bald assertions," or "legal conclusions." *Morse v. Lower Merion School Dist.,*132 F.3d 902, 906 (3d Cir. 1997) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)).

### A. Plaintiffs Fail to State a Claim for Breach of Implied-In-Fact Contract

The thrust of Plaintiffs' claims is that Health Net failed to reimburse Plaintiffs for Facility Charges under the TRICARE regulations. Compl. ¶ 33. Even assuming those allegations are true, Plaintiffs fail to state a claim for breach of an implied agreement with Health Net because they have failed to allege legal consideration or mutuality of agreement.

Under Michigan law,[5] the elements of a contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation. *Borg-Warner Acceptance Corp. v. Dep't of State*, 426 N.W.2d 717, 718-19 (Mich. Ct. App. 1988), *rev'd on other grounds*, 444 N.W.2d 786 (Mich. 1989). An implied contract requires the same elements. *See id.*

A contract is implied in fact when the court "infers" the existence of the contract from the conduct of the parties. Restatement (Second) of Contracts § 4 (1981). The difference between express and implied contracts is not in the legal effect of the contract, but rather the mode of manifesting assent. *See id.* at § 4 cmt. a. (The "intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance."). "[A]n implied-in-fact contract arises 'when the agreement and promise have simply not been expressed in words,' but 'a court may justifiably infer that the promise would have been explicitly made, had attention been drawn to it.'" *Leibowitz v. Cornell Univ.*, 445 F.3d 586, 593 (2d Cir. 2006) (quoting *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 376 n.5 (2d Cir. 2000)).

An implied-in-fact contract usually arises in one of two ways: (1) when the parties' negotiations are inconclusive, but the parties continue to deal with one another; or (2) when there is a general course of dealing, trade usage, or course of performance from which a contract may be inferred. *See* Restatement (Second) of Contracts at §4, 19. "An implied-in-fact contract exists when the conduct of the parties indicates mutual assent. An express offer and/or acceptance is absent. Implied-in-fact contracts require the same contractual elements as are required to establish an express contract, i.e., mutuality of intent, offer and acceptance, consideration, and lack of ambiguity. Only the nature of the evidence differs." *Chavez v. United States*, 18 Ct. Cl.

---

[5]    Health Net concludes from Plaintiffs' assertion of jurisdiction based on diversity of citizenship that they purport to state claims under state law. At this stage of the proceedings, it appears that the law of Michigan or Vermont would be the most likely to apply to Plaintiffs' claim based on Plaintiffs' respective geographic locations.

540, 544-45 (1989); *Gardiner v. Virgin Islands Water & Power Auth.*, 145 F.3d 635, 644-45 (3d. Cir. 1998).

The parties to this lawsuit have not simply failed to enshrine the niceties of their ongoing business dealings into a legally enforceable document. Plaintiffs allege the opposite. They allege that the longstanding practice of Health Net has been to *not pay* claims for facility charges as billed. Complaint ¶¶ 33-35, 38, 54 and 59. They do not allege that Health Net has veered from this practice; rather the basis of the claim is that Health Net is continuing the same payment practice. This does not state a claim for breach of an implied contract. Instead, the mismatch of expectations between Plaintiffs and Health Net is the epitome of a failure of the parties to have a "meeting of the minds," and constitutes a complete lack of mutuality of agreement.

The allegations show merely that Plaintiffs, as non-network hospitals, had the "option of accepting assignment of benefits from TRICARE beneficiaries" and that while they "expect[ed] to be paid" for the Facility Charges, Health Net never mutually agreed with Plaintiffs that such charges would be paid on the terms that Plaintiffs wanted. Compl. ¶ 8. Plaintiffs do not allege any conduct on the part of Health Net that would permit the inference of an agreement. The only "conduct" upon which Plaintiffs allege they were justified in anticipating the payment of Facility Charges is the existence of the TRICARE payment regulations and policies. Plaintiffs' allegation that an implied-in-fact contract with Health Net included an agreement for the payment of "Facility Charges duly submitted . . . in full as billed" (Compl. ¶ 52) merely begs the question of whether or in what circumstances "Facility Charges" are the appropriate reimbursement methodology under the TRICARE payment regulations.

Not only have the parties failed to enter into an agreement that can be implied from any allegations in the Complaint, the nature of the agreement alleged by Plaintiffs would have been gratuitous and utterly lacking in consideration, and thus invalid. Where a government agency delegates administration of a government program to a private company, no implied-in-fact contract is created between the participants in the government program and the private company,

33

and the claim must be dismissed as a matter of law. *See* Richard A. Lord, Williston on Contracts, §7.41 (4th ed. 2006) ("If a promisee is already bound by official duty to render a service, it is no detriment to him and no benefit to the promisor beyond what the law requires the promisee to suffer or to give, for him to do or agree to do the service on request.")

In *Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 178 (2d Cir. 2006), the Second Circuit affirmed the district court's dismissal of an implied contract claim arising out of the defendant's administration of a government program because "[a] promise to perform a pre-existing legal obligation does not amount to consideration." In *Murray*, the United States Department of State delegated the duties of day-to-day operation of the Irish Peace Process Cultural and Training Program ("IPPCTP") to a company called Northrup Grumman Information Technology ("NGIT"). *Id.* at 171-72. NGIT was contractually responsible for monitoring participants' compliance with program requirements and reporting terminations and withdrawals from the program. *Id.* at 172. After program participants were terminated from the program, they brought a breach of implied-in-fact contract claim against NGIT. *Id.* at 177-78. The court held that "no consideration was exchanged between the parties" and rejected the plaintiffs' argument that NGIT's issuance of certification letters for participation in the program constituted consideration. Issuance of such letters arose out of "NGIT's requirements under its contract with the DOS, not its desire to induce Appellants to travel to the United States." *Id.*[6]

Here, Plaintiffs' grievances similarly arise out of Health Net's implementation of a government contract, specifically, Health Net's agreement with DoD to administer claims in accordance with the TRICARE regulations. Compl. ¶¶ 8 and 52. It was Health Net's obligation under its contract with DOD that obligated it to process Plaintiffs' claims. *See id.*; Compl. ¶¶ 17, 26-27. However, Health Net's fulfillment of its pre-existing obligations to the government "does

---

[6]    Vermont law incorporates the same principle. "To constitute consideration, a performance or a return promise must be bargained for." *Ragosta v. Wilder*, 592 A.2d 367, 369 (Vt. 1991). *See also Quazzo v. Quazzo*, 386 A.2d 638, 641 (Vt. 1978) (a contract requires consideration as part of the bargained for exchange).

not amount to consideration" for any alleged contract with Plaintiffs. *See Murray*, 444 F.3d at

178. Plaintiffs thus fail to allege any facts supporting the existence of mutuality or consideration,

both of which are necessary components of an implied-in-fact contract. As a result, their claims

that Health Net breached an implied-in-fact contract should be dismissed for failure to state a

cause of action under Rule 12(b)(6).

> **B.    Plaintiffs Also Fail to State a Claim for Unjust Enrichment**

Under any conceivably applicable state law, to state a claim for unjust enrichment,

Plaintiffs must allege: (i) a benefit conferred on Health Net by Plaintiffs; (ii) an appreciation or

knowledge by Health Net of the benefit; and (iii) the acceptance or retention by Health Net of the

benefit under such circumstances as to make it inequitable for it to retain the benefit without

payment of its value.[7] *See, e.g.*, Williston, § 68:5; *Allegheny Gen. Hosp. v. Philip Morris, Inc.*,

228 F.3d 429, 447 (3d Cir. 2000) (same); *Taylor v. Savage*, No. 05-10-0032, 2007 WL 549913, at

*2 (Del. Ct. Com. Pl. Jan. 2, 2007) (same) (Exhibit H hereto); *Marine Dev. Corp v. Rodak.*, 300

S.E.2d 763, 766 (Va. 1983). *See also Chrysler Corp. v. Airtemp Corp.*, 426 A.2d 845, 855 (Del.

Super. Ct. 1980).

Plaintiffs' allegations of unjust enrichment miss the mark by failing to allege these

essential elements. A claim for unjust enrichment arises when a defendant is alleged to have

retained a benefit to which it is not entitled, and equity demands that a court compensate the other

party for conferring that benefit. *See, e.g.*, *Allegheny Gen. Hosp.*, 228 F.3d at 447; *R.B. Ventures*,

*Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997); *Kramer Assoc. v. Ikam, Ltd.*, 888 A.2d 247,

254 (D.C. Ct. App. 2005).

---

[7]    Specifically under Michigan law, the elements of a claim for unjust enrichment are (1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to the plaintiff because of the retention of the benefit by defendant. *Barber v. SMH (US), Inc.*, 509 N.W.2d 791 (Mich. Ct. App. 1993). Under Vermont law, in order to state a claim of quasi-contract, the plaintiff must allege sufficient facts to show that a benefit was conferred upon defendant, that defendant accepted the benefit, and that it would be inequitable for the defendant not to compensate plaintiff for its value. *See DJ Painting, Inc. v. Baraw Enters.*, 776 A.2d 413, 417 (Vt. 2001) (internal citation omitted).

The only alleged "benefit" to Health Net is Plaintiffs' provision of treatment to TRICARE beneficiaries. Specifically, Plaintiffs allege that Health Net "benefited from the outpatient services rendered by Plaintiffs," Health Net "failed to pay Facility Charges" and Health Net's resulting "benefit . . . from such improper underpayment . . . is unjust." Compl. ¶¶ 58-60. The duty to care for beneficiaries, if one exists, belongs to the government—not to Health Net, and if Plaintiffs' provision of treatment confers a benefit, it is conferred to the beneficiary and to the government, not Health Net. *Cf. City of El Centro v. United States*, 922 F.2d 816, 823 (Fed. Cir. 1990) (holding that no benefit was conferred on the government by the hospital's treatment of illegal aliens injured while fleeing border patrol agents because the aliens were not in custody at the time of treatment and thus the government's obligation to provide medical care had not yet arisen).

In addition, unjust enrichment arises where the defendant has "accepted" a benefit, and where it would be unjust under the circumstances not to provide consideration or payment in return for that benefit. *See, e.g.*, Williston, § 68:5. As discussed herein and as set forth in the Complaint, Health Net and Plaintiffs agree that when Health Net adjudicates claims submitted by non-network participating providers for the provision of services to TRICARE beneficiaries, Health Net is required to process those claims in accordance with applicable laws, TRICARE payment regulations and TMA guidance. Plaintiffs' allegation that Health Net paid Plaintiffs according to an incorrect interpretation of the regulations is a simple assertion of disagreement over the correct payment methodology that should have been used, not an allegation that Health Net has "accepted" and improperly retained a "benefit" from Plaintiffs.

Because Plaintiffs have failed to allege any facts supporting a claim of unjust enrichment, Count II should be dismissed for failure to state a cause of action.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' First Amended Complaint should be dismissed in its entirety with prejudice.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By _____

Richard L. Horwitz (Del. Bar 2246)
Jennifer Gimler Brady (Del. Bar 2874)
Jennifer C. Wasson (Del. Bar 4933)
Hercules Plaza, Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, Delaware 19899-0951
(302) 984-6000 – Telephone
(302) 658-1192 – Facsimile
rhorwitz@potteranderson.com - Email
jbrady@potteranderson.com  - Email

OF COUNSEL:

Arthur N. Lerner, Esquire
Kathleen Taylor Sooy, Esquire
Christopher Flynn, Esquire
Tracy A. Roman, Esquire
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2500 – Telephone
(202) 628-5116 – Facsimile

Dated:  March 15, 2007
783686v1 / 31173

*Attorneys for Defendant Health Net Federal Services, LLC*

37

# EXHIBIT A



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1231717 (E.D.Pa.)

**(Cite as: 2001 WL 1231717 (E.D.Pa.))**

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
NATIONAL ORGANIZATION ON DISABILITY,
et al.,
v.
Margaret M. **TARTAGLIONE**, et al.
**No. CIV. A. 01-1923.**

Oct. 11, 2001.

*MEMORANDUM*

PADOVA, J.

**\*1** Plaintiffs, organizations who advocate for the disabled, membership organizations of persons with disabilities, and disabled individuals, filed this action on April 19, 2001, alleging that the Commissioners of the City of Philadelphia in charge of elections and the purchase of voting machines have violated their civil rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 (1994), and Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794(a) (1994), by denying them equal and integrated access to polling places and accessible voting machines. Before the Court is Defendants' Motion to Dismiss the Complaint. For the reasons which follow, the Motion will be granted in part and denied in part.

I. BACKGROUND

There are four organizational Plaintiffs. National Organization on Disability is an advocacy organization which seeks to increase voting by persons with disabilities. Liberty Resources, Inc. is a social service organization which seeks to eliminate discrimination against persons with disabilities and to eliminate barriers that prevent persons with disabilities from participating fully in their communities. Pennsylvania Council of the Blind is a membership organization of blind and visually impaired persons living in Pennsylvania. The National Federation of the Blind of Pennsylvania is a membership organization that advocates for the civil rights of persons who are blind. There are nine individual Plaintiffs who have either visual or mobility impairments who seek to represent a class of similarly situated disabled voters. The visually impaired Plaintiffs, Denice Brown, Patrick Comorato, Suzanne Waters, Suzanne Erb, and Fran Fulton, are all legally blind. The mobility impaired Plaintiffs, Jesse Jane Lewis, Theresa Yates, Julia Campolongo, and Karin DiNardi, use wheelchairs to ambulate.

The Complaint alleges the following facts. The voting machines used by the City of Philadelphia are not accessible to visually impaired voters. Consequently, visually impaired voters cannot vote independently and secretly at their neighborhood polling places, as non-disabled voters do, but must be helped by a third person or vote by absentee ballot. Other jurisdictions utilize electronic voting machines which enable visually impaired voters to vote independently and secretly through the use of audio output technology.

In addition, the vast majority of Philadelphia's neighborhood polling places are inaccessible to persons with mobility impairments, and the City does not require that new polling places be accessible to persons who use wheelchairs. Only three percent of the City's 1,681 polling places are accessible to voters who use wheelchairs. Consequently, voters with mobility impairments cannot vote where their neighbors vote and are forced to vote by absentee ballot or by alternative ballot. [FN1]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 2

Not Reported in F.Supp.2d, 2001 WL 1231717 (E.D.Pa.)

**(Cite as: 2001 WL 1231717 (E.D.Pa.))**

FN1. Alternative ballots are similar to absentee ballots but may be returned to the county board of elections on election day while absentee ballots must be returned by 5:00 p.m. on the Friday before the election.

Defendants Margaret Tartaglione and Joseph Duda are Philadelphia City Commissioners responsible for supervising all elections in Philadelphia, choosing polling places and developing requests to purchase new voting machines. Defendant Louis Applebaum is the Commissioner of the Philadelphia Procurement Department and is responsible for purchasing new voting machines for the City. Defendants issued a Request for Proposal for the purchase of new electronic voting machines in December 1999, but did not request that the machines utilize audio output technology which would allow visually impaired voters to vote independently and secretly. Louis Applebaum subsequently entered into a contract, on behalf of the City of Philadelphia, for new electronic voting machines on April 4, 2001, without requiring that those new machines be accessible and independently usable by visually impaired voters. In addition, Defendants have failed to ensure that polling places selected for use in elections held in the City of Philadelphia are accessible to mobility impaired voters and have failed to explore the possibility of reasonable modifications to ensure that polling places could be accessible.

The Complaint alleges six counts: Count I alleges a claim for violation of the ADA and 28 C.F.R. § 35.130 resulting from Defendants' discrimination against Plaintiffs on the basis of their disabilities and denial of their right to vote in the same manner as non-disabled persons; Count II alleges a claim for violation of the ADA and 28 C.F.R. § 35.151 based upon Defendants' purchase of new electronic voting machines which are not accessible and independently usable by persons with disabilities; Count III alleges a claim for violation of the ADA and 28 C.F.R. §§ 35.130(B)(4) and (5), 35.150(a), (b)(1) and (d), and 35.130(b)(4) based upon Defendants' failure to select accessible polling places. [FN2] The Complaint also alleges, in Count VI, that Defendants have violated Section 504 of

the Rehabilitation Act and 45 C.F.R. § 84.22(a) and (b), by denying to Plaintiffs, because of their disabilities, the right to vote in the same manner as non-disabled persons.

FN2. Plaintiffs have agreed to withdraw Counts IV and V.

## II. LEGAL STANDARD

*2 Defendants move to dismiss the Complaint for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). When determining a Motion to Dismiss pursuant to Rule 12(b)(6), the Court may look only to the facts alleged in the complaint and its attachments. *Jordon v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the Plaintiffs. *Angelastro v. Prudential-Bache Securities, Inc.,* 764 F.2d 939, 944 (3d Cir.1985). A Rule 12(b)(6) motion will be granted when Plaintiffs cannot prove any set of facts, consistent with the complaint, which would entitle them to relief. *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). Defendants also move to dismiss for failure to join an indispensable party pursuant to Federal Rule of Civil Procedure 12(b)(7) .

## III. FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

### A. *Plaintiffs' Claims for Discrimination in Voting*

Defendants argue that Plaintiffs cannot state a claim upon which relief may be granted for violation of the ADA and the Rehabilitation Act because none of the individual Plaintiffs have been prevented from voting by Defendants' actions. Title II of the ADA states that: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. In order to state a claim for violation of Title II of the ADA, Plaintiffs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1231717 (E.D.Pa.)

**(Cite as: 2001 WL 1231717 (E.D.Pa.))**

must prove the following: (1) they are disabled; (2) they have been "excluded from participation in or denied the benefits of services, programs or activities provided by a public entity, or [were] otherwise discriminated against by a public entity"; and (3) that such discrimination was based on their disabilities. *Adelman v. Dunmire,* Civ.A.No.95-4039, 1997 WL 164240, at *1 (E.D.Pa. Mar. 28, 1997) (citations omitted). Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a). In order to state a claim for violation of Section 504 of the Rehabilitation Act, a plaintiff must establish that: "1) she is a 'handicapped individual,' 2) she is 'otherwise qualified' for participation in the program, 3) the program receives 'federal financial assistance,' and 4) she was 'denied the benefits of' or 'subject to discrimination' under the program." *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir.1991).

Defendants argue that the Complaint should be dismissed in its entirety because they have not deprived Plaintiffs of the benefit of any services, programs or activities or discriminated against them as the City of Philadelphia has provided alternative means to enable Plaintiffs to vote and Plaintiffs have voted. The City of Philadelphia provides absentee and alternative ballots for voters who cannot vote at their assigned polling places and permits assisted voting for visually impaired voters in order to comply with the Voting Accessibility of the Elderly and Handicapped Act of 1984 (the "VAEH"), 42 U.S.C. § 1973ee-1, *et seq.* (1994). The VAEH requires that the States "assure that all polling places for Federal elections are accessible to handicapped and elderly voters ..." unless "the chief election officer of the State ... (B) assures that any handicapped or elderly voter assigned to an inaccessible polling place, upon advance request of such voter ... (ii) will be provided with an alternative means for casting a ballot on the day of the election." 42 U.S.C. § 1973ee-1.

**\*3** Defendants rely on *NAACP v. Philadelphia Board of Elections,* Civ.A.No. 97-7085, 1998 WL 321253 (E.D.Pa. June 16, 1998), in which the court determined that Defendants' use of these alternative ballot procedures is a reasonable modification to comply with the ADA and fulfills their obligations under the ADA. *Id.* at *3. The issue in *NAACP v. Philadelphia Bd. of Elections* was whether the City of Philadelphia could use its alternative ballot procedures, promulgated to comply with the VAEH, in state and local elections. The NAACP argued that the alternative ballot procedures should not be used in non-federal elections because they create the opportunity for fraud. *Id.* at *5. Defendants argued that they were using the procedures to comply with their obligations under the ADA. *Id.* at *3. The court concluded that: "Defendants are not required to provide the specific procedure authorized under the VAEH, but the decision to do so is a reasonable modification to comply with the ADA and 28 C.F.R. § 35.130(b)(7)." *Id.* at *4. However, the specific issue at the center of this case, whether the ADA requires Defendants to take additional steps to avoid discrimination and provide equal access to the voting process, was not before the court. Consequently, *NAACP v. Philadelphia Bd. of Elections* is not controlling here.

Furthermore, Defendants' argument that Plaintiffs cannot state claims for relief pursuant to Title II of the ADA and Section 504 of the Rehabilitation Act because Plaintiffs have not been prevented from voting mischaracterizes the Complaint. Plaintiffs do not allege that Defendants violated the ADA and the Rehabilitation Act by preventing them from voting, or by forcing them to use alternative ballots; rather, Plaintiffs claim to have been discriminated against in the process of voting because they are not afforded the same opportunity to participate in the voting process as non-disabled voters.

The Complaint alleges that assisted voting and voting by alternative ballot is substantially different from, more burdensome than, and more intrusive than the voting process utilized by non-disabled voters for the following reasons: (1) visually impaired voters must find a person willing to assist them in voting or rely on the assistance of a poll

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1231717 (E.D.Pa.)

**(Cite as: 2001 WL 1231717 (E.D.Pa.))**

Page 4

worker who is a stranger (Compl. ¶ 28); (2) visually impaired voters cannot vote in privacy and secrecy because the ballot must be read to them and their votes must be disclosed to others (Compl. ¶ 28); and (3) mobility impaired voters cannot vote with their neighbors in a convenient location because only three percent of polling places in the City of Philadelphia are accessible to persons using wheelchairs (Compl. ¶ 46). The Complaint further alleges that, even though Defendants have had the opportunity to alleviate these barriers by purchasing electronic voting machines which could be used privately and secretly by persons with visual impairments and by choosing polling places which would be accessible to persons with mobility impairments, Defendants have failed to do so. (Compl. ¶¶ 36-37 and 44-45.) The Complaint also asserts that Defendants have violated the ADA and the Rehabilitation Act by failing to purchase electronic voting machines usable by persons with visual impairments and by failing to select accessible polling places or modify inaccessible polling places to make them accessible. (Compl. ¶ ¶ 56, 58-59, and 63-64.)

*4 The Complaint alleges that the individual Plaintiffs are qualified voters with disabilities, that Plaintiffs have been discriminated against by Defendants because they cannot participate in the program or benefit of voting in the same manner as other voters but, instead, must participate in a more burdensome process, and that the discrimination is due to Plaintiffs' disabilities. Accordingly, the Court concludes that the Complaint states a claim for discrimination in the process of voting in violation of Title II of the ADA and Section 504 of the Rehabilitation Act upon which relief could be granted.

B. *Standing*

Defendants also argue that the Complaint should be dismissed because the Plaintiffs do not have standing to assert their claims. Defendants assert that the individual Plaintiffs, who have voted in past elections, have not suffered an "injury in fact" and, consequently, lack standing to pursue their claims pursuant to the ADA. *Lujan v. Defenders of Wildlife,*

504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Defendants further argue that since the individual Plaintiffs lack standing, the organizational defendants also lack standing.

Standing has three elements: injury, a causal connection between the injury and the conduct complained of, and the likelihood that the injury would be redressed by a favorable decision. *Lujan,* 504 U.S. at 560-61. The Complaint alleges that the individual Plaintiffs have been injured because they cannot participate in the program or benefit of voting in the same manner as other voters but, instead, must participate in a more burdensome process. The Complaint further alleges that the injury was caused by Defendants' conduct in failing to purchase electronic voting machines that would enable visually impaired voters to vote in the same manner as non-disabled voters and in failing to choose polling places that are accessible to mobility impaired voters. The Complaint also alleges that Plaintiffs' injuries can be redressed by injunctive relief if the Court renders a decision in their favor. Accordingly, the individual Plaintiffs have standing to prosecute this suit.

Since the individual Plaintiffs have standing, those Plaintiffs who are membership organizations of persons with disabilities have standing as well. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 334, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) ("[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right....") In addition, those Plaintiffs who are advocacy organizations have standing because they have alleged the expenditure of significant resources in fighting Defendants' conduct. *Havens Realty Co. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

C. *Plaintiffs' Claims of Regulatory Violations*

*5 Defendants also argue that Counts II and III of the Complaint, alleging violations of the ADA through failure to comply with its implementing regulations, should be dismissed for failure to state claims upon which relief may be granted. Count II

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1231717 (E.D.Pa.)

**(Cite as: 2001 WL 1231717 (E.D.Pa.))**

of the Complaint alleges that Defendants' purchase of new electronic voting machines that are not accessible and independently usable by visually disabled voters violates the ADA and 28 C.F.R. § 35.151(a). Count III of the Complaint alleges that Defendants select polling places that are inaccessible to mobility impaired voters in violation of the ADA and 28 C.F.R. § 35.130.

*1. 28 C.F.R. § 35.151*

Section 35.151(a) of Title 28 of the Code of Federal Regulations requires that facilities constructed for the use of public entities "shall be designed and constructed" so that they are "readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992." 28 C.F.R. § 35.151. The term "facilities" is defined to include equipment and personal property. 28 C.F.R. § 35.104 ("Facility means all or any portion of ... equipment, rolling stock or other conveyances ... or other real or personal property...."). Defendants argue that Count II of the Complaint should be dismissed because voting machines are not equipment subject to 28 C.F.R. § 35.151.

Defendants rely upon the Department of Justice's commentary to this regulation which states that mobile facilities, such as bookmobiles or mobile health screening units, are not subject to this regulation, but are subject to the requirements for accessibility in existing buildings provided by 28 C.F.R. § 35.150. 28 C.F.R., pt. 35, App. A. Section 35.150 provides that public entities are not necessarily required to "make each of [their] existing facilities accessible to and usable by individuals with disabilities" and that public entities are "not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section." 28 C.F.R. § 35.150(a)(1) and (b)(1). Defendants argue that voting machines, which are transportable, are subject to 28 C.F.R. § 35.150 and, therefore, the ADA does not require the City to ensure that its new voting machines are accessible to the visually impaired.

Defendants' reliance on the commentary to Part 35 is misplaced. The definition of facility, as used in section 35.151, plainly includes equipment and personal property and does not specify any exclusion for transportable equipment or personal property such as voting machines. 28 C.F.R. § 35.104. Moreover, the commentary upon which Defendants base their argument concerns the applicability of these regulations to "activities operated in mobile facilities, such as bookmobiles or mobile health screening units" and states that such *activities* would be covered by section 35.150. 28 C.F.R., pt. 35, App. A, § 35.104. The commentary does not modify the definition of "facility" to exclude transportable equipment and personal property or relegate transportable equipment to the requirements of section 35.150 rather than section 35.151.

**\*6** Defendants also argue that Plaintiffs cannot state a claim pursuant to 28 C.F.R. § 35.151 because there is no private right of action to enforce that regulation. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval,* 531 U.S. 1049, 121 S.Ct. 1511, 1519, 149 L.Ed.2d 517 (2001) (citations omitted). This inquiry into Congressional intent begins with the text and structure of the ADA. *Id.* at 1520.

The text of the ADA evidences an intent to create a private remedy to enforce violations of Title II of that statute. *See Parker v. Universidad de Puerto Rico,* 225 F.3d 1, 4 (1st Cir.2000). The ADA specifically grants to persons alleging discrimination in violation of Title II of the ADA, the "remedies, procedures, and rights set forth in section 794a of the Title 29." 42 U.S.C. § 12133 (1994). Section 794a makes available to any person "aggrieved by any act or failure to act by any recipient of Federal assistance" the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964." 29 U.S.C. § 794a (1994). Although Title VI does not, itself, authorize a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1231717 (E.D.Pa.)

**(Cite as: 2001 WL 1231717 (E.D.Pa.))**

private cause of action, the Supreme Court has recognized that "private individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages." *Alexander v. Sandoval,* 121 S.Ct. at 1516.

The Supreme Court recognized in *Sandoval* that Congressional intent to create a private remedy for enforcement of a statute extends to the regulations promulgated to enforce that statute, if the reach of those regulations does not extend beyond that of the statute itself:

> Such regulations, if valid and reasonable, authoritatively construe the statute itself ... and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute. A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well.

*Alexander v. Sandoval,* 121 S.Ct. at 1518-19. The regulations promulgated to implement Title II of the ADA, including those governing access to new public facilities, were mandated by Congress, which specifically directed the Department of Justice to adopt regulations consistent with the "coordination regulations" which were issued with respect to the Rehabilitation Act. 42 U.S.C. § 12134(b) (1994) ("With respect to 'program accessibility', existing facilities', and 'communications', such regulations shall be consistent with regulations and analysis as in part 39 of title 28 of the Code of Federal Regulations...."). Section 35.151 of Title 28 of the Code of Federal Regulations is virtually identical to the coordination regulations promulgated with respect to the Rehabilitation Act and, consequently, is within the statutory boundaries of Title II of the ADA. *Helen L. v. DiDario,* 46 F.3d 325, 332 (3d Cir.1995) ("because Congress mandated that the ADA regulations be patterned after the section 504 coordination regulations, the former regulations have the force of law.") (citations omitted). Moreover, the House Report on the ADA reflects that Congress specifically intended that aggrieved individuals be able to bring private actions for violations of these regulations:

> *7 Section 205 of the legislation specifies that the remedies, procedure and rights set forth in section

505 of the Rehabilitation Act of 1973 (29 U.S.C. 794a) shall be available with respect to any individual who believes that he or she is being subjected to discrimination on the basis of disability in violation of an provisions of this Act, or regulations promulgated under section 204, concerning public services.

H.R.Rep. No. 101-485(II), at 99, reprinted in 1990 U.S.C.A.A.N. 267, 381. Accordingly, Plaintiffs may maintain a cause of action for violation of the ADA and 28 C.F.R. § 35.151.

*2. 28 C.F.R. § 35.130*

Section 35.130 of Title 28 of the Code of Federal Regulations provides that a public entity may not select a location for a public facility that has "the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination...." 28 C.F.R. § 35.130(b)(4). Defendants argue that Plaintiffs cannot state a claim for violation of this regulation because the mobility impaired Plaintiffs have not been denied the benefit of voting since they can take advantage of alternative ballots. Plaintiffs do not, however, claim that they have been discriminated against because they cannot vote, but because they cannot vote in the same manner as non-disabled voters. The Complaint alleges that Defendants regularly reassign polling places to new locations but do not require that those new sites be accessible to voters with mobility impairments. The Defendants' selection of inaccessible polling places, therefore, can have the effect of depriving mobility impaired voters of the benefit of voting in their neighborhood polling places in the same manner as non-disabled voters, in violation of 28 C.F.R. § 35.130(b)(4). The Complaint, therefore, does state a legally cognizable claim for violation of the ADA and 28 C.F.R. § 35.130.

*D. The Rehabilitation Act*

*8 In addition to their argument, discussed above, that Plaintiffs cannot state a claim in Count VI pursuant to the Rehabilitation Act because Plaintiffs have not been denied the right to vote, Defendants also argue that Count VI must be dismissed because

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1231717 (E.D.Pa.)

**(Cite as: 2001 WL 1231717 (E.D.Pa.))**

Page 7

Plaintiffs have failed to plead the receipt of federal funds in connection with the purchase of voting machines or the selection of polling places. Defendants rely on *Wagner v. Fair Acres Geriatric Center*, 49 F.3d 1002 (3d Cir.1995) in which the court states that in order to state a claim under the Rehabilitation Act a plaintiff must prove that "the program or activity in question receives federal financial assistance." *Id.* at 1009.

The Complaint alleges that Board of Elections and the City Departments involved in the purchase of the voting machines receive federal funds. (Compl. ¶ 62). That allegation is sufficient, for purposes of Rule 12(b)(6), to state a claim for violation of § 504 of the Rehabilitation Act:

The Rehabilitation Act requires States that accept federal funds to waive their Eleventh Amendment immunity to suits brought in federal court for violations of Section 504. 42 U.S.C § 2000d-7. Since Section 504 covers only the individual agency or department that accepts or distributes federal funds, this waiver requirement is limited in the same way. By accepting funds offered to an agency, the State waives its immunity only with regard to the individual agency that receives them.

*Jim C. v. Atkins School Dist.,* 235 F.3d 1079, 1081 (8th Cir.2000) (*en banc* ), *cert. denied,* 533 U.S. 949, 121 S.Ct. 2591, 150 L.Ed.2d 750 (2001).

IV. FEDERAL RULE OF CIVIL PROCEDURE 12(b)(7)

Defendants argue, pursuant to Federal Rule of Civil Procedure 12(b)(7), that the Complaint should be dismissed for failure to join the Secretary of the Commonwealth of Pennsylvania as a party under Rule 19. Federal Rule of Civil Procedure 19 provides as follows:

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties....

Fed.R.Civ.P. 19(a). When determining whether a party should be joined pursuant to Rule 19(a), the Court first examines "whether complete relief can be accorded to the parties to the action in the absence of the unjoined party." *Drysdale v. Woerth,* Civ.A.No. 98-3090, 1998 WL 966020, at *3 (E.D.Pa. Nov. 18, 1998). The purpose of Rule 19(a)(1) is "to avoid partial or hollow relief" because "the interests that are being furthered here are not only those of the parties, but also that of the public in avoiding repeated lawsuits on the same essential subject matter." *Id.* (citing Fed.R.Civ.P. 19 Advisory Committee's Notes). The moving party has the burden of showing why an absent party should be joined pursuant to Rule 19. *Raytheon Co. v. Continental Cas. Co.,* 123 F.Supp.2d 22, 33 (D.Mass.2000). "The moving party may present, and the Court may consider, evidence outside of the pleadings" with respect to this issue. *Id.*

The Pennsylvania Election Code prohibits the use of voting machines which have not been pre-approved by the Secretary of the Commonwealth. 25 Penn.Stat.Ann. § 3006 ("No kind of voting machines not so approved shall be used at any election."). Defendants aver, and Plaintiffs concede, that the Secretary of the Commonwealth has not approved any electronic voting machines with the audio output technology required by the visually impaired Plaintiffs. Consequently, if Plaintiffs were to succeed in this proceeding, the Court could not order Defendants to use the accessible voting machines sought by the visually impaired Plaintiffs. Plaintiffs admit that, if they are successful in this action, approval of these voting machines would have to be sought from the Secretary of the Commonwealth and, if the Secretary does not approve electronic voting machines with audio output technology, a new proceeding would have to be initiated against the Secretary.

*9 It is clear, under these circumstances, that the Court could not afford complete relief to the visually impaired Plaintiffs in this matter in the absence of the Secretary of the Commonwealth. Accordingly, Defendants' Motion to Dismiss the claims of the visually impaired Plaintiffs pursuant to Federal Rule of Civil Procedure 12(b)(7) is granted.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 8

Not Reported in F.Supp.2d, 2001 WL 1231717 (E.D.Pa.)

**(Cite as: 2001 WL 1231717 (E.D.Pa.))**

V. CONCLUSION

For the reasons set forth above, the Motion to Dismiss for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) is denied with respect to Counts I, II, III and VI of the Complaint. The Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) will be denied as moot with respect to Counts IV and V of the Complaint because Plaintiffs have agreed to withdraw those Counts. The Motion to Dismiss the claims of the visually impaired Plaintiffs for failure to join an indispensable party pursuant to Federal Rule of Civil Procedure 12(b)(7) is granted, without prejudice, and with leave to amend the Complaint to state a claim against the Secretary of the Commonwealth. An appropriate Order follows.

*ORDER*

AND NOW, this day of October, 2001, in consideration of Defendants' Motion to Dismiss (Docket No. 11), Plaintiffs' response thereto, Defendants' reply memorandum of law, and the argument of the Parties held on September 27, 2001, IT IS HEREBY ORDERED that the Motion to Dismiss is GRANTED in part and DENIED in part as follows.

1. Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(7) is GRANTED with respect to the claims for discrimination against visually impaired voters pursuant to the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Those claims are hereby DISMISSED without prejudice and with leave to amend the Complaint to add a claim against the Secretary of the Commonwealth within twenty (20) days of this Order;

2. Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is DENIED with respect to Counts I, II, III and VI of the Complaint;

3. Counts IV and V of the Complaint are marked WITHDRAWN AND Defendants' Motion to Dismiss those Counts pursuant to Federal Rule of Civil Procedure 12(b)(6) is DENIED as moot.

Not Reported in F.Supp.2d, 2001 WL 1231717

(E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:01cv01923 (Docket) (Apr. 19, 2001)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 1998 WL 518181 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Briefs and Other Related Documents
Harris v. MadisonE.D.Pa.,1998.Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Wayne HARRIS d/b/t/a W.W. Harris and Sons, Inc., Plaintiff,
v.
S.C. MADISON, Bishop, Individually and as Agent for the United House of Prayer for All People, United Building Contractors, Inc., Jim Myers, Individually, and as Agent for United Building Contractors, Inc., Defendants.
**No. CIV. A. 97-7532.**

July 24, 1998.

Oscar N. Gaskins, Phila, for Wayne Harris, Individually Individually and D/B/T/A W.W. Harris and Sons, Inc., Plaintiff.
Elizabeth J. Feeney, Piper & Marbury, L.L.P., Peter J. Mooney, White and Williams, Phila, for S.C. Madison, Bishop, Individually and Agent for the United House of Prayer for All People, United Building Contractors, Inc., Jim Myers, Individually, and Agent for and Trading as United Building Contractors, Inc., Defendants.

MEMORANDUM
GAWTHROP, J.
**\*1** Before the court in this diversity action is Defendants' Motion to Dismiss Plaintiff's Complaint. [FN1] Plaintiff, a building contractor and developer, has filed suit against Bishop S.C. Madison, the sole Trustee and Chief Executive Officer of the United House of Prayer for All People of the Church on the Rock of the Apostolic Faith (the "United House of Prayer"), to recover for services that plaintiff allegedly performed on behalf of that organization. The suit also names as defendants the construction company and its agent which was awarded the construction contract at issue. Plaintiff's complaint asserts claims against defendants for breach of

contract, conspiracy to deprive plaintiff of pay, and quantum meruit.

> FN1. Although Bishop S.C. Madison was the only defendant to file the Motion to Dismiss, the remaining defendants, United Building Contractors, Inc., and Jim Myers, later adopted and joined in the Motion. *See* Joinder of Defs. in Mot. of Def. Bishop S.C. Madison to Dismiss Pl.'s Compl.

**\*1** The defendants have moved to dismiss plaintiff's complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(7), for plaintiff's failure to join an indispensable party, inclusion of which would destroy this court's subject matter jurisdiction, and pursuant to Fed.R.Civ.P. 12(b)(6), for plaintiff's failure to state a claim upon which relief can be granted. Because I find, under Fed.R.Civ.P. 19, that the United House of Prayer is an indispensable party whose joinder would destroy diversity jurisdiction, I shall dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(7).

*I. Background*

**\*1** According to the Complaint, in March 1993, defendants were engaged in rehabilitating houses in Philadelphia and allegedly induced the plaintiff to assist them in obtaining the required permits for plumbing and electrical work and to supervise the construction. In return, the plaintiff claims the defendants promised him that he would be paid for his services and awarded a substantial contract to develop a tract of land in Philadelphia into low-income housing units. In May 1994, plaintiff claims the defendants told him that his services were no longer needed and that the contract for construction would be awarded to defendant United Building Contracting, Inc. Plaintiff claims that he performed substantial services in furtherance of his contract with defendants without receiving any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 2

Not Reported in F.Supp.2d, 1998 WL 518181 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

payment or other benefit. Defendants dispute this version of events. Additionally, defendants contend that plaintiff has not named the United House of Prayer itself as a party, for the reason that joinder of this organization would destroy diversity of citizenship and defeat subject matter jurisdiction over this action.

**\*1** A corporation is deemed a citizen of any state by which it has been incorporated and of the state where it has its principal place of business. 28 U.S.C. § 1332(c)(1). The United House of Prayer is incorporated in the Commonwealth of Pennsylvania. Defs.' Ex. E, F. Thus, it is a citizen of Pennsylvania for jurisdictional purposes.

## II. *Discussion*

**\*1** The critical issue here is whether the United House of Prayer is an indispensable party such that the court "in equity and good conscience" cannot proceed with the action in its absence. Fed.R.Civ.P. 19. The determination of indispensability under Rule 19 is a two-step process. First, a court should decide whether the person in question is a necessary party who should be joined if "feasible" under Rule 19(a). If the person should be joined, but joinder is not feasible, a court should take the second step of evaluating whether that person is "indispensable" under Rule 19(b). If the court finds the party is indeed indispensable, then it should dismiss the action. *See, e.g., H.B. General Corp. v. Manchester Partners, L.P.,* 95 F.3d 1185, 1190 (3d Cir.1996).

**\*2** Federal Rule of Civil Procedure 19(a) provides for joinder when either
**\*2** (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

**\*2** Fed.R.Civ.P. 19(a). Bishop S.C. Madison avers that any alleged dealings that he had with plaintiff related to his role as sole Trustee and CEO of the United House of Prayer and were undertaken exclusively on the behalf of that organization. Defs.' Ex. C. As support for this argument, defendants point to the three state court complaints filed by plaintiff which involve the same subject matter as the present action, but name the United House of Prayer as a party. Defs.' Ex. D. Moreover, plaintiff names Bishop S.C. Madison as a defendant both individually and as agent for the United House of Prayer. If defendant Madison was acting in his role as agent for the corporation, then it follows that the corporation has an interest in the alleged contract. " Generally, in breach of contract actions, all parties to a contract should be joined." *Rashid v. Kite,* 957 F.Supp. 70, 74 (E.D.Pa.1997) (citations omitted) (dismissing action for lack of subject matter jurisdiction where nondiverse party was indispensable to breach of contract claim). Thus, the United House of Prayer is a necessary party which should be joined if feasible. Its joinder, however, would destroy diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the plaintiff, Wayne Harris, and the United House of Prayer are both citizens of Pennsylvania. Thus, joinder is not feasible.

**\*2** Because joinder of the United House of Prayer is not feasible, the court must next consider whether it is indispensable. Since the plaintiff has the burden of demonstrating federal jurisdiction in this case, it is his burden to establish that the United house of Prayer is a dispensable party. *Enza Inc. v. We The People, Inc.,* 838 F.Supp. 975, 978 (E.D.Pa.1993) (dismissing action after finding corporation was indispensable party in breach of contract action and so could not be dismissed to preserve diversity jurisdiction). By failing to respond, plaintiff has not met his burden. Nevertheless, I shall examine the indispensability arguments raised in the defendants' motion.

**\*2** In a breach of contract action, the general rule is that a corporate officer who negotiates a contract on behalf of a corporation may not ordinarily be held personally liable for contract damages. *See Bala Corporation v. McGlinn,* 295 Pa. 74, 144 A. 823,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 518181 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

824 (Pa.1929) (citations omitted) (holding no individual officer liability within context of breach of contract action where plaintiff knew officers contracted on behalf of corporation). Here, plaintiff claims liability against Bishop S.C. Madison for the breach of a contract allegedly made in his role as agent of the United House of Prayer. However, in this context, "the breach of the contract is the breach of a promise made by the corporation, and not the breach of any promise extended by the corporate officer. It follows that only the corporation may ordinarily be held liable for contract damages." *Loeffler v. McShane,* 372 Pa.Super. 442, 539 A.2d 876, 879 (Pa.Super.1988). Nor, on the record before the court, does there appear any reason to subject Bishop S.C. Madison to individual liability. *See, e.g., The Village at Camelback Property Owners Ass'n v. Carr,* 371 Pa.Super. 452, 538 A.2d 528, 534 (Pa.Super.1988) (finding plaintiff had pled "sufficient ultimate facts" for claim against individual for breach of warranties personally extended by officer "completely apart from his position as agent for a corporation"). Thus, under this well settled doctrine, the United House of Prayer clearly is indispensable.

**\*3** An examination of the factors enumerated in Fed.R.Civ.P. 19(b) also leads to the conclusion that the United House of Prayer is indispensable. [FN2] Those factors have been interpreted by the Supreme Court as: (1) the plaintiff's interest in having a forum; (2) the defendant's interest in avoiding multiple litigation, inconsistent relief, or sole responsibility for a shared liability; (3) the extent to which a judgment may hinder the outsider's ability to protect his interest in the subject matter; and (4) the courts' and public interest in complete, consistent, and efficient settlement of controversies. *Provident Tradesmen's Bank & Trust Co. v. Patterson,* 390 U.S. 102, 109-111, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). Here, although the plaintiff has an interest in having a forum, this forum need not be federal. Indeed, the plaintiff has already brought three related actions in state court. Two of these cases ended in dismissal for non-prosecution; in the third case, the court sustained the defendants' preliminary objections and dismissed the complaint. Defs .' Ex. D. Still, the doors of the state courthouse remain open to him. Defendant Bishop S.C.

Madison has an interest in avoiding liability for a contract to which, he would argue, he was not a party and that any damages should be paid by the United House of Prayer, if anyone. Further, the absence of the United House of Prayer would hinder its ability to protect its interests. Finally, the interest in complete, consistent, and efficient settlement of controversies weighs in favor of dismissing this action. State litigation regarding this contract has already been brought.

> FN2. The factors to be considered by the court when determining whether a party is indispensable include:
> first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. Fed.R.Civ.P. 19(b).

### III. Conclusion

**\*3** In sum, I find that the United House of Prayer is an indispensable party under Fed.R.Civ.P. 19(b). Because its joinder would destroy this court's diversity jurisdiction under 28 U.S.C. § 1332, I shall dismiss this action pursuant to Fed.R.Civ.P. 12(b)(7). Accordingly, I find it unnecessary to reach defendants' other ground for dismissal.

**\*3** An order follows.

### ORDER

**\*3** AND NOW, this 22nd day of July, 1998, upon the reasoning in the attached Memorandum, the Motion to Dismiss (Doc. No. 5) Plaintiff's Complaint is GRANTED, and Plaintiff's Complaint is DISMISSED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 4

Not Reported in F.Supp.2d, 1998 WL 518181 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**


E.D.Pa.,1998.
Harris v. Madison
Not Reported in F.Supp.2d, 1998 WL 518181
(E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:97cv07532 (Docket) (Dec. 12, 1997)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C



65 Fed.Appx. 803                                                                                          Page 1

65 Fed.Appx. 803, 2003 WL 1919361 (C.A.3 (Del.))
**(Cite as: 65 Fed.Appx. 803)**

**H**
Briefs and Other Related Documents
Jurimex Kommerz Transit G.M.B.H. v. Case
Corp.C.A.3 (Del.),2003.This case was not selected
for publication in the Federal Reporter.NOT
PRECEDENTIAL Please use FIND to look at the
applicable circuit court rule before citing this
opinion. Third Circuit Local Appellate Rule 28.3(a)
and Internal Operating Procedure 5.3. (FIND CTA3
Rule 28.0 and CTA3 IOP APP I 5.3.)
      United States Court of Appeals,Third Circuit.
      JURIMEX KOMMERZ TRANSIT G.M.B.H.;
Jurimex Kommerz Transit Agrar Consulting Projekt
   KAS G.M.B.H.; Arge IPC-Jurimex Appellants,
                              v.
                  CASE CORPORATION.
                     No. 02-1916.

                 Argued March 12, 2003.
                 Decided April 23, 2003.

Foreign broker brought suit alleging that
agricultural machinery manufacturer breached oral
contract to pay commission for acting as local
liaison between manufacturer, potential financiers,
and foreign buyer. The United States District Court
for the District of Delaware, Joseph J. Farnan, Jr.,
201 F.R.D. 337, dismissed complaint and denied
broker's motion to amend, and broker appealed. The
Court of Appeals, Nygaard, Circuit Judge, held that
fact issues remained as to whether manufacturer's
foreign subsidiaries were necessary parties.

Reversed and remanded.
West Headnotes
**Federal Civil Procedure 170A ⊂⊃1831**

170A Federal Civil Procedure
      170AXI Dismissal
            170AXI(B) Involuntary Dismissal
                  170AXI(B)5 Proceedings
                        170Ak1827 Determination
                              170Ak1831 k. Fact Issues. Most
Cited Cases

Issues of whether agricultural machinery
manufacturer involved its foreign subsidiaries as
agents and exerted financial control of proposed
foreign sales transaction, and thus whether
subsidiaries were necessary parties, presented fact
questions that could not be resolved on motion to
dismiss foreign broker's action against manufacturer
seeking to recover commission for acting as local
liaison between manufacturer, potential financiers,
and foreign buyer. Fed.Rules Civ.Proc.Rules
12(b)(6), 19(a), 28 U.S.C.A.

**\*804** On Appeal from the United States District
Court for the District of Delaware. (D.C. Civil No.
00-cv-00083). District Judge: The Honorable
Joseph J. Farnan, Jr.

Daniel J. Kornstein (Argued), Kornstein Veisz
Wexler & Pollard, New York, NY, for Appellants.
David C. McBride, John W. Shaw, Young Conaway
Stargatt & Taylor, Wilmington, DE, William E.
Deitrick, William B. Berndt, James C. Schroeder
(Argued), Mayer Brown Rowe & Maw, Chicago,
IL, for Appellee.

BEFORE:    SLOVITER,    NYGAARD,    and
ALARCON,FN* Circuit Judges.

            FN* Honorable Arthur L. Alarcon, Senior
            Circuit Judge for the United States Court
            of Appeals for the Ninth Circuit, sitting by
            designation.

                  OPINION OF THE COURT
NYGAARD, Circuit Judge.
**\*\*1** This appeal involves a series of transactions
arranging for the sale of agricultural equipment in
Kazakhstan. Jurimex, a foreign plaintiff, filed suit
in the District Court against Case Corporation-the
parent company to Case France, Case Europe, and
Case Neustadt-alleging that Case breached an oral
contract providing a commission to Jurimex for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

65 Fed.Appx. 803                                                                                                              Page 2

65 Fed.Appx. 803, 2003 WL 1919361 (C.A.3 (Del.))
**(Cite as: 65 Fed.Appx. 803)**

acting as the local liaison between Case, potential financiers, and Golden Grain, a Kazakh buyer. Case filed a motion to dismiss pursuant to 12(b)(1) and 12(b)(7), arguing that its foreign subsidiaries were necessary and indispensable parties under Rule 19 and addition of these parties would destroy diversity jurisdiction. The District Court agreed and granted the motion. Jurimex argued that it was trying to hold Case liable, not merely the parent of the subsidiaries, but rather because the subsidiaries were acting as agents of Case. However, this theory could not be found anywhere in the original complaint (indeed, there was no mention of a subsidiary). The District Court properly applied a Rule 19 analysis and dismissed the complaint. The District Court also properly denied discovery on the agency theory at that time because there was nothing in the complaint to which the theory could relate. Faced with the dismissal, Jurimex moved to amend their complaint to more specifically plead an agency relationship between Case and its European subsidiaries. The District Court denied this motion, finding that the amendment would be futile.

**\*\*1** We will affirm the decision of the District Court to dismiss the original complaint because agency was never pleaded. However, we will reverse the decision to deny the amended complaint because in it Jurimex has sufficiently pleaded agency.

### I. Jurisdiction and Standard of Review

**\*\*1** The District Court had subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds $75,000 and the parties to the dispute are a citizen of a State and citizens of a foreign state. We have jurisdiction over a final order of the District Court pursuant to 28 U.S.C. § 1291.

**\*805 \*\*1** There are two decisions on appeal and each has its own standard of review. As to the decision to dismiss the complaint for failure to join an indispensable party, we have a bifurcated process of review. "To the extent that a district court's Rule 19(a) determination is premised on a

conclusion of law, ... our scope of review is plenary. We, however, review any subsidiary findings of fact only for clear error." *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,* 11 F.3d 399, 404 (3d Cir.1993). Under Rule 19(b), we review the district court's determination that the Case subsidiaries were indispensable and the resulting dismissal of the complaint for abuse of discretion. *Id.* at 403. The decision to deny discovery is also reviewed under an abuse of discretion standard. *Brumfield v. Sanders,* 232 F.3d 376, 380 (3d Cir.2000).

**\*\*1** The District Court's second order denied Jurimex's motion for leave to amend its complaint as futile. We review such decisions for abuse of discretion. *Krantz v. Prudential Investments Fund Management,* 305 F.3d 140, 144 (3d Cir.2002). "A district court abuses its discretion when its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Hofkin v. Provident Life & Acc. Ins. Co.,* 81 F.3d 365, 369 (3rd Cir.1996) (quoting *International Union, United Auto., Aerospace and Agric. and Implement Workers of Am., UAW v. Mack Trucks, Inc.,* 820 F.2d 91, 95 (3d Cir.1987) appeal on remand, 917 F.2d 107 (3rd Cir.1990)).

### II. Background

**\*\*2** As this appeal comes on a motion to dismiss, " we accept all factual allegations in the complaints and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiffs." *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1411 (3d Cir.1993). According to the amended complaint, [FN1] in April 1999, Case Neustadt, on behalf of Case, sought to obtain Jurimex's assistance in brokering a sale between Case and Agro Industrial Corporation Golden Grain (Golden Grain), a corporation in Kazakhstan. Although another company, I.P. Consult (IPC), was acting as Case's representative in Kazakhstan, it had no experience in the grain trade or with such large transactions. In May 1999, representatives of Case, Jurimex, and IPC met in Vienna, Austria, and reached a business agreement. This agreement divided the work required to effectuate the transaction in Kazakhstan. IPC

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

65 Fed.Appx. 803, 2003 WL 1919361 (C.A.3 (Del.))
**(Cite as: 65 Fed.Appx. 803)**

would handle the 'technical' aspects of the transaction relating to the equipment and Jurimex agreed to handle the 'agricultural' aspect. Jurimex would be responsible for lining up "offtakers," which are companies that agree to purchase the wheat produced by Golden Grain once they are using the new Case equipment. These guarantees by the offtakers are essential for securing credit from a bank for the purchase of the Case equipment, as they evince future income and assuage the bank that the money lent to Golden Grain will be repaid.

> FN1. We draw the factual scenario alleged by Jurimex from the amended complaint where Jurimex identified the specific subsidiaries involved in the meeting, transactions, etc. The original complaint was identical in factual nature but referred to "Case" generically, rather than acknowledging the subsidiaries, and failed to allege agency.

**\*\*2** After the meeting, Patrice Loiseleur, Business Manager of International Sales at Case France, on behalf of Case, requested that Jurimex conduct a project study for the machinery and a feasibility study on the exportation of Golden Grain's wheat in Kazakhstan. Loiseleur also promised Jurimex that it would act as Case's future representative in Kazakhstan and would be responsible for financing the **\*806** transaction. To accommodate this request, Jurimex formed Jurimex Kommerz Transit Agrar Consulting Projekt KAS (Jurimex Projekt) and created an Austrian partnership with IPC, called Arge IPC-Jurimex (IPC-Jurimex) to negotiate with Golden Grain.

**\*\*2** The parties met again at the end of May 1999 in Paris and agreed to the financial aspects of the transaction. Specifically, of the estimated $40 million in revenues, $23.2 million would go to Case and the remaining $16.8 million would be used for freight costs and compensation to IPC-Jurimex. During the meeting, Girard Chiffert, an executive of Case Europe, confirmed to Jurimex that the financing guidelines were dictated by Case and that any changes would have to go through Case. Jurimex was also instructed by Loiseleur to

continue negotiating with Golden Grain and Golden Grain's bank and continue to seek more offtakers.

**\*\*2** Several exchanges occurred in June of 1999, where top management of Case, Case Europe, Case France and IPC-Jurimex reached an understanding of the financial structure and decided to affirmatively proceed with the transaction. However, Case and IPC held a secret meeting with a different bank that had expressed interest in financing the transaction and Glencore Grain, an offtaker already obtained by Jurimex, at which time the parties agreed to proceed with Case directly and cut Jurimex out of the deal with respect to both the bank's financing and the future sale of Golden Grain's wheat to Glencore. Ultimately, the transaction was completed without Jurimex's involvement. Jurimex claims that Case's unlawful exclusion of Jurimex from the transaction deprived them of $7.5 million in proceeds from the direct transaction, as well as an additional $28 million from the fees associated with the wheat sales previously arranged and finalized by Jurimex. Case also reneged on its promise to make Jurimex its representative in Kazakhstan, depriving Jurimex of substantial future business.

**\*\*3** The amended complaint asserts claims against Case, as joint tortfeasor by virtue of its agency relationship with its subsidiaries, Case France, Case Europe, Case Neustadt, for (1) breach of contract and implied covenant of good faith and fair dealing, (2) breach of implied contract, (3) promissory estoppel, (4) quasi-contract/unjust enrichment/restitution, (5) tortious interference, (6) unfair competition and misappropriation, and (7) prima facie tort.

**\*\*3** In response to Jurimex's original complaint, Case filed a motion to dismiss under Rule 12(b)(1), 12(b)(7), 19, and the doctrine of forum non conveniens. The heart of Case's argument was that the allegedly improper conduct took place entirely in Europe and through the sole initiative of Case's subsidiaries. As the subsidiaries are separate corporate entities, to hold the parent corporation liable for their actions, they must be joined to the lawsuit as necessary parties. The District Court agreed and engaged in Rule 19 analysis of whether

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

65 Fed.Appx. 803

65 Fed.Appx. 803, 2003 WL 1919361 (C.A.3 (Del.))
**(Cite as: 65 Fed.Appx. 803)**

the subsidiaries were necessary and indispensable parties. Because the conduct took place through the subsidiaries and joinder would destroy diversity, the District Court found 19(a) satisfied. Turning to 19(b), the District Court explained its concern for prejudice to the unjoined subsidiaries if a judgment was entered against the parent corporation and the likelihood that there was a better forum in Europe. The District Court specifically excluded consideration of the principal-agency theory put forth by Jurimex because it was not alleged in the complaint and denied discovery as to the theory for the same reason.

*807 **3 In light of the adverse decision, Jurimex moved to amend its complaint to include specific language alleging the principal-agency theory, as well as a joint tortfeasor theory. The District Court denied this motion as futile in its March 27, 2002 opinion. The District Court held that Jurimex had not alleged a factual predicate for agency because it did not point to consent by the subsidiaries to act as Case's agent, nor Case's request that the subsidiaries so act. The District Court also found the allegations of Case's control to be too conclusory. The joint tortfeasor theory was also denied, on the grounds that Jurimex had not alleged any tortious conduct by Case, but rather by its subsidiaries. Ultimately, the District Court denied the motion to amend for failure to state a claim.

### III. Discussion

**4 After the initial complaint was dismissed, Jurimex moved to amend its complaint to include specific language detailing the agency relationship. FN2 The District Court denied the motion after finding that the facts alleged were not sufficient to state a claim. The District Court committed legal error by failing to consider the effects of certain factual pleadings, and applied an incorrect pleading standard for agency in the context of a Rule 12(b)(6) motion. The decision reached by the District Court demonstrates that it was not satisfied with the evidence of agency. However, if a complaint is properly pleaded, the concern for lack of evidence is only germane after an opportunity for discovery.

FN2. We will center our discussion on the District Court's decision to deny the amended complaint and affirm the decision to dismiss the original complaint without comment.

**4 In *Shane v. Fauver,* we discussed the appropriate standard for a District Court to evaluate a motion to amend in light of its potential futility. 213 F.3d 113 (3d Cir.2000). We explained that:
**4 Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility. "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted. In assessing "futility," the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6). Accordingly, if a claim is vulnerable to dismissal under Rule 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency.

**4 *Id.* at 115 (citations omitted). During its analysis of the original complaint, the District Court found that the failure to allege agency was fatal to Jurimex's argument that subsidiaries do not have to be joined. Specifically, the District Court noted that the deficiency in the complaint was the reason the jurisdictional analysis was facial rather than factual. *See* Mem. Op. at J.A. 11 (citing *Gould Elecs. Inc. v. U.S.,* 220 F.3d 169, 176 (3d Cir.2000) ). Thus, the District Court regarded the complaint as having failed to state a claim under the agency theory and review of Jurimex's amended complaint should fall under the procedural protections of Rule 12(b)(6).

**4 Under Delaware law,FN3 proof of agency within the context of a parent-subsidiary relationship requires that the plaintiff "demonstrate that the agent was acting on behalf of the principal and that the cause of action arises out of that relationship." *808E.I. DuPont de Nemours and Co. v. Rhone Roulenc Fiber and Resin Intermediates,* 269 F.3d 187, 198 (3d Cir.2001). We have said that "[o]ne corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

65 Fed.Appx. 803                                                                      Page 5

65 Fed.Appx. 803, 2003 WL 1919361 (C.A.3 (Del.))
**(Cite as: 65 Fed.Appx. 803)**

" *Id.* (quoting *Phoenix Canada Oil Co. v. Texaco, Inc.,* 842 F.2d 1466, 1477 (3d Cir.1988)). Specifically, a "restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting." *Id.* Jurimex must allege facts sufficient to allow such a relationship to be proven at trial, but it is not required to have extensive proof at the complaint stage. *See In re Craftmatic Sec. Litigation v. Kraftsow,* 890 F.2d 628, 645 (3d Cir.1989)( " [P]laintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs [at the pleading stage]."").FN4

> FN3. Both parties analyze the potential agency relationship under Delaware law and we will proceed on that assumption.
>
> FN4. Although *Craftmatic Sec. Litigation* dealt with agency in the context of corporate fraud, it seems illogical to require a more developed factual background in a complaint alleging contract violations that is evaluated under a Rule 8 standard than the factual background we have required under the higher Rule 9 pleading standard for fraud.

**\*\*4** Further, we have held that discovery is necessary when an agency relationship is alleged, thereby implicitly allowing allegations of agency to survive a facial attack. *Canavan v. Beneficial Finance Corp.,* 553 F.2d 860, 865 (3d Cir.1977)(" Because the existence of an agency relationship hinges largely on the particular facts of each case, discovery was essential to the preparation of an agency theory argument in this case."). Here, Jurimex has alleged that its past dealings with Case have involved its subsidiaries as agents in the same manner as the present and has alleged or produced affidavits evincing financial control of the transaction by Case, not its subsidiaries.

**\*\*5** Under a Rule 12(b)(6) motion, a complaint may be dismissed "only if it is certain that no relief could be granted under any set of facts which could be proven." *Rossman v. Fleet Bank(RI) National*

*Assoc.,* 280 F.3d 384, 387 (3d Cir.2002). Based on the allegations, Jurimex may bring a claim against Case as the parent corporation without joining the subsidiaries if Jurimex proves there is an agency relationship between Case and its subsidiaries. *See Publicker Indus., Inc. v. Roman Ceramics Corp.,* 603 F.2d 1065, 1070 (3d Cir.1979). Even if the District Court thought the evidence provided by Jurimex during the original jurisdictional hearing fell short from clearly establishing agency, we can presume that the factual nature of the relationship alleged in the amended complaint would be better understood after discovery. For example, during its earlier request for discovery, Jurimex asked for all documents concerning the communications between Case and its subsidiaries specifically limited to the Golden Grain transaction. Evidence of control by Case over the actions of Case France, Paris, and Neustadt would likely be found in such documents and demonstrate agency. By including in its amended complaint the necessary occurrences and reasons that Case controlled its subsidiaries' actions, Jurimex has alleged sufficient facts to survive a Rule 12(b)(6) motion.

**\*\*5** We will reverse the District Court and remand with instructions to allow the amended complaint.

C.A.3 (Del.),2003.
Jurimex Kommerz Transit G.M.B.H. v. Case Corp.
65 Fed.Appx. 803, 2003 WL 1919361 (C.A.3 (Del.))

Briefs and Other Related Documents (Back to top)

• 2002 WL 32819309 (Appellate Brief) Reply Brief on Behalf of Appellants (Dec. 20, 2002) Original Image of this Document (PDF)
• 2002 WL 32819310 (Appellate Brief) Brief of Defendant-Appellee Case Corporation (Nov. 25, 2002) Original Image of this Document (PDF)
• 2002 WL 32819311 (Appellate Brief) Appellants' Brief and Joint Appendix (Volume 1-Pages JAI-JA35) (Sep. 16, 2002) Original Image of this Document with Appendix (PDF)
• 02-1916 (Docket) (Apr. 08, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D



130 Fed.Appx. 535

Page 1

130 Fed.Appx. 535, 2005 WL 1098838 (C.A.3 (N.J.))
**(Cite as: 130 Fed.Appx. 535)**

C
Briefs and Other Related Documents
Feriozzi Co., Inc. v. Ashworks, Inc.C.A.3 (N.J.),2005.This case was not selected for publication in the Federal Reporter.NOT PRECEDENTIAL Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
The FERIOZZI COMPANY, INC.,
v.
ASHWORKS, INC., Appellant.
**No. 04-1565.**

Submitted Pursuant to Third Circuit LAR 34.1(a)
April 5, 2005.
Decided May 10, 2005.

**Background:** Lender sued to recover on demand loan, and borrower moved to dismiss on limitations grounds and on ground that corporation bringing suit was not real party in interest. The United States District Court for the District of New Jersey, Joseph E. Irenas, J., denied dismissal motion, and borrower appealed.

**Holdings:** The Court of Appeals, Cowen, Circuit Judge, held that:

(1) letter from borrower to lender, indicating that borrower had "every intention of paying" its $300,000 obligation on demand loan, but that restricted cash flow prevented it from making payment pending certain developments, was not clear, distinct and unequivocal acknowledgment of subsisting debt, such as might trigger application of longer six-year statute of limitations;

(2) statute began to run only from time of lender's demand; and

(3) corporation bringing suit was real party in interest.

Affirmed.
West Headnotes
**[1] Limitation of Actions 241 ⬤⟞148(4)**

241 Limitation of Actions
    241III Acknowledgment, New Promise, and Part Payment
        241k140 Acknowledgment or New Promise
          241k148 Sufficiency of Acknowledgment or Promise in General
          241k148(4) k. Admission of Existing Liability and Renewal of Obligation. Most Cited Cases
Letter from borrower to lender, indicating that borrower had "every intention of paying" its $300,000 obligation on demand loan, but that restricted cash flow prevented it from making payment pending certain developments, was not clear, distinct and unequivocal acknowledgment of subsisting debt, such as might trigger application, when lender later sought to recover from borrower, of longer six-year statute of limitations applicable under Delaware law to causes of action arising " from a promissory note, bill of exchange, or an acknowledgment under the hand of the party of a subsisting demand." 10 Del.C. § 8109.

**[2] Limitation of Actions 241 ⬤⟞66(12)**

241 Limitation of Actions
    241II Computation of Period of Limitation
      241II(B) Performance of Condition, Demand, and Notice
        241k66 Demand
          241k66(12) k. Liability Payable on Demand. Most Cited Cases
Under Delaware law, statute of limitations on lender's cause of action to recover on demand loan did not begin to run from date that borrower and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

130 Fed.Appx. 535                                                                                    Page 2

130 Fed.Appx. 535, 2005 WL 1098838 (C.A.3 (N.J.))
**(Cite as: 130 Fed.Appx. 535)**

lender entered into their oral loan agreement, but only from time of lender's demand. 10 Del.C. § 8106.

**[3] Federal Civil Procedure 170A ⟨⟩131**

170A Federal Civil Procedure
  170AII Parties
    170AII(C) Real Parties in Interest
      170Ak131 k. In General. Most Cited Cases
Estate of individual with whom borrower struck agreement for $300,000 demand loan from corporation was not real party in interest in suit brought by corporate lender to recover thereon, on theory that it was this individual, rather than corporation, that had lent funds, where testimony of borrower's witnesses to this effect was not supported by documentary evidence, including fact that loan was funded by checks written on corporation's checking account and letter from borrower acknowledging its debt to corporation. Fed.Rules Civ.Proc.Rule 17(a), 28 U.S.C.A.

***535** On Appeal from the United States District Court for the District of New Jersey. (D.C. Civil No. 02-cv-00559). District Judge: Hon. Joseph E. Irenas.

Joseph M. Armstrong, Salla & Armstrong, Philadelphia, PA, for Appellee.
***536** Jeffrey S. Welch, Welch & Associates, Wilmington, DE, for Appellant.

Before BARRY, AMBRO and COWEN, Circuit Judges.

OPINION

COWEN, Circuit Judge.
**\*\*1** Ashworks, Inc. ("Ashworks") appeals the District Court's order denying its motion to dismiss the complaint filed by the Feriozzi Company, Inc. ( "Feriozzi Company").[FN1] Ashworks argues that the District Court committed the following errors: (1) holding that the statute of limitations for demand notes begins to run from the date a demand for payment is made, rather than the date the agreement is entered, and (2) finding that the estate of Joseph Feriozzi was not an indispensable party to, nor a

real party in interest in, this action.[FN2] We will affirm the District Court's order.

> FN1. Concetta Feriozzi, the sister of the late Joseph Feriozzi, filed this action on behalf of the Feriozzi Company.

> FN2. The issue of whether the transferee Court properly applied the law of the case doctrine is moot because we find that the initial Court properly denied Ashworks' motion to dismiss the complaint. Further, the transferee court considered the statute of limitations argument and concluded that the action was not time-barred.

**\*\*1** The District Court had diversity jurisdiction under 28 U.S.C. § 1332 and we have jurisdiction pursuant to 28 U.S.C. § 1291. It is undisputed that Delaware law governs this case. As we write solely for the parties, we only provide a brief recitation of the facts.

**\*\*1** The Feriozzi Company brought an action to recover a $300,000 demand loan made to Ashworks in the early Fall of 1996. This loan was evidenced by two checks issued from the account of the Feriozzi Company to Ashworks, each in the amount of $150,000. Ashworks denied liability and brought a counterclaim asserting that the $300,000 received from the Feriozzi Company was a partial payment of a $450,000 investment to be paid under an alleged oral partnership or buy-in agreement and argued it was entitled to the remaining and outstanding $150,000 of the purchase price of the stock and other damages.

**\*\*1** Ashworks filed a motion to dismiss the claims on various grounds, including statute of limitations and failure to join an indispensable party. The District Court, Wolfson, J., denied the motion and the case was transferred to Irenas, J., to conduct a bench trial. Following the bench trial, the District Court entered judgment in favor of the Feriozzi Company in the amount of $300,000 plus interest against Ashworks.

**\*\*1** First, Ashworks contends that the District Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

130 Fed.Appx. 535, 2005 WL 1098838 (C.A.3 (N.J.))
**(Cite as: 130 Fed.Appx. 535)**

erred in determining that the complaint was not time-barred. Ashworks asserts that the complaint is untimely because a six-year, rather than three-year, statute of limitations is applicable here. Alternatively, Ashworks argues that even if the three-year statute were applicable, the action would nonetheless be time-barred because the cause of action accrued when the demand loan was entered, rather than when a demand for payment was made.

**\*\*1** We review *de novo* the District Court's order denying Defendant's motion to dismiss. *Worldcom, Inc. v. Graphnet, Inc.,* 343 F.3d 651, 653 (3d Cir.2003). Dismissal on a pre-answer motion is only appropriate if it " 'appears beyond doubt that plaintiff can prove no set of facts in support of its claim which would entitle [it] to relief.' " *See id.* at 653 (quoting \*537*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

**\*\*1** The three-year statute of limitations pursuant to the Delaware Code provides in pertinent part: " [N]o action to recover a debt not evidenced by a record or by an instrument under seal ... [and] no action based on a promise ... shall be brought after the expiration of 3 years from the accruing of the cause of such action." 10 Del. C. § 8106. The six-year statute of limitations under the Delaware Code provides: "When a cause of action arises from a promissory note, bill of exchange, or an acknowledgment under the hand of the party of a subsisting demand, the action may be commenced at any time within 6 years from the accruing of such cause of action." 10 Del. C. § 8109.

**\*\*2** [1] We find that the six-year statute of limitations is inapplicable here because there is no note, bill of exchange or acknowledgment. The letter from Joseph Dell Aversano, President and CEO of Ashworks, to Gary J. McCarthy, counsel to the Feriozzi Company, dated November 15, 2001, was not an acknowledgment for purposes of the statute. The letter indicated that Ashworks "has every intention of paying the $300,000.00 Demand note to The Feriozzi Company, Inc." (App. at 68.) However, the letter further explained that "[l]ower sales over the last three years is restricting cash flow .... We are currently trying to increase business. As soon as more funds are paid [d]own to the bank

Ashworks will make payments to The Feriozzi Company [o]n this note." (*Id.*)

**\*\*2** Rather than being a "clear, distinct and unequivocal acknowledgment of a subsisting debt," *Kojro v. Sikorski,* 267 A.2d 603, 605 (Del.Super.Ct.1970), this promise was "qualified [and] conditional." *Hart v. Deshong,* 8 A.2d 85 (Del.Super.Ct.1939). Accordingly, it could not serve as the basis for applying the six-year statute of limitations under the Delaware Code. *See Lowe v. Pfirrman,* 1976 WL 146594, 1976 Del. C.P. Lexis 1 (Del.Com.Pl. Jan. 27, 1976) (holding that evidence failed to demonstrate there was such an unqualified and unconditional acknowledgment as to remove the bar of the statute of limitations); *see also Fineberg v. Credit Int'l Bancshares, Ltd., et. al.,* 857 F.Supp. 338, 353 (D.Del.1994) ("In order to be entitled to the six year statute of limitations in 10 Del. C. § 8109 an acknowledgment must be in writing ... and must in itself establish the plaintiff's claim or cause of action.").

**\*\*2** [2] Having determined that the three-year, rather than the six-year, statute of limitations is applicable, we must now determine when the statute of limitations began to run. Appellants argue that the statute began to run from the date the agreement was entered. The District Court found that the statute began to run from the date the demand was made: "The idea of accrual of a cause of action is that you have a right to get money back on a demand note. You don't have to get the money back until they make a demand for it." (App. at 345.)

**\*\*2** Ashworks concedes that the only case in Delaware that has addressed this issue is *The Kent County R.R. Co. v. Wilson,* 1875 WL 1943, 1875 Del. Lexis 9 (Del.Super.1875). In that case, the Court recognized that the statute of limitations on a promissory note payable on demand begins to run from the date it was executed. However, the Court held that the statute of limitations did not begin to run on the promissory note until after the time the note became payable according to the terms of the notices for payment because the agreement was entered into before the company was organized. *See id.* at \*1, 1875 Del. L at 17. Many years after

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

130 Fed.Appx. 535

130 Fed.Appx. 535, 2005 WL 1098838 (C.A.3 (N.J.))
**(Cite as: 130 Fed.Appx. 535)**

the *Wilson* case was decided the Delaware *538 legislature enacted 6 Del. C. § 3-118, which outlines the accrual of a cause of action on a written demand note:

**\*\*2** [I]f demand for payment is made to the maker of a note payable on demand, an action to enforce the obligation of a party to pay the note must be commenced within six years after the demand. If no demand for payment is made to the maker, an action to enforce the note is barred if neither principal nor interest on the note has been paid for a continuous period of 10 years.

**\*\*3** 6 Del. C. § 3-118(b).

**\*\*3** Although this statute is not controlling in this case because the loan was not evidenced by a writing, its reasoning is persuasive. The cases cited by Ashworks are not controlling here, not only because they are from different jurisdictions, but more importantly because the law in those states regarding accrual of causes of actions for demand notes in writing conflict with the law of Delaware. *See, e.g., Stebens v. R.V. Wilkinson,* 249 Iowa 365, 87 N.W.2d 16 (1957) ("The Iowa authorities and rule are to the effect a [promissory] note payable on demand is payable upon the date of its execution, and is barred by the statute of limitations in ten years from its date.")

**\*\*3** Here, there was no demand or desire for payment for a few years after the loan was made because the parties were trying to negotiate an investment deal. There was no expectation for payment on the loan until it was clear, after the death of Joseph Feriozzi, that there was no potential for an equity investment in Ashworks and the Feriozzi Company demanded payment. Accordingly, we find that there was no breach until payment was demanded and refused. It is undisputed that the cause of action was commenced within three years of the first demand for payment. We therefore affirm the District Court's conclusion that the Feriozzi Company's cause of action is not time-barred.

**\*\*3** [3] Ashworks also argues that the District Court erred by not dismissing the complaint for failure to join the estate of Joseph Feriozzi-an allegedly

indispensable party to this action. Ashworks contends that the estate is the real party in interest because Joseph Feriozzi struck the deal with Joseph Dell Aversano in his individual capacity, rather than through the Feriozzi Company. We disagree and will affirm the District Court's conclusion that the estate is not an indispensable party.

**\*\*3** We review the District Court's determinations regarding necessary parties pursuant to Rule 19(a) of the Federal Rules of Civil Procedure under a " plenary standard to the extent that it rests on conclusions of law and under a clear error standard as to any subsidiary findings of fact." *HB Gen. Corp. v. Manchester Partners, L.P.,* 95 F.3d 1185, 1190 (3d Cir.1996). We review the Court's conclusions regarding indispensable parties under Rule 19(b) for abuse of discretion. *See id.*

**\*\*3** To dismiss a case for failure to join an indispensable party, a two-part inquiry should be applied. The first determination is whether the party is a "necessary party" under Rule 19(a). A party is a necessary party if, in its absence: (1) complete relief cannot be accorded to the present parties, (2) the disposition of the action would impair the party's ability to protect its own interest, or (3) any of the present parties would be subject to a substantial risk of multiple or inconsistent obligations. Fed.R.Civ.P. 19(a). If the party is deemed a necessary party, we must then consider whether the party in an "indispensable party" under Rule 19(b). In determining whether a party is indispensable the interests of the plaintiff, the defendant, the absentee party, the courts and the public should be balanced. *See* \*539*Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 109-111, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

**\*\*4** There is no dispute that the two checks, each in the amount of $150,000, were issued by the Feriozzi Company to Ashworks. (App. at 96, 99.) Further, the letter signed by Joseph Dell Aversano to Gary McCarthy, counsel for the Feriozzi Company, conceded liability to the Company: " Ashworks, Inc. has every intention of paying the $300,000.00 Demand [N]ote to The Feriozzi Company, Inc." (App. at 68.) Aside from the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

130 Fed.Appx. 535                                                                Page 5

130 Fed.Appx. 535, 2005 WL 1098838 (C.A.3 (N.J.))
**(Cite as: 130 Fed.Appx. 535)**

testimony of Ashworks' witnesses at trial, Ashworks has not presented any evidence that the $300,000 was given to Ashworks by Joseph Feriozzi and not the Feriozzi Company. The District Court did not err in determining that the estate is not a necessary party because the documentary evidence, including the checks and the letter, outweighed the testimony of Ashworks' witnesses.

**\*\*4** Because we find that the estate of Joseph Feriozzi was not a necessary party, it cannot be the real party in interest. Rule 17(a) states that "[e]very action shall be prosecuted in the name of the real party in interest," and provides for dismissal of actions if the real party in interest is not substituted or joined. Fed.R.Civ.P. 17(a). This rule ensures that under the "governing substantive law, the plaintiffs are entitled to enforce the claim at issue." *See HB Gen. Corp.,* 95 F.3d at 1196. We have already concluded that the Feriozzi Company was entitled to enforce the loan. Accordingly, we reject Ashworks' argument that the claim should be dismissed because the estate, not the Feriozzi Company, was the real party in interest.

**\*\*4** For the foregoing reasons, the judgment of the District Court entered on February 5, 2004, will be affirmed.

C.A.3 (N.J.),2005.
Feriozzi Co., Inc. v. Ashworks, Inc.
130 Fed.Appx. 535, 2005 WL 1098838 (C.A.3 (N.J.))

Briefs and Other Related Documents (Back to top)

• 04-1565 (Docket) (Mar. 03, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E



104 Fed.Appx. 218                                                                                    Page 1

104 Fed.Appx. 218, 2004 WL 1465688 (C.A.3 (Pa.))
**(Cite as: 104 Fed.Appx. 218)**

**H**
Briefs and Other Related Documents
Guthrie Clinic, Ltd. v. Travelers Indem. Co. of Ill.C.A.3 (Pa.),2004.This case was not selected for publication in the Federal Reporter.NOT PRECEDENTIAL Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
GUTHRIE CLINIC, LTD., Appellant,
v.
TRAVELERS INDEMNITY COMPANY OF ILLINOIS; Ellen Thurston; AON Corp; AON Risk Ser, Now known as AON Risk Services Inc.,
of Maryland.
**No. 02-3502.**

Argued Jan. 15, 2004.
Decided June 29, 2004.

**Background:** Insured brought action alleging that insurer made unilateral changes in renewal excess liability insurance policies without notice. The United States District Court for the Middle District of Pennsylvania, James M. Munley, J., dismissed action, and insured appealed.

**Holding:** The Court of Appeals held that district court did not abuse its discretion in finding that resident insurance broker was indispensable party.

Affirmed.
West Headnotes
**Federal Civil Procedure 170A** ☞**211**

170A Federal Civil Procedure
    170AII Parties
        170AII(E) Necessary Joinder
            170AII(E)2 Particular, Necessary or Indispensable Parties
                170Ak211 k. In General. Most Cited

Cases

**Federal Courts 170B** ☞**289**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
        170BIV(B) Controversies Between Citizens of Different States
            170Bk289 k. Necessary and Unnecessary Parties; Nominal or Formal Parties. Most Cited Cases
District court did not abuse its discretion in finding that resident insurance broker was indispensable party in insured's action alleging that insurer made unilateral changes in renewal excess liability insurance policies without notice, and thus that federal diversity jurisdiction did not exist, even though broker was involved in only one of policies in question, where insured's complaint predicated liability and relief on policy in effect in year in question, state forum was available to insured, it would be impossible to accord complete relief with respect to insured's claim against policy in effect in year in question without prejudicing broker, and it would be difficult to fashion adequate relief without broker. Fed.Rules Civ.Proc.Rule 19, 28 U.S.C.A.

*219 Appeal from the United States District Court for the Middle District of Pennsylvania. (D.C. Civil No. 00-cv-01173). District Judge: Honorable James M. Munley.

Stephen J. Mathes [Argued], Jan F. Call, Hoyle, Fickler, Herschel & Mathes, Philadelphia, PA, for Appellant.
Todd B. Narvol [Argued], Thomas, Thomas & Hafer, Harrisburg, PA, for Appellee, Travelers Indemnity Company of Illinois.
J. David Smith [Argued], McCormick, Reeder, Nichols, Bahl, Knecht & Person, Williamsport, PA, for Appellees, AON Corp and AON Risk Ser, Now known as AON Risk Services Inc., of Maryland.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

104 Fed.Appx. 218                                                    Page 2

104 Fed.Appx. 218, 2004 WL 1465688 (C.A.3 (Pa.))
**(Cite as: 104 Fed.Appx. 218)**

Before SLOVITER, RENDELL and ALDISERT, Circuit Judges.

### OPINION OF THE COURT

**\*\*1** This appeal comes to us from an order of the United States District Court for the Middle District of Pennsylvania dismissing an action brought by Guthrie Clinic, Ltd. ("Guthrie"), a Pennsylvania entity, against several entities purportedly responsible for providing Guthrie with excess liability insurance coverage for certain years. In particular, Guthrie alleges that renewal insurance policies it retained for 1998 and 1999 were, contrary to its expectations, materially different from its previous insurance policies. Because of the resulting gaps in coverage, Guthrie alleges that it suffered losses which it urges it had reasonably assumed were covered. Guthrie filed a diversity suit in federal court against the insurance carrier for the 1998 and 1999 policies, Travelers Indemnity Company of Illinois ("Travelers"), and certain entities that brokered the relevant insurance policies. Upon a motion filed by Travelers, the District Court concluded that Guthrie had failed to join the particular insurance broker, a Pennsylvania entity that it alleged had been instrumental in securing Guthrie's 1999 renewal policy. Having determined that broker to be a necessary and indispensable party pursuant to Fed.R.Civ.P. 19, the District Court dismissed the action because the joinder of a non-diverse party would destroy its subject matter jurisdiction. We have jurisdiction over the District Court's final order under 28 U.S.C. § 1291. We will affirm.

### I.

**\*\*1** Guthrie purchased a $5 million excess insurance policy from Travelers covering the period between September 1, 1996 and September 1, 1997 (the "1996 policy"). An excess insurance policy provides secondary insurance after the primary insurers' coverage, here $1.2 million, has been exhausted. Travelers issued a renewal policy identical to the 1996 policy in 1997. The 1998 renewal policy was, by contrast, materially different. The changes allegedly included a new

definition of covered claims and modified notification procedures. Guthrie alleges that because these changes to the insurance policy were made unilaterally and without any notice, it was under the belief that the coverage was identical **\*220** to the 1996 and 1997 policies. In August of 1999, Guthrie signed a 1999 renewal policy that was identical to the 1998 renewal policy in all material respects, again assuming the provisions mirrored those of the 1996 and 1997 policies.

**\*\*1** In June of 1998, Ellen Thurston filed a medical malpractice claim against various defendants including Guthrie. Aware that the suit was likely to reach the limits of its primary coverage and implicate its excess liability coverage, Guthrie notified Travelers of the Thurston claim. Citing the changed portions of the 1998 policy, Travelers rejected coverage of the claim on September 17, 1999. The Thurston suit eventually settled for $6.1 million, $2.5 million of which was in excess of Guthrie's primary coverage, and which Guthrie contends Travelers should have paid. In addition to Thurston's lawsuit, twenty-seven other medical malpractice claims have been since brought against Guthrie, but these claims have yet to implicate any excess insurance coverage policy.

**\*\*2** Each of these Travelers policies, from 1996 to 1999, was brokered by various entities related to Aon Corporation, a Delaware corporation. Guthrie learned through discovery that Aon Corporation was merely a parent holding company for specific entities that brokered the relevant insurance policies to Guthrie. One such entity was Aon Risk Services, Inc. of Pennsylvania (hereinafter "ARS PA I"),[FN1] a Pennsylvania corporation, which sold Guthrie the 1996 and 1997 policies. In March of 1998, ARS PA I merged with Alexander & Alexander, Inc. to form an entity called Aon Risk Services, Inc. U.S., a Maryland corporation.[FN2] In June 1999, Aon Risk Services, Inc. U.S. changed its name to Aon Risk Services, Inc. of Maryland (hereinafter "ARS US/MD"). ARS US/MD brokered the 1998 policy, which was implicated in the settlement following the Thurston lawsuit. In February of 1999, a new Pennsylvania corporation was formed, Aon Risk Services, Inc. of Pennsylvania (hereinafter "ARS PA III").[FN3] ARS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

104 Fed.Appx. 218                                                    Page 3

104 Fed.Appx. 218, 2004 WL 1465688 (C.A.3 (Pa.))
**(Cite as: 104 Fed.Appx. 218)**

PA III sold Guthrie the 1999 policy.

> FN1. For the sake of convenience, we will retain the abbreviations used by the District Court.

> FN2. The District Court expressly declined to consider Travelers' challenges to the propriety of this merger in support of its Rule 19 motion. Likewise, we need not entertain this issue on appeal as it was not considered by the District Court and is unnecessary to our disposition.

> FN3. In June of 1998, Aon Risk Services, Inc. U.S. sought to register itself in Pennsylvania under the fictitious name of Aon Risk Services, Inc. of Pennsylvania (hereinafter "ARS PA II"), but then canceled this name not long thereafter.

**\*\*2** After Travelers rejected secondary insurance coverage of the Thurston claim, Guthrie sued under various theories seeking *inter alia* compensatory damages with respect to the Thurston claim and declaratory relief ensuring that the twenty-seven other malpractice claims would be covered by Travelers. Guthrie filed the action in federal court, invoking diversity jurisdiction under 28 U.S.C. § 1332. The complaint named Travelers (a Connecticut company), Aon Corporation (a Delaware company and the parent company of the various brokerage entities), and ARS US/MD (a Maryland company). Travelers moved the District Court to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(7) and 19, contending that a non-diverse (Pennsylvania) entity, ARS PA III, was an indispensable party to the action. The District Court agreed that Guthrie's complaint could not go forward without the joinder of ARS PA III, which divested the Court of diversity jurisdiction and required **\*221** dismissal for lack of jurisdiction. Guthrie timely appealed.

II.

**\*\*2** A Rule 19 inquiry is bifurcated.[FN4] First,

under Rule 19(a), a district court considers whether a party is necessary to an action. If a party is deemed necessary, then joinder must occur if feasible. If, as here, the addition of a necessary party would divest a court of subject matter jurisdiction, then a court must determine whether in "equity and good conscience" the action should proceed without that party, or whether the action should be dismissed, "the absent person being thus regarded as indispensable." Accordingly, a finding of indispensability under Rule 19(b) necessitates dismissal for lack of subject matter jurisdiction.

> FN4. Rule 19 provides in part that:
> (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if
> (1) in the person's absence complete relief cannot be accorded among those already parties, or
> (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may
> (i) as a practical matter impair or impede the person's ability to protect that interest or
> (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.
> (b) Determination by the Court Whenever Joinder Not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

104 Fed.Appx. 218, 2004 WL 1465688 (C.A.3 (Pa.))
**(Cite as: 104 Fed.Appx. 218)**

conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. Fed.R.Civ.P. 19.

**\*\*2** We review a district court's determination as to Rule 19(a) *de novo,* while reviewing subsidiary findings of fact under a clear error standard. *Gardiner v. V.I. Water & Power Auth.,* 145 F.3d 635, 640 (3d Cir.1998). We review a court's ruling under Rule 19(b) for abuse of discretion. *Id.*

### A.

**\*\*3** The District Court concluded that ARS PA III was a necessary party under Rule 19(a), holding that absent ARS PA III "complete relief [could not] be accorded among those already parties." Fed.R.Civ.P. 19(a)(1). We agree.

**\*\*3** The District Court held that while Guthrie sought relief with respect to the 1999 policy, it did not name the necessary party responsible for brokering that policy, ARS PA III. Initially, along with Travelers, Guthrie sued Aon Corporation, the parent entity based in Delaware, but upon discovering that it was but a holding company, Guthrie amended its complaint to "add[ ] the Aon corporate entity responsible for procuring the 1998 Renewal Policy," which was ARS US/MD.App. Br. at 10. But the allegations and relief requested in Guthrie's complaint were not limited to the 1998 **\*222** policy, but indeed referenced the 1999 policy as well.

**\*\*3** Guthrie argues that any mention of the 1999 policy in the complaint was just a "factual statement " and not an allegation as such. But even a cursory reading of the complaint reveals specific allegations concerning the 1999 policy. Guthrie does not just set out facts but seeks to attach liability with respect to the brokerage of the 1999 policy. *See* Pl. Compl. ¶ 128 ("[A]t no time during the 1999 renewal process did AON inform Guthrie that the terms and conditions of the proposed 1999 Renewal Policy differed materially from the terms and conditions of the 1997 Renewal Policy or that the 1999 Renewal Policy would create a significant gap in Guthrie's Insurance Coverage.") [FN5] For the gaps in coverage in both the 1998 and 1999 policies, Guthrie "demand [ed] that judgment be entered against AON for compensatory damages in excess of \$75,000 plus exemplary damages, interest and attorneys' fees, together with such relief as the Court deems just and appropriate." Pl. Compl.¶ 209. As noted above, the specific corporate entity that brokered the 1999 policy was not ARS US/MD but ARS PA III. We agree with the District Court that, as the complaint predicated liability and relief on the 1999 policy, complete relief cannot be accorded without the joinder of ARS PA III as per Rule 19(a)(1).

> FN5. Guthrie further averred that "[b]ut for AON's conduct, Guthrie would have procured excess layer insurance policies for the 1998 and 1999 policy period which provided coverage for the claims at issue in this litigation and which would not have created the gap in coverage created by the 1998 and 1999 Travelers policies." *Id.* ¶ 204, 655 A.2d 549.

**\*\*3** Having determined that Rule 19(a)(1) applies, we need not labor over the remaining factors. *See Angst v. Royal Maccabees Life Insur, Co.,* 77 F.3d 701, 706 (3d Cir.1996) ("Under Rule 19(a), we need only find that the party's absence results in any of the problems identified in the rule." (citing *Estrella v. v. & G Mgmt. Corp.,* 158 F.R.D. 575, 579 (D.N.J.1994))). Our conclusion that ARS PA III is a necessary party under Rule 19(a) brings us to the indispensability inquiry under Rule 19(b), to

104 Fed.Appx. 218, 2004 WL 1465688 (C.A.3 (Pa.))
**(Cite as: 104 Fed.Appx. 218)**

which we turn next.

### B.

**\*\*3** While not exhaustive, the four factors listed under Rule 19(b) are "the most important considerations" in deciding whether a party is indispensable. *See Gardiner,* 145 F.3d at 640-41. The District Court focused its Rule 19(b) inquiry on the fourth factor listed under the Rule, namely, the availability of an adequate remedy for the plaintiff if the matter were dismissed. The District Court observed that Guthrie has an alternative forum in state court, a conclusion which Guthrie has not seriously contested. [FN6] Rather, Guthrie takes issue with the District Court's statement that the fourth factor was dispositive of the Rule 19(b) inquiry.

> FN6. Guthrie acknowledges that it has filed a Writ of Summons in state court against ARS PA III and ARS US/MD.

**\*\*4** To support its reasoning that one Rule 19(b) factor was sufficient, the District Court cited to our opinion in *Angst,* where we indeed reasoned that the fourth factor was dispositive of the inquiry. But we limited the holding in *Angst* to the facts of that case. 77 F.3d at 706 (*"In this case,* the fourth factor listed in Rule 19(b), whether the plaintiff will have an adequate remedy if the action is dismissed, is dispositive." (emphasis supplied)). Ordinarily, however, the availability of a state forum cannot alone support a finding of indispensability. *See* *223Bank of Am. Nat'l Trust & Sav. Assoc. v. Nilsi,* 844 F.2d 1050, 1055 (3d Cir.1988) ("surely the availability of an alternative forum cannot be the sole basis for dismissing a suit commenced in the federal courts." (quoting J. Moore, Moore's Federal Practice ¶ 19.07-2[4], at 19-161 (2d ed.1979))). Regardless of the fourth factor, the District Court nevertheless went on to briefly consider the three remaining factors.

**\*\*4** Rule 19(b)'s first factor involves the extent to which "a judgment rendered in the person's absence might be prejudicial to the person or those already

parties." Fed.R.Civ.P. 19(b). We have observed that this factor is closely related to the "inability to accord complete relief" test under 19(a)(1). *Gardiner,* 145 F.3d at 641 n. 4 ("The first factor under Rule 19(b) overlaps considerably with the Rule 19(a) analysis."). We conclude that it would be impossible to accord complete relief with respect to Guthrie's claim against the 1999 policy without prejudicing ARS PA III.

**\*\*4** We agree with the District Court that the interest of ARS PA III was also "great" because of the specific allegations against it in the complaint, against which ARS PA III if not present could not defend. Any adverse judgment or finding as to liability could, as Travelers suggests, be held to bind ARS PA III in another forum, if it were considered to be in privity with the related AON entity, ARS US/MD, the named party that sold Guthrie its 1998 policy. *See, e.g., Delaware Port Auth. v. Fraternal Order of Police,* 290 F.3d 567, 572 (3d Cir.2002). If, based on such privity, Guthrie were to seek to preclude ARS PA III from relitigating a judgment or related issues found in this case, it is likely that the law of Pennsylvania would govern. While we express no opinion here as to the Pennsylvania courts' understanding of privity, or predict the outcome of any privity analysis, we note that there are some indications in the record that could arguably support a finding of privity. For instance, the various Aon entities share the same counsel, a factor which, while not necessarily dispositive, is considered by some courts to be indicative of privity. *Vasquez v. Bridgestone/Firestone, Inc.,* 325 F.3d 665, 677 (5th Cir.2003). Further, despite the various corporate forms, the record indicates that the same insurance agent, using the same office in Pennsylvania, brokered each of the relevant policies. These and other relevant factors might compel a court to later find an identity of interest between ARS MD and the absent ARS PA III. *See Ammon v. McCloskey,* 440 Pa.Super. 251, 655 A.2d 549, 554 (1995). Accordingly, the attendant possibility of claim or issue preclusion further supports the conclusion that ARS PA III is likely to be prejudiced absent its joinder.

**\*\*5** The second and third factors listed under Rule

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

104 Fed.Appx. 218, 2004 WL 1465688 (C.A.3 (Pa.))
**(Cite as: 104 Fed.Appx. 218)**

19(b) are closely linked and, in this case, also weigh in favor of finding indispensability. The second factor involves the extent to which a court can shape the relief awarded in such a manner as to mitigate prejudice, and the third factor ensures that any such relief will be adequate. As noted above, Guthrie's complaint sought to attach liability with respect to the brokerage of the 1999 policy; specifically Guthrie averred, and sought a ruling, that intentional or negligent misrepresentation of the contents of the 1999 policy led to a gap in its coverage. For this harm, Guthrie "demand[ed] that judgment be entered against AON for compensatory damages in excess of $75,000 plus exemplary damages, interest and attorneys' fees, together with such relief as the Court deems just and appropriate." Pl. Compl.¶ 209. However, in the absence of ARS PA III in this litigation, it would have been difficult to fashion *any* adequate remedy with respect to the 1999 policy.

*224 **5 On appeal, Guthrie lamely argues that because it does not yet face any lawsuits that have implicated the excess liability coverage in the 1999 policy, no damages have yet accrued under that policy, and it only seeks declaratory relief regarding the broker's liability. But even if the District Court is not assessing monetary damages, Guthrie has sought other "just and appropriate" relief. And it is plain that without the joinder of ARS PA III, any remedy related to the brokerage of the 1999 policy, be it injunctive or declaratory relief, would be unfair and prejudicial to ARS PA III.

III.

**5 Accordingly, we conclude that the District Court did not abuse its discretion in finding that ARS PA III was an indispensable party. The order of the District Court will be AFFIRMED.

C.A.3 (Pa.),2004.
Guthrie Clinic, Ltd. v. Travelers Indem. Co. of Ill.
104 Fed.Appx. 218, 2004 WL 1465688 (C.A.3 (Pa.))

Briefs and Other Related Documents (Back to top)

• 2003 WL 24031490 (Appellate Brief) Reply Brief of Appellees Aon Corporation and Aon Risk Services, Inc. of Maryland (Dec. 24, 2003) Original Image of this Document (PDF)
• 2003 WL 24031491 (Appellate Brief) Reply Brief of Appellant (Oct. 30, 2003) Original Image of this Document (PDF)
• 2003 WL 24031489 (Appellate Brief) Reply Brief of Appellee Travelers in Response to Reply of the Aon Appellees and Supplemental Appendix (page 322) not Included in Original Appendix (Oct. 13, 2003) Original Image of this Document with Appendix (PDF)
• 2003 WL 24031492 (Appellate Brief) Brief of Appealers Eon Corporation and Aon Risk Services, Inc. of Marylan (Oct. 08, 2003) Original Image of this Document (PDF)
• 2003 WL 24031493 (Appellate Brief) Brief of Appellant (Sep. 08, 2003) Original Image of this Document with Appendix (PDF)
• 02-3502 (Docket) (Sep. 19, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Ohio, Western Division.
Kenneth D. **CHRISTMAN,** M.D., Plaintiff,
v.
William A. **GRAYS,** Defendant.
**No. 1:05-CV-192.**

Nov. 17, 2005.

Steven Charles Katchman, Dayton, OH, for Plaintiff.

Donetta Donaldson Wiethe, U.S. Department of Justice, Cincinnati, OH, for Defendant.

*ORDER*

WEBER, Senior J.

*1 This matter is before the Court upon defendant William A. Grays's motion for summary judgment (doc. 2), plaintiff's response (doc. 7), and defendant's reply (doc. 9). Also before the court is plaintiff's motion to remand (doc. 8), and defendant's response to that motion (doc. 11). The Court has ascertained the disputed and undisputed facts from the parties' briefs and affidavits. Additionally, the Court has determined that the United States is the real party in interest in this action and substitutes the United States as the defendant.

I. Factual allegations

The facts are undisputed unless otherwise noted. William Grays sustained injuries in an automobile accident on November 16, 2002. His injuries included multiple facial lacerations. Grays was brought to the emergency room at Sycamore Hospital in Miamisburg, Ohio for treatment. Although the hospital had physicians and other medical staff on duty, the nature of Grays's injuries demanded the attention of a plastic surgeon. The hospital contacted the plaintiff, Dr. Kenneth Christman, M.D., the plastic surgeon on call at the time.

At the time of the accident, Grays was a Staff Sergeant in the United States Army Ohio National Guard, serving on active duty. He was covered by the TRICARE [FN1] medical benefits program. Before administering treatment, Dr. Christman asked Grays whether he had medical insurance. Grays stated that he was covered by the TRICARE program, and presented his TRICARE identification card to Dr. Christman.

FN1. TRICARE is a supplement to the older CHAMPUS medical benefits program for service members, intended to reduce costs through contractor underwriting and a network provider arrangement. *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Svcs.,* 368 F.3d 894, 895-96 (6th Cir.2004). Since William Grays was a member of TRICARE, the Court uses that designation to refer to the military medical benefits program.

Dr. Christman informed Grays that he did not participate in the TRICARE program and would not submit a claim to the program for reimbursement. Dr. Christman allegedly further explained that Grays would be personally responsible for the cost of the care he was about to provide. Dr. Christman argues that Grays orally agreed to assume responsibility for the charges. Grays denies agreeing to pay out-of-pocket costs in the emergency room. Dr. Christman treated Grays's injuries.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2005 WL 3088529 (S.D.Ohio)

**(Cite as: 2005 WL 3088529 (S.D.Ohio))**

Subsequently, Dr. Christman billed Grays a total of $5,542 for five medical procedures. After receiving this bill, Grays submitted a claim under the Supplemental Health Care Program ("SHCP"), which provides benefits to covered servicemembers who receive treatment from civilian medical facilities. 32 C.F.R. § 199.16(a)(2). The SHCP, while not part of TRICARE, employs the TRICARE reimbursement scheme and related regulations, subject to some special rules. *Id.* at (a)(1), (2).

Grays's claim was handled by Palmetto Government Benefits Administrators ("PGBA"), the TRICARE claims contractor for Grays's region. PGBA sent Grays a check for $746.10 in fulfillment of the claim, along with the following explanation of benefits detailing the procedures performed by Dr. Christman and the billed and allowable amounts for each:

| Procedure | Amount Billed | TRICARE Approved |
| --- | --- | --- |
| Repair of wound or lesion | $ 1,779.00 | $ 437.07 |
| Repair of wound or lesion | $ 1,779.00 | $ 0.00 |
| Repair wound/lesion add-on | $ 1,516.00 | $ 138.51 |
| Repair superficial wound(s) | $ 338.00 | $ 73.20 |
| Medical services at night | $ 130.00 | $ 0.00 |
| TRICARE Approved: | | $ 648.78 |
| Paid to beneficiary (115 % of approved amount): | | $ 746.10 |

**\*2** PGBA determined that the charges for one of the two "repair of wound or lesion" procedures was a duplicate charge and the charge for "medical services at night" was not a covered charge under the TRICARE program, and denied payment for those services. Neither party has disputed PGBA's determination of which services were covered and which were not.

Grays forwarded the TRICARE check to Dr. Christman's collection agency, which credited it against the bill, leaving a balance of $4,795.90. Dr.

Christman sued Grays to recover this balance, alleging that he and Grays had entered into an oral contract prior to treatment, whereby Grays assumed personal liability for all charges. He also argues that imposing the TRICARE reimbursement scheme on non-participating providers amounts to an unconstitutional taking under the Fifth Amendment.

The United States argues that there was no such agreement, that Dr. Christman's recovery is limited to the TRICARE allowable amount, and that Grays was unable to waive the SHCP billing limits by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3088529 (S.D.Ohio)

**(Cite as: 2005 WL 3088529 (S.D.Ohio))**

agreement. Additionally, the government argues that Dr. Christman's claim is barred by the doctrine of sovereign immunity because the United States is the real party in interest.

### II. Procedural posture
The plaintiff, Dr. Christman, brought this action in the Municipal Court of Lebanon, Ohio. Prior to judgment in those proceedings, the United States Attorney substituted itself as counsel for defendant Grays. Grays then removed the action to this Court under 28 U.S.C. § 1442a (providing for the removal of state court actions against members of the armed forces under certain circumstances) (doc. 1). The United States filed a motion for summary judgment in its favor and requested that it be substituted as defendant in the action (doc. 2). The plaintiff Dr. Christman filed an opposing memorandum and a motion to remand the action to state court (docs.7, 8).

### III. Motion to Remand
Dr. Christman moves to remand this action back to the state court for resolution of the alleged oral agreement between the parties. The United States opposes the motion to remand, pointing to its arguments in support of its motion for summary judgment. The United States argues that removal to this Court was proper under 28 U.S.C. § 1442a. The Court finds that plaintiff Dr. Christman does not expressly challenge the removal under § 1442a in either his opposition to the United States's motion for summary judgment (doc. 7) or his motion to remand (doc. 8); and he asserts no basis for remand to the state court. Accordingly, the plaintiff's motion to remand is denied.

### IV. Subject Matter Jurisdiction
The federal defendant and Grays base the subject matter jurisdiction of the Court in this action upon 28 U.S.C. § 1346 and § 1442a.

Plaintiff does not challenge the substitution of the United States as the defendant in this case. The United States is the real party in interest in actions where the federal treasury might ultimately be liable. See Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). Here, the United States concedes that the federal treasury is ultimately responsible for any judgment against Grays under 32 C.F.R. § 199.16(d)(1). This section states that the SHCP does not impose beneficiary cost sharing, and that "all amounts due to be paid to the provider shall be paid by the program." The United States concludes that if Grays is held liable to Dr. Christman in excess of the amount already paid by the SHCP, the United States must pay the judgment.

**\*3** Plaintiff Christman does not refute the United States's assertion that it is the real party in interest. The Court finds the substitution of the United States as the defendant is proper and this Court has subject matter jurisdiction over this action.

### V. Sovereign immunity
The United States argues that sovereign immunity bars Dr. Christman's suit. It is well-established that the United States, as sovereign, "may not be sued without its consent." United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) . The Court has already found that the United States is the real party in interest. There is no evidence or allegation that the United States has expressly consented to this action. Further, plaintiff Christman does not refute the United States's assertion of immunity, nor does he offer evidence that immunity has been waived. Accordingly, the United States is entitled to summary judgment on this ground. Even if a waiver can be shown, the United States is entitled to summary judgment on Dr. Christman's claim for the reasons stated below.

### VI. Summary Judgment
In its motion for summary judgment, the United States argues that Dr. Christman has already been fully reimbursed under the SHCP and therefore is not entitled to further recovery for the medical services he provided to Grays. In response, Dr. Christman claims that he did not participate in the SHCP or TRICARE and therefore was not bound by their reimbursement provisions, and that Grays entered into an oral agreement to pay for the services personally. Plaintiff Christman attempts to establish the existence of a genuine issue of material fact by presenting his own affidavit attesting to such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3088529 (S.D.Ohio)

**(Cite as: 2005 WL 3088529 (S.D.Ohio))**

an agreement.

In reply, the United States concedes that there may have been "some agreement" made between Grays and Christman in the emergency room but argues that the existence of such an agreement is immaterial. It asserts that the SHCP regulations encompass all medical providers, whether they participate in the program or not, limiting the reimbursement to which they are entitled. Finally, the United States argues that Grays was unable to circumvent the operation of the SHCP by private agreement.

If the SHCP precludes Dr. Christman from further recovery, no genuine issue of material fact remains, and the United States is entitled to summary judgment. If the SHCP does not fully resolve Grays's liability for the medical services Dr. Christman provided, a genuine issue of material fact exists. For the reasons stated below, the Court finds that no issues of material fact remain and that the United States is entitled to summary judgment.

A. Summary judgment standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*4 The party opposing a properly-supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson,* 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158, 90 S.Ct. 1598, 26 L.Ed.2d 142

(1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249 (citing *Cities Serv.,* 391 U.S. at 288-89). If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 84, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), or is not significantly probative, *Cities Serv.,* 391 U.S. at 290, judgment may be granted. *Anderson,* 477 U.S. at 249.

B. Applicable law

The SHCP [FN2] reimburses private sector medical service providers for charges arising from the treatment of active duty members of the armed forces. 32 C.F.R. § 199.16. Reimbursement is limited to the allowable amount as defined under the TRICARE program. *Id.* at (b), (d)(5). This reimbursement limitation applies to all providers.

> FN2. Though the SHCP is distinct from TRICARE, it incorporates by reference certain TRICARE provisions. 32 C.F.R. § 199.16(a)(2), (b). The TRICARE references that follow serve only to explain the SHCP, which governs this action.

(1) *Dr. Christman is an authorized, non-participating provider*

(a) *Authorized providers*

Only TRICARE-authorized providers are eligible for reimbursement under the SHCP. 32 C.F.R. § 199.6(a)(7). Section 199.6(c) establishes an individual professional provider class. Subsection (c)(3)(i)(A) specifies that, subject to the standards of the SHCP participation provisions, Doctors of Medicine are among the individual professional providers authorized to provide services to TRICARE beneficiaries. Conditions of authorization for this class of providers include a professional license requirement or a professional

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2005 WL 3088529 (S.D.Ohio)

**(Cite as: 2005 WL 3088529 (S.D.Ohio))**

certification requirement. *Id.* at (c)(2)(i),(ii). Thus, all licensed physicians (with limited exceptions that are not material to this case) are authorized providers, subject to the SHCP participation provisions.

There is no dispute that Dr. Christman is an M.D. and a plastic surgeon and that the procedures he performed on defendant Grays were within of the scope of his training. Based on this record, the Court finds that Dr. Christman is an "authorized provider" within the meaning of the SHCP. As an authorized provider, Dr. Christman must either hold participating or non-participating status.

(b) *Participating v. Non-participating*

A TRICARE-authorized individual provider is a participating provider if either (1) he or she voluntarily enters into a participation agreement or (2) he or she chooses not to enter into a participation agreement but instead elects to participate on a claim-by-claim basis by submitting a signed claim form on behalf of the beneficiary. 32 C.F.R. § 199.6(a)(8)(ii), (iii). An individual provider who takes neither of these actions is a non-participating provider.

*\*5* Dr. Christman maintains that he is a non-participating provider and asserts that he informed Grays of this fact in the emergency room before treatment. No evidence has been presented that Dr. Christman entered into a voluntary agreement to participate. Likewise, there is no evidence that he elected to participate with respect to Grays's claim. Rather, Grays submitted his own claim. Accordingly, the Court finds that Dr. Christman is a non-participating provider under the SHCP.

B. *Reimbursement under the SHCP*

Under the SHCP "no provider may bill an active duty member any amount in excess of the ... allowable amount." 32 C.F.R. § 199.16(d)(5). By its language, this restriction is not limited to participating providers, so it applies to all authorized providers. Thus, a non-participating

provider may not bill an active duty service member beyond the allowable amount for services without the authorization of the SHCP administrator. *Id.* The allowable amount is defined in 32 C.F.R. § 199.14(j). The parties have not disputed the PGBA's determination that the allowable amounts for the services at issue total $648.78.

Because Dr. Christman is an authorized provider and defendant Grays's claim was made under the SHCP, he is only entitled to the allowable amount for the services he provided. Accordingly, Dr. Christman is not entitled to payment beyond the amount already disbursed in satisfaction of Grays's claim.

VII. Fifth Amendment

Dr. Christman also argues that the SHCP regulations constitute a taking in violation of the Fifth Amendment to the United States Constitution to the extent they preclude the payment he seeks for his services. The basis of this argument is that the time and skills of a physician are property that is taken without just compensation by the SHCP program due to the allegedly low reimbursement rates the program provides. In support, plaintiff Christman cites Supreme Court authority recognizing Fifth Amendment protection for the holder of trade secrets confronted with a federal statute mandating public release of that information. *Ruckelhaus v. Monsanto Co.,* 467 U.S. 986, 1001-03, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). The United States counters with a barrage of authority denying takings claim brought by medical professionals in response to Medicare billing limitations. *See e.g., Garelick v. Sullivan,* 987 F.2d 913 (2d. Cir.1993); *Whitney v. Heckler,* 780 F.2d 963 (11th Cir.1986); *Metrolina v. Sullivan,* 767 F.Supp. 1314 (W.D.N.C.1989).

Plaintiff Christman's Fifth Amendment claim is without merit. The weight of authority dictates that medical billing restrictions imposed by Medicare do not work an unconstitutional taking. The present circumstances, involving SHCP billing restrictions, are not materially distinguishable from the Medicare context. The authority plaintiff Christman cites--allowing Fifth Amendment protection for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3088529 (S.D.Ohio)

**(Cite as: 2005 WL 3088529 (S.D.Ohio))**

trade secrets--is far too tenuous to support the dramatic departure from existing Fifth Amendment jurisprudence that he advocates. Accordingly, the plaintiff cannot establish a Fifth Amendment violation.

### VIII. Conclusion

*6 For the foregoing reasons, the United States is substituted for William A. Grays as defendant. The plaintiff's motion to remand is DENIED. The United States's motion for summary judgment is GRANTED as to plaintiff's claim for recovery of unpaid medical charges and plaintiff's claim under the Fifth Amendment. The plaintiff's complaint is DISMISSED with prejudice. This case is terminated on the docket of this Court.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 3088529 (S.D.Ohio)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 3708379 (Trial Motion, Memorandum and Affidavit) Federal Defendant's Reply Memorandum in Support of Motion for Summary Judgment (Jul. 22, 2005)Original Image of this Document (PDF)

• 2005 WL 3708378 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant's Motion for Summary Judgment (Jul. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3708377 (Trial Motion, Memorandum and Affidavit) Federal Defendant's Motion for Summary Judgment and Memorandum in Support (Jun. 3, 2005)Original Image of this Document (PDF)

• 1:05cv00192 (Docket) (Mar. 24, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G



Slip Copy                                                                                            Page 1

Slip Copy, 2007 WL 625849 (D.Del.)
**(Cite as: Slip Copy)**

**Briefs and Other Related Documents**
Lannak v. BidenD.Del.,2007.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Dr. Frederick Joseph LANNAK, Plaintiff,
v.
U.S. Senator Joseph R. BIDEN, Jr., U.S. Senator Thomas R. Carper, and Congressman Michael N. Castle, Defendants.
**No. Civ.06 180 SLR.**

Feb. 27, 2007.

Frederick Joseph Lannak, Newark, DE, pro se.
Thomas E. Caballero, Patricia M. Bryan, Office of Senate Legal Counsel, Washington, DC, Ellen W. Slights, U.S. Attorney's Office, Wilmington, DE, John D. Filamor, Office of the General Counsel, Washington, DC, for Defendants.

MEMORANDUM ORDER
ROBINSON, J.
**\*1** At Wilmington this 26th day of February, 2007, having reviewed defendants' motion to dismiss and the papers filed in connection therewith;

**\*1** IT IS ORDERED that said motion (D.I.13) is granted, for the reasons that follow:

**\*1** 1. Background. Plaintiff, Dr. Frederick Joseph Lannak, has filed a complaint against Senator Joseph R. Biden, Jr., Senator Thomas R. Carper, and Representative Michael N. Castle ("defendants" ). In his complaint, plaintiff asserts that the defendants have violated the Age Discrimination Act of 1975, U.S.C. § 6102 ("ADA"), by repeatedly refusing his requests that defendants direct the Department of Health and Human Services ("HHS" ) to grant the National Institutes of Health ("NIH") permission to analyze and prove plaintiff's research regarding the cause of a spinal condition he calls " equilibrium scoliosis." More specifically, plaintiff

asserts that, in 1992, he requested that the NIH analyze and prove his research demonstrating that idiopathic scoliosis (a condition involving curvature of the spine) was caused by the weight of the stomach. NIH allegedly informed plaintiff that it needed permission from HHS to undertake such an investigation. When plaintiff contacted HHS, he allegedly was told that HHS needed written permission from plaintiff's elected federal officials before it could grant permission for NIH to undertake the research. (D.I.1, ¶ 9) Plaintiff claims that "numerous times" in the "last thirteen years" he has requested such written permission from the defendants; such requests have been denied without reason given. Plaintiff declares that, in January 2006, he learned that defendants would never direct HHS to give its written permission to investigate his research and concludes, thereby, that defendants have discriminated against him based on his age (73 years of age at the time of filing), in violation of the ADA. Plaintiff seeks $75 million in damages.

**\*1** 2. Legal standard. In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiffs. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiffs cannot demonstrate any set of facts that would entitle them to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

**\*1** 3. Analysis. The ADA generally prohibits

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2

Slip Copy, 2007 WL 625849 (D.Del.)
**(Cite as: Slip Copy)**

discrimination on the basis of age in "any programs or activities receiving Federal financial assistance." 42 U.S.C. §§ 6101-6102. For purposes of that statute, a "program or activity" is defined in pertinent part as all of the operations of: (a) state and local governments, agencies, or instrumentalities; (b) a college, university, other post secondary institution, or a public system of higher education, or a local education agency or other school system; (c) a corporation, partnership, or other private organization or sole partnership, or part thereof depending on receipt of Federal financial assistance. 42 U.S.C. § 6107(4). The term "program or activity" does not include any federal entity or any Member of Congress. Therefore, the ADA does not cover actions taken by Members of Congress and defendants' alleged denials of plaintiff's requests are not violative of the ADA.

**\*2** 4. Even if the ADA were found to cover the alleged conduct of the named defendants, plaintiff's claim is not cognizable because plaintiff has not exhausted the administrative remedies provided for under the ADA. 42 U.S.C. § 6104(e)(2). Although plaintiff asserts that he filed an administrative complaint in February 2006 with the Office of Civil Rights at HHS (D.I.1, att.3), the complaint was still pending at the time suit was filed. *See Burgess v. Carmichael,* 37 Fed. Appx. 228, 292 (9th Cir.2002)(collecting cases)(unpublished).

**\*2** 5. Moreover, the ADA does not provide for montary relief as sought in the complaint; instead, the ADA only authorizes a person to bring an action in federal court "to enjoin a violation of this Act by any program or activity receiving Federal financial assistance." 42 U.S.C. § 6104(e)(1). Plaintiff's claim, which seeks only monetary damages, does not state a claim upon which relief may be granted.

**\*2** 6. Finally, plaintiff's claim is barred under the legal principle that a member of Congress' refusal to assist a constituent in response to the constituent's request for help does not create a cognizable claim. *See Richards v. Harper,* 864 F.2d 85, 88 (9th Cir.1988).

**\*2** 7. Conclusion. For the reasons stated above, plaintiff has not stated a cognizable claim under the

ADA. Therefore, defendants' motion to dismiss shall be granted.

D.Del.,2007.
Lannak v. Biden
Slip Copy, 2007 WL 625849 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:06cv00180 (Docket) (Mar. 16, 2006)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H



Not Reported in A.2d                                                    Page 1

Not Reported in A.2d, 2007 WL 549913 (Del.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

H
Taylor    v.    SavageDel.Com.Pl.,2007.Only    the
Westlaw citation is currently available.
UNPUBLISHED    OPINION.    CHECK    COURT
RULES BEFORE CITING.
Court of Common Pleas of Delaware,Kent County.
Gregory TAYLOR, Plaintiff
v.
Dorethea A. SAVAGE, Defendant.
andGregory Taylor, Plaintiff below/Appellee.
v.
Dorethea Savage, Defendant below/Appellant.
**C.A. No. 05-10-0032, 05-09-0066AP.**

Submitted: Dec. 14, 2006.
Decided: Jan. 2, 2007.

Gregory Taylor, Dover, Delaware, Plaintiff pro se.
I. Barry Guerke, Parkowski, Guerke & Swayze,
P.A., Dover, Delaware, for Defendant.

Decision after trial.
TRADER, J.

Judgment is entered in behalf of Plaintiff and
against Defendant.

**\*1** This civil action is a consolidation of a claim
based on a contract implied in law on an appeal
from Justice of the Peace Court 16 and a complaint
filed in this Court in which the plaintiff, Gregory
Taylor ("Taylor"), is seeking half of the net
proceeds resulting from the sale of a house
purchased by Dorethea Savage ("Savage"). Taylor
claims that he helped Savage purchase the home by
providing money toward the down payment, closing
costs and insurance, and that they had a verbal
agreement that the home belonged to both of them.
Additionally, he contends that he paid for the
furnishings for the new home and provided work on
the house for which he should be compensated.

**\*1** I hold that Taylor is not entitled to a share of the

profits resulting from the sale of the house because
Delaware's statute of frauds, 6 *Del. C.* Sec. 2614,
requires that any contract for the sale of real estate
be in writing and because Taylor has not provided
clear and convincing evidence of actual part
performance that would take the case out of the
statute of frauds. As to Taylor's quantum meruit
claim, I hold that he is not entitled to compensation
for painting the house because these services were
provided gratuitously. But based on a contract
implied in law, Taylor is entitled to recover
damages from Savage for contributions he made to
furnish the house as well as reimbursement for his
contribution to one-half of the down payment on the
purchase of the house.

**\*1** The relevant facts are as follows: Taylor and
Savage first met in 1999 and resided together on
and off at a residence rented by Savage. On May
24, 2003, Savage executed a contract to purchase a
house and lot located at 224 West Darby Circle,
Camden, Delaware. Settlement was made on May 5,
2004, for a sales price of $167,279.00 and Savage
paid the closing costs of $11,369.33 plus one-half
of the $1,000.00 deposit on the contract, and Taylor
paid the sum of $500.00 toward the down payment.
The settlement sheet, the mortgage and all other
papers were signed by Savage, and the deed to the
house was in Savage's name only. Taylor helped
furnish the house by paying $999.00 for a sofa set,
one-half of the sum of $2,199.00 for a bedroom set
and $788.00 for a sofa and love seat combination.
Taylor is a self-employed painter and he painted
much of the interior of the house which he valued at
$7,500.00. He also paid Savage $833.00 in June
2004 to be applied toward half of the monthly
mortgage on the house. The relationship of the
parties deteriorated and in August 2004 Savage
asked Taylor to leave the house and she changed the
locks on the property so that he could not enter the
house. They attempted to reconcile the relationship
in May of 2005, but they quickly decided to end the
relationship permanently. In August 2005, Savage
resold her house for $242,900.00.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 2

Not Reported in A.2d, 2007 WL 549913 (Del.Com.Pl.)
(Cite as: Not Reported in A.2d)

**\*1** Taylor contends that he and Savage entered into an oral contract to purchase the house together and that he should share in half the proceeds from the sale. To support this contention he points to the $500.00 he provided toward the down payment, the money spent on furnishing the house, the payment of one-half the mortgage in June 2004 and the effort he expended in painting the house. On the other hand, Savage contends that she never entered into an agreement with Taylor that he would have an interest in the real estate that she purchased in her own name. The documentary evidence supports her contention in this regard. Additionally, I find Savage's testimony more credible and in so doing I reject Taylor's testimony on this issue. I therefore conclude that there was no agreement between the parties that Taylor have a joint interest in the land purchased by Savage.

**\*2** Additionally, any contract concerning the sale of land is required to be in writing under the Delaware statute of frauds, 6 *Del. C.* Sec. 2714(a), which reads in part as follows:
**\*2** No action shall be brought to charge any person .. . upon any contract or sale of lands, tenements, or hereditaments, or any interest in or concerning them ... unless the contract is reduced to writing, or some memorandum or notes thereof, are signed by the party to be charged therewith....

**\*2** "The purpose of the statute is explained by its title, namely to afford protection against fraud...." *Durand v. Snedecker,* 177 A .2d 649, 651 (Del. Ch.1962). Therefore any promise regarding Taylor obtaining an interest in land which was purchased in Savage's name would be subject to the statute of frauds and would require a written memorandum signed by Savage.

**\*2** An exception to the statute of frauds is that a partly performed oral contract may be enforced upon proof by clear and convincing evidence of actual part performance. "[T]he theory [is] that acts of part performance, even if incomplete, constitute substantial evidence that a contract actually exists." *Quillen v. Sayers,* 482 A.2d 744, 747 (Del.1984). Under this exception, substantial evidence must ultimately be produced to convince the court that the part performance in fact evinces the alleged

contract with a high degree of certainty. *Durand, supra* at 651. Taylor has not provided the level of evidence necessary to establish the part performance exception to the statute of frauds. The paying of $500.00 of the initial closing costs on the house, providing one-half of the mortgage payment one month out of the four months he resided at the house, buying some furnishings for the house and painting some of the interior of the house does not provide clear and convincing evidence that he entered in an oral contract with Savage to obtain an interest in the real estate and that he was partly performing his part of the agreement.

**\*2** As to Taylor's claim for compensation for work done in painting the house, I accept as credible Savage's testimony that she never requested that the interior of the house be painted. Accordingly, I conclude that these services were provided by Taylor gratuitously and he cannot recover any compensation for the painting of the house.

**\*2** As to the money Taylor spent on the furniture for the house, I hold he is entitled to recover on a quantum meruit theory. This theory was discussed in *Spanish Tiles, Ltd. v. Hensey,* 2005 Del.Super. LEXIS 427 (Del.Super.Mar. 30, 2005).
**\*2** A contract implied in law permits recovery of that amount by which the defendant has benefited at the expense of the plaintiff in order to preclude unjust enrichment. To claim restitution, the plaintiff must show that the defendant was unjustly enriched and secured a benefit that it would be unconscionable to allow her to retain. The essential elements of a quasi-contract are a benefit conferred upon the defendant by the plaintiff, appreciation or realization of the benefit by the defendant, and acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable to retain it without paying the value thereof.

**\*3** *Id.* at \*8 (citations omitted).

**\*3** In this case, Taylor spent a total of $2,886.50 to furnish the home and he provided Savage with a $500.00 down payment on the house. He paid $999.00 for a loveseat and sofa, $788.00 for leather chairs, and one-half of the value of the bedroom set

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 3

Not Reported in A.2d, 2007 WL 549913 (Del.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

in the amount of $1,099.50. Savage reimbursed Taylor in the amount of $100.00 for part of the money he paid for the bedroom set. He is entitled to recover for this benefit provided to Savage subject to any offset she claims for storing the furniture. Savage has not used this furniture since April 18, 2005, and she paid $570.00 to have it stored from that date until January 10, 2006. She spent at least $250.00 to have the furniture transported out of storage and she has repeatedly asked Taylor to remove the furniture from her possession. She is therefore entitled to an offset in the amount of $920.00. Deducting this offset from Taylor's claim of $3,386.50 reduces his claim to $2,466.50.

**\*3** Taylor asserts that part of the money used to pay the closing costs came from a $3,000.00 check issued by FEMA for damages done to his car from Hurricane Isabelle. The check was issued to Savage and she claims that it was for damages done to her car. I accept her explanation as to the $3,000.00 check. Taylor also seeks reimbursement for the sum of $833.00 that he paid Savage in June of 2004 for one-half of the mortgage payment. Since he lived in the house rent free for three months, I reject his claim for this amount.

**\*3** Based on the above findings of fact and conclusions of law, judgment is entered in behalf of Gregory Taylor and against Dorethea Savage for the sum of $2,466.50 plus the costs of these proceedings.

**\*3** IT IS SO ORDERED.

Del.Com.Pl.,2007.
Taylor v. Savage
Not Reported in A.2d, 2007 WL 549913 (Del.Com.Pl.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Jennifer Gimler Brady, hereby certify this 15th day of March, 2007, that the

foregoing **HEALTH NET FEDERAL SERVICES, LLC'S MEMORANDUM IN SUPPORT**

**OF ITS MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** was

electronically filed with U.S. District Court District of Delaware via CM/ECF (Official Court

Electronic Document Filing System) which will send notification of such filing that the document

is available for viewing and downloading via CM/ECF to the following counsel of record:

> Matt Neiderman, Esquire
> Duane Morris LLP
> 1100 North Market Street
> Suite 1200
> Wilmington, DE 19801

> Jennifer Gimler Brady (Del. Bar 2874)
> POTTER ANDERSON & CORROON LLP
> Hercules Plaza, Sixth Floor
> 1313 North Market Street
> P.O. Box 951
> Wilmington, DE 19899
> (302) 984-6000 - Telephone
> (302) 658-1192 - Facsimile
> jbrady@potteranderson.com – Email

> *Attorneys for Defendant Health Net Federal*
> *Services, LLC*