**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NORTHERN MICHIGAN HOSPITALS, INC. and GIFFORD MEDICAL CENTER, INC., *for themselves and on behalf of all other similarly situated class members,* : : : : : : | |
| : | Civil Action No. 07-39 (GMS) |
| : | |
| Plaintiffs, : : | JURY TRIAL DEMANDED |
| : | CLASS ACTION |
| v. : : | |
| HEALTH NET FEDERAL SERVICES, LLC, (f/k/a HEALTH NET FEDERAL SERVICES, INC.), : : : : | |
| Defendant. : | |

**ANSWERING BRIEF OF PLAINTIFFS
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

*OF COUNSEL*                         Matt Neiderman (Del. Bar No. 4018)
John J. Soroko                       DUANE MORRIS LLP
Seth A. Goldberg                     1100 N. Market St., Suite 1200
DUANE MORRIS LLP                     Wilmington, Delaware 19801
30 South 17th St.                    302.657.4900
Philadelphia, PA 19103               302.657.4901 *fax*
215.979.1000                         mneiderman@duanemorris.com
215.979.1020 *fax*


Michael R. Gottfried                 Gregory A. Brodek
Patricia R. Rich                     DUANE MORRIS LLP
DUANE MORRIS LLP                     88 Hammond Street, Suite 500
470 Atlantic Avenue, Suite 500       Bangor, ME 04401
Boston, MA 02210                     207.262.5440
857.488.4290                         207.262.5401 *fax*
857.488.4201 *fax*


*Attorneys for Plaintiffs Northern Michigan Hospitals, Inc.
and Gifford Medical Center, Inc., for themselves and
on behalf of all other similarly situated class members*

Dated: April 16, 2007

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ............................................................1

SUMMARY OF THE ARGUMENT ..........................................................................3

COUNTER-STATEMENT OF FACTS ......................................................................5

I.      THE "AT-RISK" MCS CONTRACTS ...........................................................5

II.     REIMBURSEMENT UNDER 32 C.F.R. § 199.14(a)(5).................................7

ARGUMENT...............................................................................................................9

I.      STANDARDS OF REVIEW FOR MOTIONS PURSUANT TO FED. R. CIV. P. 12(b)(6), 12(b)(1), AND 12(b)(7).........................................................9

II.     THE COMPLAINT STATES CLAIMS FOR BREACH OF CONTRACT IMPLIED-IN-FACT AND UNJUST ENRICHMENT .....................................11

        A.      Plaintiffs' Rendering Of Outpatient Services To Defendant's Enrollees In Exchange For Payment By Defendant Results In An Implied-In-Fact Contract Between Plaintiffs And Defendant.........................................................12

        B.      Plaintiffs Have Stated A Valid Claim For Unjust Enrichment Because They Allege That Defendant Refuses To Pay The Full Amount For The Services Plaintiffs Provide To Defendant's Enrollees..........................................16

III.    DEFENDANT, AND NOT THE UNITED STATES, IS THE REAL PARTY IN INTEREST IN THIS ACTION .....................................................19

IV.     THE UNITED STATES IS NOT A NECESSARY OR INDISPENSABLE PARTY ......................................................................................................23

        A.      The United States Is Not A Necessary Party In This Litigation ...........................24

        B.      The United States Is Not Indispensable Under Rule 19(b)...................................27

        C.      The Bohall Affidavit Should Be Stricken Because It Is Not Probative Of The Indispensability Of The United States In This Action...................................30

V.      THE ADMINISTRATIVE EXHAUSTION DOCTRINE IS INAPPLICABLE BECAUSE PLAINTIFFS COULD NOT HAVE APPEALED THIS DISPUTE WITHIN THE TRICARE ADMINISTRATIVE REVIEW PROCESS ...........................31

VI.    THE DOCTRINE OF PRIMARY JURISDICTION IS NOT APPLICABLE
       WHERE THE COURT NEEDS ONLY TO INTERPRET A REGULATION ...............33

CONCLUSION.........................................................................................................................37

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Angst v. Royal Maccabees Life Ins. Co.*,
   77 F.3d 701 (3d Cir. 1996)....................................................................................23

*Auburn v. Brown*,
   230 N.W.2d 385 (Mich. Ct. App. 1975) ................................................................12

*Baptist Phys. Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*,
   2007 U.S. App. LEXIS 6447 (6th Cir. Mar. 21, 2007)...........................19, 20, 35

*Baptist Phys. Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*,
   368 F.3d 894 (6th Cir. 2004) ..................................................................... passim

*Bd. of Trs. of Bay Med. Ctr. v. Humana Military Healthcare Servs., Inc.*,
   447 F.3d 1370 (Fed. Cir. 2006)................................................................... passim

*Bd. of Trs. of Bay Med. Ctr. v. Humana Military Healthcare Servs., Inc.*,
   2004 U.S. Dist. LEXIS 22147 (N.D. Fla. Mar. 16, 2004) .................................19

*Bd. of Trs. v. Foodtown, Inc.*,
   296 F.3d 164 (3d Cir. 2002)....................................................................................9

*Berardi v. Swanson Memorial Lodge No. 48 of Fraternal Order of Police*,
   920 F.2d 198 (3d Cir. 1990)..................................................................................10

*Bishop v. Office of Civilian Health & Med. Programs of the Uniformed Servs. (CHAMPUS)*,
   917 F. Supp. 1469 (E.D. Wash. 1996) ..................................................................22

*Booker v. City of Detroit*,
   668 N.W.2d 623 (Mich. 2003)...............................................................................16

*Brookside Mem'l, Inc. v. Barre City*,
   702 A.2d 47 (Vt. 1997) .........................................................................................16

*Buckley v. O'Hanlon*,
   2007 U.S. Dist. LEXIS 22211 (D. Del. Mar. 28, 2007) .................................9, 11

*Christman v. Grays*,
   2005 WL 3088529 (S.D. Ohio Nov. 17, 2005).....................................................22

*City of El Centro v. United States*,
   922 F.2d 812 (Fed. Cir. 1990)...............................................................................16

*Costanzo Coal Min. Co. v. Weirton Steel Co.*,
    150 F.2d 929 (4th Cir. 1945) ...................................................13

*Cushman & Wakefield, Inc. v. Backos*,
    1991 U.S. Dist. LEXIS 11906 (E.D. Pa. Aug. 22, 1991)............................11, 31

*Dawley v. Erie Indem. Co.*,
    100 F. App'x 877 (3d Cir. 2004) ...............................................31

*In re Deemer Steel Casting Co.*,
    117 B.R. 103 (Bankr. D. Del. 1990) ...........................................16

*Dorsey v. Tompkins*,
    917 F. Supp. 1195 (S.D. Ohio 1996) ..................................25, 29, 35

*Elkin v. Bell Tel. Co.*,
    420 A.2d 371 (Pa. 1980) .......................................................34

*FHM Constructors, Inc. v. Village of Canton Housing Auth.*,
    779 F. Supp. 677 (N.D.N.Y. 1992) .............................................25

*Far E. Conference v. United States*,
    342 U.S. 570 (1952)......................................................34, 35

*Fox v. Mt. W. Elec.*,
    52 P.3d 848 (Idaho 2002).......................................................13

*Francis Oil & Gas, Inc. v. Exxon Corp.*,
    661 F.2d 873 (10th Cir. 1981) .................................................27

*Friends of Concord Creek v. Springhill Farm Wastewater Treatment Facility Ass'n*,
    2003 U.S. Dist. LEXIS 3123 (E.D. Pa. Feb. 13, 2003) ..........................24

*Gardiner v. V.I. Water & Power Auth.*,
    145 F.3d 635 (3d Cir. 1998).........................................27, 28, 29, 30

*Healthcare Servs. Group, Inc. v. Integrated Health Servs. of Lester, Inc.*,
    1998 U.S. Dist. LEXIS 6470 (D. Del. Apr. 23, 1998)...........................12

*Helzberg Diamond Shop, Inc. v. Valley West Des Moines Shopping Ctr., Inc.*,
    564 F.2d 816 (8th Cir. 1977) ..................................................27

*Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*,
    11 F.3d 399 (3d Cir. 1993).....................................................24

*Jordan v. Fox, Rothschild, O'Brien & Frankel*,
    20 F.3d 1250 (3d Cir. 1994)..............................................................................9

*Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*,
    65 F. App'x 803 (3d Cir. 2003) ...............................................................11, 31

*Jurimex Kommerz Transit G.m.b.H. v. Case Corp.*,
    201 F.R.D. 337 (D. Del. 2001) .......................................................................11

*Local 670, United Rubber, Cork, Linoleum & Plastic Workers of Am. v. Int'l Union, United Rubber, Cork, Linoleum & Plastic Workers of Am.*,
    822 F.2d 613 (6th Cir. 1987) ..........................................................................10

*Luden's Inc. v. Local Union No. 6 of the Bakery, Confectionery & Tobacco Workers Int'l Union*,
    28 F.3d 347 (3d Cir. 1994)..............................................................................12

*Lummi Nation v. Golder Assocs., Inc.*,
    236 F. Supp. 2d 1183 (W.D. Wash. 2002)...............................................24, 25

*M.B. Guran Co., Inc. v. City of Akron*,
    546 F.2d 201 (6th Cir. 1976) ..........................................................................24

*MCI Telecomms. Corp. v. Teleconcepts, Inc.*,
    71 F.3d 1086 (3d Cir. 1995)............................................................................34

*McCurdy v. Esmonde*,
    2003 U.S. Dist. LEXIS 1349 (E.D. Pa. Jan. 30, 2003) ..............................10, 30

*Merkle v. Health Options, Inc.*,
    940 So. 2d 1190 (Fl. Dist. Ct. App. 2006) ......................................................17

*Metrophones Telecommunications., Inc. v. Global Crossing Telecommunications., Inc.*,
    423 F.3d 1056 (9th Cir. 2005) ..........................................................13, 18, 24

*Michael Reese Hosp. & Med.  Ctr. v. Chi. HMO, Ltd.*,
    554 N.E.2d 472 (Ill. App. Ct. 1990) .........................................................16, 17

*Mortensen v. First Fed. Sav. & Loan Ass'n*,
    549 F.2d 884 (3d Cir. 1977)........................................................................10, 19

*Murray v. Northrop Grumman Information Technology, Inc.*,
    444 F.3d 169 (2d Cir. 2006)............................................................................15

*OAO Healthcare Solutions, Inc. v. Nat'l Alliance of Postal & Fed. Employees*,
    394 F. Supp. 2d 16 (D.D.C. 2005) ............................................................ passim

*Pharm. Research & Mfrs. of Am. v. Walsh*,
    538 U.S. 644 (2003)................................................................34

*Precision Pay Phones v. Qwest Communc'n Corp.*,
    210 F. Supp. 2d 1106 (N.D. Cal. 2002) ...............................18

*Prevo v. Evarts*,
    500 A.2d 227 (Vt. 1985) ......................................................12

*Puerto Rico Maritime Shipping Auth. v. Valley Freight Sys., Inc.*,
    856 F.2d 546 (3d Cir. 1988)................................................34

*R.C. Hedreen Co. v. Crow Tribal Housing Auth.*,
    521 F. Supp. 599 (D. Mont. 1981).......................................25

*Ricci v. Chicago Mercantile Ex.*,
    409 U.S. 289 (1973)............................................................34

*Riley v. Taylor*,
    2006 U.S. Dist. LEXIS 88661 (D. Del. Dec. 7, 2006)..........9

*River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc*,
    173 S.W.3d 43 (Tenn. Ct. App. 2002) ...........................17, 18

*Rosado v. Wyman*,
    397 U.S. 397 (1970)............................................................34

*Shiloh Indus. v. Rouge Indus.*,
    326 B.R. 55 (Bankr. D. Del. 2005) ......................................10

*Special Jet Servs., Inc. v. Fed. Ins. Co.*,
    83 F.R.D. 596 (W.D. Pa. 1979) ..........................................27

*Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*,
    832 A.2d 501 (Pa. Super. Ct. 2003).....................................17

*Trauma Serv. Group v. Keating*,
    907 F. Supp. 110 (E.D. Pa. 1995) .......................................32

*United States v. W. Pac. R.R. Co.*,
    352 U.S. 59 (1956)........................................................34, 35

*Winkler v. Interim Servs., Inc.*,
    36 F. Supp. 2d 1026 (M.D. Tenn. 1999)........................25, 29

## STATUTES & REGULATIONS

10 U.S.C. § 1072(7) ...................................................................................................19

32 C.F.R. § 199.1 ...............................................................................5, 10, 19, 21

32 C.F.R. § 199.2(b) ..........................................................................................7, 32

32 C.F.R. § 199.10(a)(6) .............................................................................. passim

32 C.F.R § 199.14(a)(5) ............................................................................... passim

32 C.F.R. § 199.16(d)(1).................................................................................22

Fed. R. Civ. P. 12(b)(1)..................................................................................9, 10

Fed. R. Civ. P. 12(b)(6)............................................................................9, 10, 19

Fed. R. Civ. P. 12(b)(7)...................................................................................10

Fed. R. Civ. P. 19 ......................................................................................... passim

Fed. R. Civ. P. 56(e) .......................................................................................31

TRICARE Ops. Man. 6010.51-M Ch. 1, § 2 .................................................5

TRICARE Ops. Man. 6010.51-M Ch. 1, § 6 .............................6, 20, 22, 26

TRICARE Ops. Man. 6010.51-M Ch. 3, § 6 .................................................21

TRICARE Ops. Man. 6010.51-M Ch. 13, § 1 ...............................................26

TRICARE Ops. Man. 6010.51-M Ch. 13, § 2 ...............................................32

## BOOKS & TREATISES

2 James Wm. Moore et al., *Moore's Federal Practice* (2006) ....................................10

Richard A. Lord, *Williston on Contracts* (4th ed. 2006) ........................................12, 16

E. Alan Farnsworth, *Contracts* (3d ed. 1999)..............................................................14

Restatement (Second) Contracts (1981) ................................................................12, 14

## NATURE AND STAGE OF PROCEEDINGS

Defendant's Motion to Dismiss (the "Opening Brief") attempts to pass off to the United States certain obligations that Defendant itself assumed when it entered into a TRICARE Managed Care Support contract ("MCS Contract"). Under its MCS Contract, Defendant operates a "for-profit" TRICARE managed health care network, and is responsible for paying for the health care of beneficiaries of the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") enrolled in Defendant's TRICARE managed care plan ("Defendant's enrollees").

Pursuant to its MCS Contract, Defendant enters into separate "network contracts" with health care providers and reimburses them at negotiated, contracted rates. In the absence of such "network contracts," however, Defendant reimburses "non-network" providers at rates provided by the regulations governing TRICARE, such as 32 C.F.R. § 199.14(a)(5), which covers hospital outpatient services. Notwithstanding these obligations, Defendant has failed to pay Plaintiffs, who are non-network providers, the rates established by the TRICARE regulations. Defendant now argues that it owes Plaintiffs nothing despite the services rendered by Plaintiffs to Defendant's enrollees, and that the United States, and *only* the United States, is ultimately responsible for any payment owed to Plaintiffs. However, this argument does not comport with the basic common law principles of contract implied-in-fact and unjust enrichment.

Under these principles, Plaintiffs' rendering of outpatient services to Defendant's enrollees, and the parties' mutual understanding that reimbursement would be in accordance with § 199.14(a)(5), gives rise to a contract implied-in-fact. Defendant's failure to reimburse Plaintiffs accordingly constitutes a breach of this implied contract. Moreover, by having rendered services that Defendant has agreed in its MCS Contract to provide, Plaintiffs have conferred a benefit upon Defendant for which it must pay. Indeed, it is self-evident that a

1

publicly-traded company, like Defendant, benefits when health care services that it underwrites are rendered to its enrollees. Defendant's failure to pay Plaintiffs fully for such services is improper and results in its unjust enrichment. Given the favorable inferences the Court must afford Plaintiffs' allegations, there is no question that Plaintiffs' First Amended Complaint ("Complaint") states claims for breach of contract implied-in-fact and unjust enrichment.

Nor is there any question that Defendant alone is responsible for these claims. The very purpose of TRICARE was to transfer the risk of administering the CHAMPUS program from the United States Treasury to privately-held companies that would endeavor to contain program costs in order to maximize their own profits. To achieve this cost-shifting objective, the MCS Contracts are "at-risk," meaning that the United States has not indemnified, and does not indemnify, Defendant for claims arising out of its failure to meet its payment obligations to providers. Thus, Defendant, and Defendant alone – not the United States Treasury – bears the financial burden of a judgment in Plaintiffs' favor. *See Bd. of Trs. of Bay Med. Ctr. v. Humana Military Healthcare Servs., Inc.*, 447 F.3d 1370 (Fed. Cir. 2006) (hereinafter "*Bay Medical I*"); *Baptist Phys. Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 368 F.3d 894 (6th Cir. 2004) (hereinafter "*Baptist I*").

For these reasons, and others, which are discussed more fully below, Plaintiffs respectfully request that Defendant's Motion to Dismiss be denied in its entirety.

## SUMMARY OF THE ARGUMENT

1.0    Accepting the allegations in the Complaint as true, and viewing all inferences therefrom in the light most favorable to Plaintiffs, the Court should conclude that the Complaint states claims for breach of contract implied-in-fact and unjust enrichment.

1.1    A contract of legal force equal to a "network contract" must be implied from Plaintiffs' "participation" in TRICARE and Defendant's MCS Contract.  In the absence of a "network contract," Plaintiffs provide outpatient services to Defendant's enrollees, and Defendant pays for those services, all with the mutual understanding that § 199.14(a)(5) supplies the method of reimbursement for such services.  Accordingly, the Complaint alleges a claim for breach of contract implied-in-fact.  *See* First Am. Compl. ¶¶ 3, 7-8, 18, 20-21, 26-28, 35-36, 53.

1.2    Defendant entered into its "at-risk" MCS Contract with full knowledge that it would have to pay Plaintiffs for services provided to Defendants' enrollees.  Plaintiffs provided services to Defendants' enrollees, thereby conferring a benefit on Defendant, but for which Defendant has not paid Plaintiffs, and thus it would be unjust for Defendant to retain the benefit conferred.  Plaintiffs have stated a claim for unjust enrichment.  *See* First Am. Compl. ¶¶ 9, 20, 24, 27, 33-35, 57-60.

2.0    The United States is not the real party in interest.  Defendant's MCS Contract with the United States is an "at-risk" contract, whereby the United States has not agreed to indemnify Defendant for Plaintiffs' claims.  Defendant accepted this risk in entering into the MCS Contract.  Moreover, Plaintiffs have no privity of contract with the United States, and Plaintiffs' claims are directed at Defendant only, *not* the United States.  A money judgment against Defendant will be paid from Defendant's funds solely, not from the United States Treasury.

3.0    This action can and should proceed without the United States as a party.

3.1    The United States is not a "necessary party" under Rule 19(a). Consequently, the Court can grant the complete relief requested without impairing any regulatory interest of the government or subjecting the Defendant to a risk of inconsistent obligations.  Any dispute between Defendant and TMA regarding Defendant's duties under the MCS Contract can be resolved in a separate action between those parties.

3.2    The United States is not an "indispensable party" under Rule 19(b).  This action does not risk prejudice to either Defendant or the United States.  Instead, while a judgment in Plaintiffs' favor here would provide it with the full relief it has requested, dismissal for failure to join the United States would leave the Plaintiffs without a remedy to vindicate their right to be reimbursed properly for services rendered.

4.0    The administrative exhaustion doctrine is inapplicable here because Plaintiffs could not have appealed this dispute within the CHAMPUS/TRICARE administrative review process.  Plaintiffs' claims constitute a "dispute regarding the requirement of a law or regulation," which is, by definition, a "non-appealable issue" under the CHAMPUS/TRICARE regulations.

5.0    The doctrine of primary jurisdiction is also inapplicable here.  The Court is being asked to interpret a regulation, which is obviously well within the Court's conventional experience.  Moreover, having defined this dispute as a "non-appealable issue," TMA has necessarily abdicated its jurisdiction over claims like those asserted by Plaintiffs here.

## COUNTER-STATEMENT OF FACTS

### I.     THE "AT-RISK" MCS CONTRACTS

The parties agree that: (1) TRICARE is a "comprehensive managed care program that coordinates the provision of health care services for active duty and retired uniform services members and their families;" (2) TRICARE Management Activity ("TMA") manages TRICARE, enters into MCS Contracts with MCS Contractors, and allocates and executes TRICARE funding; and (3) Defendant, as an MCS Contractor, is "required by the MCS contract to establish a network of civilian health care providers for the provision of care to TRICARE beneficiaries" in the TRICARE North Region.  *See* Def. Op. Br. 1, 3-4; TRICARE Ops. Man. 6010.51-M, August 1, 2002, Ch. 1, § 2, ¶ 1.0 (Appendix B2) ("The foundation of the business relationship between TMA and the Managed Care Support contractor is the contract.").

However, Defendant fails to acknowledge the critical fact that its MCS Contract is "at-risk."  In other words, Defendant has the opportunity to profit, and indeed does profit, from the delivery of CHAMPUS benefits, as long as the cost of financially underwriting CHAMPUS benefits does not exceed revenues that Defendant earns from, among other things, the monthly capitation payments made by the United States based on the value of its fixed-price MCS Contract.  *See* 32 C.F.R. § 199.1(e) (MCS Contractors are "reimbursed for the adjudication and payment of CHAMPUS claims at a rate (generally fixed-price) prescribed in their contracts.").

Another fact Defendant omits from its Opening Brief, and which is a critical component of the "at-risk" structure of TRICARE, is that the current MCS Contracts, unlike the *former* "Fiscal Intermediary Contracts," do not contain indemnification clauses, under which the United

States, and not the MCS Contractor, would be liable for claims like those of Plaintiffs.[1]  *See* First Am. Compl. ¶ 12; *Bay Medical I*, 447 F.3d at 1372.  Instead, payment of such claims comes directly from the MCS Contractors' funds, and not from the United States Treasury.  *See generally* TRICARE Ops. Man. 6010.51-M, August 1, 2002, Ch. 1, § 6 (Appendix B5-7).  In fact, in contrast to the Fiscal Intermediary Contracts, under TRICARE, the United States merely *reserves the right* to determine whether the government should be a party to the legal process, whether "the contractor is to be indemnified against judgments, settlements and costs," and whether "the government is the real party in interest to an action which challenges a TRICARE determination."  *See id.*

Although Defendant was required to notify TMA immediately upon the commencement of this action, and to forward to TMA a copy of the Complaint, Plaintiff is not aware of any efforts, and Defendant has not pointed to any in its Opening Brief, by the United States to intervene, or to participate in some other way, as a party in this action.  *See* TRICARE Ops. Man. 6010.51-M, August 1, 2002, Ch. 1, § 6, ¶¶ 1.1-1.3 (Appendix B6) ("The Office of General Counsel, TMA, shall be notified by telephone immediately upon receipt of any summons, writ,

---

[1] The "at-risk" scheme introduced by TRICARE transformed the delivery and financing of CHAMPUS benefits.  *See* First Am. Compl. ¶ 13.  Prior to TRICARE, the Department of Defense contracted with "fiscal intermediaries" ("Fiscal Intermediary Contracts") to process claims, and the United States indemnified the fiscal intermediaries for claims arising out of the discharge of their duties under their "Fiscal Intermediary Contracts."  *See* First Am. Compl. ¶¶ 11-12; *Bay Medical I*, 447 F.3d at 1372.  In fact, in entering into the "Fiscal Intermediary Contracts," the Department of Defense *expressly reserved* for the United States the status of "real party in interest" for claims against the fiscal intermediaries because payment of such claims came directly from the U.S. Treasury.  *See* First Am. Compl. ¶¶ 11-12; *Bay Medical I*, 447 F.3d at 1372 (quoting from the fiscal intermediary contract as follows:  "In civil law suits which seek the disbursement of funds, the United States is the real party in interest since the funds disbursed are United States Treasury funds appropriated by Congress to the Department of Defense.").

or other legal process which develops as a result of performance under a TRICARE contract . . . .

[C]opies of all documentation shall be transmitted to TMA by facsimile as soon as possible.").

## II.    REIMBURSEMENT UNDER 32 C.F.R. § 199.14(a)(5)

The parties also agree that: (1) there are different categories of providers; (2) that Plaintiffs are "non-network participating providers;" and (3) "when paying TRICARE claims to non-network participating providers such as Plaintiffs, [Defendant] is required to adhere to the TRICARE regulations."  The parties agree further that 32 C.F.R. § 199.14(a)(5)[2] establishes the methodology for determining the reimbursement of certain outpatient services provided by non-network participating providers, including "Facility Charges," which are to be "paid as billed." *See* Def. Op. Br. 4-6 (quoting 32 C.F.R. § 199.14(a)(5)(xi) ("TRICARE payments for hospital outpatient facility charges that would include the overhead costs of providing for outpatient service would be paid as billed.")); First Am. Compl. ¶¶ 28-30.[3]

TMA recently confirmed the requirement of § 199.14(a)(5)(xi) that facility charges relating to hospital outpatient services are to be reimbursed "as billed," in a letter to Defendant, dated April 14, 2006, which was attached to the Complaint, and which provides, in part:

> [A] thorough research of TRICARE Systems Manual was conducted and findings coordinated and staffed between TMA Office of General Counsel, Medical Benefits & Reimbursement Systems (MB&RS) Office and Contracting

---

[2] Effective July 1, 2007, reimbursement of hospital outpatient services will no longer be paid in accordance with § 199.14(a)(5) because TMA has adopted the Outpatient Prospective Payment System, which is a system of reimbursement that is entirely different than reimbursement under § 199.14(a)(5).

[3] The term "facility charges" means "the charge, either inpatient or outpatient, made by a hospital or other institutional provider to cover the overhead costs of providing the service. These costs would include building costs, i.e. depreciation and interest; staffing costs; drugs and supplies; and overhead costs, i.e., utilities, housekeeping, maintenance, etc."  32 C.F.R. § 199.2(b).

Management. Below are the results to the research with the applicable manual references:

*****

For outpatient services, SCHs [Sole Community Hospitals] are reimbursed based on the allowable charge when the claim has sufficient HCPCS coding information, as stated in TRM, Chapter 1, Section 24. *Other services without allowable charges, such as facility charges, are reimbursed based on billed charges.*

*****

For outpatient services, CAHs [Critical Access Hospitals] are reimbursed based on the allowable charge when the claim has sufficient HCPCS coding information, as stated in TRM, Chapter 1, Section 24. *Other services without allowable charges, such as facility charges, are reimbursed based on billed charges.*

*****

*The March 10, 2000, Policy Manual issuance was the agency's formal statement of its interpretation. It was not a new interpretation.* These reimbursement requirements apply to all hospital outpatient billings, unless there is an exemption. Regarding sole community hospitals and critical access hospitals and the outpatient hospital services they provide, the Regulation does not give an exemption.

*See* Letter from Office of the Assistant Secretary of Defense, Health Affairs, to Health Net (Apr. 14, 2006) (emphasis added) (hereinafter "TMA Letter, Apr. 14, 2006"), attached to the Complaint as Exhibit A.[4]

Notwithstanding this regulatory scheme, Defendant has not paid Plaintiffs for their facility charges "as billed." Defendant's failure to make such payment, despite the requirement to do so, as reflected in TMA's guidance on this point, has resulted in this action.

---

[4] Because TMA's letter of April 14, 2006 was attached to the Complaint it may be considered by the Court in evaluating all aspects of Defendant's Opening Brief.

## ARGUMENT

**I.    STANDARDS OF REVIEW FOR MOTIONS PURSUANT TO FED. R. CIV. P. 12(b)(6), 12(b)(1), AND 12(b)(7)**

Defendant's motion to dismiss the Complaint under Rule 12(b)(6) should be denied. Where, as here, the Court evaluates a motion to dismiss for failure to state a claim or for failure to exhaust administrative remedies under Rule 12(b)(6), "the defendant must show 'beyond doubt' that the plaintiff can prove no set of facts which would entitle him to relief." *Buckley v. O'Hanlon*, 2007 U.S. Dist. LEXIS 22211, at *3 (D. Del. Mar. 28, 2007) (Sleet, J.) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Defendant cannot do so in this case. Indeed, by accepting "as true all allegations in the complaint," and giving "Plaintiff the benefit of every favorable inference that can be drawn from the allegations," it is clear, as set forth below, there is no basis to dismiss Plaintiffs' claims. *Bd. of Trs. v. Foodtown, Inc.*, 296 F.3d 164, 168 (3d Cir. 2002); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). *See also Riley v. Taylor*, 2006 U.S. Dist. LEXIS 88661, at *12-15 (D. Del. Dec. 7, 2006) (Sleet, J.) (applying Rule 12(b)(6) standard to question of administrative exhaustion). Moreover, despite Defendant's inclusion of extrinsic evidence in its Opening Brief, the Court should look "only to the facts alleged in the complaint and its attachments without reference to other parts of the record." *Jordan*, 20 F.3d at 1261.

Defendant fairs no better on its assertions that the Complaint should be dismissed pursuant to Rule 12(b)(1) on the grounds of sovereign immunity. Defendant facially challenges the Court's subject matter jurisdiction, and does not rely on its purported evidence, *i.e.*, the affidavit of Pamela A. Bohall ("Bohall Affidavit"), in making its arguments that the Court lacks

subject matter jurisdiction.[5]  *See McCurdy v. Esmonde*, 2003 U.S. Dist. LEXIS 1349, at *11 (E.D. Pa. Jan. 30, 2003) ("[A] facial challenge under 12(b)(1) argues that the complaint fails to allege subject matter jurisdiction, or contains defects in the jurisdictional allegations").  Having made only a facial challenge to the Court's subject matter jurisdiction, the Court must, as it would under Rule 12(b)(6), accept all of Plaintiffs' allegations as true and construe them in the light most favorable to Plaintiffs.  *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).[6]

Lastly, Defendant's contention that the Complaint should be dismissed under Rule 12(b)(7) utterly fails because Defendant cannot meet its burden of demonstrating that the United States "must be joined for a just adjudication."  *Shiloh Indus. v. Rouge Indus.,* 326 B.R. 55, 58 (Bankr. D. Del. 2005); *see also* 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 12.35 (2006) ("Any party moving under Rule 12(b)(7) has the burden of showing that the absent person should be joined under Rule 19.").  Rule 19 "is not to be applied in a rigid manner but should instead be governed by the practicalities of the individual case."  Here, those practicalities dictate that the United States is *not* indispensable.  *Local 670, United Rubber, Cork, Linoleum & Plastic Workers of Am. v. Int'l Union, United Rubber, Cork, Linoleum & Plastic Workers of Am.,* 822 F.2d 613, 618 (6th Cir. 1987).  Moreover, while the Court may consider relevant evidence outside of the pleadings for the purposes of a Rule 12(b)(7) motion, as discussed more fully

---

[5] In this case, the parties cite to the TRICARE manuals, which are not extrinsic evidence because they are adopted as part of the CHAMPUS/TRICARE regulations pursuant to the regulatory authority granted to TMA under 32 C.F.R. § 199.1.

[6] To the extent that the Court determines that Defendant's Rule 12(b)(1) motion is a factual challenge and that the facts of record are insufficient to deny the motion to dismiss, Plaintiffs request leave to take discovery to create a complete factual record on which this Court may consider the motion.  *Berardi v. Swanson Memorial Lodge No. 48 of Fraternal Order of Police,* 920 F.2d 198, 200 (3d Cir. 1990).

herein, much of the extrinsic evidence upon which Defendant relies, *i.e.*, the Bohall Affidavit, does not relate in any way, and is not probative of, the indispensability of the United States in this action, and must therefore be ignored. *Jurimex Kommerz Transit G.m.b.H. v. Case Corp.*, 201 F.R.D. 337, 340 (D. Del. 2001).[7]

## II.     THE COMPLAINT STATES CLAIMS FOR BREACH OF CONTRACT IMPLIED-IN-FACT AND UNJUST ENRICHMENT

Accepting as true all of the allegations in the Complaint, and giving Plaintiff the benefit of every favorable inference that may be drawn therefrom, as the Court is required to do, Defendant has not shown "beyond doubt" that Plaintiffs can prove no set of facts entitling them to relief. *Buckley*, 2007 U.S. Dist. LEXIS 22211, at *3. To the contrary, Plaintiffs have unquestionably alleged claims for breach of contract implied-in-fact and unjust enrichment.

---

[7] As discussed more fully below, the Bohall Affidavit, *see* Def. Op. Br. A15-18, is not probative, in any respect, of the indispensability of the United States in this action, and, therefore, is "evidence" that is not properly before the Court and should not be considered in addressing Defendant's motion to dismiss. Not a single paragraph in the Bohall Affidavit addresses the United States' purported indispensability and nothing in Defendant's argument relating to indispensability depends upon the Bohall Affidavit. The Bohall Affidavit is simply a ploy to introduce extrinsic evidence in support of Defendant's other arguments. Further, the Bohall Affidavit contains hearsay and bald assertions without any factual or documentary foundation or support. It is therefore inadmissible. For example, the affidavit is devoid of any details of how the audits are conducted, what information Defendant provides to TMA during the course of the audit, and whether the audits review Defendant's payment of facility charges. However, should the Court disagree and consider the Bohall Affidavit, Plaintiffs should be granted leave to take discovery so that they have a fair opportunity to challenge the assertions and present a complete factual record to the Court on this matter. *Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, 65 F. App'x 803, 807 (3d Cir. 2003); *Cushman & Wakefield, Inc. v. Backos*, 1991 U.S. Dist. LEXIS 11906, at *4 (E.D. Pa. Aug. 22, 1991); *see also* Fed. R. Civ. P. 19 advisory committee's note (noting it is not inappropriate to "defer decision until the action [is] further advanced").

A.    **Plaintiffs' Rendering Of Outpatient Services To Defendant's Enrollees In Exchange For Payment By Defendant Results In An Implied-In-Fact Contract Between Plaintiffs And Defendant**

The elements of an implied-in-fact contract are identical to those of an express contract: (1) mutuality of intent, (2) consideration, and (3) lack of ambiguity in offer and acceptance. Richard A. Lord, 1 *Williston on Contracts* § 1:5 (4th ed. 2006).[8]  The only difference between an implied-in-fact contract and an express contract is that an implied-in-fact contract is proven by the conduct of the parties in light of the surrounding circumstances.  *Luden's Inc. v. Local Union No. 6 of the Bakery, Confectionery & Tobacco Workers Int'l Union*, 28 F.3d 347, 355 (3d Cir. 1994) (citing Restatement (Second) Contracts § 19(1) (1981)); *Healthcare Servs. Group, Inc. v. Integrated Health Servs. of Lester, Inc.*, 1998 U.S. Dist. LEXIS 6470, at *8 (D. Del. Apr. 23, 1998).  An implied-in-fact contract has the same legal effect as an express contract.  *Healthcare Servs.*, 1998 U.S. Dist. LEXIS 6470, at *8.

Here, Plaintiffs have alleged mutuality of intent and legal consideration, and Defendant's arguments to the contrary are both incorrect and are also contradicted by the TRICARE program itself.  *See* Def. Op. Br. 31.  In the absence of a network contract, the CHAMPUS/TRICARE regulations serve a "rate-setting" function so that MCS Contractors and non-network participating providers have a common understanding, *i.e.*, a meeting of the minds, on the terms of reimbursement.  For hospital outpatient services, 32 C.F.R. § 199.14(a)(5) sets the rates of

---

[8] Defendant notes that either Vermont or Michigan law would most likely apply to Plaintiffs' claims.  As there are no material state-by-state differences in the substantive law with regard to the present issues before the Court, the disposition of Defendant's motion does not hinge upon the Court's choice of law at this time.  *See, e.g., Prevo v. Evarts,* 500 A.2d 227, 228 (Vt. 1985) ("A contract implied in fact arises under circumstances which, according to the ordinary course of dealing and common understanding, of men, show a mutual intention to contract.") (citing *Erickson v. Goodell Oil Co.,* 180 N.W.2d 798, 800 (Mich. 1970)); *Auburn v. Brown,* 230 N.W.2d 385, 389 (Mich. Ct. App. 1975) (stating same).

reimbursement by Defendant. Indeed, such a meeting of the minds is consistent with the fact that terms of an implied-in-fact contract may be provided by industry practices and standards, including regulatory rates. *See generally Costanzo Coal Min. Co. v. Weirton Steel Co.*, 150 F.2d 929, 936 (4th Cir. 1945) (holding that, as the federal Bituminous Coal Act of 1937 set minimum price for coal, "there arose upon the acceptance of the goods by the buyer an implied contract on its part to pay for them at [that] price") (citing *Pittsburgh, Cincinnati, Chi. & St. Louis R. Co. v. Fink*, 250 U.S. 577, 581 (1919)); *Fox v. Mt. W. Elec.*, 52 P.3d 848, 854 (Idaho 2002) (affirming district court's determination "that there was an implied-in-fact contract using the industry standard's flow-down method of compensation for the change orders"). Defendant itself recognizes that it "is required to process those claims in accordance with applicable laws, TRICARE payment regulations, and TMA guidance." Def. Op. Br. 36.

*Metrophones Telecommunications., Inc. v. Global Crossing Telecommunications., Inc.*, 423 F.3d 1056 (9th Cir. 2005), a case involving a rate-setting system that is analogous to TRICARE's system, exemplifies Plaintiffs' claim for breach of implied-in-fact contract. In *Metrophones*, FCC regulations provided a "per-call" payphone default rate that long distance carriers were required to pay payphone service providers in the absence of express contracts. 423 F.3d at 1062. The court summarized the plaintiff's claim as follows:

> In its claims for breach of "implied contract," Plaintiff characterizes the interaction between itself and Defendant as conduct evidencing a mutual intention to enter into a contract. Plaintiff's theory is that, by making its payphones available to the general public, Plaintiff impliedly offered them for the use of Defendant's customers at the rates established by the FCC. Then, "[b]y accepting, transporting, and completing calls made from Plaintiff's payphones by Defendant['s] customers, Defendant[ ] impliedly accepted Plaintiff's offer of service," forming a contract for payphone compensation in the exact amount set by the FCC.

*Id.* at 1075.

Similarly, Plaintiffs' "participation" in the TRICARE system as non-network providers, and Defendant's participation in TRICARE as an MCS Contractor, implies mutuality of intent. First Am. Compl. ¶¶ 3, 7-8, 18, 20-21, 26-27, 35-36.  The absence of a network contract implies Defendant's intent to reimburse non-network participating providers for outpatient services in accordance with § 199.14(a)(5), as opposed to at pre-negotiated, contracted rates.  Def. Op. Br. 4; First Am. Compl. ¶¶ 26-27.  Correspondingly, the participation of non-network providers in TRICARE, like Plaintiffs, through "accepting assignment" of benefits, also implies an intent to be reimbursed for outpatient services in accordance with § 199.14(a)(5).  First Am. Compl. ¶¶ 26, 28, 35-36, 53.  Defendant's suggestion that its failure to reimburse Plaintiffs in accordance with § 199.14(a)(5) somehow vitiates the underlying meeting of the minds between Plaintiffs and Defendant defies logic.  Rather, Defendant's failure to pay facility charges in accordance with § 199.14(a)(5) constitutes the *breach* of the implied-in-fact contract with Plaintiffs that is at the heart of this case.

Defendant's reliance on the "pre-existing legal duty" rule is also misplaced.  The pre-existing legal duty rule protects a promissor when a promissee attempts to modify an existing agreement by demanding additional consideration for a performance that he has already agreed to carry out.  *See* E. Alan Farnsworth, *Contracts*, 276-80 (3d ed. 1999).  Consequently, Defendant may not avail itself of the rule vis-à-vis Plaintiffs by arguing that it owes a pre-existing duty to TMA "to administer claims in accordance with the TRICARE regulations."  *See* Def. Op. Br. 34.  Certainly, Defendant's explicit promise to TMA that it would underwrite CHAMPUS benefits pursuant to the TRICARE regulations is *not* the same as Defendant's implied promise to reimburse Plaintiffs for their services.  The two promises made by Defendant represent separate, independent bargained-for-exchanges.  *See* Restatement (Second) Contracts

§§ 71(1)-(2) ("To constitute consideration, a performance or a return promise must be bargained for. A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.") In exchange for Defendant's explicit promise to TMA, Defendant has been paid the $10 billion fixed-price amount of the MCS Contract. In exchange for Defendant's implied promise to Plaintiffs, Plaintiffs have provided services to Defendant's enrollees. *See OAO Healthcare Solutions, Inc. v. Nat'l Alliance of Postal & Fed. Employees*, 394 F. Supp. 2d 16, 20 (D.D.C. 2005) (finding the relationship between a federal contractor, who administered a health insurance plan for federal employees under the Federal Employee Health Benefits Program ("FEHBP"), and its subcontractor, who provided administrative services for claims filed by FEHBP beneficiaries, to be "distinct from any relationship between the [federal contractor] and [the federal agency administering FEHBP]"). Accordingly, Plaintiffs have stated a claim for breach of implied-in-fact contract.

Moreover, *Murray v. Northrop Grumman Information Technology, Inc.*, 444 F.3d 169 (2d Cir. 2006), does not support Defendant's position. In *Murray*, the court held only that the *beneficiaries* of a government program could not bring a breach of implied-in-fact contract claim against a government contractor because they had provided nothing to the contractor for which they could have expected anything in return. 444 F.3d at 178. Thus, as applied here, *Murray* stands for the unremarkable proposition that an implied-in-fact contract may not be created between the United States and *TRICARE beneficiaries* merely as a result of the beneficiaries' enrollment in TRICARE. Yet, it is not beneficiaries of TRICARE who have brought this lawsuit. Rather, Plaintiffs are subcontractors of Defendant, who have been hired, based on the promise of reimbursement. First Am. Compl. ¶¶ 7-8. *Murray* is therefore completely inapposite.

B.     **Plaintiffs Have Stated A Valid Claim For Unjust Enrichment Because They Allege That Defendant Refuses To Pay The Full Amount For The Services Plaintiffs Provide To Defendant's Enrollees**

A claim for unjust enrichment under a quasi-contractual theory is legally sufficient if it alleges: (1) a benefit conferred on the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment. *See* 26 *Williston on Contracts* § 68:5; *In re Deemer Steel Casting Co.,* 117 B.R. 103, 108 (Bankr. D. Del. 1990).[9]  The Complaint properly alleges these elements.

Contrary to Defendant's assertions, Defendant has realized a benefit from the services Plaintiffs provided to Defendant's enrollees.[10]  Defendant has agreed under the MCS Contract to assume the risk of providing health care to CHAMPUS beneficiaries for a profit that undoubtedly benefits Defendant.  Courts have recognized that providers, such as Plaintiffs, confer a benefit upon managed care organizations ("MCOs"), similar to Defendant, when services are rendered to Medicaid beneficiaries enrolled in an MCO's Medicaid managed care plan that is operated pursuant to a government contract.  *See, e.g.*, *Michael Reese Hosp. & Med.*

_____

[9] *See also Booker v. City of Detroit*, 668 N.W.2d 623, 623 (Mich. 2003) (finding unjust enrichment where the "city has received a benefit from plaintiff, which benefit it would be inequitable for the city to retain"); *Brookside Mem'l, Inc. v. Barre City*, 702 A.2d 47, 49 (Vt. 1997) ("Under a quasi-contract theory of unjust enrichment, the law implies a promise to pay when a party receives a benefit and retention of the benefit would be inequitable.").

[10] In support of its argument that Plaintiff fails to state a claim for unjust enrichment, Defendant cites *City of El Centro v. United States*, 922 F.2d 812, 817 (Fed. Cir. 1990), in which a hospital sued the United States government for the value of the treatment it rendered to illegal aliens who were injured while fleeing from INS agents.  *See* Def. Op. Br. 36.  *City of El Centro* is completely inapplicable because the United States Court of Appeals for the Federal Circuit did not even address the elements of unjust enrichment, as the court below had held that Congress did not waive sovereign immunity with respect to implied-in-law contractual obligations and neither party disputed that holding on appeal.  922 F.2d at 820.

*Ctr. v. Chi. HMO, Ltd.*, 554 N.E.2d 472, 474-75 (Ill. App. Ct. 1990) (hospital sufficiently alleged unjust enrichment when it asserted that it treated public aid recipients for whose medical services an MCO was required, under government contract, to pay); *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 832 A.2d 501, 507 (Pa. Super. Ct. 2003) (hospital conferred benefit on MCO by treating Medicaid recipients whose medical services were administered by MCO pursuant to its contract with Pennsylvania's Department of Public Welfare); *River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc*, 173 S.W.3d 43, 59-60 (Tenn. Ct. App. 2002) (hospital sufficiently alleged unjust enrichment against MCO, where hospital asserted that it treated Medicaid recipients whose medical services were administered by the MCO according to the MCO's government contract with State of Tennessee); *see also Merkle v. Health Options, Inc.*, 940 So. 2d 1190, 1199 (Fl. Dist. Ct. App. 2006) (complaint sufficiently stated an unjust enrichment claim because "Merkle alleged facts sufficient to support its argument that Merkle's treatment of the subscribers conferred a benefit on the HMOs").  In each of these cases, as in this case, allegations of the MCO's failure to pay the reasonable value for services provided to its enrollees stated a claim for unjust enrichment.

Moreover, a "disagreement over payment methodology," which is what is presented here, is *precisely* what constitutes unjust enrichment when one party has not been paid the value of the services it rendered to another party.  Indeed, courts have found that an unjust enrichment claim will lie in cases where the dispute between private MCOs and providers amounts to a disagreement over payment rates for medical services rendered to Medicaid beneficiaries enrolled in the MCOs' Medicaid managed care plans.  *See, e.g., Merkle*, 940 So. 2d at 1193; *Michael Reese Hosp.*, 554 N.E.2d at 474-75; *River Park Hosp*, 173 S.W.3d at 55; *Temple Univ. Hosp.*, 832 A.2d at 507.

17

*Metrophones* is paradigmatic on this point as well. There, the plaintiff's claim for unjust enrichment was based on the defendant's failure to pay the plaintiff the full default rate set by FCC regulations, and as the Court explained, under the theory of unjust enrichment "[t]he obligation to pay is imposed by law, not by the defendant's agreement to enter into a contract; it is imposed to prevent the defendant from being unjustly enriched by services provided in the absence of a contract *for which the plaintiff deserves, and expected, payment*." 423 F.3d at 1076 (emphasis added); *see also Precision Pay Phones v. Qwest Communc'n Corp.*, 210 F. Supp. 2d 1106, 1112 (N.D. Cal. 2002) (finding plaintiff stated a claim for unjust enrichment when defendant failed to pay FCC-default rates).

Here, the Complaint alleges that Defendant became an MCS Contractor pursuant to an "at-risk" contract, with full knowledge that it would have to pay non-network "participating" providers, such as Plaintiffs, for services provided by Plaintiffs to Defendants' enrollees. First Am. Compl. ¶¶ 20-27; *see also River Park*, 173 S.W.3d at 59 ("under its risk agreement with the State, BlueCare [an MCO] is required to pay for emergency services for its enrollees, whether the services are provided by an in-network provider or by an out-of-network provider"). Plaintiffs' allegations demonstrate that they have provided services to Defendant's enrollees, thereby conferring a benefit on Defendant, but for which Defendant has not paid Plaintiffs for their facility charges "as billed." *Id.* at 59-60. *See* First Am. Compl. ¶¶ 9, 24, 33-35, 57-60. Accordingly, Plaintiffs have unquestionably stated a claim for unjust enrichment.

## III.    DEFENDANT, AND NOT THE UNITED STATES, IS THE REAL PARTY IN INTEREST IN THIS ACTION

Defendant's attempt to dismiss this case on the basis of sovereign immunity fundamentally mischaracterizes Defendant's role in the TRICARE program and the legal effect of Defendant's "at-risk" MCS Contract.[11]    In fact, Defendant, not the United States, is the real party in interest because the "at-risk" nature of Defendant's contract with TMA puts only *Defendant's funds* at stake in this action.[12]    As described above, *prior* to the establishment of TRICARE, the Department of Defense provided CHAMPUS benefits through "fiscal intermediary contracts," under which the United States *expressly agreed* to be the real party in interest and to indemnify fiscal intermediaries for any judgment, settlement, or costs arising thereunder.    *Bd. of Trs. of Bay Med. Ctr. v. Humana Military Healthcare Servs., Inc*., 2004 U.S. Dist. LEXIS 22147, at *6-7 (N.D. Fla. Mar. 16, 2004) (hereinafter *Bay Medical II*).

In contrast, the entire premise of TRICARE is different.    TRICARE is a "managed health care program" under which managed care providers – such as Defendant – enter into "at-risk" contracts with the United States for the provision of health care to beneficiaries.    10 U.S.C. § 1072(7); 32 C.F.R. §§ 199.1(e) & (f)(1).    Under TRICARE, the United States reserves the right *not* to indemnify an MCS Contractor for claims arising out of the discharge of duties under an MCS Contract and itself decides, on a case-by-case basis, whether the United States is the real

---

[11]    Defendant's motion under 12(b)(1) presents a facial challenge only, meaning Plaintiffs' allegations must be taken as true and construed in the light most favorable to Plaintiffs, as under Rule 12(b)(6).    *See Mortensen*, 549 F.2d at 891.

[12]    As Defendant acknowledges, sovereign immunity is only an obstacle here if the United States is the real party in interest.    *See* Def. Op. Br. 18.

party in interest to any such action. *Bay Medical II*, 2004 U.S. Dist. LEXIS 22147, at *7; TRICARE Ops. Man. 6010.51-M, August 1, 2002, Ch. 1, § 6, ¶¶ 1.2-1.3 (Appendix B6).[13]

The "at-risk" nature of the TRICARE program was the basis for the decision of the Court of Appeals for the Federal Circuit in *Bay Medical I*. In that case, Humana argued, as Defendant does here, that the United States was the real party in interest for contract claims alleging improper reimbursement for services provided to CHAMPUS beneficiaries. The court disagreed, holding that the plaintiff-hospitals could proceed against Humana alone as the real party in interest because: (1) the plaintiffs' complaint explicitly targeted Humana for damages, not the federal government; (2) the MCS Contract, unlike the pre-TRICARE "Fiscal Intermediary Contracts," lacked an indemnification clause declaring that the United States was the real party in interest in all CHAMPUS-related disputes; and (3) there was no privity of contract between the hospitals and the United States. *Bay Medical I*, 447 F.3d at 1375. These same conclusions apply with equal force here.

Plaintiffs' claims, like those of the plaintiffs in *Bay Medical I*, are for money damages "directed against" the MCS Contractor, and not against the United States. First Am. Compl. ¶¶ 53-55, 58-60; *see also* First Am. Compl. 15 (Prayer for Relief) (seeking "judgment and relief against Defendant"). Second, as the court in *Bay Medical I* noted, TMA's shift from contracting with fiscal intermediaries to contracting with MCS Contractors means that the United States cannot be haled into court each time a CHAMPUS contractor is sued because the United States is

---

[13] Even if Defendant requests indemnification from the United States for Plaintiffs' claims, that would still not render the United States the real party in interest because, as the court of appeals in *Bay Medical I* noted, such indemnification would be determined in a separate action between Defendant and the United States. *See Bay Medical I*, 447 F.3d at 1375 ("[T]hat Humana may seek reimbursement from the government *after* a finding of liability in this case does not mean that the government is the 'real party in interest' on the Hospitals' contract claims." (emphasis added)).

no longer necessarily the real party to every lawsuit involving the provision of CHAMPUS benefits. 447 F.3d at 1375. Third, while an at-risk contractual relationship exists between the United States and Defendant, and a separate contractual relationship exists between Defendant and Plaintiffs, Plaintiffs have no direct relationship or privity of contract with the United States. *Id.*

Moreover, the mere fact that the reimbursement checks from MCS Contractors to network and non-network providers bear the statement "This payment is made with Federal funds" does not make the United States the real party in interest. Def. Op. Br. 18 (citing TRICARE Ops. Man. 6010.51-M, August 1, 2002, Ch. 3, § 6, ¶ 1.0 (Appendix B9)). Unquestionably, the funds used to pay Defendant under its MCS Contract are appropriated by Congress in the first instance. 32 C.F.R. § 199.1(e). But once those funds are disbursed by the federal government to the MCS Contractor, then the MCS Contractor "'has ownership over the funds.'" *Baptist I*, 368 F.3d at 901 (quoting *Bay Medical II*, 2004 U.S. Dist. LEXIS 22147, at *24); *see also Bay Medical I*, 447 F.3d at 1374 (agreeing with plaintiffs' position that "the money given to Humana each month from the government becomes Humana's money when it receives it").

Additionally, Defendant is the real party in interest in this case because it forms an *independent contractual relationship* with Plaintiffs when Plaintiffs provide services to Defendant's enrollees in exchange for payment by Defendant at rates set by TMA. Defendant owes one contractual obligation *to the government* to administer CHAMPUS benefits and owes a separate, enforceable contractual duty *to providers* to make proper payments under negotiated or default rates of reimbursement. The "at-risk" MCS Contract provides that Defendant, and *not* the government, may be solely liable for claims arising out of the *independent contractual*

*relationship* between Defendant and Plaintiffs. *See Bay Medical I*, 447 F.3d at 1375-76 (rejecting claim that government was real party in interest for network provider's contract claim against MCS Contractor); *Baptist I*, 368 F.3d at 900 (holding that MCS Contractor could establish separate contractual duties owed to providers); TRICARE Ops. Man. 6010.51-M, August 1, 2002, Ch. 1, § 6, ¶¶ 1.2-1.3 (Appendix B6) (providing that the United States will not be involved in "private matter[s]" involving an MCS Contractor and a subcontractor).

Defendant would have this Court entirely overlook the MCS Contract so as to reach the conclusion that, because TMA has a statutory obligation to set the rates at which non-network participating providers are reimbursed, the United States, and only the United States, may be held liable for Defendant's failure to pay according to those terms. Def. Op. Br. 19. However, this argument ignores the risk-shifting that occurs with the MCS Contract, under which *Defendant alone* makes the decision, and bears the risk, of whether to enter into express contracts with providers or to accept the default rates set by TMA. In either case, separate contracts are formed between *Defendant* and *providers*, the terms of which include rates of reimbursement that may be enforced by providers against Defendant, like any other contractual right. To allow Defendant to avoid the independent legal obligations it owes to subcontracting non-network providers would undermine the sea change that occurred when TMA moved from the pre-TRICARE "fiscal intermediary contracts" to the "at-risk" MCS Contracts.[14] By making

---

[14] Defendant relies on two cases that are inapposite here. *Christman v. Grays*, 2005 WL 3088529 (S.D. Ohio Nov. 17, 2005), is clearly distinguishable from the instant case because it involved an action for medical expenses brought by a non-network provider against a patient beneficiary, not an MCS Contractor. Because, under 32 C.F.R. § 199.16(d)(1), the provider's only recourse for payment was the government, neither the provider nor the government challenged the substitution of the United States as the defendant in *Christman*. *Id*. at *2. There is no such concession in this case, and the claims made here by TRICARE participating providers are directed against the MCS Contractor, and not against a TRICARE beneficiary.
(Continued…)

this shift, TMA made MCS Contractors accountable to providers for failing to make payment in accordance with their subcontracts.[15]  *See Bay Medical I*, 447 F.3d at 1375-76; *Baptist I*, 368 F.3d at 900.

The mere fact that Plaintiffs have certain appeal rights in the TRICARE administrative review process is irrelevant to this action because, as discussed below, disputes regarding a requirement of a regulation, such as the payment requirements of § 199.14(a)(5), are *not* appealable within the TRICARE administrative review process.  With regard to such a dispute, a non-network participating provider must turn to the courts for a determination of its rights.

## IV.    THE UNITED STATES IS NOT A NECESSARY OR INDISPENSABLE PARTY

The United States is neither a necessary nor indispensable party to this action.  Under Rule 19, the Court must first decide whether the United States is *necessary* to the litigation and thus must be joined.  If the Court determines that the United States must be joined, but that joinder is not feasible, the Court must then consider whether the United States is *indispensable* under Rule 19(b).  Only if the Court determines that the United States is both *necessary* and *indispensable* must the suit be dismissed.  *Angst v. Royal Maccabees Life Ins. Co.*, 77 F.3d 701,

_____

(Continued…)

*Bishop v. Office of Civilian Health & Med. Programs of the Uniformed Servs. (CHAMPUS)*, 917 F. Supp. 1469 (E.D. Wash. 1996), is likewise distinguishable because it involved a determination about the provision of services to a beneficiary, not the reimbursement due to providers for services.  TMA is obviously an interested party in cases that involve the scope of services provided to CHAMPUS beneficiaries.  By contrast, because CHAMPUS beneficiaries will continue to receive the same benefits regardless of the outcome of this dispute, the United States is not the real party in interest.

[15] Defendant's attempt to analogize itself to an independent contractor that provides payroll services to government employees based on a government pay scale is wholly inapposite because the analogy does not incorporate the "at-risk" nature of Defendant's relationship with the United States.  Def. Op. Br. 19-20.

23

705 (3d Cir. 1996); *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir. 1993). Here, the United States is neither necessary nor indispensable.

## A.    The United States Is Not A Necessary Party In This Litigation

Rule 19(a) provides that a party shall be joined if (1) "complete relief" cannot be accorded among the parties in the absence of the non-joined person, (2) the non-joined person has an interest relating to the case that may be impaired or impeded by the litigation, or (3) there is a substantial risk that a party will "incur[] double, multiple, or otherwise inconsistent obligations" absent the non-joined party.

Here, the Court can grant "complete relief" in the absence of the United States as a party because the subject of this lawsuit is Defendant's failure to meet contractual obligations *owed to Plaintiffs*. Plaintiffs challenge no conduct of the United States and seek no relief from the United States. TMA's rate-setting function does not eliminate the *independent commercial contract* that results when Plaintiffs, as non-network participating providers, treat Defendant's enrollees, nor does it establish privity between the United States and Plaintiffs. *See generally Metrophones*, 423 F.3d at 1075. The law is clear that, under these circumstances, complete relief may be granted without joining the United States as a necessary party under Rule 19(a). *See M.B. Guran Co., Inc. v. City of Akron*, 546 F.2d 201, 204 n.3 (6th Cir. 1976) (finding that Department of Housing and Urban Development ("HUD") is not an appropriate party in action alleging private defendant had violated HUD rule); *Friends of Concord Creek v. Springhill Farm Wastewater Treatment Facility Ass'n*, 2003 U.S. Dist. LEXIS 3123, at *3-4 (E.D. Pa. Feb. 13, 2003) (rejecting request to join state agency as indispensable party because private defendant was alleged to be violating terms of permit granted by agency and relief could therefore be granted without joinder); *Lummi Nation v. Golder Assocs., Inc.*, 236 F. Supp. 2d 1183, 1190-91 (W.D. Wash. 2002) ("Whether defendants breached their contractual obligations and/or violated [the

law] can be determined based on their own promises and actions, regardless of the contractual obligations and potential liability of [a federal program]."); *Winkler v. Interim Servs., Inc.*, 36 F. Supp. 2d 1026, 1028 (M.D. Tenn. 1999) (holding that federal agency was not an indispensable party because plaintiffs asked nothing of the United States and did not challenge any administrative action); *Dorsey v. Tompkins*, 917 F. Supp. 1195, 1200 (S.D. Ohio 1996) (same); *FHM Constructors, Inc. v. Village of Canton Housing Auth.*, 779 F. Supp. 677, 685-86 (N.D.N.Y. 1992) (finding complete relief could be granted without joining HUD as an indispensable party where actions of named defendant, not HUD, were at issue); *R.C. Hedreen Co. v. Crow Tribal Housing Auth.*, 521 F. Supp. 599, 608 (D. Mont. 1981) (same).

Furthermore, the cases are clear that the United States is not a necessary party in this action simply because TRICARE is a federal program, the United States promulgated § 199.14(a)(5), or federal funds are disbursed to MCS Contractors. "Courts are called upon daily to interpret federal laws and regulations . . . .  The fact that an agency may be able to lend its expertise to the interpretation of laws or regulations does not mandate its joinder as an indispensable party."  *Dorsey*, 917 F. Supp. 2d at 1200; *see also Baptist I*, 368 F.3d at 900 (interpreting TRICARE regulations in connection with providers' claim for reimbursement *without* joining the United States as a party); *OAO Healthcare Solutions*, 394 F. Supp. at 20 (administrative agency not a necessary party "despite its supervisory authority over activities" of contractor and subcontractor); *Lummi Nation*, 236 F. Supp. 2d at 1190-91 (federal agency not necessary party despite alleged misuse of federal funding); *Winkler*, 36 F. Supp. 2d at 1028 (agency that administers Medicare not necessary party where Medicare private contractor was alleged to be in violation of Medicare regulations).

Moreover, as discussed below, TMA has determined that the TRICARE appeals process does not cover a "dispute regarding a requirement of the law," 32 C.F.R. § 199.10(a)(6)(i), and that a party may not "challenge the propriety, equity, or legality of any provision of law or regulation" in a TRICARE administrative appeal, TRICARE Ops. Man., August 1, 2002, Ch. 13, § 1, ¶ 1.0 (Appendix B11). Having excluded from its own review such disputes and challenges, it would be incongruent to conclude that TMA deems itself a necessary party to every action that involves the interpretation of TRICARE regulations. Indeed, despite Defendant's obligation to notify TMA about this action so that TMA could "render a determination concerning whether the government should be a party to the legal process," TMA has not, to Plaintiffs' knowledge, taken any steps to intervene in this lawsuit. TRICARE Ops. Man. 6010.51-M, August 1, 2002, Ch. 1, § 6, ¶¶ 1.1, 1.2 (Appendix B6). There is simply no evidence, other than Defendant's speculation, that TMA's regulatory interests are threatened by Plaintiffs' claims.

Finally, there is no risk that Defendant would be subject to inconsistent obligations were the Court's interpretation of § 199.14(a)(5) to conflict with TMA's interpretation. Def. Op. Br. 12. Because Plaintiffs are demanding that Defendant *abide* by the TRICARE regulations, there is no threat that Defendant "could be required to take steps as a result of any judgment that are *inconsistent* with the regulations." Def. Op. Br. 12 (emphasis added). Likewise, because Defendant's MCS Contract expressly incorporates the TRICARE regulations and imposes upon Defendant an obligation to observe these requirements, Defendant will not be subject to an inconsistent *contractual* obligation by virtue of this case. Moreover, even if Defendant's contractual obligation to TMA to follow the TRICARE regulations could somehow conflict with the duties it owes to Plaintiffs, it is well-established that a person does not become necessary to an action to determine rights under a contract simply because that person's rights or obligations

under an *entirely separate contract* will be affected by the result of an action.  *See OAO Healthcare Solutions*, 394 F. Supp. 2d at 20 (holding that the United States "is not integral to the fair disposition of the contract claims" between government contractor and subcontractor); *see also Francis Oil & Gas, Inc. v. Exxon Corp.*, 661 F.2d 873, 878 (10th Cir. 1981); *Helzberg Diamond Shop, Inc. v. Valley West Des Moines Shopping Ctr., Inc.*, 564 F.2d 816, 820 (8th Cir. 1977); *Special Jet Servs., Inc. v. Fed. Ins. Co.*, 83 F.R.D. 596, 599 (W.D. Pa. 1979).  Thus, the United States is not a necessary party under any of the three factors under Rule 19(a).

### B.    The United States Is Not Indispensable Under Rule 19(b)

There is also no doubt that this case could continue "in equity and good conscience" without joining the United States.  In determining whether to proceed without a necessary party, courts consider: (1) the extent to which a judgment rendered in the person's absence might be prejudicial to the person or those already parties; (2) the extent to which the court can lessen or avoid such prejudice; (3) whether a judgment rendered in the person's absence will be adequate; and (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.  These factors support a decision to proceed without the United States here, even if it were held to be necessary under Rule 19(a).[16]

With respect to the first factor, Defendant will not be subjected to conflicting obligations and therefore will not be prejudiced if this case proceeds without the United States.  This case

---

[16] Contrary to Defendant's contention, the Third Circuit Court of Appeals has never adopted the view that there is "very little room for balancing" the Rule 19(b) factors when a necessary party enjoys sovereign immunity, and *no court* in the Third Circuit has ever relied upon any of the three cases Defendant cites as authority for this proposition.  *See* Def. Op. Br. 15.  On the contrary, in a case the Defendant cites in its Opening Brief, the Third Circuit balanced all four Rule 19(b) factors to determine whether the United States was indispensable, notwithstanding its sovereign immunity.  *Gardiner v. V.I. Water & Power Auth.*, 145 F.3d 635, 640-41 (3d Cir. 1998).  *Gardiner* demonstrates that the United States is not indispensable merely because it enjoys sovereign immunity.

involves "a commercial contract dispute between a federal contractor and its subcontractor." *OAO Healthcare Solutions*, 394 F. Supp. 2d at 21. Defendant has a separate contract with the United States (the MCS Contract), which expressly imposes an obligation on Defendant to operate in accordance with the TRICARE regulations. *See id.* at 20 n.7. Any dispute regarding Defendant's contractual obligations to TMA under the MCS Contract can be resolved in a *separate suit* between Defendant and TMA. *See Gardiner*, 145 F.3d at 642 (noting that the defendant "is free to pursue any claim it has against the United States in a separate action" to resolve inconsistent obligations). While it might "be more convenient and expeditious" for Defendant if its obligations to both Plaintiffs and TMA could be determined in a single lawsuit, it will not prejudice Defendant if this case proceeds without the United States, and more importantly, "equity does not demand dismissal of this case" merely for the convenience of Defendant. *OAO Healthcare Solutions*, 394 F. Supp. 2d at 21.

Similarly, the United States will not be prejudiced if this litigation proceeds in its absence. As other courts have held, the United States is not indispensable simply because the original source of the funds at issue is the United States Treasury. *See Gardiner*, 145 F.3d at 642; *OAO Healthcare Solutions*, 394 F. Supp. 2d at 20-21. *Gardiner* and *OAO Healthcare Solutions* are also instructive in demonstrating that TMA's "regulatory interests" will not be prejudiced if this case proceeds without the United States. In *Gardiner*, the court of appeals noted that "there [was] little danger of prejudice to the absent party – the United States – if this case goes forward without it" because "the United States does not want to become a party to the suit." *Id.* at 641. Here, by shifting from the "fiscal intermediary contracts" to the "at-risk" MCS Contracts and excluding this dispute from the TRICARE appeals process, the United States has made it clear that it does not wish to be a party to the purely private dispute between Plaintiffs

and Defendant and will not be prejudiced if it is not joined.  Likewise, in *OAO Healthcare Solutions*, the court rejected the defendants' claim that the Office of Personnel Management was indispensable simply because it was "the federal agency vested by Congress with the authority to supervise and administer all federal employee insurance programs under the [Federal Employees Health Benefits Act of 1959]."  394 F. Supp. 2d at 19.  An administrative agency is not an indispensable party to every case involving a statute that it administers or regulation it promulgates.  *See also Winkler*, 36 F. Supp. 2d at 1028; *Dorsey*, 917 F. Supp. at 1200-01.  Therefore, a judgment rendered in the absence of the United States would not cause prejudice to the United States nor to the Defendant and, by extension, the Court does not need to address the second factor of Rule 19(b).

The third factor of Rule 19(b) also weighs in Plaintiffs' favor and supports a finding that the United States is not indispensable.  Just as in *Gardiner* and *OAO Healthcare Solutions*, a judgment in Plaintiffs' favor here would be effective and permit Plaintiffs to recover fully from Defendant, regardless of whether the United States is joined.  Notwithstanding Defendant's assertion to the contrary, *Plaintiffs* will not have to pursue parallel litigation against TMA if the agency disagrees with the Court's interpretation of § 199.14(a)(5).  *See* Def. Op. Br. 16-17.  If separate litigation is necessary, it will be litigation between *Defendant* and TMA to determine their rights and obligations under the MCS Contract.  Such a subsequent litigation will not involve Plaintiffs, and thus, is collateral to Plaintiffs' claims under their subcontracts with Defendant and will not affect their ability to recover from Defendant here.  *See Gardiner*, 145 F.3d at 642; *OAO Healthcare Solutions*, 394 F. Supp. 2d at 21.

Similarly, the final factor likewise weighs against dismissal because Plaintiffs do not have an alternative remedy available to them.  This legal dispute is not appealable within the

TRICARE review process. 32 C.F.R. § 199.10(a)(6)(i). Furthermore, Plaintiffs cannot bring a direct claim against the United States in the Court of Claims because their claims are not based on "a contract of any sort with the United States" and do not constitute "a cause of action against the United States." *Gardiner*, 145 F.3d at 642-43. It is Defendant, not the United States, who owed Plaintiffs a duty to pay, in accordance with § 199.14(a)(5), for health care services provided by Plaintiffs to Defendant's enrollees. Thus, Plaintiffs' rights must be vindicated in a suit against Defendant, not against the United States.

### C.    The Bohall Affidavit Should Be Stricken Because It Is Not Probative Of The Indispensability Of The United States In This Action

As set forth above, in addressing Defendant's motion to dismiss, the only argument for which the Court may consider evidence outside the Complaint is the argument that the United States is an indispensable party. *See McCurdy*, 2003 U.S. Dist. LEXIS 1349, at *11. However, nothing in the Bohall Affidavit relates to or is probative of the purported indispensability of the United States in this action. Therefore, the Bohall Affidavit is improper evidence that is outside of the Complaint. In addition, the Bohall Affidavit, and paragraph 8 in particular, contains hearsay. For these reasons, the Bohall Affidavit should be stricken from the record.

The Bohall Affidavit on its face makes clear that the "evidence" it purports to admit has no bearing whatsoever on whether or not the Government is an indispensable party in this action. Rather, the Bohall Affidavit merely suggests, without any factual or documentary support, that TMA has "audited" and "approved" Defendant's reimbursement of Plaintiffs. However, the fact that Defendant was "audited" by TMA, even if supported with proper foundation and documentation, does not in any way address Defendant's theory as to why the United States should be joined as an indispensable party. Consequently, the Bohall Affidavit should be stricken from the record.

To the extent that the Court denies Plaintiffs' request to strike the Bohall Affidavit and instead considers it in evaluating Defendant's motion under 12(b)(7), Plaintiffs must be provided with an opportunity to conduct discovery to address the points raised in the Bohall Affidavit. As noted above, the Bohall Affidavit contains bald, unsupported statements for which there is no foundation. For example, the Bohall Affidavit is devoid of any details of how the audits are conducted, what information Defendant provides to TMA during the course of the audit, and whether the audits review Defendant's payment of facility charges. Similarly, paragraph 8 of the Bohall Affidavit consists of unequivocal hearsay statements which cannot be used under any circumstances in support of any motion. *See Dawley v. Erie Indem. Co.*, 100 F. App'x 877, 882 (3d Cir. 2004) (supporting affidavit's "lack of personal knowledge, its reliance on hearsay, and its completely speculative nature, . . . runs afoul of Rule 56(e) of the Federal Rules of Civil Procedure" and was not considered on summary judgment). Plaintiffs cannot be deprived of a fair opportunity to challenge the statements and in order to do so need discovery with respect to the issues raised in the Bohall Affidavit. Accordingly, if the Court is willing to consider the Bohall Affidavit, it should provide Plaintiffs with an opportunity to gather and secure evidence on this issue. *See Jurimex Kommerz*, 65 F. App'x at 807; *Cushman & Wakefield*, 1991 U.S. Dist. LEXIS 11906, at *4; Fed. R. Civ. P. 19 advisory committee's note.

## V.    THE ADMINISTRATIVE EXHAUSTION DOCTRINE IS INAPPLICABLE BECAUSE PLAINTIFFS COULD NOT HAVE APPEALED THIS DISPUTE WITHIN THE TRICARE ADMINISTRATIVE REVIEW PROCESS

Defendant's argument that the Complaint must be dismissed because Plaintiffs have failed to exhaust their administrative remedies prior to bringing this action is without merit. As Plaintiffs have alleged, Plaintiffs' dispute with Defendant is a "non-appealable" issue, and therefore, could not have been raised as a TRICARE appeal. Thus, dismissal based on the

exhaustion doctrine would be inappropriate because this dispute could not have been, and cannot be, resolved within the TRICARE administrative appeals process.

Although the "CHAMPUS regulations provide an extensive administrative appeal procedure" under 32 C.F.R. § 199.10, *see* Def. Op. Br. 23 (citing *Trauma Serv. Group v. Keating*, 907 F. Supp. 110, 113 (E.D. Pa. 1995), even Defendant recognizes that an absolute prerequisite "for an adverse determination to be appealed" is the existence of an "appealable issue," *see* Def. Op. Br. 24 ("The procedures described above are available for resolution of any 'appealable issue'"). An "appealable issue" is defined as "[d]isputed questions of *fact* which, if resolved in favor of the appealing party, would result in the authorization of CHAMPUS benefits, or approval as an authorized provider." 32 C.F.R. § 199.2 (emphasis added); TRICARE Ops. Man., August 1, 2002, Ch. 13, § 2, ¶ 3.2 (Appendix B22). Specifically among the issues that TMA has expressly listed as *not* appealable within the administrative review process is a "dispute regarding a requirement of the law or regulation." 32 C.F.R. § 199.10(a)(6)(i).

Here, the *only* issue in dispute is what reimbursement is required under § 199.14(a)(5). Plaintiffs assert that § 199.14(a)(5) imposes upon Defendant an obligation to reimburse non-network participating hospitals for facility charges related to all outpatient services provided to CHAMPUS beneficiaries "as billed." Defendant contends that, despite the plain language of § 199.14(a)(5), it is required by the regulation to pay *only* the "CHAMPUS-allowable charge" that corresponds to a given service *but not* the facility charge that a hospital bills in relation to that service. *See* Def. Op. Br. 6. Unquestionably, this dispute can only be characterized as "a dispute regarding a requirement of the law or regulation," as it turns on the legal requirements of § 199.14(a)(5). *Id.* § 199.10(a)(6)(i). Therefore, this dispute is "non-appealable" under the

regulations, which Plaintiffs have properly pled. *See* First Am. Compl. ¶ 37 ("HNFS's failure to pay the Facility Charges for the Subject Claims, despite (i) regulations governing TRICARE, (ii) TMA's longstanding policy, and (iii) the confirming letter sent to HNFS by DoD directly addressing this issue, *is not appealable under the regulations governing TRICARE*." (emphasis added)).

Defendant spuriously attempts to portray § 199.10(a)(6)(i) as barring only challenges to "the *validity* of the applicable rules or regulations." *See* Def. Op. Br. 25 (emphasis added). However, the plain language of § 199.10(a)(6)(i) applies much more broadly to prohibit appeals of any "dispute regarding a *requirement* of the law or regulation," not just disputes regarding the *validity* of a regulation. Consequently, *any* purely legal determinations, such as the "requirements" or "validity" of a law or regulation, are outside of the TRICARE administrative review process and are therefore uniquely within the province of the courts to determine. The legal dispute between Plaintiffs and Defendant falls squarely within the scope of § 199.10(a)(6)(i).[17]

## VI.   THE DOCTRINE OF PRIMARY JURISDICTION IS NOT APPLICABLE WHERE THE COURT NEEDS ONLY TO INTERPRET A REGULATION

The primary jurisdiction doctrine is inapplicable to this action and therefore cannot be invoked as a basis for the Court to transfer the action to TMA. This doctrine loosely refers to a court's discretionary authority, in certain circumstances, to defer its power to hear an action

---

[17] A requirement that a plaintiff must appeal a "non-appealable" claim, if only so that TMA can confirm the claim is in fact "non-appealable," would render the regulations and manual provisions concerning "non-appealable" issues meaningless. Similarly, the "non-appealability" of Plaintiffs' claims renders moot Defendant's assertion that agency autonomy, agency expertise, separation of powers, and judicial economy compel exhaustion in this case. *See* Def. Op. Br. 26. Because the legal issue involved in this dispute is "non-appealable," a dismissal of Plaintiffs' claims on the grounds of exhaustion would not open the administrative review process to Plaintiffs, or otherwise vindicate that process. 32 C.F.R. § 199.10(a)(6)(i).

pending an administrative determination of issues that are both particularly within the agency's expertise *and* outside the usual competence of a court. *Far E. Conference v. United States*, 342 U.S. 570, 574-75 (1952). "No fixed formula exists for applying the doctrine of primary jurisdiction." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956); *see also Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 672 (2003) (Breyer, J., concurring). Instead, the court must make a practical determination of whether the purposes of the doctrine "will be aided by its application in the particular litigation." *W. Pac. R.R. Co.*, 352 U.S. at 64; *see also Ricci v. Chicago Mercantile Ex.*, 409 U.S. 289, 321 (1973) (Marshall, J., dissenting) ("[T]he primary jurisdiction doctrine, like the related exhaustion requirement, must not be 'applied blindly in every case' without 'an understanding of its purposes and of the particular administrative scheme involved.'" (quoting *McKart v. United States*, 395 U.S. 185, 193, 201 (1969))). Indeed, the doctrine is not, as Defendant has suggested, a broad invitation to courts to decline to decide any case which falls within the general rubric of an administrative agency's competence. *See MCI Telecomms. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1104 (3d Cir. 1995) ("'Accommodation of the judicial and administrative functions does not mean abdication of judicial responsibility.'" (quoting *Elkin v. Bell Tel. Co.*, 420 A.2d 371, 377 (Pa. 1980))).

Significantly, the primary jurisdiction doctrine "presupposes that the administrative agency to which referral is made has jurisdiction over the subject matter of the action." *Puerto Rico Maritime Shipping Auth. v. Valley Freight Sys., Inc.*, 856 F.2d 546, 549 (3d Cir. 1988). Where an agency has no procedures under which to review and resolve the issue involved in a case, a stay under the doctrine of primary jurisdiction is inappropriate. *Rosado v. Wyman*, 397 U.S. 397, 405-06 & n.8 (1970). Here, TMA has, by its own regulations, excluded from its jurisdiction the issue now before this Court. 32 C.F.R. § 199.10(a)(6)(i). By establishing that

34

disputes regarding the requirements of a regulation are "non-appealable" within its administrative review process, TMA has waived any claim that it otherwise may have had that such legal issues are within its primary jurisdiction.

Not surprisingly, Defendant has pointed to no reported decision in which a court has referred a case to TMA under the doctrine of primary jurisdiction and, indeed, Plaintiffs' legal research did not locate a single case in which primary jurisdiction was even raised in a case involving TMA, TRICARE, or CHAMPUS.  On the other hand, there are instances in which courts have interpreted TRICARE regulations on their own, without seeking the guidance of TMA.  *See Baptist Phys. Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 2007 U.S. App. LEXIS 6447, at *14 (6th Cir. Mar. 21, 2007) (hereinafter *Baptist II*) (utilizing de novo standard of review to interpret the TRICARE regulations dealing with "capital payments"); *id.* at *15 (resolving an issue that "turn[ed] on the question of regulatory interpretation" without referring case to TMA).  Accordingly, Defendant's arguments that this dispute should be referred to TMA fail on this ground alone.

Furthermore, the doctrine of primary jurisdiction is also inapplicable because its purpose is to allow an agency to resolve issues not within the conventional experience of judges.  *Far E. Conference*, 342 U.S. at 574-75.  Here, the Court is asked simply to interpret § 199.14(a)(5) and determine what is required under it.  Because this case involves the interpretation of a regulation, this Court, like the Sixth Circuit Court of Appeals in *Baptist II*, is perfectly suited and well within its authority to handle the matter without first referring it to TMA for an initial determination.  *See W. Pac. R.R.*, 352 U.S. at 65-66 (noting that courts may pass on the construction of an administratively created tariff "where the question is simply one of construction" such that the court "may pass on it as an issue solely of law"); *Dorsey*, 917 F.

Supp. at 1200 (noting that "[c]ourts are called upon daily to interpret federal laws and regulations" and that they may do so without referring to "an agency that may be able to lend its expertise to the interpretation of laws or regulations").   Accordingly, Defendant's primary jurisdiction argument cannot withstand judicial scrutiny.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request the Court deny Defendant's Motion in its entirety.

Dated: April 16, 2007                    DUANE MORRIS LLP


                                         /s/  Matt Neiderman
*OF COUNSEL*                             Matt Neiderman (Del. Bar No. 4018)
John J. Soroko                           DUANE MORRIS LLP
Seth A. Goldberg                         1100 N. Market St., Suite 1200
DUANE MORRIS LLP                         Wilmington, Delaware 19801
30 South 17th St.                        302.657.4900
Philadelphia, PA 19103                   302.657.4901 *fax*
215.979.1000                             mneiderman@duanemorris.com
215.979.1020 *fax*

Michael R. Gottfried                     Gregory A. Brodek
Patricia R. Rich                         DUANE MORRIS LLP
DUANE MORRIS LLP                         88 Hammond Street, Suite 500
470 Atlantic Avenue, Suite 500           Bangor, ME 04401
Boston, MA 02210                         207.262.5440
857.488.4290                             207.262.5401 *fax*
857.488.4201 *fax*

*Attorneys for Plaintiffs Northern Michigan Hospitals, Inc.*
*and Gifford Medical Center, Inc., for themselves and*
*on behalf of all other similarly situated class members*

DM1\1091701.5

37

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NORTHERN MICHIGAN HOSPITALS,　　　:
INC. and GIFFORD MEDICAL　　　　　　:
CENTER, INC., *for themselves and*　　:
*on behalf of all other similarly*　　　　:
*situated class members,*　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:　　Civil Action No. 07-39 (GMS)
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:　　JURY TRIAL DEMANDED
　　　　　　　　　　Plaintiffs,　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:　　CLASS ACTION
　　　　　　v.　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
HEALTH NET FEDERAL SERVICES,　　:
LLC, (f/k/a HEALTH NET FEDERAL　　:
SERVICES, INC.),　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendant.　　　　　　:

## APPENDIX IN SUPPORT OF THE ANSWERING BRIEF OF PLAINTIFFS IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*OF COUNSEL*
John J. Soroko
Seth A. Goldberg
DUANE MORRIS LLP
30 South 17th St.
Philadelphia, PA 19103
215.979.1000
215.979.1020 *fax*

Michael R. Gottfried
Patricia R. Rich
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
857-488-4290
857-488-4201 *fax*

Matt Neiderman (Del. Bar No. 4018)
DUANE MORRIS LLP
1100 N. Market St., Suite 1200
Wilmington, Delaware 19801
302.657.4900
302.657.4901 *fax*
mneiderman@duanemorris.com

Gregory A. Brodek
DUANE MORRIS LLP
88 Hammond Street, Suite 500
Bangor, ME 04401
207.262.5440
207.262.5401 *fax*

*Attorneys for Plaintiffs Northern Michigan Hospitals, Inc.*
*and Gifford Medical Center, Inc., for themselves and*
*on behalf of all other similarly situated class members*

Dated: April 16, 2007

## <u>TABLE OF CONTENTS</u>

**Document**                                                                        **Page**

"TRICARE Operations Manual," DoD Directive 6010.51-M (August 1, 2002)
  (Revised as of March 27, 2007)

Chapter 1, Section 2.................................................................................................B1

Chapter 1, Section 6.................................................................................................B5

Chapter 3, Section 6.................................................................................................B8

Chapter 13, Section 1.............................................................................................B10

Chapter 13, Section 2.............................................................................................B17

"TRICARE OPERATIONS MANUAL"
DOD DIRECTIVE 6010.51-M (AUGUST 1, 2002)
(REVISED AS OF MARCH 27, 2007)

CHAPTER 1, SECTION 2

CHAPTER 1
SECTION 2

# CONTRACT ADMINISTRATION AND INSTRUCTIONS TO CONTRACTORS

## 1.0. GENERAL

The foundation of the business relationship between TMA and the Managed Care Support contractor is the contract. The contract normally includes, directly or by reference, requirements of the Federal Acquisition Regulation (FAR) and its supplements, excerpts of the contractor's proposal (as incorporated by TMA), 32 CFR 199, the TRICARE Operations Manual (6010.51-M), the Policy Manual (6010.47-M), the TRICARE Reimbursement Manual, the TRICARE Systems Manual, and supplemental instructions officially issued by TMA.

## 2.0. TRICARE MANUALS

These include the TRICARE Operations Manual, the TRICARE Policy Manual, the TRICARE Reimbursement Manual, and the TRICARE Systems Manual. The TRICARE Manuals are the principal vehicles for general operating instructions to all health care delivery contractors and may be accessed at http://www.tricare.osd.mil/tricaremanuals. The official archive copies of these documents are maintained at TMA. The documents and all official changes to them will be maintained at TMA in an electronic medium using the PDF (Portable Document Format) format, and are available for distribution to contractors via three different media: printed paper, CD-ROM, and downloading from a designated file location in an electronic format. Regardless of publication medium, their printed and displayed appearance will be identical. The principal means of distribution will be via an electronic notification of publication and the contractor's subsequent download of the manual or change from a TMA designated file location. Paper copies of manuals or changes to those Manuals will be furnished to contractors only in those limited quantities currently utilized for contract administration. All proposed changes to these documents will be distributed for review and comment in an electronic medium, using PDF as the document format, and comments must be returned to TMA in an acceptable electronic format. Contractors shall furnish the TMA Contracting Officer with designated point(s) of contact and email address(es) for review and comment on proposed manual changes, and notification of final publication of manual changes.

## 3.0. LETTERS

Letters are used for routine contract administrative matters not covered in the above manuals. Letters which give new instructions are signed by a Contracting Officer. Routine contract administrative matters do not include TRICARE benefit determination and reimbursement functions for which instructions are provided in the manuals. In limited circumstances, urgent instructions may be issued in an individual letter and then followed by manual changes.

B2

**4.0.    IMPLEMENTATION OF INSTRUCTIONS**

The contractor shall implement changes in instructions as specified in the "changes" clause of the contract. If a contractor is unable to comply by the effective date, the TMA AM&S Contracting Officer, shall be notified, in writing, within ten days of receipt of the instructions. The notification shall include the reasons for the noncompliance and a proposal for reaching compliance. The proposal shall include milestones, if appropriate, and a firm date for completion. It is essential that a contractor distribute TRICARE instructions to all of its appropriate personnel, including any subcontractor and, as needed, contracted providers. The contractor shall ensure that new instructions are distributed and implemented on a timely basis. TRICARE manuals (including additions, deletions, and amendments) and instructions will be forwarded as required by changes or need for clarification. Requests for additional copies or for clarification shall be directed to the contracting officer or contracting officer's representative.

**5.0.    COMMUNICATIONS WITH TMA**

**5.1.**    The contractor shall:

**5.1.1.**    Provide complete replies to TMA requests for rough orders of magnitude, comments and/or cost estimates on proposed changes to the manuals within 30 calendar days following receipt of the request unless a different period of time is provided by TMA in the transmitting correspondence. TMA will allow 30 days for response to major changes. Fewer days will be allowed for minor changes; i.e., changes which are not complex or changes which do not require substantial programming effort and/or extensive cost proposals by the contractor. In addition, in the event of an urgent need imposed by law or a program requirement under which significant loss to the government would result from delay, a period of less than 30 days will be imposed, whether it is a major or minor change.

**5.1.2.**    Provide timely responses to all requests for information directed to them by TMA.

**5.1.3.**    All cost estimates/proposals for changes shall be sent to TMA with a detailed breakdown of the time required for analyses, programming and testing requirements including machine time, where appropriate.Proposals involving substantial amounts of time may require on-site review by TMA personnel.

**5.1.4.**    Use assigned contracting officer representatives (CORs) at TMA as the initial point of contact for program interpretation or other forms of guidance unless it is a situation which falls within the specific exceptions listed below.

**5.1.5.**    The contractor shall directly contact the TMA Contracting Officer in response to:

- Requests for information necessary to answer in-house correspondence.

- Requests for information applicable to individual appeal cases and final decision letters.

- Communications regarding termination or suspension of providers of care.

B3

Case 1:07-cv-00039-GMS    Document 21-2    Filed 04/16/2007    Page 6 of 28

TRICARE OPERATIONS MANUAL 6010.51-M, AUGUST 1, 2002
CHAPTER 1, SECTION 2
CONTRACT ADMINISTRATION AND INSTRUCTIONS TO CONTRACTORS

- Requests for information on potential fraud or abuse cases.

- Information concerning scheduled on-site reviews.

- Communications regarding litigation cases.

- Provider authorization questions.

- Questions or requests for comment on press releases and related materials published by TMA. Copies of releases shall be sent to all contractors to keep them informed of TRICARE information activities.

- Information concerning the creation and transmission of health care data.

**6.0.    TMA-REQUIRED MEETINGS**

**6.1.**    A 14 calendar day notice will be provided by the Contracting Officer for all meetings hosted by TMA. The contractor shall provide annual representation at two contractor conferences (senior management level) at TMA, two regional contractor and two regional provider conferences, and one Provider Representative meeting at TMA. The contractor shall provide up to four Provider Representatives at up to four additional meetings at the direction of the Contracting Officer per contract year. The cost of attendance at these meetings shall be included in the contractor's cost for Administrative Support Services.

**7.0.    TMA DELEGATION OF AUTHORITY**

Authority has been delegated to the Director, TMA, Beneficiary and Provider Services (BPS) to perform the following:

- Grant exceptions to the claims filing deadline,

- Grant "good faith payments",

- Waive the signature requirements on TRICARE claims,

- Adjudicate and process unique claims requiring special handling, and claims for emergency care provided by a Department of Veterans Affairs (DVA) facility or a facility under the Bureau of Indian Affairs,

- Authorize benefits for which the authority has not otherwise been delegated to other TRICARE officials or contractors,

- Authorize an "override" of information contained on DEERS, pending a system update, based on appropriate documentation regarding eligibility under the law, regulation and policy.

B4

"TRICARE OPERATIONS MANUAL"
DOD DIRECTIVE 6010.51-M (AUGUST 1, 2002)
(REVISED AS OF MARCH 27, 2007)

---

CHAPTER 1, SECTION 6

TRICARE OPERATIONS MANUAL 6010.51-M, AUGUST 1, 2002
ADMINISTRATION

CHAPTER 1
SECTION 6

# LEGAL MATTERS

## 1.0.    LITIGATION

**1.1.**    The Office of General Counsel, TMA, shall be notified by telephone immediately upon receipt of any summons, writ, or other legal process which develops as a result of performance under a TRICARE contract. In no event, shall the telephonic notice to TMA General Counsel be more than three workdays following receipt of any such legal process which could involve TRICARE. Such notice shall include the nature of the legal process, the name of the court of jurisdiction, the parties named in the suit, the type of TRICARE issue or claim involved, the amount involved and any other relevant information. Additionally, copies of all documentation shall be transmitted to TMA by facsimile as soon as possible and followed up with hardcopy mailed to The Office of General Counsel, TMA, on the same workday as telephone notice is given.

**1.2.**    The United States reserves the right to render a determination concerning whether the government should be a party to the legal process. Additionally, TMA will determine if the contractor is to be indemnified against judgments, settlements and costs in favor of an individual, or his or her assignee, in accordance with any applicable indemnification clauses in the TRICARE contract.

**1.3.**    In some cases, the Office of General Counsel, TMA, may determine that the government is the real party in interest to an action which challenges a TRICARE determination. In such a case, the suit may be removed from a State court to the appropriate United States District Court, however, such action must be taken immediately. Therefore, it becomes imperative that the contractor fully cooperates with TMA counsel assigned to direct the case. TMA counsel may request the appropriate United States Attorney to the district court of the United States for the district and division embracing the place wherein the action is pending, dismiss the contractor, and substitute the United States of America as defendant in its place. In other cases, the Office of General Counsel may determine the issue is a private matter between the plaintiff and the defendant contractor or subcontractor. Additionally, the court may decline to substitute parties. Nevertheless, in some cases, the contractor may remain fully responsible for defending the case.

**1.4.**    Acts of fraud, theft, embezzlement, or sabotage involving TRICARE funds or materials, may constitute violations of the United States Criminal Code and ensuing investigations may be matters within the jurisdiction of the Federal government. In such cases, as stated above, immediate notice shall be given to the Office of General Counsel, TMA. When the act clearly involves **only** contractor funds, action should be instituted by the contractor under the laws of the state with jurisdiction.

**2.0.    SUBPOENAS**

Department of Defense regulations restrict contractor disclosure of information obtained in carrying out its TRICARE functions. When a contractor is served with a subpoena in connection with its TRICARE responsibilities, the Office of General Counsel, TMA shall be notified in a timely manner to safeguard against the unauthorized disclosure of information. This procedure will be followed whether the subpoena is for reproduction of records which are, or may be protected, or for the personal appearance of a representative of the contractor. If a contractor is served a summons by the U.S. Internal Revenue Service to produce and disclose any file, record, report or other paper, or information in connection with TRICARE and Federal tax laws, the summons must be honored. The assistance of TMA shall be requested immediately if the contractor encounters any problems in complying with the IRS request (e.g., machine capability, cost).

**3.0.    ASSIGNMENTS OF PROVIDERS' RIGHTS TO PAYMENT**

A provider of services in need of funds might arrange for a commercial loan from a bank or other lending institution and, as collateral on the loan, attempt to assign its TRICARE payments to the creditor. Such TRICARE benefit payments shall be made only to providers of services which are eligible to file for such payment. The authorization given by Congress to expend TRICARE funds does not permit compliance with a commercial assignment, even though such arrangement may otherwise be in full compliance with the law of the appropriate state.

**4.0.    BANKRUPTCY**

When any TRICARE debtor files a petition in bankruptcy, contractors will follow the instructions in Chapter 11, Section 3, paragraph 23.0. When a TRICARE provider files a petition in bankruptcy, regardless of whether there is an outstanding recoupment action against that provider, contractors will follow the applicable laws of the state in which the bankruptcy was filed.

B7

"TRICARE OPERATIONS MANUAL"
DOD DIRECTIVE 6010.51-M (AUGUST 1, 2002)
(REVISED AS OF MARCH 27, 2007)

---

CHAPTER 3, SECTION 6

TRICARE OPERATIONS MANUAL 6010.51-M, AUGUST 1, 2002
FINANCIAL ADMINISTRATION

CHAPTER 3
SECTION 6

# PAYMENTS TO BENEFICIARIES/PROVIDERS

## 1.0.    CHECKS

When issuing checks for payments to beneficiaries and providers, the contractor shall use the following formats/statements:

- The check shall be dated the same date the contractor received authorization from TMA, CRM Budget Office to release checks.

- The words "TRICARE Payment" shall be printed in at least 18-point font at the top of the check.

- The TRICARE logo and the contractor's name and address shall be on the check.

- The following endorsement statement shall be printed using 4 or 5 point type in the 1.5 inches allotted on the reverse side of the check. This will comply with Federal Reserve Bank Regulation CC regarding check endorsements. The endorsement shall read as follows:

  "This payment is made with Federal funds. Fraud in procuring, forging of signature or endorsement, or materially altering this check is punishable under the U.S. Criminal Code. IF PAYABLE TO A PARTICIPATING PROVIDER OF SERVICES - By endorsing this check, the undersigned payee agrees that he/she is subject to the terms of the participating agreement (assignment) as set forth in the TRICARE regulation."

- A statement that the check must be negotiated within 120 calendar days.

## 2.0.    ELECTRONIC FUNDS TRANSFER (EFT)

Payments may be made by EFT to beneficiaries and providers. EFTs shall be done under the same guidelines as checks other than situations unique to EFT type transactions (i.e., EFTs do not staledate since an EFT is accepted or returned almost immediately).

"TRICARE OPERATIONS MANUAL"
DOD DIRECTIVE 6010.51-M (AUGUST 1, 2002)
(REVISED AS OF MARCH 27, 2007)

CHAPTER 13, SECTION 1

Chapter 13
Section 1

# General

## 1.0.    PURPOSE OF APPEAL PROCESS

An appeal under TRICARE is an administrative review of program determinations made under the provisions of law and regulation. An appeal cannot challenge the propriety, equity, or legality of any provision of law or regulation. This chapter sets forth the policies and procedures for appealing decisions made by *TRICARE* and the National Quality Monitoring Contractor (NQMC) that adversely affect the rights and liabilities of beneficiaries and participating providers, and providers denied the status of an authorized provider under TRICARE.

## 2.0.    AUTHORITY

Title 32, Code of Federal Regulations (CFR), Part 199 authorizes the appeal process. It established the appeals and hearing process effective April 4, 1977. The procedures and principles included in this chapter are based on the requirements of 32 CFR 199.10. For additional information regarding the appeal process refer to Chapter 12, Section 6, "Provider Exclusions, Suspensions and Terminations"; and the TRICARE Policy Manual, Chapter 1, Section 4.1, "Waiver of Liability".

## 3.0.    CONTRACTOR RESPONSIBILITIES

It is the responsibility of the contractor to ensure that the rights of appealing parties are protected at all levels of the appeal process in which the contractor participates. The contractor's responsibility begins with the initial determination and does not end until a final resolution is reached, including, where appropriate, timely payment following a reversal.

## 3.1.    Initial Determinations

The contractor shall develop a written plan and implement a formal appeal process that incorporates the requirements for initial medical necessity and factual determinations set forth below. The contractor shall issue a dated initial determination in the form of an Explanation of Benefits (EOB) or a letter. The initial determination shall contain sufficient information to enable the beneficiary or provider to understand the basis for the denial. The initial determination shall state with specificity what services and supplies are being denied and for what reason. The contractor shall retain a legible hardcopy or microcopy of the initial determination or be able to produce a duplicate EOB from electronic records upon request. The initial determination shall include adequate notice of appeal rights and requirements. If a request for authorization for services or supplies is denied and a claim is later submitted for the services or supplies, both the denial of authorization and the claim denial are considered initial determinations and, therefore, either may be appealed. Suggested notices are at paragraph 3.6. and paragraph 3.7. below.

**3.2.    Medical Necessity Initial Determinations**

The appeal process applicable to medical necessity initial denial determinations is addressed in Chapter 13, Section 4. A flow chart diagramming the appeal process relating to medical necessity denials is at Chapter 13, Addendum A, Figure 13-A-5.

**3.3.    Factual Initial Determinations**

The appeal process applicable to factual initial denial determinations is addressed in Chapter 13, Section 5. A flow chart diagramming the appeal process relating to factual denials is at Chapter 13, Addendum A, Figure 13-A-6.

**3.4.    TRICARE/Medicare Dual Eligible - Initial Determinations**

Services and supplies denied payment by Medicare will not be considered for coverage by TRICARE if the Medicare denial of payment is appealable under the Medicare appeal process. If, however, a Medicare appeal results in some payment by Medicare, the services and supplies covered by Medicare will be considered for coverage by TRICARE. Services and supplies denied payment by Medicare will be considered for coverage by TRICARE, if the Medicare denial of payment is not appealable under the Medicare appeal process. The appeal procedures set forth in this chapter are applicable to initial denial determinations by TRICARE under the TRICARE Dual Eligible Fiscal Intermediary Contract. *A flow chart diagramming the appeal process relating to TRICARE/Medicare dual eligible appeals is at Chapter 13, Addendum A, Figure 13-A-7.*

**3.5.    Written Notice Of Initial Determination (Not EOB)**

Suggested wording for a nonexpedited written appeal notice (including factual determinations):

> "An appropriate appealing party (i.e., (1) the TRICARE beneficiary, (2) the non-network participating provider of care, or (3) a provider of care who has been denied approval under TRICARE or the appointed representative of an appropriate appealing party who is dissatisfied with the initial determination has the right to request a reconsideration. To avoid a possible conflict of interest, an officer or employee of the United States, such as an employee or member of a Uniformed Service, including an employee or staff member of a Uniformed Service legal office, or a Health Benefits Advisor, subject to the exceptions in Title 18, United States Code, Section 205, is not eligible to serve as a representative. An exception usually is made for an employee or member of a Uniformed Service who represents an immediate family member. The request must be in writing, must be signed, and must be postmarked or received by (insert name of contractor, postal address, e-mail address, and fax number), within 90 calendar days from the date of this decision and must include a copy of this decision. For purposes of TRICARE, a postmark is a cancellation mark issued by the United States Postal Service. If the

TRICARE OPERATIONS MANUAL 6010.51-M, AUGUST 1, 2002
CHAPTER 13, SECTION 1
GENERAL

postmark on the envelope is not legible, then the date of receipt is deemed to be the date of filing."

"Additional documentation in support of the appeal may be submitted; however, because a request for reconsideration must be postmarked or received within 90 calendar days from the date of this decision, a request for a reconsideration should not be delayed pending the acquisition of additional documentation. If additional documentation is to be submitted at a later date, the letter requesting the reconsideration must include a statement that additional documentation will be submitted and the expected date of submission."

"Upon receiving your request, all TRICARE claims related to the entire course of treatment will be reviewed."

**3.6.    Suggested Modified Wording For An Appeal Of A Preadmission/Preprocedure Initial Denial Determination**

"A TRICARE beneficiary, or the appointed representative of the beneficiary, who is dissatisfied with the initial determination, may request an expedited reconsideration. The request must be in writing, must be signed, must be received by (insert contractor name, postal address, e-mail address, and fax number) within three (3) calendar days after receipt of this denial determination, and must include a copy of this denial determination. A request for an expedited reconsideration which is received after the expedited reconsideration filing deadline will be addressed as a nonexpedited reconsideration. We recommend that you submit any additional documentation with the request for an expedited reconsideration. Upon receiving your request, all TRICARE claims related to the entire course of treatment will be reviewed."

**3.7.    Suggested Modified Wording For An Appeal Of A Concurrent Review Initial Denial Determination**

"A TRICARE beneficiary, who is an inpatient in the facility, or the appointed representative of the beneficiary who is dissatisfied with the initial determination, may request a reconsideration. The request must be in writing, must be signed, and must be sent to (insert contractor name, postal address, e-mail address, and fax number). To ensure expedited processing of a request for reconsideration, the beneficiary must submit the request by noon of the day following the day of receipt of this denial determination; however, a request for reconsideration which is received after the reconsideration filing deadline, but which is postmarked or received within 90 calendar days from the date of this denial determination, will be accepted. A request for reconsideration must include a copy of the denial determination. We recommend that you submit any additional documentation with

B13

the request for reconsideration. Upon receiving your request, all TRICARE claims related to the entire course of treatment will be reviewed."

**3.8.    Submission Of Reconsideration Requests**

The contractor shall establish unique post office boxes or addresses for submission of reconsideration requests.

**4.0.    WAIVER OF LIABILITY**

If applicable, waiver of liability as it applies to the beneficiary and non-network provider for services found not to be medically necessary, at an inappropriate level, custodial care, or other reasons relative to reasonableness, necessity or appropriateness of care, shall be addressed in the initial determination. Refer to Chapter 13, Section 4, paragraph 4.0. for additional information relating to the applicability of waiver of liability.

**5.0.    UNDELIVERABLE INITIAL DETERMINATIONS**

If the notice of initial determination is returned as undeliverable, the contractor shall follow the procedures set forth in *Chapter 8, Section 6, paragraph 6.0.*

**6.0.    NOTICE TO PROVIDER SEEKING AUTHORIZED PROVIDER STATUS**

When a provider has requested approval as a TRICARE provider, the contractor shall mail the initial notice of approval or disapproval to the last known address of the provider.

**7.0.    FINALITY OF INITIAL DETERMINATION**

The initial determination is final and binding unless the initial determination is reopened by the contractor or revised upon appeal.

**8.0.    PROVIDING ASSISTANCE**

**8.1.    To Appealing Parties**

The contractor shall ensure that the rights of appealing parties are protected. In discharging this responsibility, the contractor shall:

- Issue initial and reconsideration determinations which clearly explain appeal rights when an adverse decision is made.

- Explain to inquirers the procedures for requesting a reconsideration, a formal review or a hearing.

- Complete the file documentation when necessary, e.g., provide an EOB copy when an appeal is filed without a copy, or develop for additional information

when the appealing party's statements indicate a need for added support or the file indicates added development is appropriate.

- When requested to do so, provide the appealing party a copy of the appeal file.

**8.2.     To The TRICARE Management Activity (TMA)**

When an appealing party files for a formal review or hearing with TMA, the contractor shall provide a complete file record to TMA on a timely basis. (See Chapter 13, Section 6 for requirements.)

**9.0.     REPROCESSING OF CLAIMS AND PREADMISSION/PREPROCEDURE REQUESTS FOLLOWING ISSUANCE OF RECONSIDERATION DETERMINATIONS, FORMAL REVIEW DETERMINATIONS AND HEARING FINAL DECISIONS**

TMA will provide the appropriate contractor with a copy of the formal review determination and hearing final decision. All contractor determinations reversed in whole or in part by the contractor's or the NQMC's reconsideration determination, the TMA formal review determination, or by a hearing final decision, shall be reprocessed by the contractor in accordance with the standards set forth in *Chapter 1, Section 3*. For the purposes of *Chapter 1, Section 3*, the date of receipt is considered the date the NQMC's reconsideration determination, the formal review determination or the hearing final decision is received by the contractor. The contractor must return to the TMA Appeals and Hearings Division, any formal review determinations or hearing final decisions misdirected to the contractor.

**10.0.     QUALITY OF CONTRACTOR RECONSIDERATION CASES**

The contractor shall implement a process to ensure that 90 percent of contractor reconsideration cases demonstrate accurate contractor processing of the appeal, consistent with the TOM requirements and the documentation in the case file.

**11.0.     TIMELINESS OF CONTRACTOR RECONSIDERATION DETERMINATIONS**

Timeliness of contractor reconsideration determinations is addressed in Chapter 13, Sections 4 and 5.

**12.0.     SERVICES AND SUPPLIES AUTHORIZED IN ERROR**

If a contractor authorizes services or supplies, and the beneficiary obtains the services or supplies in reliance on the authorization, and the services or supplies are later determined not to be a benefit under TRICARE, Government funds cannot be used to pay for the services or supplies.

B15

**TRICARE OPERATIONS MANUAL 6010.51-M, AUGUST 1, 2002**
CHAPTER 13, SECTION 1
GENERAL

## 13.0.    DOCUMENTATION

The contractor shall deliver to TMA, Appeals and Hearings Division, one complete set of its processing guidelines, desk instructions, and reference materials covering all tasks required in Chapter 13 and *Chapter 12, Section 9,* no later than 60 calendar days prior to the start of health care delivery.

"TRICARE OPERATIONS MANUAL"
DOD DIRECTIVE 6010.51-M (AUGUST 1, 2002)
(REVISED AS OF MARCH 27, 2007)

CHAPTER 13, SECTION 2

Chapter 13
Section 2

# Governing Principles

**1.0.    APPEALING PARTY**

**1.1.    Proper Appealing Party**

Persons or providers who may appeal are limited to:

- The TRICARE beneficiary (including minors),

- The participating provider of services (except network providers whose recourse is through the contractual provision for appeal or the state court system), or

- A non-network provider appealing a preadmission/preprocedure denial (when services have not been rendered), or

- A provider that has been denied approval as an authorized TRICARE provider or who has been terminated, excluded, suspended, or otherwise sanctioned.

**1.2.    Appeals From More Than One Party**

An appeal may be accepted from more than one *proper* appealing party. If more than one party appeals, the contractor and the NQMC shall mail separately addressed appeal determination letters to each appealing party (or representative, if a representative has been appointed).

**1.3.    Appealing Party/Representative**

**1.3.1.    Appeals On One's Own Behalf**

An appealing party is entitled to file an appeal on his or her own behalf.

**1.3.2.    Minors And Incompetent Beneficiaries As Appealing Parties**

**1.3.2.1.    A minor beneficiary is a proper appealing party.**

**1.3.2.2.    Generally, the *custodial* parent of a minor beneficiary and the legally appointed guardian of an incompetent or minor beneficiary shall be presumed to have been appointed representative without specific designation *by* the beneficiary. *The parent of a minor beneficiary shall be presumed to be the custodial parent unless there is evidence to the contrary.* If a parent or guardian is pursuing the appeal on behalf of a minor beneficiary and the minor reaches 18 years of age during the appeal, the parent or guardian will be presumed to be authorized to continue the appeal on behalf of the beneficiary unless the beneficiary provides a written

statement of his or her desire to pursue the appeal in his or her own behalf, *in which case the appeal decision will be mailed to the beneficiary.* Once the contractor issues the appeal determination, the beneficiary who reached 18 years of age during the appeal must request all subsequent levels of appeal or appoint a representative to do so. (Refer to paragraph 1.3.3.1. for additional information relating to parents and guardians as representatives.)

### 1.3.3.    Representative

If the proper appealing party cannot or does not wish to pursue the appeal personally, or wishes to have another person directly assist in pursuing an appeal, the appealing party may appoint a representative to act in his or her behalf at any level of the appeal process. The appointment of a representative must be in writing and must be signed by the proper appealing party or an individual must be appointed to act as representative by a court of competent jurisdiction.

### 1.3.3.1.    Parents Or Guardians As Representatives

The sponsor or *custodial* parent of a beneficiary under 18 years of age or the guardian of an incompetent beneficiary cannot be an appealing party; however, such persons may represent the appealing party in an appeal. The *custodial* parent of a minor beneficiary and the legally appointed guardian of an incompetent beneficiary shall be presumed to have been appointed representative without specific designation by the beneficiary; however, this presumption shall not apply if the claim was signed by a minor and the claim is related to abortion, alcoholism, substance abuse, venereal disease, or AIDS. (Refer to paragraph 1.3.2. for additional information relating to minors as appealing parties.) A suggested format for "Appointment of Representative and Authorization to Disclose Information" is included at Chapter 13, Addendum A, Figure 13-A-1.

### 1.3.3.2.    Conflict Of Interest

To avoid possible conflict of interest, an officer or employee of the United States, such as an employee or member of a Uniformed Service, including an employee or staff member of a Uniformed Service legal office, or a Health Benefits Advisor, subject to the exceptions in Title 18, United States Code, Section 205, is not eligible to serve as a representative. An exception usually is made for an employee or member of a Uniformed Service who represents an immediate family member.

### 1.3.4.    Appeal Filed By Attorney

If an attorney files an appeal on behalf of a *proper* appealing party, the contractor shall assume, absent any evidence to the contrary, that the attorney has been duly authorized to act as the appealing party's representative in the appeal. Care shall be taken to ensure that the attorney is representing a *proper* appealing party (e.g., an appeal filed by an attorney as the representative of a nonparticipating provider or as the representative of the spouse of a beneficiary, or parent of an adult beneficiary, shall not be accepted).

### 1.3.5.    Appeal Filed By Provider On Behalf Of Beneficiary

Managers or administrators of facilities or individual providers, may enter appeals only as participating providers, acting in their own behalf. A participating provider is not authorized to enter an appeal for a beneficiary unless the provider has been designated by the beneficiary, in writing, to act as his/her representative in the appeal process. A desire to assist the beneficiary is not, in itself, sufficient reason to permit others to act for the beneficiary without specific appointment by the beneficiary.

### 1.3.6.    Appeal Filed For Deceased Beneficiary

An appeal may be filed for a deceased beneficiary by a person authorized to sign TRICARE claims on behalf of the deceased beneficiary under the provisions of *Chapter 8, Section 4, paragraph 5.0.*

### 1.3.7.    Inquiries Made By Members Of Congress On Behalf Of Beneficiaries

Inquiries submitted by Members of Congress regarding a specific appealing party's claim or claims are not considered requests for a reconsideration. If the letter from the Member of Congress is postmarked or received by the contractor or NQMC before the expiration of the appeal filing deadline and is accompanied by a letter from the appealing party which meets the requirements of a request for reconsideration, the appealing party's letter to the Member of Congress may be accepted as an appeal. The Member of Congress and the appealing party shall be advised that a reconsideration will be conducted and that the appealing party will be notified of the results. If the congressional inquiry is not accompanied by a letter from the appealing party which contains all the elements of a request for a reconsideration, the contractor shall explain the procedure for filing an appeal so that the Member of Congress may advise the appealing party. Response to Congressional inquiries are subject to the provisions of the Privacy Act of 1974 (see Chapter 1, Section 5, paragraph 4.0.). Once an appeal has been accepted, the contractor may tell a Member of Congress inquiring on behalf of an appealing party only that an appeal has been filed and that it would be inappropriate for the contractor to comment on the case unless the appealing party has authorized the Member of Congress, in writing, to receive information on behalf of the beneficiary.

### 1.4.    Participating Providers

A non-network participating provider is entitled to file an appeal of those claims in which the provider participated. For the purposes of filing an appeal of a preadmission/preprocedure denial, a non-network provider is considered a participating provider and is entitled to file an appeal. The non-network participating provider may file an appeal instead of, or in addition to, the beneficiary or beneficiary's representative. When denial of payment for claimed services is being appealed, a non-network nonparticipating provider is not a party to the determination and would not receive any information regarding the claim or claim determination without the signed authorization of the beneficiary or the beneficiary's representative.

**EXCEPTION:**    Peer reviewer's comments may be released to non-network nonparticipating providers without the patient's permission, since these comments are directed toward the

B20

provider and the provider's ability to document treatment. In order for the non-network nonparticipating provider to provide additional information on behalf of the patient, it is necessary for the provider to be aware of the peer reviewer's comments.

NOTE:    In those cases in which a non-network participating provider files an appeal and the care also involves a network provider (e.g., a non-network participating professional provider renders care to a beneficiary in a network hospital), the non-network participating provider would be considered a proper appealing party. Although the network provider's input, claims history, medical records, etc., may be used in adjudicating the appeal, a network provider is never a proper appealing party. (A network provider's disputes are handled under the provisions of the provider's contract or the state court system.)

## 1.5.    Providers Denied Approval

A non-network provider who has been denied certification as an authorized provider under TRICARE is entitled to appeal the initial determination made by either the contractor or TMA. These initial determinations are considered factual initial determinations (see Chapter 13, Section 5). When the denial is based on the exclusion of the provider by another Federal or Federally funded program, e.g., Medicare or Medicaid, because of fraud or abuse, the issue is not appealable through the TRICARE appeal system. Unlike beneficiaries or providers who appeal denial of a claimed benefit, providers denied approval are deemed to have met any required amount in dispute at all levels of appeal. A contractor determination denying network provider status to an authorized provider is not appealable. Additional information relating to the appeal process is included in Chapter 14, Section 6, "Provider Exclusions, Suspensions and Terminations".

## 2.0.    APPEAL PROCESSING JURISDICTION

## 2.1.    Jurisdiction

The contractor who made the adverse initial determination shall be responsible for the initial steps of the appeal process. A contractor receiving a request for reconsideration of an initial determination not within its jurisdiction shall send the request to the correct contractor within five working days of receipt and shall notify the appealing party of this action. The contractor shall make no comments on the merits of an appeal not within its jurisdiction and shall direct the appealing party to send any further correspondence relating to the appeal to the appropriate contractor.

## 2.2.    More Than One Jurisdiction

Appeals may be received involving more than one jurisdiction. For example, a case may involve services processed by both the outgoing contractor and the incoming contractor in a period of transition and will require separate review. The contractor receiving the appeal shall notify the appealing party that the services will be reviewed separately by the outgoing contractor and the incoming contractor. The notification shall also include the name and address of each contractor performing the reviews. The contractor shall photocopy the written appeal request, the notification to the appealing party of the referral, and other relevant information and forward the photocopies to the other contractor with an

B21

explanation of the action taken within 21 calendar days of the stamped date of receipt of the appeal in the mailroom.

## 3.0.    APPEAL REQUIREMENTS

For all appeals at all levels:

### 3.1.    Must Be Filed In A Timely Manner

The appealing party must comply with the "allowed time to file" requirements established by 32 CFR 199.10 and 199.15 (see Chapter 13, Section 3, paragraph 1.4.).

### 3.2.    Must Be An Appealable Issue

*Services or supplies must have been rendered by a TRICARE authorized provider, the denial of which raises a* disputed question of fact which, if resolved in favor of the appealing party, would result in an extension of TRICARE benefits or approval as a TRICARE-authorized provider. *Examples of nonappealable issues may be found at* Chapter 13, Section 3, paragraph 1.3.2.

### 3.3.    Must Be An Amount In Dispute

There must be an amount in dispute before an appeal can be accepted (see paragraph 4.0.). This involves the following requirements:

- In a case involving an appeal of denial of authorization in advance of the actual services, the amount in dispute will be the estimated allowable charge for the services requested.

- There must be a legal obligation on the part of the beneficiary, parent, guardian, or sponsor to pay for the service or supply.

- Payment or authorization of TRICARE benefits for the service or supply must have been denied in whole or in part.

- When the episode of care involves the services of both network and non-network providers, only the claims submitted by the non-network providers will be considered in determining the amount in dispute.

**NOTE:**    A non-network provider appealing a denial of its authorized TRICARE provider status will be deemed to have met any required amount in dispute. Also, the amount in dispute will be considered to have been met in an appeal of a request for authorization of benefits for obtaining services or supplies unless the estimated allowable charge involved in such a request would be less than the required amount in dispute.

**EXAMPLE:**    A TRICARE beneficiary who had been hospitalized for ten days was notified by the contractor that benefits would terminate on the 15th day. The beneficiary left the hospital on the 15th day and filed an appeal on the basis that continued hospitalization was medically necessary. In this case, there would be no basis for

B22

the appeal. The beneficiary left the hospital on the day TRICARE benefits terminated and expenses were no longer incurred; therefore, there was no amount in dispute. The beneficiary would be advised that there could be no appeal since there was no amount in dispute.

**3.4.    Must Be A Proper Appealing Party**

See paragraph 1.0.

**3.5.    Must Be In Writing**

All appeal requests must be in writing and submitted by a proper appealing party. A signature is not required if a determination can be made that the request was submitted by a proper appealing party. If it cannot be determined that the appeal request was submitted by a proper appealing party, the proper appealing party shall be instructed by the contractor that a proper appeal, must be filed within 20 calendar days of the contractor's letter or by the appeal filing deadline, whichever is later. A verbal request for a reconsideration cannot be accepted. When telephone calls are received or personal visits occur which relate to an adverse initial determination, the contractor shall make every effort to satisfy the inquirer's complaint, inquiry, or question, including advising the inquirer of his or her right to appeal, if applicable. If an appropriate appealing party or representative submits a letter which includes both an appealable issue and a grievance, the appeal and grievance shall be processed separately under the appropriate appeal and grievance provisions of the Operations Manual.

**4.0.    AMOUNT IN DISPUTE**

An amount in dispute is required for an adverse determination to be appealable. Although some amount must be in dispute for a reconsideration, unless specifically waived (e.g., the appeal involves denial of certification as a TRICARE authorized provider), there is no established minimum dollar amount. Fifty dollars or more shall be in dispute for a formal review request to be accepted at TMA. Three hundred dollars or more, shall be in dispute for the case to be accepted as a hearing. The determination of "amount in dispute" affects the appealing party's rights and must be carefully evaluated, including, when appropriate, multiple claims for the same service and related claims. Under TRICARE Prime, if the beneficiary has no liability, other than a nominal per visit copayment, there is no amount in dispute (this does not preclude a Prime enrollee from appealing a preadmission/ preprocedure denial determination). If the services at issue are not a benefit under TRICARE, and the provider is a network provider, the Prime or Extra beneficiary shall be held harmless by the network provider, unless the beneficiary is properly informed that the care is not covered (or probably is not covered) and agrees in advance to pay for the care. An agreement to pay can be evidenced by, e.g., a progress note in the beneficiary's medical record, entered contemporaneously with the occurrence of the event. (Refer to Chapter 5, Section 1, paragraph 2.5. for additional information regarding "hold harmless".)

**4.1.    Calculating The Amount In Dispute**

The "amount in dispute" is calculated as the actual amount the contractor would pay if the services and/or supplies involved in the dispute were determined to be payable.

B23

**4.1.1.      Examples Of Excluded Amounts**

EXAMPLE 1:    Amounts in excess of the TRICARE-determined allowable charge or cost are excluded.

EXAMPLE 2:    The beneficiary's TRICARE deductible and cost-share amounts are excluded.

EXAMPLE 3:    Amounts which the TRICARE beneficiary, parent, guardian, or other responsible person has no legal obligation to pay are excluded.

EXAMPLE 4:    Amounts under the double coverage provisions of the TRICARE Reimbursement Manual, Chapter 4 are excluded.

**4.1.2.      Amounts For Preadmission/Preprocedure Appeals**

When the dispute involves denial of a request for authorization in advance of actual care or service, the amount in dispute shall be the estimated allowable charge or cost for the service requested.

**4.1.3.      Amounts For Provider Status Appeals**

If the dispute involves the denial of a provider's request for approval as an authorized TRICARE provider or the determination to terminate a provider as an authorized TRICARE provider, there is no requirement for an amount in dispute. Initial determinations in provider status appeals are considered factual initial determinations (Refer to Chapter 13, Section 5).

**4.2.      Combining Claims**

Individual claims may be combined to meet the required amount in dispute for referral of the appeal to TMA if all of the following exist:

- Claims involve the same beneficiary (When the episode of care involves the services of both network and non-network providers, only the claims submitted by the non-network providers will be considered in determining the amount in dispute),

- Claims involve the same issue, and

- At least one of the claims, so combined, has had a reconsideration determination issued by a contractor.

**4.3.      Related Claims**

When the contractor receives an appeal on a claim which has been denied, the contractor shall retrieve and examine all claims related to the specific service or supply or episode of care received by the beneficiary to determine if the claim in dispute was properly denied and if related claims were properly processed. All claims which relate to the same incident of care or the same type of service to the beneficiary shall be processed in the same

manner *and shall be readjudicated and resolved along with the denied claim in the same reconsideration determination.* If one claim which relates to an excluded procedure is denied, all claims which relate to the same procedure shall also be denied. If a procedure is covered and one claim involving that procedure and episode of care is paid, other claims relating to the same procedure and/or period of care which have been denied should be examined in conjunction with the paid claim to see if the other claims may be paid or whether all the claims should be uniformly denied. The contractor shall take action in accordance with paragraph 4.4.2. to determine if any claim for the services or supplies was improperly paid or denied. All related claims shall be made part of the appeal file. The file shall contain full documentation pertaining to the issue and the care in dispute, to include a record of actions taken by the contractor on all claims involving the same issue.

EXAMPLE 1:    The contractor receives claims for hospitalization, testing, physician services, and the purchase of a cerebellar stimulator implant device for a TRICARE beneficiary. These claims involve the surgical implant of the cerebellar stimulator in the patient's skull. The claims for the hospital care, physician's services, and the stimulator device are denied by the contractor on the basis that the procedure is unproven. The claims for testing are paid. Upon appeal, the contractor shall retrieve all the claims for the episode of care. The contractor shall find that the charges for the testing were erroneously paid because they relate to the denied unproven procedure. The contractor shall take action in accordance with paragraph 4.4.2.

EXAMPLE 2:    A beneficiary with out-of-control diabetes is hospitalized, during which she receives nutrition counseling, an eye examination and insulin therapy. On the last day of the hospitalization, an M.D. performs an abortion. The initial determination denies cost-sharing for all services and the hospital requests a reconsideration. All services must be reviewed to determine which are related to the covered hospitalization for diabetes and which are related to the noncovered abortion.

EXAMPLE 3:    Outpatient psychotherapy sessions are provided to a beneficiary and cost-shared by the contractor for a period of twelve months. All claims for the thirteenth month are denied due to lack of an adequate treatment plan. Upon appeal of the denial of the claim, all previously paid claims shall be retrieved and examined to determine whether all the claims should be paid, all denied, or whether denial is proper for some of the claims.

EXAMPLE 4:    The contractor denies a claim for physical therapy on the basis that the services were not medically necessary. At reconsideration, the contractor discovers that previous claims for the same services and condition were paid in error. Because the erroneously paid claims involve the same issue - medical necessity of the physical therapy - the contractor shall add the erroneously paid claims to the reconsideration and review all claims together.

**4.4.    Erroneous Payments**

In considering an issue under appeal, questions may arise concerning previous payment of services or claims not under appeal. Possible erroneous payments will be

B25

TRICARE OPERATIONS MANUAL 6010.51-M, AUGUST 1, 2002
CHAPTER 13, SECTION 2
GOVERNING PRINCIPLES

reviewed in depth, including medical review if necessary, to determine if, at the time the initial determination was made, there existed any basis for the payment. If the reviewer concludes there was a basis for payment at the time the claim was processed, the payment may stand. When the evidence indicates a payment was erroneous and not supported by law or regulation, the following action will be taken.

### 4.4.1.    Recoupment Involving Separate Issues

The contractor may request a refund and treat the recoupment action as an initial determination. Appeal rights shall be offered to the next level of appeal. Any new appeal must address itself to the benefit issue in dispute and not the fact that a refund has been requested.

### 4.4.2.    Recoupment Involving Issues Under Appeal

When the contractor examines claims which are related to the claim in dispute and determines that one or more of the related claims were improperly paid, the contractor shall explain the erroneous payment in detail and advise the appealing party of any recoupment. If the contractor determines recoupment is appropriate, the amount of the erroneously paid claim(s) will be added to the amount in dispute, and the reconsideration review will consider both the claim(s) in dispute and the erroneously paid related claim(s) which involve the same issue. If the total amount in dispute permits a higher level appeal, the appealing party will be so advised.

B26

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NORTHERN MICHIGAN HOSPITALS, INC. and GIFFORD MEDICAL CENTER, INC., *for themselves and on behalf of all other similarly situated class members,* | : : : : : : | |
| | : | Civil Action No. 07-39 (GMS) |
| | : | |
| | : | JURY TRIAL DEMANDED |
| Plaintiffs, | : : | CLASS ACTION |
| | : | |
| v. | : : | |
| | : | |
| HEALTH NET FEDERAL SERVICES, LLC, (f/k/a HEALTH NET FEDERAL SERVICES, INC.), | : : : : | |
| | : | |
| Defendant. | : : | |

**COMPENDIUM OF UNREPORTED CASES CITED IN PLAINTIFFS' ANSWERING
BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

*OF COUNSEL*
John J. Soroko
Seth A. Goldberg
DUANE MORRIS LLP
30 South 17th St.
Philadelphia, PA 19103
215.979.1000
215.979.1020 *fax*

Michael R. Gottfried
Patricia R. Rich
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
857-488-4290
857-488-4201 *fax*

Matt Neiderman (Del. Bar No. 4018)
DUANE MORRIS LLP
1100 N. Market St., Suite 1200
Wilmington, Delaware 19801
302.657.4900
302.657.4901 *fax*
mneiderman@duanemorris.com

Gregory A. Brodek
DUANE MORRIS LLP
88 Hammond Street, Suite 500
Bangor, ME 04401
207.262.5440
207.262.5401 *fax*

*Attorneys for Plaintiffs Northern Michigan Hospitals, Inc.
and Gifford Medical Center, Inc., for themselves and
on behalf of all other similarly situated class members*

Dated: April 16, 2007

**VOLUME I
Exhibits A - E**

# TABLE OF CONTENTS

**Case**                                                                            **Exhibit**

*Baptist Physician Hospital Organization, Inc. v. Humana Military Healthcare Services, Inc.,*
    2007 U.S. App. LEXIS 6447 (6th Cir. Mar. 21, 2007) ........................................................A

*Board of Trustees of Bay Medical Center v. Humana Military Healthcare Services, Inc.,*
    2004 U.S. Dist. LEXIS 22147 (N.D. Fla. Mar. 16, 2004) .............................................. B

*Buckley v. O'Hanlon,*
    2007 U.S. Dist. LEXIS 22211 (D. Del. Mar. 28, 2007) ....................................................C

*Christman v. Grays,*
    2005 WL 3088529 (S.D. Ohio Nov. 17, 2005) ................................................................D

*Cushman & Wakefield, Inc. v. Backos,*
    1991 U.S. Dist. LEXIS 11906 (E.D. Pa. Aug. 21, 1991) ................................................ E

*Dawley v. Erie Indemnity Co.,*
    100 F. App'x 877 (3d Cir. 2004) ......................................................................................F

*Friends of Concord Creek v. Springhill Farm Wastewater Treatment Facility Ass'n,*
    2003 U.S. Dist. LEXIS 3123 (E.D. Pa. Feb. 12, 2003) ....................................................G

*Healthcare Services Group, Inc. v. Integrated Heath Services of Lester, Inc.,*
    1998 U.S. Dist. LEXIS 6470 (D. Del. Apr. 23, 1998) .....................................................H

*Jurimex Kommerz Transit G.M.B.H v. Case Corporation,*
    65 F. App'x 803 (3d Cir. Apr. 23, 2003) ...........................................................................I

*McCurdy v. Esmonde,*
    2003 U.S. Dist. LEXIS 1349 (E.D. Pa. Jan. 30, 2003) ..................................................... J

*Riley v. Taylor,*
    2006 U.S. Dist. LEXIS 88661 (D. Del. Dec. 5, 2006) ......................................................K

# EXHIBIT A

LEXSEE 2007 U.S. APP. LEXIS 6447



Analysis
As of: Apr 01, 2007

**BAPTIST PHYSICIAN HOSPITAL ORGANIZATION, INC. and BAPTIST HOS-
PITAL OF EAST TENNESSEE, INC., Plaintiffs-Appellees, v. HUMANA MILI-
TARY HEALTHCARE SERVICES, INC., Defendant-Appellant.**

No. 06-5364

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

07a0107p.06;

*2007 U.S. App. LEXIS 6447*

**January 31, 2007, Argued
March 21, 2007, Decided
March 21, 2007, Filed**

**PRIOR HISTORY:** [*1] Appeal from the United
States District Court for the Eastern District of Tennes-
see at Knoxville. No. 01-00588—Thomas W. Phillips,
District Judge. *Baptist Physician Hosp. Org., Inc. v.
Humana Military Healthcare Servs., 415 F. Supp. 2d
835, 2006 U.S. Dist. LEXIS 8968 (E.D. Tenn., 2006)*

**COUNSEL:** ARGUED: Michael J. Kitchen, J. BRUCE
MILLER LAW GROUP, Louisville, Kentucky, for Ap-
pellant. Reuben N. Pelot IV, EGERTON, McAFEE,
ARMISTEAD & DAVIS, Knoxville, Tennessee, for
Appellees.

ON BRIEF: Michael J. Kitchen, J. Bruce Miller, J.
BRUCE MILLER LAW GROUP, Louisville, Kentucky,
for Appellant. Reuben N. Pelot IV, Cheryl G. Rice,
EGERTON, McAFEE, ARMISTEAD & DAVIS, Knox-
ville, Tennessee, for Appellees.

**JUDGES:** Before: NORRIS, COLE, and CLAY, Circuit
Judges.

**OPINION BY:** CLAY

**OPINION:**

CLAY, Circuit Judge. In this appeal, Defendant,
Humana Military Healthcare Services, Inc., appeals the
district court's order finding Defendant liable to Plain-

tiffs, Baptist Physician Hospital Organization, Inc. and
Baptist Hospital of East Tennessee, Inc., for breach of
contract and awarding Plaintiffs $ 1,277,872.90 in com-
pensatory damages, as well as $ 731,488.65 in prejudg-
ment interest. Plaintiffs properly invoke diversity of citi-
zenship as the basis for federal jurisdiction in this case.
*See 28 U.S.C. § 1332.* For the reasons that follow, [*2]
we **AFFIRM** the district court's order.

**BACKGROUND**

This Tennessee breach of contract suit was previ-
ously before this Court. *See Baptist Physician Hosp.
Org., Inc. v. Humana Military Healthcare Servs., Inc.,
368 F.3d 894 (6th Cir. 2004)* (hereinafter "*Baptist Physi-
cian I*"). That appeal arose when the district court
granted summary judgment to Defendant on Plaintiffs'
breach of contract claim, and separately dismissed Plain-
tiffs' remaining claims as untimely. On appeal, this Court
reversed and remanded.

*Baptist Physician I* aptly set forth background rele-
vant to the initial contract between the parties:

> Pursuant to authority delegated to it by
> Congress, the Department of Defense es-
> tablished the Civilian Health and Medical
> Program of the Uniformed Services,
> called CHAMPUS, in 1967. CHAMPUS
> beneficiaries include retired armed forces

personnel and dependents of both active and retired military personnel. In 1995, the Department of Defense established TRICARE, a managed health care program operating as a supplement to CHAMPUS and involving the competitive selection of private contractors to financially underwrite the delivery of health care services [*3] under CHAMPUS. The overall goal of the TRICARE program is to improve the quality, cost, and accessibility of healthcare to the nation's military through the mechanism of a managed care program, and one aspect of the new TRICARE program was the establishment of "Civilian Preferred Provider Networks." *See 32 C.F.R. § 199.17(p)*. TRICARE Management Activity, which was previously known as Office of CHAMPUS, is the government office charged with the responsibility of administering TRICARE/CHAMPUS.

In January 1996, Humana Military Healthcare Services, Inc. was awarded the TRICARE contract for Regions 3 and 4, which covers seven states and includes the State of Tennessee. Under the contract, Humana became the managed care support contractor charged with the responsibility of establishing and managing a Civilian Preferred Provider Network throughout the seven state area. Humana established the preferred provider network by entering into contractual arrangements with individual CHAMPUS participating providers of medical services, one of which was Baptist. Broadly speaking, TRICARE preferred network providers agreed to accept from a managed care support contractor [*4] lower reimbursement rates than those authorized under the CHAMPUS reimbursement system, with the understanding that in exchange they would see an increase in directed volume. These discounted rates might be expressed as discounts from the maximum allowable rate under the CHAMPUS diagnostic grouping system (DRG), n1 or as a fixed per diem rate, or as some other agreed-upon rate of reimbursement.

In the early spring of 1996, Baptist Physician Hospital Organization, Inc. and Baptist Hospital of East Tennessee, or more simply "Baptist," entered into negotiations with Humana to become a TRICARE preferred network provider.

*Baptist Physician I, 368 F.3d at 895-97.*

n1 Diagnostic related groups (DRGs) are "a method of dividing hospital patients into clinically coherent groups based on the consumption of resources." *32 C.F.R. § 199.2.* "Patients are assigned to the groups based on their principle [sic] diagnosis (the reason for admission, determined after study), secondary diagnoses, procedures performed, and the patient's age, sex, and discharge status." *Id.*

[*5]

At trial, the parties presented a more detailed picture of their relationship preceding, during, and subsequent to executing the Letter of Agreement (hereinafter "Agreement"), by which Plaintiffs contracted to provide care to TRICARE beneficiaries in Defendant's network. n2 On August 6, 1996, Defendant's Director of Network Development, Richard Mancini ("Mancini"), signed the Agreement on Defendant's behalf. Therein, Defendant contracted to reimburse Plaintiffs according to the terms of a "Hospital Payment Arrangement." As the court in *Baptist Physician I* explained, the parties adopted

a three-tiered system of discounted reimbursement from the CHAMPUS rates depending on the number of other TRICARE providers in the area . . . . [T]he "Hospital Payment Arrangement" . . . was expressed as a percentage discount off the CHAMPUS DRG reimbursement rate with a "stop loss" provision (in the italicized language below) consisting of an increased rate of payment for certain high-dollar inpatient claims as an alternative to a percentage discount from standard government rates. The purpose of the stop-loss provision is to reduce the risk of losses to Baptist in large individual [*6] cases that Baptist believed the percentage discount off CHAMPUS DRG rates would create. The contractual provision was expressed as follows:

**Baptist Health System as Exclusive Provider**

Inpatient

20% Discount from CHAMPUS DRG rates;

*Any case with provider charges greater than $ 30,000 reverting to a 45% discount from provider charges.*

Outpatient

30% Discount from CHAMPUS allowables.

**Baptist Health System + 1 Additional Provider**

Inpatient

20% Discount from CHAMPUS DRG rates;

*Any case with provider charges greater than $ 25,000 reverting to a 35% discount from provider charges.*

Outpatient

25% Discount from CHAMPUS allowables.

**Baptist Health System + 2 Additional Providers**

Inpatient

15% Discount from CHAMPUS DRG rates;

*Any case with provider charges greater than $ 25,000 reverting to a 30% discount from provider charges.*

Outpatient

25% Discount from CHAMPUS allowables.

(Emphasis added.) Under each tier, Baptist and Humana agreed to the "stop loss" language which increased reimbursement to Baptist when a particular inpatient [*7] hospital stay exceeded a certain dollar amount. In such cases, the reimbursement rate would not be a percentage discount off the CHAMPUS DRG rate, but rather would "revert" to a percentage discount off the provider charges, which are the charges the hospital would otherwise charge for the services rendered.

An example illustrates how the "stop loss" provision would work. Suppose a certain hospital stay resulted in provider charges of $ 77,098, but the maximum CHAMPUS DRG reimbursement rate for this particular stay is only $ 27,755.00. Without the stop loss provision, Baptist as the exclusive TRICARE provider under the above agreement would receive $ 22,204, which represents a 20% discount from the CHAMPUS DRG rate and an effective 71% discount from provider charges. Under the stop loss provision, however, Baptist would receive $ 42,404, or a 45% discount from the provider charges. In effect, the stop loss provision operates to increase the net overall discount for the business associated with the TRICARE program.

As illustrated above, for certain claims the reimbursement amount calculated as a percentage of provider charges was greater than 100% of the CHAMPUS DRG rate. [*8]

*Baptist Physician I, 368 F.3d at 896-97.* At the time he signed the Agreement, Mancini knew Defendant had no intention of paying the stop loss claims pursuant to the Agreement inasmuch as they exceeded CHAMPUS allowable charges.

n2 We are largely guided in our narrative by the district judge's findings of fact, which we find -- with one insignificant exception -- were not clearly erroneous. *See Kalamazoo River Study Group v. Rockwell Int'l Corp., 355 F.3d 574, 589 (6th Cir. 2004).*

Two days after he executed the Agreement, in an August 8, 1996 letter to Plaintiffs' representative, Jim Goodloe, Mancini wrote as follows:

> Jim, as we move toward the next round of negotiations, specifically: Inpatient per diem rates, I want to make sure we both understand that your claims will be paid according to a discount from Government allowables. I know there has been some question that you wanted to be paid more than the Government provides, but we aren't allowed to pay your [*9] facilities any greater than the non-network rate. Accordingly, the per diem rates that we agree upon will need to be comparable as provided for in paragraph M of our contract.

*Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc., 415 F. Supp. 2d 835, 848 (E.D. Tenn. 2006)* (hereinafter *"Baptist Physician II"*). The district court found that this letter concerned physician reimbursement terms, and not the stop loss provisions. n3

    n3 In fact, the district court found that the parties amended the physician payment provisions in September 1996, but that those amendments did not impact hospital reimbursement for stop loss claims.

The Agreement contemplated additional negotiations in September 1996 to establish a system of reimbursement on a per diem basis and, at trial, Mancini testified that he believed that the parties would have dispensed with the stop loss provisions at that time. No subsequent renegotiation occurred, and the stop loss provisions remained [*10] in effect throughout the life of the Agreement. Mancini further testified that Defendant did not pursue renegotiation because the process would have clarified that Defendant intended to cap payments at government allowables, and not to pay according to the Agreement.

In August 1996, Plaintiffs lacked the personnel and technology necessary to closely monitor payments from third party payors, including Defendant, to insure payment of submitted claims according to negotiated contract terms. However, over the course of the Agreement with Defendant, Plaintiffs took steps to improve claims tracking. To start, Plaintiffs purchased software (called "PCMS") capable of auditing payments and exposing

payment variances. This software required Plaintiffs to load their contracts into the system before it could adequately monitor payment compliance. Plaintiffs also hired a contract analyst, Anahita Hodge ("Hodge"), primarily assigning her to scrutinize payments from third party payors. Ultimately, Plaintiffs loaded their contract with Defendant into the PCMS system in November 1998.

In early 1999, Hodge identified the underpaid stop loss claims and, in February 1999, requested that Defendant reprocess [*11] the claims in compliance with the terms of the Agreement. In a July 22, 1999 letter to Defendant's government benefits administrator, Hodge again requested the additional stop loss reimbursement. Subsequently, Hodge spoke to Carmen Montanez ("Montanez"), then one of Defendant's employees, who informed her that Defendant would not pay the full stop loss amount on the contested claims. During the conversation, Montanez cited the TRICARE / CHAMPUS policies and procedures and told Hodge that those policies foreclosed Defendant from paying rates in excess of the CHAMPUS DRG-rates. In the months that followed, Plaintiffs at no point communicated to Defendant an intent to drop the stop loss claims. Ultimately, Defendant sent Plaintiffs a letter on February 5, 2001 notifying Plaintiffs that it was exercising its right to terminate the Agreement, effective May 6, 2001. Defendant terminated the Agreement due to Plaintiffs' continued insistence that they be reimbursed according to the Agreement's stop loss provisions.

Between July 1, 1996 and May 6, 2001 -- the life of the Agreement -- 85 inpatient claims for medical care rendered at Plaintiffs' facilities exceeded the stop loss threshold. In [*12] each instance, Plaintiffs did not receive reimbursement according to the stop loss provisions. Rather, without Plaintiffs' knowledge, Defendant capped reimbursement at 100% of the CHAMPUS DRG-rate. Applying the stop loss provisions of the Agreement, Plaintiffs should have received $ 2,595,294.94 in payment of those claims. In actuality, Defendant paid only $ 1,317,422.05, thus yielding an underpayment of $ 1,277,872.89 on the stop loss claims. n4

    n4 The district court additionally found facts relevant to Defendant's counterclaim that it had overpaid Plaintiffs for a number of outpatient claims by misapplying the "tier" system established in the Agreement. On appeal, Defendant waives its challenge to the district court's dismissal of its counterclaim. Accordingly, we need not further explore the circumstances of Defendant's overpayment.

The district court considered several issues at trial on remand, including: (1) whether the parties modified the Agreement so that high-dollar claims would be paid under the [*13] CHAMPUS DRG-based payment system as opposed to the stop loss provisions; (2) whether Plaintiffs waived their claims; (3) whether equitable doctrines barred Plaintiffs' claims; and (4) whether Defendant was entitled to recover alleged overpayments on outpatient claims. Ultimately, the district court ruled in favor of Plaintiffs on their breach of contract claim, and against Defendant on its defenses of modification, estoppel, failure to mitigate damages, and laches. The district court further found that Defendant failed to prove damages, a required element of its counterclaim. In an opinion dated February 13, 2006, the district court awarded Plaintiffs $ 1,277,872.90 on their breach of contract claim, along with prejudgment interest totaling $ 731,488.65. Defendant timely appealed.

## DISCUSSION

## I. THE DISTRICT COURT DID NOT ERR IN DEEMING CAPITAL REIMBURSEMENT EVIDENCE IRRELEVANT

As a matter of law, the district court concluded that "[t]he monies paid to [Plaintiffs] pursuant to Capital Reimbursements are totally irrelevant to the Agreement at issue, would have been paid with or without an agreement between the parties, and were not paid pursuant to the Agreement. [*14] " *Baptist Physician II, 415 F. Supp. 2d at 853*. Defendant vehemently disagrees and, in fact, rests the weight of its appeal on this very question. Because the district court's disposition does not elucidate the rationale underlying its conclusion that capital payment evidence was irrelevant, we review the matter *de novo* as a conclusion of law. n5 *Kalamazoo River Study Group, 355 F.3d at 589*.

n5 In the alternative, we could construe this as a ruling on the admissibility of the capital payment evidence and, accordingly, could review for abuse of discretion. See *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)*. Although the district court's review of the evidence presented at trial notably excludes reference to Defendant's proffered capital payment exhibits (Exhibits 54(A)-(K)), it does recount witness testimony on the issue. See *Baptist Physician II, 415 F. Supp. 2d at 841, 847*. Because we cannot say with certainty that the district court intended to rule on the admissibility of the capital payment exhibits, we err on the side of caution and apply the less deferential *de novo* standard of review.

[*15]

The relevance of the proffered capital payment evidence substantially turns on a question of regulatory interpretation. That is, whether capital payments flow only to those preferred network providers subject to the DRG-based payment system, or whether providers which contract for alternative payment methodologies may also receive capital payments consistent with the TRICARE / CHAMPUS regulations. As a corollary, we must also consider the significance of certifications submitted to obtain capital payments, wherein providers document the total number of inpatient days "provided to all patients in units subject to DRG-based payment," as well as the "[t]otal allowed CHAMPUS inpatient days provided in units subject to DRG-based payment." See *32 C.F.R. § 199.14(a)(1)(iii)(G)(3)(vi)-(vii)*.

As with all matters of regulatory interpretation, we look first to the plain and unambiguous meaning of the regulation, if any. See *Henry Ford Health Sys. v. Shalala, 233 F.3d 907, 910 (6th Cir. 2000)* (quoting *Bartlik v. United States DOL, 62 F.3d 163, 165-66 (6th Cir. 1995))* ("We read statutes and regulations with an eye to their straightforward [*16] and commonsense meanings," and where the regulation's language reveals an "unambiguous and plain meaning . . ., our task is at an end"). Defendant fails to identify provisions either in the applicable regulations or the authorizing statutes that plainly sets forth the meaning of the regulations. Nor could it, for the TRICARE / CHAMPUS regulations do not squarely address this question.

We next look to the regulatory scheme, reading the regulation in its entirety to glean its meaning. In so doing, we find that the TRICARE / CHAMPUS regulations do not preclude capital payments to preferred network providers which, by agreement with Managed Care Support ("MCS") Contractors, receive reimbursement for inpatient care under alternative payment methodologies. As detailed in the TRICARE regulations,

[t]he TRICARE program implements management improvements primarily through managed care support contracts that include special arrangements with civilian sector health care providers . . . . Implementation of these management improvements includes adoption of special rules and procedures not ordinarily followed under CHAMPUS . . . . This section establishes those special rules and procedures. [*17]

32 C.F.R. § 199.17(a)(1). While managed care contractors may enter into special arrangements with preferred network providers consistent with the "special rules and procedures" set forth in the TRICARE regulations, CHAMPUS regulations remain effective and applicable to TRICARE providers unless the special rules and procedures state otherwise.

As CHAMPUS providers, by default, Plaintiffs were entitled to receive capital payments regardless of their Agreement with Defendant. Federal regulations permit all CHAMPUS providers to receive capital payments to offset the costs of treating CHAMPUS beneficiaries. *See 32 C.F.R. § 199.14(a)(1)(iii)(G).* n6 Under *32 C.F.R. § 199.14*, a TRICARE preferred network provider is not rendered ineligible for capital payments merely because they have negotiated an "alternative payment methodology" for reimbursement. Regulations implementing the TRICARE Program provide that where "rules, procedures, rights and obligations" under TRICARE differ from those under CHAMPUS, those set forth in the TRICARE regulations "take precedence and are binding." *32 C.F.R. § 199.17(a)(4)* [*18] . Illustratively, the TRICARE Reimbursement Manual ("the Manual") cites to *32 C.F.R. § 199.14* as authority for its discussion of capital payments. Accordingly, where the TRICARE regulations do not explicitly conflict with the CHAMPUS regulations, those pre-existing regulations apply to TRICARE as well.

n6 Specifically, the regulations state:

When requested in writing by a hospital, CHAMPUS shall reimburse the hospital its share of actual capital costs reported annually to the CHAMPUS fiscal intermediary. Payment for capital costs shall be made annually based on the ratio of CHAMPUS inpatient days for those beneficiaries subject to the CHAMPUS DRG-based payment system to total inpatient days applied to the hospital's total allowable capital costs. Reductions in payments for capital costs which are required under Medicare shall also be applied to payments for capital costs under CHAMPUS.

32 C.F.R § 199.14(a)(1)(iii)(G)(1).

Defendant directs [*19] our attention to the section of the Manual that discusses adjustments to payment amounts, such as capital payments, and, specifically, to the introductory paragraph on 'Applicability.' There, the Manual states --

This policy is mandatory for reimbursement of services provided by either network or non-network providers. However, alternative network reimbursement methodologies are permitted when approved by TMA *and specifically included in the network provider agreement.*

TRICARE / CHAMPUS Policy Manual, 6010.53-M, Ch. 6, Section 8 at I (*available at* J.A. at 1050 (emphasis added)) The Agreement at issue does not specifically include language excepting Plaintiffs from the category of providers typically eligible to receive capital payments under the regulations.

In fact, that same section of the Manual details the entitlement to, and procedures for payment of, capital costs. More specifically, it establishes the obligations of both the provider and the MCS contractor. In a subpart with the heading "Negotiated Rates," the Manual states:

*If a contract* between the MSC prime contractor and a subcontractor or institutional network provider *does not specifically* [*20] *state the negotiated rate includes all costs that would otherwise be eligible for additional payment, such as capital* and DME, *the MCS prime contractor is responsible for reimbursing these costs* to the subcontractors and institutional network providers *if a request for reimbursement is made.*

*Id.* at III.B.4.d. (*available at* J.A. at 1058-59 (emphasis added)) Defendant, as the MCS contractor for its region, negotiated rates with Plaintiffs, an institutional network provider. n7 Consistent with the Manual, the Agreement *could have* expressly stipulated that payment at the negotiated rate would incorporate capital payments. The Agreement did not make Plaintiffs' receipt of reimbursement under the stop loss provisions conditional upon forbearance from receipt of capital payments. n8 Plaintiffs therefore remained entitled to receive capital payments notwithstanding the operation of the negotiated alternative to the DRG-based rates.

n7 Neither the statute nor the regulations reveal a relevant distinction between an "MSC prime contractor" and an "MSC contractor" more generally. The statutory provisions that, in part, establish the TRICARE program define "TRICARE Prime" as "the managed care option of the TRICARE program." *10 U.S.C. § 1079(g)(5); 10 U.S.C. § 1097a(f)(1)*. Although those provisions make the definition applicable only to those sections, no more generally applicable definition of TRICARE Prime exists in the current statute or regulations. Nor do the statute or regulations define "MSC Prime Contractor." The Manual lends further support to this view in clarifying that the MCS Contractor is responsible for all TRICARE Prime, Extra, *and* Standard claims. (See J.A. at 1006)

[*21]

n8 On appeal, Defendant argues "there is no question that the parties can contractually eliminate the entitlement to Capital Reimbursement." (Def.'s Br. at 28-29) We agree. Yet, while this may be true, Defendant does not identify any provision in the Agreement to this effect and, accordingly, the argument does little to advance Defendant's cause.

This reading of the regulations is reinforced by the Department of Defense's ("DOD's") intent in implementing the TRICARE program. In response to its Proposed Rule, DOD received comments suggesting that the Final Rule should more specifically detail special reimbursement methods for network providers under *§ 199.17(p)*. DOD responded:

The rule provides added flexibility to vary payment provisions from those established by regulation, to accommodate local market conditions. To attempt to specify in advance the possible reimbursement approaches would defeat our purpose of providing a flexible mechanism. We also disagree that network rate setting should be the same as under standard CHAMPUS rules; a key aim of managed care programs is to negotiate [*22] lower rates of reimbursement with networks of preferred providers.

*TRICARE Program; Uniform HMO Benefit; Special Health Care Delivery Programs, 60 Fed. Reg. 52,078-01, at 52,086* (Oct. 5, 1995) (now codified at *32 C.F.R. § 199.17*). Although the parties here did not negotiate lower rates of reimbursement for the stop loss claims, Defendant did have increased flexibility in negotiations enabling it to insure access to health care for the TRICARE beneficiaries in its region.

We additionally note that this result is manifestly consistent in purpose and effect with more traditional CHAMPUS reimbursement methods, which permit payment of capital costs along with additional payments for outlier cases. *32 C.F.R. § 199.14(a)(1)*. Specifically, the regulations provide reimbursement greater than the standard DRG-rate for cost outliers and for length-of-stay outliers. *Id.* at *§ 199.14(a)(1)(iii)(E)(1)(ii)* (providing additional payment for "[a]ny discharge which has standardized costs that exceed a[n established] threshold"); *id.* at *§ 199.14(a)(1)(iii)(E)(1)(i)* (additional payment for "[a]ny discharge . . . which [*23] has a length-of-stay (LOS) exceeding a threshold established"). The additional outlier payment in no way diminishes the provider's entitlement to capital payments under the same regulatory provision. *Id.* at *§ 199.14(a)(1)(iii)(G)*. Thus, Plaintiffs' receipt of both capital payments and inpatient reimbursement under the stop loss provisions runs consistent with the apparent intent of the regulators to appropriately reimburse more costly patient care.

Other portions of the TRICARE / CHAMPUS regulations demonstrate the DOD did not intend to preclude capital payments to providers under special programs, even though they may be reimbursed in excess of governmental allowable rates. For example, under the Supplemental Care Program, a program related to CHAMPUS, the military provides payment for health care services rendered at civilian facilities for its active duty members. *See 32 C.F.R. § 199.16(a)(2)*. The regulations implementing the Supplemental Care Program acknowledge that the CHAMPUS provider reimbursement regulations generally will guide payment and administration of Supplemental Care claims. *32 C.F.R. § 199.16(c)*. However, [*24] the regulations further establish exceptions and clarifications to the general rule. *See 32 C.F.R. § 199.16(d)*. Specifically, the regulations clarify that "annual cost pass-throughs for capital . . . costs that are available under the CHAMPUS DRG-based payment system are also available, upon request, under the supplemental care program." *32 C.F.R. § 199.16(d)(4)*. Notwithstanding the entitlement to capital payments, that same subsection goes on to clarify that for some providers, "payment in excess of CHAMPUS allowable amounts" may be authorized. *Id.* at *§ 199.16(d)(5)*. Accordingly, the Supplemental Care Program regulations demonstrate that DOD contemplated simultaneous enti-

tlement to capital payments and payments exceeding typical CHAMPUS allowable amounts.

In view of the foregoing, we hold that the regulations authorize capital payments to TRICARE preferred network providers regardless of the methodology employed to reimburse claims for inpatient care -- whether it be the DRG-based system, or some alternative.

We next examine the significance, if any, of the capital payment certifications. Because the regulations authorize [*25] capital payments for all TRICARE / CHAMPUS providers, we find the certifications do not somehow operate to make Plaintiffs' application for and receipt of capital payments dispositive. Defendant would rely on Plaintiffs' capital payment certifications as evidence of mutuality of assent to modify the Agreement. To that end, Defendant seizes upon language contained on the capital payment certification forms and in correspondence between Plaintiffs and Defendant's government benefits administrator. The certification forms refer to TRICARE / CHAMPUS inpatient days as "[p]rovided in units subject to DRG-based payment," while the correspondence characterizes capital payments as "reimbursement . . . under the CHAMPUS DRG-based payment system." (See, e.g., J.A. at 1294, 1299)

Looking first to the plain language of the regulations, we find that Plaintiffs' hospitals were "subject to the DRG-based payment system." The CHAMPUS regulations provide --

(ii) Applicability of the DRG system.

. . .

(B) Services subject to the DRG-based payment system. All normally covered inpatient hospital services furnished to CHAMPUS beneficiaries by hospitals are subject to the CHAMPUS DRG-based [*26] payment system.

. . .

(D) Hospitals subject to the CHAMPUS DRG-based payment system. *All hospitals within the fifty states . . . which are certified to provide services to CHAMPUS beneficiaries are subject to the DRG-based payment system* except for . . . hospitals units which are exempt.

32 C.F.R. § 199.14(a)(1)(ii)(D) (emphasis added). Typically, only hospital units exempt from the Medicare Prospective Payment System are exempt from the

CHAMPUS DRG-based payment system. *Id.* at § 199.14(a)(1)(ii)(D)(1)-(5). Additionally, "[a]11 hospitals subject to the CHAMPUS DRG-based payment system . . . may be reimbursed for allowed capital . . . costs by submitting a request to the CHAMPUS contractor." *Id.* at § 199.14(a)(1)(iii)(G)(3).

The capital payment provision of the CHAMPUS regulations lists the information required in order to verify the appropriate capital payment amount. Among this list, the regulation directs providers to submit "[t]otal inpatient days provided to all patients in *units subject to DRG-based payment* " and "[t]otal allowed CHAMPUS inpatient days provided in *units subject to DRG-based payment.*" *Id* [*27] . at § 199.14(a)(1)(iii)(G)(3)(vi)-(vii) (emphasis added). The regulations notably do not define "DRG-based payment." Nor do the regulations clarify whether "DRG-based payment" in the former context refers collectively to Medicare and CHAMPUS inpatients, to some broader group, or to CHAMPUS alone. n9

> n9 As the regulation provides, "All costs reported to the CHAMPUS contractor must correspond to the costs reported on the hospital's Medicare cost report." 32 C.F.R. § 199.14(a)(1)(iii)(G)(3). The term "DRG-rate" originated in Medicare. See *id.* at § 199.14(a)(1)(i)(A).

The Manual makes clear, however, that TRICARE uses the certification forms to insure that it does not pay capital costs for patients whose other (primary) health insurance fully covered the patient's charges. TRICARE / CHAMPUS Policy Manual, 6010.53-M, Ch. 8, Section 8 at III.B.3 (*available at* J.A. at 1053) (setting forth the method of calculating capital payment and noting "[t]hroughout these calculations claims [*28] on which TRICARE / CHAMPUS made no payment because other health insurance paid the full TRICARE / CHAMPUS-allowable amount are not to be counted"). The Manual details the steps that providers must follow in determining the "total allowable TRICARE / CHAMPUS capital payment for DRG discharges." *Id.* To begin, providers calculate the total TRICARE / CHAMPUS inpatient days. According to the Manual, providers should exclude --

(1) Any days determined to be not medically necessary, and

(2) Days included on claims for which TRICARE / CHAMPUS made no payment because *other health insurance paid*

*the full TRICARE / CHAMPUS-allowable amount.*

*Id.* (emphasis added). Later in the same section, the Manual clarifies that TRICARE will not make capital payments for claims of dual-eligible beneficiaries that were paid by Medicare. *Id.* at B.4.f (*available at* J.A. at 1058) Rather, it expressly states that "TRICARE capital . . . cost payments will be made only on claims on which TRICARE is the primary payer." *Id.* Thus, the point of the certification forms is to separate the claims for which TRICARE / CHAMPUS serves as the primary payor from those where third [*29] parties foot the bill.

As careful review of the regulations makes abundantly clear, the CHAMPUS regulations were never thoroughly amended following implementation of the TRICARE program to allow for the possibility that MCS contractors would enter into alternative payment arrangements with health care providers in their networks. In fact, the DOD Final Rule implementing the TRICARE program proves as much. *TRICARE Program; Uniform HMO Benefit; Special Health Care Delivery Programs, 60 Fed. Reg. 52,078-01, at 52,079* (Oct. 5, 1995) (now codified at *32 C.F.R. § 199.17*) ("Our regulatory approach is to leave the existing CHAMPUS rules largely intact and to create new *sections 199.17* and *199.18* to describe the TRICARE Program and the uniform HMO benefit."). As a result, the claims forms and the capital payment request forms that the TRICARE / CHAMPUS regulations require TRICARE providers to use essentially pound a square peg to a round hole. They simply do not neatly fit together.

Furthermore, as a strictly factual matter, Defendant's proffered capital payment evidence does not "tend[] to make the existence of any fact that is of consequence to the [*30] determination of the action more probable than it would be" otherwise. *See Fed. R. Evid. 401.* Importantly, the Agreement at issue remained in effect from August 6, 1996 to May 6, 2001. Accordingly, only Plaintiffs' certifications for purposes of capital payment during Fiscal Years (FY) 1997 through 2001 would even *arguably* be relevant. In Plaintiffs' FY 1997 submission, they certified 536 "[t]otal inpatient days . . . [b]ased on discharges within [the] reporting period." (J.A. at 1284) From FY1998-2000, when TRICARE modified the certification form to request "[t]otal TRICARE/CHAMPUS inpatient days. . . [p]rovided in units subject to DRG-based payment," Plaintiffs' certification forms did not set forth a number. (J.A. at 1299, 1348, 1378) Rather, on each occasion, Plaintiffs directed the government benefits administrator to "Use System Data." (*Id.* In FY 2001, Plaintiffs failed to timely submit certification for capital payments. Thus, none of Plaintiffs' requests for

capital payments during the relevant period affirmatively certified that the stop loss claims were "subject to DRG-based payment;" rather, Defendant's own government benefits administrator put forth the numbers that included Plaintiffs' stop loss inpatients. It strikes this Court as disingenuous that Defendant now seeks to rely on those certifications to establish mutuality of assent to modification of the Agreement, and communication of intent to waive its rights under the stop loss provisions. This is particularly so because evidence pre-dating and post-dating the relevant period clearly demonstrates that Plaintiffs applied for and received capital payments at times not covered by the Agreement.

Whether viewed as a legal conclusion or an evidentiary ruling, we affirm the district court's view on the significance of capital payment evidence.

## II. ADDITIONAL CLAIMS ON APPEAL

On appeal, Defendant challenges several of the district court's conclusions of law, alleging: (1) Plaintiffs' application for and acceptance of capital payments effectively modified the contract such that the stop loss claims would be subject to the DRG-based payment system; (2) Plaintiffs waived their rights to payment under the stop loss provision and "decisively communicated . . . intent to waive" by certifying, for purposes of capital payment, that those "claims [*32] were subject to DRG-based payment," (Def.'s Br. at 38). Additionally, Defendant asserted defenses of equitable estoppel, failure to mitigate, and laches. n10 Finally, Defendant claims the district court abused its discretion in awarding prejudgment interest.

> n10 Although Defendant's "Statement of Issues" contemplates additional challenges to the district court's rulings, as we later note, Defendant waived them on appeal.

### A. No Valid Modification Occurred

Defendant posits that Plaintiffs' application for and acceptance of capital payments effectively modified the contract. In Defendant's view, Plaintiffs demonstratively assented to modify the Agreement by certifying that the inpatient stop loss claims were "subject to the DRG-based payment system." Moreover, Defendant contends that the capital payments themselves constitute consideration. The district court concluded that "[t]he evidence did not reveal a meeting of the minds or an exchange of consideration necessary to support defendant's claim of [*33] modification." *Baptist Physician II, 415 F. Supp. 2d at 851.* We review the district court's conclusions of law *de novo. See Kalamazoo River Study Group, 355 F.3d at 589.* In doing so, we uphold the district court's

determination that the parties did not validly modify the Agreement.

Tennessee substantive law controls in the instant case, as it comes before us on diversity. In Tennessee, the parties to an existing contract can modify its terms at any time. *Bonastia v. Berman Bros., Inc.*, 914 F. Supp. 1533, 1538 (W.D. Tenn. 1995). However, an existing contract cannot be unilaterally modified. *Balderacchi v. Ruth*, 36 Tenn. App. 421, 256 S.W.2d 390, 391 (Tenn. Ct. App. 1952). Rather, valid modification requires "the same mutuality of assent and meeting of the minds as required to make a contract" in the first instance. *Id.*; *see also Prudential Secs. v. Mills*, 944 F. Supp. 631, 635 (W.D. Tenn. 1996). Additionally, consideration must be exchanged to effect modification of an existing contract. *Boyd v. McCarty*, 142 Tenn. 670, 222 S.W. 528, 529-30 (Tenn. 1920). Importantly for [*34] our purpose today though, "[p]erforming what was already promised in the original contract is not consideration to support a second contract." *Dunlop Tire & Rubber Corp. v. Serv. Merch. Co.*, 667 S.W.2d 754, 758-59 (Tenn. Ct. App. 1983) (citing *Am. Fruit Growers, Inc. v. Hawkinson*, 21 Tenn. App. 127, 106 S.W.2d 564 (Tenn. Ct. App. 1937)).

To show mutual assent, Defendant relies on the certifications Plaintiffs submitted requesting capital payments. We cannot agree that the certifications manifest Plaintiffs' intent to modify the Agreement and forego payment under the stop loss provisions therein contained. As previously discussed at length, neither the statute, nor the implementing regulations, nor the policy manual preclude Plaintiffs, as preferred network providers, from requesting and receiving capital payments. This is so notwithstanding the operation of an Agreement establishing a negotiated rate of reimbursement for inpatient care which exceeds 100% of the DRG-rate. Although Defendant, and other MCS Contractors, can expressly provide that negotiated rates include costs otherwise additionally payable under the statute and regulations, such as [*35] capital costs, providers remain eligible to receive such additional payments upon request. *See* TRICARE / CHAMPUS Policy Manual, 6010.53-M, Ch. 6, Section 8 at III.B.4.d. (*available at* J.A. 1057-58).

Defendant analogizes the instant case to *Bonastia*. There, a company hired the plaintiff as an account manager and by letter conveyed that plaintiff's "annual salary will be $ 62,400 for the next two years." *Bonastia*, 914 F. Supp. at 1535. On his first day of work, the plaintiff signed a document acknowledging that he "read and received the company's Employee Handbook and agrees to abide by the policies, procedures, and rules it contains." *Id.* The document continues, however, and clarifies that the "Employee Handbook is not, and is not intended to be, a contract of employment," and that the plaintiff's "employment is 'at will.'" *Id.* Nearly a year later, the

plaintiff signed yet another copy of the acknowledgment form. *Id.* Less than two years after reporting to work, the company terminated the plaintiff, who then sued for breach of an employment contract. *Id. at* 1535-36. The court in *Bonastia* assumed that the company's letter [*36] constituted a binding two-year employment contract, but found the second acknowledgment form modified that contract to create an employment at-will arrangement. *Id.* at 1538-39.

*Bonastia* is not on point. Defendant likens Plaintiffs' capital payment certifications to the acknowledgment form in *Bonastia*. The acknowledgment form indicates an agreement to comply with the policies and procedures of the Employee Handbook. The capital payment certifications, however, do not reference the regulations, policies, or procedures governing TRICARE / CHAMPUS and, even if they did, those regulations and policies comprise a complex federal regulatory scheme devoid of a definition of "DRG-based payment." Ambiguously, the phrase "units subject to DRG-based payment" appears at two places in the certification forms -- both under "inpatient days" and under "total TRICARE/CHAMPUS inpatient days." (*See* J.A. at 1343) What is more, the information certified must comport with information submitted in the hospital's Medicare cost report and "DRG-based payment" is a phrase with its origins under the Medicare program. Thus, unlike the rather straightforward acknowledgment form in [*37] *Bonastia*, the signature of which could appropriately be taken to manifest intent, Plaintiffs' certifications for capital payment in the case at hand cannot be employed to demonstrate Plaintiffs' intent.

At any rate, Defendant cannot show valid consideration. The Agreement did not strip Plaintiffs of their entitlement to capital payment, even for the stop loss claims. In making capital payments to Plaintiffs, Defendant's government benefits administrator merely performed consistently with a pre-existing duty under the Agreement and the applicable regulations. *See Dunlop Tire & Rubber Corp.*, 667 S.W.2d at 758-59. Additionally, under the TRICARE / CHAMPUS regulations and policies, Defendant's government benefits administrator made capital payments *independently* of Plaintiffs' regularly submitted claims for reimbursement under the Agreement. These constitute "pass-through" payments and, accordingly, although Plaintiffs submitted their capital payment requests to Defendant's government benefits administrator, the payments flow directly from the federal government. *See* 32 C.F.R. § 199.14(a)(1)(iii)(G)(3) (" CHAMPUS shall [*38] *reimburse* the hospital its share of actual capital costs.")

(emphasis added); *see also* General Accounting Office, Defense Health Program (DHP), B-287619, (July 5, 2001), http://redbook.gao.gov/17/fl0083859.php ("For

payment of pass through costs, the contractor provides information to DOD to seek approval for payment. If DOD approves payment, the contractor is notified to pay the claim."). Thus, Defendant's claim of modification falls on two swords. We affirm the district court on this claim.

## B. Plaintiffs Never Waived Their Rights

Defendant asserts that Plaintiffs waived their right to receive stop loss payments. To support this claim, Defendant states that, in early 1999, Plaintiffs knew of the stop loss underpayment and of Defendant's actions in capping those claims at 100% of the DRG-rate and, yet, did not terminate the Agreement. Defendant further relies on Plaintiffs' capital payment certifications as evidence of intent to waive. In fact, on more than one occasion, Defendant goes so far as to classify Plaintiffs' submission of capital payment requests as "unequivocal and decisive acts." (Def.'s Br. at 35, 37) The district court concluded, as a matter of law, that [*39] Plaintiffs did not "intentionally and knowingly waive[] their rights to receive payments pursuant to the stop loss provisions," nor did Plaintiffs "manifest any such intent." *Baptist Physician II, 415 F. Supp. 2d at* 851. Reviewing this issue *de novo, see Kalamazoo River Study Group, 355 F.3d at* 589, we agree with the district court that Plaintiffs did not waive their right to payment under the stop loss provisions.

Waiver is the knowing and intentional relinquishment or abandonment of a known right. *Gitter v. Tenn. Farmers Mut. Ins. Co., 60 Tenn. App. 698, 450 S.W.2d 780, 784 (Tenn. Ct. App. 1969); Faught v. Estate of Faught, 730 S.W.2d 323, 325 (Tenn. 1987).* There can, therefore, be no effective waiver of rights where a party either does not know its rights or fails to fully understand those rights. *Faught, 730 S.W.2d at* 326. Put another way, intent to waive is required. "Waiver may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct." *Reed v. Wash. County Bd. of Educ., 756 S.W.2d 250, 255 (Tenn. 1988);* [*40] *see also Faught, 730 S.W.2d at 326; Gitter, 450 S.W.2d at* 784. Where a party seeks to prove waiver by course of conduct, "there must be clear, unequivocal and decisive acts of the party or an act which shows determination not to have the benefit intended in order to constitute a waiver." *Gitter, 450 S.W.2d at* 784 (citing *Webb v. Bd. of Trs. of Webb Sch., 38 Tenn. App. 173, 271 S.W.2d 6, 19 (1954)).*

Plaintiffs did not knowingly relinquish their rights to reimbursement. At the time Plaintiffs entered into the Agreement, Plaintiffs lacked the resources necessary to adequately monitor third party payor compliance with agreed-upon contract terms and, thus, to identify under-

payments. To more closely track payments, Plaintiffs acquired new payment tracking software (PCMS) and hired a contract analyst whose primary task was to monitor payments. Plaintiffs loaded their contract with Defendant into the PCMS system in November 1998 and, in early 1999, Plaintiffs learned -- through Hodge, its contract analyst -- that Defendant had been reimbursing stop loss claims at an amount lower than the stop loss amounts.

Plaintiffs' contract [*41] analyst began conversations with Defendant in February 1999 to secure full payment of the stop loss claims. On July 22, 1999, she wrote to Defendant's government benefits administrator demanding full payment of the stop loss claims. Plaintiffs never communicated an intent to waive Plaintiffs' rights under the Agreement, nor did Plaintiffs intend to waive those rights. By letter dated February 5, 2001, Defendant ultimately terminated the Agreement with Plaintiffs because they had reached an impasse on the amount due under the stop loss provisions. Additionally, Plaintiffs' request and receipt of capital payments cannot be deemed "clear, unequivocal and decisive acts . . . which show[] determination not to have the benefit intended." *Gitter, 450 S.W.2d at* 784. Our exploration of the regulatory scheme underlying the TRICARE / CHAMPUS program proves as much. Consequently, we find that Plaintiffs did not waive their rights under the Agreement. n11

---

n11 Although Defendant's brief on appeal alludes to implied waiver, Defendant wholly fails to develop such an argument. Accordingly, Defendant has waived a challenge on implied waiver grounds. *See Moore v. LaFayette Life Ins. Co., 458 F.3d 416, 448 (6th Cir. 2006)* ("The courts of appeals are not self-directed boards of legal inquiry and research, but essentially arbiters of legal questions presented and argued by the parties."); *Indeck Energy Servs. v. Consumers Energy Co., 250 F.3d 972, 979 (6th Cir. 2000)* ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

---

[*42]

## C. Laches Does Not Bar Plaintiffs' Claim, Nor Did Plaintiffs Fail to Mitigate

The district court concluded that the doctrine of laches did not bar Plaintiffs' claim since Plaintiffs took action to obtain full reimbursement upon learning of the underpayment and filed suit "when [it] felt it had exhausted all options of receiving payment." *Baptist Physician II, 415 F. Supp. 2d at* 852. Additionally, the district

court determined that, after learning of the breach, Plaintiffs did not fail to mitigate damages. Defendant challenges these conclusions. Again, we review de novo, see *Kalamazoo River Study Group, 355 F.3d at 589*, and Defendant's claims fail.

"[E]quitable defenses may bar purely legal claims." *M.J. Jansen v. Clayton, 816 S.W.2d 49, 52 (Tenn. Ct. App. 1991)*. To successfully invoke the doctrine of laches, a defendant must show "an inexcusably long delay in commencing the action which causes prejudice to the other party," and mere delay will not suffice. *Patton v. Bearden, 8 F.3d 343, 347 (6th Cir. 1993)* (internal citations omitted); *see also M.J. Jansen, 816 S.W.2d at 51*. A finding [*43] of sufficient prejudice frequently follows from "the death of witnesses[,] . . . the loss of evidence," *M.J. Jansen, 816 S.W.2d at 52* (collecting cases), or "failure of memory resulting in obscuration of facts" which "render uncertain the ascertainment of truth, and make it impossible for the court to pronounce a decree with confidence." *Brown v. Ogle, 46 S.W.3d 721, 727 (Tenn. Ct. App. 2000)*.

Laches does not bar Plaintiffs' claim. Plaintiffs timely filed this suit within the applicable statute of limitations. *See Tenn. Code Ann. § 28-3-109* (six-year statute of limitations). Moreover, Plaintiffs filed suit in December 2001 — ten months after Defendant notified Plaintiffs of its intent to terminate the Agreement following impasse, seven months after the effective termination date, and approximately two years and ten months following discovery of the underpayments. Up until February 1999, Plaintiffs did not know that Defendant was reimbursing its stop loss claims at below the agreed-upon rate. At that time, Plaintiffs' contract analyst began conversations with Defendant to secure full payment of the stop loss claims. [*44] On July 22, 1999, the analyst wrote to Defendant's claims administrator demanding full payment of the stop loss claims. This delay does not rise to the level of "inexcusably long." Further, Defendant has not shown that it suffered prejudice in the form of lost evidence, deceased witnesses, or failed memory sufficient to impede the truth-finding process. See *M.J. Jansen, 816 S.W.2d at 52; Brown, 46 S.W.3d at 727*.

Neither can Defendant succeed on its claim of failure to mitigate. The party alleging breach of contract "has a legal duty to exercise reasonable and ordinary care under the[] circumstances to prevent and diminish the damages." *ACG, Inc. v. Se. Elevator, Inc., 912 S.W.2d 163, 169 (Tenn. Ct. App. 1995)*. Although the injured party must take "reasonable and ordinary" steps to mitigate, "[o]ne is not required . . . to make extraordinary efforts." *Id.* (citing *Arkansas River Packet Co. v. Hobbs, 105 Tenn. 29, 58 S.W. 278, 282 (Tenn. 1900)*). Plaintiffs acted with "reasonable and ordinary care" by informing Defendant promptly upon discovery that, in their view,

Defendant was in breach of the Agreement's stop [*45] loss provisions. Plaintiffs pressed their view in a subsequent letter and phone call with Defendant. Defendant concedes in its brief that it terminated the Agreement with Plaintiffs in February 2001 "because [Plaintiffs] insisted on being paid the full stop loss, and in excess of DRG." (Def.'s Br. at 21) Defendant knew of this insistence long before February 2001. Plaintiffs were not required "to make extraordinary efforts" to further clarify their position for Defendant's benefit. See *ACG, Inc., 912 S.W.2d at 169*. Consequently, we find that the district court correctly ruled that the defense of laches does not bar Plaintiffs' claim, and that Plaintiffs took reasonable steps to mitigate.

### D. Prejudgment Interest

Defendant further argues that the district court abused its discretion in awarding prejudgment interest because "[u]p to the day of trial the number and amount of stop loss claims was contested." (Def.'s Br. at 46) The district court awarded prejudgment interest at a rate of ten percent per annum "from the date that payment was actually posted on each inpatient claim" improperly reimbursed. *Baptist Physician II, 415 F. Supp. 2d at 853*. [*46] In so doing, the district court observed that Plaintiffs "ha[d] remained without the use of the money" and "[Defendant] could have entirely avoided the dispute . . . had it simply disclosed to [Plaintiffs] prior to signing the Agreement that it had no intention of paying more than CHAMPUS DRG on those claims." *Id.* On review, challenges to the district court's award of prejudgment interest "will not be disturbed . . . unless the record reveals a manifest and palpable abuse of discretion." *Myint v. Allstate Ins. Co., 970 S.W.2d 920, 927 (Tenn. 1998)*; *see also Daily v. Gusto Records, Inc., 14 F. App'x 579, 591 (6th Cir. 2001)* (noting that state law determines the appropriate standard of review). We find no abuse of discretion.

Where consistent with principles of justice and equity, Tennessee Code provides for the award of prejudgment interest at a rate not to exceed ten percent per annum. *Tenn. Code Ann. § 47-14-123*. First and foremost, principles of equity guide trial courts in exercising their discretion to award prejudgment interest. *Myint, 970 S.W.2d at 927*; *see also Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 447 (Tenn. 1992)*. [*47] Second, a trial court will more readily award prejudgment interest "when the amount of the obligation is certain, or can be ascertained by proper accounting." *Myint, 970 S.W.2d at 927* (citing *Mitchell v. Mitchell, 876 S.W.2d 830, 832 (Tenn. 1994)*). Third, "interest is allowed when the existence of the obligation is not disputed on reasonable grounds." *Id.* While useful as guideposts, the Tennessee Supreme Court has observed that "these criteria have not been used to deny prejudgment interest in every

2007 U.S. App. LEXIS 6447, *

case where the defendant reasonably disputed the existence or amount of an obligation." *Id.*

The district court did not abuse its discretion in awarding prejudgment interest. First, the award is consistent with principles of equity. Defendant entered into the Agreement knowing full well it had no intention of ever paying over 100% of the CHAMPUS DRG-rate on the stop loss claims. Defendant deliberately failed to reimburse Plaintiffs according to the stop loss provisions, and thereby deprived Plaintiffs of the use of the difference in reimbursement. Second, the parties stipulated to the "accuracy, and admissibility" of a list detailing the [*48] inpatient claims at issue in the case. (J.A. at 1568, 1570-74) Thus, the amount of the obligation could be readily "ascertained by proper accounting." *See Myint, 970 S.W.2d at 927.* Finally, although Defendant disputed Plaintiffs' claim of breach, it did not "reasonably dispute" the claim in light of its intent from the start of the Agreement *not* to honor the stop loss reimbursement provisions contained therein. Accordingly, we find the district court did not abuse its discretion in awarding prejudgment interest.

### E. Claims Waived on Appeal

At the outset, Defendant's brief contemplates challenges to the district court's conclusions on Defendant's equitable estoppel claim and its counterclaim. However, Defendant's brief is notably devoid of any developed argumentation on these issues. Accordingly, Defendant has waived these challenges. *See Moore, 458 F.3d at 448; Indeck Energy Servs., 250 F.3d at 979.*

### CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order.

# EXHIBIT B

LEXSEE 2004 U.S. DIST. LEXIS 22147

**BOARD OF TRUSTEES OF BAY MEDICAL CENTER, a special district of the state of Florida; BAPTIST HOSPITAL, INC., a Florida not for profit corporation; and THE HEALTHCARE AUTHORITY OF THE CITY OF HUNTSVILLE, an Alabama public corporation, on their own behalf and on behalf of all CLASS MEMBERS similarly situated, Plaintiffs, v. HUMANA MILITARY HEALTHCARE SERVICES, INC., a Delaware corporation; OFFICE OF CIVILIAN HEALTH AND MEDICAL PROGRAM OF THE UNIFORMED SERVICES and TRICARE MANAGEMENT ACTIVITY, subdivisions of the DEPARTMENT OF DEFENSE OF THE UNITED STATES OF AMERICA; and DONALD RUMSFELD, in his official capacity as the Secretary of Defense for the United States of America, Defendants.**

**Case No. 5:03-cv-144/MCR**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA, PANAMA CITY DIVISION**

*2004 U.S. Dist. LEXIS 22147*

**March 16, 2004, Decided**

**SUBSEQUENT HISTORY:** Remanded by *Bd. of Trs. of Bay Med. Ctr. v. Humana Military Healthcare Servs.,* 2005 U.S. App. LEXIS 1399 (Fed. Cir., Jan. 28, 2005)

**DISPOSITION:** [*1] Defendant Humana Military Healthcare Services' motion to dismiss plaintiffs' complaint, or in alternative, to transfer denied. Defendants Tricare Management Activity and Donald Rumsfeld's motion to dismiss, or alternatively, to stay claim for declaratory judgment granted. Count II of complaint dismissed without prejudice. Stay in this case lifted.

**COUNSEL:** For BOARD OF TRUSTEES OF BAY MEDICAL CENTER, A SPECIAL DISTRICT OF THE STATE OF FLORIDA, BAPTIST HOSPITAL INC, A FLORIDA NOT FOR PROFIT CORPORATION, HEALTHCARE AUTHORITY OF THE CITY OF HUNTSVILLE, AN ALABAMA PUBLIC CORPORATION, Plaintiffs: JAMES NIXON DANIEL, RUSSELL FRANK VAN SICKLE, BEGGS & LANE, PENSACOLA, FL.

For HUMANA MILITARY HEALTHCARE SERVICES INC, Defendant: CHARLES MICHAEL TRIPPE,

DAVID C REEVES, ROBERT BRUCE PARRISH, ROBERT E WARREN, MOSELEY WARREN PRICHARD ETC, JACKSONVILLE, FL; JOHN W MERTING, JOHN W MERTING PA, GULF BREEZE, FL; KIMBERLY H ISRAEL, HELD & ISRAEL, JACKSONVILLE, FL.

For OFFICE OF CIVILIAN HEALTH AND MEDICAL PROGRAM OF THE UNIFORMED SERVICES, TRICARE MANAGEMENT ACTIVITY, DEPARTMENT OF DEFENSE, DONALD RUMSFELD, Defendants: JD ROY ATCHISON, US ATTORNEY, NORTHERN DISTRICT OF FLORIDA, PENSACOLA, FL; SARA W CLASH-DREXLER, US DEPARTMENT OF JUSTICE, WASHINGTON, DC.

**JUDGES:** M. CASEY RODGERS, United States District Judge.

**OPINION BY:** M. CASEY RODGERS

**OPINION:**

**ORDER**

On June 6, 2003, Plaintiffs BAY MEDICAL

CENTER, BAPTIST HOSPITAL, INC., and THE HEALTHCARE AUTHORITY [*2] OF THE CITY OF HUNTSVILLE (collectively referred to as "Plaintiffs") filed the current action in this Court based on both federal question and diversity jurisdiction, asserting two causes of action: (1) breach of contract against Defendant HUMANA MILITARY HEALTH SERVICES, INC. ("Humana"); and (2) declaratory judgment against Defendants TRICARE MANAGEMENT ACTIVITY and DONALD RUMSFELD ("Government"). (Doc. 1). On August 25, 2003, the Government filed a *Rule 12(b)(1)* motion to dismiss, or in the alternative, to stay the declaratory judgment claim (see doc. 16) along with a supporting memorandum of law (see doc. 17), which is now pending. On the same day, Humana also filed a *Rule 12(b)(1)* motion to dismiss, or in the alternative, to transfer venue to the Court of Federal Claims (see doc. 11) along with a supporting memorandum of law (see doc. 12), which is now also pending. n1 One month later, Plaintiffs (see doc. 29) and Humana (see doc. 27) each timely filed a response in opposition to the Government's motion. On the same day, Plaintiffs (see doc. 30) and the Government (see doc. 28) each filed a timely response in opposition to Humana's motion. n2 The [*3] Court heard oral arguments on both motions on January 9, 2004. (Docs. 66, 68). The Court now concludes that the Government's motion should be granted for lack of standing of the Plaintiffs and that Humana's motion should be denied because the Court does have subject matter jurisdiction over Plaintiffs' breach of contract claim.

n1 On August 25, 2003, Humana also filed affidavits in support of its motion (see doc. 13), and one day later, filed additional supporting affidavits (see doc. 14).

n2 On October 22, 2003, the Government filed a declaration in support of its response to Humana's motion. (Doc. 42).

*Facts*

The Department of Defense ("DOD"), pursuant to authority from Congress, established the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") in 1967. CHAMPUS beneficiaries include retired armed forces personnel and dependents of both active and retired military personnel. The DOD subsequently established TRICARE, a managed healthcare program which involves [*4] the competitive selection of contractors to financially underwrite the delivery of health care services under CHAMPUS. TRICARE Management Activity ("TMA"), which was previously known as Office of CHAMPUS, is the government office charged with the responsibility of administering TRICARE/CHAMPUS. TMA assists in the operational management and direction of all CHAMPUS programs and activities.

On January 23, 1996 (effective November 28, 1995), the DOD entered into a contract ("Prime Contract") with Humana whereby Humana agreed to provide comprehensive health care and associated services for all CHAMPUS beneficiaries residing in Regions 3 and 4 (Alabama, Florida, Georgia, Mississippi, South Carolina, a small area in Arkansas, a portion of eastern Louisiana, and most of Tennessee). Under the Prime Contract, Humana became a managed care support ("MCS") n3 contractor. The Prime Contract was based on a fixed price with monthly payments to Humana, which was "intended to create strong incentives for efficiency and cost-effectiveness in the delivery of health care services." (Doc. 1, P10). Under the Prime Contract, the contractor assumed the risk for the cost of healthcare provided to the [*5] CHAMPUS beneficiaries. The Prime Contract provides that "...if the contractor is able to control costs while providing the contractually required services, the contractor receives a larger profit. If the contractor is unable to control costs while providing the required services, the contractor loses its profit and a previously negotiated risk premium." (Doc. 42, P8).

n3 Under an MCS contract, a contractor is required to: "[establish] and manage a network of health care providers; [enroll] beneficiaries in the TRICARE Prime (health maintenance organization option); operate a medical management program; [process] health care claims; provide customer services; educate [the] providers and beneficiaries regarding TRICARE programs and procedures; operate local TRICARE Service Centers; and provide government access to data." *Sierra Military Health Services, Inc. v. United States, 58 Fed. Cl. 573, 575 (Fed. Cl. 2003).*

The Prime Contract required Humana to establish "civilian provider networks" [*6] for those CHAMPUS beneficiaries residing within Regions 3 and 4. A "provider" is "an entity or person that provides healthcare." (Doc. 1, P11). n4 Humana established the civilian provider networks through contractual arrangements with the individual providers. Humana negotiated different payment amounts and methodologies with the providers in order to encourage them to participate in the network; however, the Prime Contract required Humana to "make timely and accurate reimbursement to all providers of care with whom it has contracts in strict accordance with the terms and conditions of the contracts." (Doc. 1, P12).

n4 Hospitals are institutional providers, but physicians are professional (*i.e.,* non-institutional) providers.

Prior to TRICARE, the DOD used claims processors, called fiscal intermediaries, to process claims under the CHAMPUS program. Fiscal intermediaries were not legally responsible for claims that arose regarding the discharge of those duties required by the fiscal intermediary ("FI") [*7] contracts. When the FI contracts expired, the DOD began using MCS contracts, like the Prime Contract in the current case. Noticeably absent from the MCS contracts are indemnity provisions, which had been included in the FI contracts. Pursuant to the indemnity provision in the FI contracts, the Government agreed to hold the fiscal intermediaries harmless and indemnify them for any judgment, settlement, or costs arising out of the contractor's function as a fiscal intermediary. The FI contracts also explicitly stated that the Government was the real party in interest in civil lawsuits which sought the disbursement of funds, because the funds provided to the fiscal intermediaries with which to pay CHAMPUS claims were disbursed directly from the United States Treasury. When the DOD made the change to MCS contracts, it also made the decision to not include an indemnity provision in them. By using the MCS contracts, the DOD intended to create a new contractual relationship with the MCS contractor. n5

n5 In fact, pursuant to the MCS contracts, the

MCS contractor is solely liable for negligent acts or omissions of contractor supplied resource support and resource sharing personnel.

[*8]

Under the Prime Contract, TMA pays a monthly sum via electronic fund transfer to Humana based on several contract service categories, including healthcare costs and administrative costs. "The healthcare price is the cost to the government of certain specified health care services. The administrative price is the cost to the government for all administrative functions required under the contract such as customer services and claims processing." (Doc. 42, P9). From the healthcare portion of the monthly payments, Humana is responsible for the payment of all healthcare benefits for the CHAMPUS beneficiaries residing in Regions 3 and 4 to the network providers based on the terms of Humana's network provider contracts.

The Prime Contract permits Humana to negotiate rates of payment with its network providers. Those rates of payment are subject to the maximum payment methodologies set forth by federal law. Federal law prohibits the reimbursement of out-patient *professional* services billed by institutional providers in excess of the CHAMPUS/TRICARE Maximum Allowable Charge ("CMAC"). "CMACs are the allowable amounts used by TMA to pay for professional[, *i.e.,* non-institutional, [*9] ] providers that are either rendered on an in-patient or out-patient basis." (Id., P14). "Although the CMAC methodology limits the MCS contractor reimbursement from the government for institutional out-patient professional services, the [Prime Contract] between Humana and the government does allow the contractor to pay these providers (on an annual basis or by other arrangement) sums in addition to government imposed limits on individual claims...." (Id.). n6 "As stated in the [Prime Contract], it is TMA policy that these additional sums must come out of the funds the government pays to Humana for administrative services (not health care services)... That is, all additional sums paid to providers by Humana must come from contractor funds." (Id.). In other words, if Humana's negotiated rates exceeded the Government's reimbursement limits, then Humana would have to pay for the overage out of its profit. n7

n6 MCS contractors are allowed "to pay network providers sums in addition to individual

claims payments if it is deemed necessary to entice providers into the network," but the contractor cannot use "health care dollars...to pay amounts in excess of the maximum payment methodology set forth by federal law...." (Doc. 66, Attach. Exh. 2; see also Id., Exh. 3).

[*10]

n7 If, hypothetically, a MCS contractor breached one of its network provider contracts, the resulting damages would not be allowable healthcare costs. In addition, such damages could not be added to the administrative costs paid to the MCS contractor by the Government, because the administrative costs are fixed by the MCS contract and are not subject to adjustment. Thus, any monetary damages recovered by Plaintiffs would not be paid with funds directly from the federal treasury.

Plaintiffs are all institutional providers with whom Humana contracted to provide healthcare services to CHAMPUS beneficiaries within Regions 3 and 4. The network provider contracts n8 between Humana and Plaintiffs generally explain that, in exchange for providing certain "covered" healthcare services to the beneficiaries, Humana would pay Plaintiffs agreed upon amounts for those services as established by the contracts. One category of the healthcare services that Plaintiffs contracted to provide was outpatient non-surgical services.

n8 The Government was not a party to those network provider contracts, and in fact, Plaintiffs have no direct relationship with the Government.

[*11]

On September 23, 1998, Dr. John E. Crum, MD, who was Humana's Chief Medical Officer, sent a letter to Beverly Carey, a TMA contracting officer, seeking advice as to the propriety of a proposed billing practice. Dr. Crum informed Ms. Carey that Humana "desired to apply the CMAC fee schedule, professional and technical components as appropriate, to reimburse hospitals for radiology, laboratory, other diagnostic, and medical services performed in the outpatient setting." (Doc. 13,

Affidavit of Ray Prior, Exh. H). Dr. Crum inquired as to whether or not such a proposed billing practice would comply with TMA policy. On December 1, 1998, Ms. Carey responded to Dr. Crum's letter. She informed him that his proposal was "not inconsistent with TMA policy." (Id., Exh. I). However, she cautioned that TMA planned to adopt the Medicare reimbursement system but that an implementation of that system was a few years away. Ms. Carey told him to "please continue to operate under current guidelines" until the time such a system could be implemented. (Id.).

Prior to October 1, 1999, Humana paid Plaintiffs the agreed upon amounts according to the terms of the written contracts. Beginning [*12] October 1, 1999, however, Humana (without prior notice) ceased paying Plaintiffs the normal amount for the reimbursement of outpatient non-surgical services. Humana began reducing the payments to Plaintiffs by applying CMAC rates to those services. In Count I of the complaint, Plaintiffs assert that Humana's application of the CMAC rates to cap the reimbursement of out-patient non-surgical services breached the previously agreed-upon reimbursement methodology for those services. To be absolutely clear, when an outpatient non-surgical service is billed, there are two components to the bill, a professional and a technical component. Plaintiffs admit that the services complained-of in this case involve only Humana's reimbursement of the technical component of the bill for radiology and laboratory fees, i.e., the fees charged by the institutional providers for use of radiological and laboratory equipment. Plaintiffs' breach of contract claim does not involve professional charges of those physicians who were involved with the delivery of Plaintiffs' radiological or laboratorial services.

Plaintiffs allege that, on March 10, 2000, approximately five (5) months after Humana began [*13] reducing the payments to Plaintiffs, the TRICARE program issued a policy related to the reimbursement of outpatient hospital services. It is alleged that the policy approved of the application of CMAC rates to institutional providers. n9 In Count II of Plaintiffs' complaint, Plaintiffs assert that the policy is void for two reasons: (1) "it was in direct conflict with the reimbursement plan for those services promulgated as *32 C.F.R. § 199.14*[;]" and (2) "it was actually an attempt to issue a substantive rule that [should have been] promulgated as a regulation." (Id., P29). n10

n9 Plaintiffs quote a portion of the policy in their complaint; however, Plaintiffs did not provide the Court with a copy of the policy statement in its entirety. (Doc. 1, P27).

n10 Plaintiffs also allege that "regardless of the validity of the policy, its existence did not change or otherwise affect the contracts entered into between Humana and plaintiffs and the members of the proposed class." (Doc. 1, P29).

Then [*14] on or after August 12, 2002, Plaintiffs allege that the DOD issued a regulation, *32 CFR 199.14(a)(5)(iv)*, as to the application of CMAC rates to institutional providers regarding radiology services. In Count II, Plaintiffs claim that the regulation is invalid for four reasons: (1) "the regulation requires that laboratory services are to be reimbursed under home health rules as set forth in *32 CFR 199.14(h)(1)(viii)(1998)*, which is in error[;]" (2) "the promulgation of [the] regulation was deficient because it failed to include the changes to the institutional outpatient reimbursement payments in the title or summary description of the interim final rule[;]" and (3) "the regulatory procedures section of the proposed interim rule refers to an analysis as to the proposed rule's effect on skilled nursing facilities, but no analysis as to the effect on the hospitals which would be affected by the reimbursement changes as to the outpatient procedures[;]" and (4) "the standard practice of soliciting public comments prior to issuance of the regulation was improperly not followed." (Id., P30). n11

n11 Plaintiffs also allege that "institutional providers are not subject to CMAC rates for outpatient non-surgical procedures and have not been subject to such rates at any time relevant to this litigation." (Doc. 1, P31). Furthermore, Plaintiffs claim that "CMAC rates are applicable only to individual non-institutional providers of services." (Id.).

[*15]

### Standard for a Motion to Dismiss Pursuant to Rule 12(b)(1)

Challenges to subject matter jurisdiction under *Rule 12(b)(1) of the Federal Rules of Civil Procedure* come in

two forms, facial and factual challenges. See *Lawrence v. Dunbar, 919 F.2d 1525, 1528-29 (11th Cir. 1990)*. Facial challenges are limited to the four corners of the complaint while factual challenges permit investigation of matters outside the pleadings themselves. See *Garcia v. Copenhaver, Bell, and Assocs., 104 F.3d 1256, 1260-61 (11th Cir. 1997)*. "Facial attacks on the complaint [require] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Id., 919 F.2d at 1529 (11th Cir. 1990)* (quoting *Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir.))* (internal quotations omitted). A facial attack affords a plaintiff safeguards similar to those provided in a *Rule 12(b)(6)* motion. See *Lawrence, 919 F.2d at 1529*. If the jurisdictional allegations in the complaint [*16] are sufficient, the complaint stands. See *Paterson v. Weinberger, 644 F.2d 521, 523 (5th Cir. 1981)*. "Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such a testimony and affidavits, are considered." Id. (quoting *Menchaca, 613 F.2d at 511*) (internal quotations omitted). In the instant case, the Court will treat Humana's motion as "factual" challenge and the Government's motion as a "facial" challenge. n12

n12 The Government asserts in its motion that it is raising purely a facial attack. Humana's motion does not specify whether it is facial or factual, but it does refer to matters outside of the pleadings. As a result, the Court will treat Humana's motion as a factual challenge to subject matter jurisdiction.

When the facts of a case do not implicate the merits of a plaintiff's case, "the trial court is free to weigh the evidence and satisfy itself as to [*17] the existence of its power to hear the case." *Lawrence, 919 F.2d at 1529* (citation omitted). "In short, no presumptive truthfulness attaches to [a] plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Id. On the other hand, if the attack on subject matter jurisdiction implicates an element of a plaintiff's cause of action, then:

The proper course of action for the district court...is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case....Judicial economy is best promoted when the existence of a federal right is directly reached, and where no claim is found to exist, the case is dismissed on the merits. This refusal to treat indirect attacks on the merits as *Rule 12(b)(1)* motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under *Rule 12(b)(6)*...or *Rule 56*...both of which place great restrictions on the district court's discretion...

[*18] *Garcia, 104 F.3d at 1261* (quoting *Williamson v. Tucker, 645 F.2d 404, 415-16 (5th Cir. 1981)*, cert. denied, *454 U.S. 897, 102 S. Ct. 396, 70 L. Ed. 2d 212 (1981))*.

### A. Humana's Motion to Dismiss

In its motion to dismiss, Humana argues that the Government is 100% liable for any breach of the network provider contracts by Humana. Humana maintains that the Government is the real party in interest, because Humana is essentially a fiscal intermediary who simply processes claims on behalf of the Government for the CHAMPUS/TRICARE program. Because Humana claims that the Government is the real party in interest, Humana asserts that the Government is an indispensable party as to Count I.

If the Government was in fact an indispensable party and solely liable for any breach of contract damages, this Court would lack subject matter jurisdiction over Count I. The Court of Federal Claims has exclusive jurisdiction over cases in which the federal government's potential liability exceeds $ 10,000.00. *See 28 U.S.C. §§ 1346(a)(2)* and *1491(a)(1) (West 2003)*. Because Humana's claim for damages in [*19] Count I would likely exceed $ 10,000.00, the only court that would have subject matter jurisdiction over Count I would be the Court of Federal Claims. Accordingly, Humana seeks dismissal of Count I, or as an alternative to dismissal, transfer of the case to the Court of Federal Claims

pursuant to *28 U.S.C. § 1631*.

### 1. Indispensable Party Under Rule 19

*Rule 19 of the Federal Rules of Civil Procedure* provides, in pertinent part:

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by [*20] reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

*FED. R. CIV. P. 19(a)* (2003). *Rule 19* provides a two step analytical framework to determine whether or not an action should proceed in a non-party's absence. *See City of Marietta v. CSX Transp., Inc., 196 F.3d 1300, 1305 (11th Cir. 1999)*. "The first question is whether complete relief can be afforded in the present procedural posture, or whether the nonparty's absence will impede either the nonparty's protection of an interest at stake or subject parties to a risk of inconsistent obligations." *Id.* Only when the answer to that question is yes and the nonparty cannot be joined does the Court move on to step two. *See id.* (citing *Temple v. Synthes Corp., Ltd., 498 U.S. 5, 8,*

*111 S. Ct. 315, 316, 112 L. Ed. 2d 263 (1990)).* [*21] On step two, a court must determine whether "in equity and good conscience" the litigation should go forward without the non-party. See *id.* In this case, because the Court answers the first question in the negative, the Court will not reach step two.

Under the first step in the *Rule 19* analysis, the Court must determine whether complete relief can be afforded with the present parties, or whether the non-party has an interest in the litigation. In order to make such a determination, the Court must first inquire into whether suit may be brought against the Government for Humana's alleged breaches of the network provider contracts.

The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages. See *J.J. Gumberg Co. v. Janis Services, Inc., 847 So. 2d 1048, 1049 (Fla. 4th D.C.A. 2003).* In the current case, the provider network contracts were valid contracts between only Plaintiffs and Humana. In other words, the Government was not a party to those contracts. Therefore, Plaintiffs have no privity of contract with the Government. See *Merritt v. United States, 267 U.S. 338, 340-41, 45 S. Ct. 278, 279, 69 L. Ed. 643, 61 Ct. Cl. 1019 (1925)* [*22] (where there was a contract between only private entities, the subcontractor was unable to sue the United States pursuant to that contract); *National Leased Housing Assoc. v. United States, 105 F.3d 1423, 1435-37 (Fed. Cir. 1997)* (privity of contract with the United States is required in order to establish jurisdiction under the *Tucker Act*). As a non-party, the Government cannot be sued` by Plaintiffs for breach of contract absent an indemnification agreement in the Prime Contract or some other provision demonstrating that the Government consented to an agency relationship with Plaintiffs. See e.g., *United States v. Johnson Controls, Inc., 713 F.2d 1541 (Fed. Cir. 1983).*

To demonstrate an agency relationship, a subcontractor must show that: (1) prime contractor was acting as a purchasing agent for the government; (2) the agency relationship between the government and the prime contractor was established by clear contractual consent; and (3) the prime contractor stated that the government would be directly liable to the subcontractors for the purchase price. See *id. at 1551; Globex Corp. v. United States, 54 Fed. Cl. 343, 348 (2002).* [*23] "[A] contractor cannot bind the Government via provisions of a subcontract unless such authority has been granted by the Government." *Globex Corp., 54 Fed. Cl. at 350.* Courts look to the provisions of a prime contract to determine whether or not such consent exists. See *id. at 348.*

The former FI contracts contained a separate indemnification provision which held the Government responsible for the actions of the fiscal intermediary. For FI contracts, the federal funds given to its contractor were considered true pass-through funds. In other words, the contractor acted as a fiscal intermediary and just processed claims on behalf of the Government. The fiscal intermediary did not have any ownership interest in the funds transferred from federal coffers to the individual providers. At oral arguments in this case, Humana maintained that it was a "fiscal intermediary plus." Humana asserted that it merely processed the CHAMPUS/TRICARE claims for Regions 3 and 4, acting as a steward of the Government's funds. However, in addition to such fiscal intermediary duties, Humana admitted that it had to manage and cut costs, but at the same time argued that [*24] any additional duties did not alter its fiscal intermediary status.

Humana's "fiscal intermediary plus" argument is unavailing. In the present case, the Prime Contract is an MCS contract, and accordingly does not contain an indemnity provision like the former FI contracts. In creating MCS contracts, the DOD intentionally omitted an indemnity provision in an effort to alter the contractual relationship between the DOD and its healthcare contractors. The MCS contracts created an arrangement whereby the contractor (Humana) received control over a monthly allotment of governmental funds that the federal government electronically transferred to the contractor's bank account. The MCS contractor has ownership over the funds and can distribute those funds to network providers as it sees fit. The contractor cannot pay any claim beyond what federal law allows from the healthcare portion of the monthly allotment; however, the contractor is permitted to pay network providers beyond the Government's allowed amounts. If the contractor chooses to do so, then any overage is paid for out of the contractor's administrative portion of the allotment, which results in less profit for the contractor. [*25] Thus, the funds do not simply "pass-through" to the providers, as suggested by Humana. Similarly, Humana is not a fiscal intermediary. To the contrary, Humana is an MCS contractor with much greater responsibility and

many more duties than a former FI contractor.

Furthermore, there is no provision in the Prime Contract whereby the DOD consents to an agency relationship with Humana. n13 To the contrary, there logically would not be such a provision if the Government restructured its healthcare contracts from FI to MCS contracts to alter the relationship between the DOD and its contractors. Plaintiffs cannot sue the Government for monetary damages based upon Humana's alleged breach of the network provider contracts. The Government is neither the real party in interest nor an indispensable party for Count I, and there is no basis for waiver of sovereign immunity by the Government. Humana is the real party in interest, thereby providing the Court with subject matter jurisdiction over Count I. Accordingly, Humana's motion to dismiss, or in the alternative, to transfer venue (see doc. 11) is DENIED.

n13 Humana does not point to any such contractual provision in the Prime Contract.

[*26]

**B. Government's Motion to Dismiss**

In its Motion to Dismiss, the Government argues that Plaintiffs have no Article III standing to assert the declaratory judgment action in Count II. The Government maintains that, as alleged, the complaint fails to demonstrate causation and redressability. Before addressing the Government's standing argument, it is important to explain the nature of the alleged injuries. In their response to the Government's motion to dismiss, Plaintiffs argue that their complaint asserts two types of damages, retrospective and prospective. The retrospective, or past, damages relate to Plaintiffs' receipt of less monies from Humana than that to which Plaintiffs claim a contractual entitlement. The prospective, or future, damages relate to Plaintiffs' claim that from the present time until the future expiration date of the network provider contracts Humana will continue to pay Plaintiffs less monies than that to which they are allegedly entitled. Second, Plaintiffs claim that the existence of the allegedly invalid DOD policy and regulation prevent Plaintiffs from negotiating new network provider contracts with Humana.

*1. Standing*

[*27] Although this case involves an agency policy and an agency regulation, the Government only challenges the existence of Article III standing under the United States Constitution. "Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claim." *Dillard v. Baldwin County Comm'rs, 225 F.3d 1271, 1275 (11th Cir. 2000).* In order to satisfy the constitutional requirements of standing, a plaintiff must allege the following three things: (1) that he or she has suffered or will immediately suffer an injury; (2) that the injury is fairly traceable to the defendant's challenged actions; and (3) that a favorable court ruling is likely, as opposed to merely speculatively, to redress the plaintiff's injury. See *Bennett v. Spear, 520 U.S. 154, 167, 117 S. Ct. 1154, 1163, 137 L. Ed. 2d 281 (1997); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992);* see also *Dillard, 225 F.3d at 1275;* ERWIN CHEMERINSKY, *Federal Jurisdiction,* § 2.3.1 (3d ed. 1999). Satisfaction of this three-part test is required where, as here, [*28] a plaintiff seeks to challenge agency action pursuant to the Administrative Procedure Act ("APA"), *5 U.S.C. § 701, et seq.* See *Moore v. Navy Public Works Center, 139 F. Supp. 2d 1349, 1354 (N.D. Fla. 2001)* (citations omitted). The Government's motion assumes that Plaintiffs have demonstrated an injury-in-fact; thus, the Government only challenges the existence of causation and redressability.

**1. Causation**

To satisfy the causation requirement, Plaintiffs must allege that the Government's issuance of the policy and regulation in question caused harm to Plaintiffs. See ERWIN CHEMERINSKY, *Federal Jurisdiction,* § 2.3.3 (3d ed. 1999).

> Importantly, in evaluating Article III's causation (or "traceability") requirement, we are concerned with something less than the concept of "proximate cause." As [the Eleventh Circuit has] noted..., "no authority even remotely suggests that proximate causation applies to the doctrine of standing." Instead, even harms that flow indirectly from the action in question can be said to be "fairly traceable" to that action for standing purposes.

*Focus on the Family v. Pinellas Suncoast Transit Authority, 344 F.3d 1263, 1273 (11th Cir. 2003)* [*29] (citations omitted). n14

> n14 "[To prove standing a plaintiff] must establish causation--a 'fairly...traceable' connection between the alleged injury in fact and the alleged conduct of the defendant." *Vermont Agency of Natural Res., 529 U.S. 765, 771, 146 L. Ed. 2d 836, 120 S. Ct. 1858, 1861 (2000)* (citations omitted).

The Government argues that Plaintiffs' injury was not caused by the Government's policies and regulations. The Government notes that Plaintiffs' complaint repeatedly alleges that their injury resulted from Humana's breaches of its network provider contracts. In addition, the complaint explicitly alleges that Plaintiffs' injury occurred independent of the policy and regulation in question. (Doc. 1, PP29, 31).

The Government is correct. The allegations in Plaintiffs complaint fail to meet Article III's causation requirement. Plaintiffs' injury involving alleged breach of contract damages of the receipt of less monies than that to which they allege entitlement, whether retrospective or [*30] prospective, are not "fairly traceable" to the Government's adoption of the policy and regulation. Those alleged damages are fairly traceable solely to the breach of contract claim. As to Plaintiffs' argument regarding prospective injury, Plaintiffs complaint does not adequately identify such an injury, even under a liberal construction of the complaint. As pled, the declaratory judgment action deals only with relief from the breach of the network provider contracts, already in place.

**2. Redressability**

To meet the redressability requirement for standing, Plaintiffs' must allege that a favorable court decision is likely to remedy Plaintiffs' injury. See ERWIN CHEMERINSKY, *Federal Jurisdiction*, § 2.3.3 (3d ed. 1999). In other words, it must be likely, not merely speculative, that Plaintiffs' injury will be redressed by a favorable decision. See *Kelly v. Harris, 331 F.3d 817, 819-20 (11th Cir. 2003)* (citations omitted). The Government argues that Plaintiffs injury, i.e., receiving

less money than allegedly entitled from Humana, cannot be redressed with a declaratory judgment. The Government maintains that a favorable decision striking both the [*31] regulation and the policy as invalid will not result in Plaintiffs' receipt of the unpaid monies to which they claim a contractual entitlement.

The Government is again correct. Plaintiffs' explicit allegation that their injury occurred independent of the DOD policy and regulation in question is fatal to their claim. Furthermore, Plaintiffs complaint does not adequately identify a prospective injury. n15 Thus, there would be no injury to redress by a declaratory judgment. n16

> n15 Assuming *arguendo* that the complaint asserted such a prospective injury, that injury would be extremely speculative, because there is nothing requiring either party to contract or to negotiate for a contract.

> n16 In addition, Count II presents no "actual controversy" as required by Article III. "Basically, the question in each case is whether the facts alleged, under all of the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S. Ct. 510, 512, 85 L. Ed. 826 (1941)*. Whether the controversy is sufficiently immediate or real is a question of degree that must be determined on a case-by-case basis. *Golden v. Zwickler, 394 U.S. 103, 108, 89 S. Ct. 956, 959-60, 22 L. Ed. 2d 113 (1969)*; *Simmonds Aerocessories, Ltd. v. Elastic Stop Nut Corp. of America, 257 F.2d 485, 489 (3rd Cir. 1958)*. Based on the allegations in the Plaintiffs' complaint, there is no substantial controversy between Plaintiffs and the Government, no adverse legal interest between them, and no sufficient immediacy to warrant a declaratory judgment. Thus, as plead, the complaint fails to allege an "actual controversy" for Count II.

[*32]

In sum, Plaintiffs' complaint fails on its face to demonstrate the causation and redressability requirements

of Article III standing. Because the complaint fails to establish standing for Count II, the Government's motion to dismiss that count (see doc. 16) must be GRANTED. Count II, therefore, is DISMISSED without prejudice. Plaintiffs shall have fourteen (14) days from the date of this Order in which to file an amended complaint correcting the defects in Count II as outlined above. In the event Plaintiffs file an amended complaint, Defendants shall have ten (10) days thereafter to file a responsive pleading. See *FED. R. CIV. P. 15(a)* (2003). In the event Plaintiffs do not amend the complaint within the time period specified by the Court, Count II will be DISMISSED with prejudice. n17

n17 On January 9, 2004, the Court entered an Order staying the case and tolling the discovery period and all deadlines until Defendants' motions to dismiss were resolved. (Doc. 65). Because the current Order resolves Defendants' motions, the stay is hereby LIFTED. Because the stay is now lifted, the Clerk is directed to add sixty-seven (67) days to the discovery period in this case.

[*33]

Accordingly, it is hereby ordered:

1. Defendant HUMANA MILITARY HEALTHCARE SERVICES, INC.'s Motion to Dismiss Plaintiffs' Complaint, or in the Alternative, to Transfer Pursuant to *28 U.S.C. § 1631* (see doc. 11) is

DENIED.

2. Defendants TRICARE MANAGEMENT ACTIVITY and DONALD RUMSFELD's Motion to Dismiss, or Alternatively, to Stay Claim for Declaratory Judgment (see doc. 16) is GRANTED. Count II of the complaint is DISMISSED without prejudice. Plaintiffs shall have fourteen (14) days from the date of this Order in which to file an amended complaint correcting the defects in Count II as outlined above. In the event Plaintiffs file an amended complaint, Defendants shall have ten (10) days thereafter to file a responsive pleading. See *FED. R. CIV. P. 15(a)* (2003). In the event Plaintiffs do not amend the complaint within the time period specified by the Court, Count II will be DISMISSED with prejudice.

3. The stay in this case (see doc. 65) is LIFTED. Therefore, the Clerk is directed to add sixty-seven (67) days to the discovery period in this case.

ORDERED on this 16th day of March 2004.

M. [*34] CASEY RODGERS

United States District Judge

# EXHIBIT C

LEXSEE 2007 U.S. DIST. LEXIS 22211

**DENNIS J. BUCKLEY, AS TRUSTEE OF THE DVI LIQUIDATING TRUST, Plaintiff, v. MICHAEL A. O'HANLON, STEVEN R. GARFINKEL, RICHARD E. MILLER, JOHN P. BOYLE, ANTHONY J. TUREK, RAYMOND D. FEAR, WILLIAM S. GOLDBERG, GERALD D. COHN, JOHN E. MCHUGH, HARRY T. J. ROBERTS, and NATHAN SHAPIRO, Defendants.**

**C.A. No. 04-955 (GMS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2007 U.S. Dist. LEXIS 22211*

**March 28, 2007, Decided**

**COUNSEL:** [*1] For Official Committee of Unsecured Creditors of DVI Inc. et al, Plaintiff: Francis A. Monaco, Jr., LEAD ATTORNEY, Joseph J. Bodnar, Monzack & Monaco, P.A., Wilmington, DE.

Dennis J. Buckley, as Trustee of The DVI Liquidating Trust, Plaintiff, Pro se.

For Richard E. Miller, Defendant: David E. Brand, LEAD ATTORNEY, Prickett, Jones & Elliott, P.A., Wilmington, DE.

For Anthony J. Turek, Defendant: David A. Felice, LEAD ATTORNEY, Cozen O'Connor, Wilmington, DE.

For William S. Goldberg, John E. McHugh, Nathan Shapiro, Defendants: Arthur G. Connolly, Jr., LEAD ATTORNEY, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For Harry T.J. Roberts, Defendant: Joanne Ceballos, LEAD ATTORNEY, Adam Balick, Balick & Balick, LLC, Wilmington, DE; Gregory P. Miller, Michael A. Morse, Miller, Alfano & Raspanti, P.C., Philadelphia, PA.

For Steven R. Garfinkel, Defendant: Martin James Weis, LEAD ATTORNEY, Dilworth Paxson LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM**

**I. INTRODUCTION**

The Official Committee of Unsecured Creditors of DVI, Inc. (the "Committee") filed this action on August 19, 2004. The [*2] Committee was dissolved, and Dennis J. Buckley was appointed as Trustee for the DVI Liquidating Trust ("Buckley") by order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on November 24, 2004. Buckley was substituted as plaintiff in this action in this court's Order of April 6, 2006. The complaint states claims for breach of fiduciary duty and deepening insolvency as to the officer defendants (Michael A. O'Hanlon, Steven R. Garfinkel, Richard E. Miller, John P. Boyle, Anthony J. Turek, and Raymond D. Fear) and the director defendants/audit committee members (O'Hanlon, William S. Goldberg, Gerald D. Cohn, John E. McHugh, Harry T. J. Roberts, and Nathan Shapiro). The complaint also includes a claim for fraud as to O'Hanlon, Garfinkel, and Miller. Presently before the court are eight motions to dismiss.

**II. LEGAL STANDARD**

Pursuant to the motion of a party, a court may dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In

making this determination, the court must accept as true all allegations in the complaint, and must draw all reasonable inferences in the light most favorable [*3] to the plaintiff. *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998).* The defendant must show "beyond doubt" that the plaintiff can prove no set of facts which would entitle him to relief. *Conley v. Gibson, 355 U.S. 41, 45-46 (1957).*

### III. BACKGROUND n1

n1 This section is a summary of facts, taken from the pleadings, and do not constitute findings of fact.

DVI and its subsidiaries are Delaware corporations with principal places of business in Pennsylvania. (D.I. 1, P 11.) Prior to filing for bankruptcy, DVI extended lease and loan financing to healthcare providers to facilitate the purchase of sophisticated medical equipment, and extended revolving lines of credit that were secured by liens on accounts receivable generated by that provider's operations. (D.I. 1, PP 13-15.) To raise capital and maintain their lines of credit, DVI used a securitization system, through which financial contracts were pledged as collateral to [*4] lenders. (D.I. 1, P 33.) Recognizing losses or establishing reserves on underperforming contracts would have negatively affected the securitization system, so although the payment histories of impaired leases and loans worsened in the years leading up to filing, DVI's loss reserves and level of write-offs for bad credit remained fairly static. (D.I. 1, P 39.) By 1999, DVI began experiencing shortages of capital, so the defendants used irregular financial practices to make ends meet while at the same time investing large amounts of cash in ill-performing markets and non-core businesses. (D.I. 1, P 54.) Defendants O'Hanlon, Garfinkel, and Miller were allegedly the first to implement such practices, as they had access to DVI's record keeping software. Apparently, the other defendants discovered, ignored, or participated in the practices. (D.I. 1, PP 92-100.)

The plaintiff alleges that, to maintain the appearance of solvency, the defendants injured DVI and its creditors by repurchasing delinquent loans and leases without receiving commensurate value, and transferring funds within DVI's subsidiaries and among select borrowers to disguise underperforming accounts. (D.I. 1, PP 60-68.) Other [*5] irregular practices that the defendants are alleged to have committed include investing substantial amounts of money in consistently unprofitable or non-core businesses, obtaining otherwise-unavailable lines of credit by pledging the same collateral to several lenders, ignoring internal controls and reporting procedures, and disregarding numerous warnings from DVI's outside auditor and the SEC. (*Id.*) The independent auditor resigned in June 2003 after refusing to approve DVI's Form 10-Q for the quarterly period ending March 31, 2003. DVI also began defaulting on its loans in June 2003, and ultimately filed for bankruptcy on August 25, 2003. (D.I. 1, P 57.)

### IV. DISCUSSION

"When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." *In Re Corestates Trust Fee Litig., 837 F. Supp. 104, 105 (E.D. Pa. 1993), aff'd 39 F.3d 61 (3d Cir. 1994).* "Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation." *National Org. for Women v. Scheidler, 510 U.S. 249, 255 (1994).* [*6] Therefore, the court will address the issue of standing first.

#### A. Standing

Defendant Roberts posits that the causes of action pursued in the complaint are beyond the scope of the remedies contemplated by the statutory predicates cited in the Motion to Authorize Official Committee of Unsecured Creditors to Investigate and Pursue Causes of Action Against Pre-Petition Officers and Directors. In the May 10, 2004 Order approving that motion, however, the Bankruptcy Court authorized the Debtors to "investigate, and, if appropriate, pursue, *any causes of action* of the Debtors' estates against the Defendants." (D.I. 27, Ex. A) (emphasis added). Whether this Order granted to the Committee greater authority than the Committee requested is immaterial; the court had the power to do so. The plain language of the Bankruptcy Court's Order makes clear that Buckley has standing to assert claims on behalf of DVI's debtors.

Other defendants argue that Buckley cannot bring claims on behalf of the creditors because the Committee

had standing as to the debtors only. In support of their argument, the defendants rely on the Supreme Court's decision in *Caplin v. Marine Midland Grace Trust Co.*, *406 U.S. 416, 434 (1972)*, [*7] wherein the Court held that a trustee in bankruptcy does not have standing to pursue claims on behalf of creditors of the debtor company's estate. In response, Buckley argues that, as trustee, it is empowered to pursue claims on behalf of the debtors' creditors because the Bankruptcy Court confirmed the assignment of the creditors' claims to the trustee under the provisions of the Plan and Confirmation Order, dated November 24, 2004.

While the court acknowledges that, in theory, a bankruptcy trustee can pursue claims that the debtors' creditors assigned to it, a plaintiff must have standing to pursue its claims at the time of filing. *See Minneapolis & St. Louis R.R. Co. v. Peoria & Pekin Union Ry. Co., 270 U.S. 580, 586 (1926)* ("The jurisdiction of the lower court depends upon the state of things existing at the time the suit was brought."). Here, the complaint was filed in August 2004 but the trustee did not obtain an assignment of rights from a subset of creditors until four months later, in December 2004, when the Bankruptcy Court's Plan and Confirmation Order became effective. Moreover, since that Order, Buckley has not sought to supplement the existing complaint. [*8]

The court will not proceed with claims for which the plaintiff obtained standing after the lawsuit was filed. As Judge Longobardi so aptly stated in *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*:

> As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their

arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day.

*917 F. Supp. 305, 310 (D. Del. 1995) (quoted in Gaia Technologies, Inc. v. Reconversion Technologies, Inc., 93 F.3d 774, 780 (Fed. Cir. 1996), as amended on rehearing,* [*9] *104 F.3d 1296 (Fed. Cir. 1996)).* The court will dismiss, without prejudice, any claims Buckley asserts on behalf of the debtors' creditors.

### B. Breach of Fiduciary Duty Claim

Delaware law provides that corporate officers and directors owe the corporation a triad of fiduciary duties: loyalty, good faith, and due care. *McMullin v. Beran, 765 A.2d 910, 917 (Del. 2000)*. To state a claim for breach of fiduciary duty, a plaintiff may allege that the officers and directors of a company knew or should have known that violations of the law were occurring, that they took no good faith steps to ameliorate the situation, and that the company suffered losses as a result. n2 *In re Caremark Intern. Inc. Deriv. Lit., 698 A.2d 959, 971 (Del. Ch. 1996)* (stating that liability may be based upon either an ill-advised or negligent decision, or an unconsidered failure to act when due attention would arguably have prevented the loss). The Court of Chancery later elaborated on what constitutes such an ill-advised decision in *Guttman v. Huang, 823 A.2d 492, 507 (Del. Ch. 2003)* (listing as an example "that the audit committee had clear [*10] notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation").

> n2 Delaware law provides that fiduciary duties are owed to a corporation by both officers and directors. *Arnold v. Soc'y for Savings Bancorp, Inc., 678 A.2d 533, 539 (Del. 1996)*. Therefore, to the extent that cases cited in this memorandum refer only to one of these groups, the court will consider them as applicable to both.

Buckley alleges that the defendants either knew or should have known that violations of law were occurring, that they took no good faith steps to ameliorate the situation, and that DVI and its creditors suffered damages. Buckley also alleges that the officer defendants perpetuated an array of irregular accounting practices, of

which the director defendants were aware, and which they ignored. All of the director defendants were alleged to be members of DVI's audit committee. Buckley's complaint is consistent with the *Guttman* pleading example, [*11] in that it alleges that the officer defendants eliminated the Criticized Asset Reporting system and manipulated delinquent loans and leases to make them appear profitable. Also, as in *Guttman*, Buckley alleges that the audit committee received eleven warning letters over eight years from their independent auditor, and that the auditor resigned after no action was taken in response to the alert. Buckley further avers that a series of inquiries from the SEC were also ignored by both the audit committee and the board of directors.

Several of the defendants have attempted to analogize the facts in this case to those in *Guttman* because the Court of Chancery viewed that plaintiff's allegations as overly conclusory. In *Guttman*, however, the complaint made sweeping accusations regarding accounting irregularities without discussing how management was expected to be aware of the problem, or even the presence of an audit committee. Here, the court finds that the contents of Buckley's complaint dictate a different result.

The defendants also challenge Buckley's claim for breach of fiduciary duty by disputing many of the substantive contentions. For example, several state that they, [*12] lacked knowledge or notice of the accounting irregularities, that they held their relevant positions for only a portion of the time in which DVI allegedly was put on notice of the irregularities, that they immediately attempted to rectify the situation upon learning of the problem, that the letters sent by DVI's outside auditor or the SEC could not be expected to alert them to the problems, or that the Examiner's Report painted a different picture of the internal workings of DVI. These responses address, however, the substantive merits of Buckley's claim. Because Buckley's allegations are accepted as true for the purposes of these motions, such factual disputes are not appropriately resolved on motions to dismiss. Rather, the court must focus its consideration on the sufficiency of the complaint.

1. Sufficiency of Pleading

Several of the defendants insist that, because they are not mentioned individually in many of Buckley's allegations, the claims are too broad to proceed. "When group pleading is utilized by a plaintiff 'the identification of the individual sources of statements is unnecessary when the fraud allegations arise from the misstatements or omissions in group-published [*13] documents, such as annual reports, prospectuses, registration statements, press releases or other group-published information that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation.'" *Tracinda Corp. v. DaimlerChrysler AG, 197 F. Supp. 2d 42, 85 (D. Del. 2002)* (citations and internal quotations omitted). Therefore, group pleading may be sufficient in some circumstances.

Defendant Roberts argues that breach of fiduciary duty claims must satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b). Such an assertion is correct when the allegations of breach of fiduciary duty sound in fraud. *ePlus Group v. Panoramic Communications, Inc., No. 02-7992, 2003 WL 21512229* at *2 (S.D.N.Y. July 2, 2003). However, in the absence of such allegations, Rule 9(b) does not apply. *In re Fruehauf Trailer Corp., 250 B.R. 168, 197 (D. Del. 2000)* (stating that the heightened pleading requirement generally does not apply to state law claims for breach of fiduciary duty). In *Fruehauf*, Rule 9(b) was not triggered even in the presence of multiple allegations that the [*14] defendant knew or should have known that certain representations were false and misleading. Neither was particularized pleading required when the plaintiff's complaint included such statements as "knew or should have known the financial statements . . . misrepresented to System One the Division's financial condition." *In re InaCom Corp., No. 00-2426, 2001 WL 1819987* at *3 (Bankr. D. Del. Aug. 7, 2001) (finding the claim did not sound in fraud).

While not all of Buckley's allegations name the involved defendants individually, Buckley did separate the list of defendants into smaller groups who worked together on various committees and boards. Although Buckley frequently refers simply to "defendants" in the body of the complaint, the parties involved in each alleged practice of bad-faith were identified expressly in the introductory paragraphs of Buckley's complaint, and later, in his factual allegations and claims. (D.I. 1, PP16-28.) The court accepts that Buckley uses the categories of officers and directors merely as substitutes for listing names, rather than using them as sweeping terms to avoid having to associate specific parties to particularized conduct. Wherein [*15] much of the alleged conduct involved collective action and decision

making, Buckley has sufficiently identified the small groups within DVI and their roles in approving or participating in each alleged bad-faith practice.

The court rejects Defendant Roberts' assertion that Buckley's allegations sound in fraud. Granted, Buckley describes much of the defendants' conduct as intentional or knowing, however, Buckley's choice of terms, which are also seen in fraud claims, do not transform claims for breach of fiduciary duty into claims based in fraud. In fact, the fiduciary duty claims in Buckley's complaint are very similar in structure to what were deemed acceptable fiduciary duty claims in *Fruehauf* and *InaCom*. Buckley's allegations for breach of fiduciary duty, while they must not be conclusory, need not be pled with the particularity required of fraud claims.

2. Applicability of Business Judgment Rule

The business judgment rule is a presumption that a board's actions are entitled to deference, because it would be overly harsh to condemn such a decision that only in hindsight was poorly conceived. This presumption is rebutted, however, when a plaintiff pleads particularized [*16] facts sufficient to raise a reason to doubt that the action was taken in good faith or on an informed basis. *In re The Walt Disney Co. Deriv. Litig., 825 A.2d 275, 286 (Del. Ch. 2003).* Such doubt is raised when officers and directors fail to be "active monitors of corporate performance," *Caremark, 698 A.2d at 968* (providing as an example the replacement of a board of directors following the discovery of large losses caused by phantom trades by a prominent trader). Nor may officers and directors consciously disregard visible "red flags." *See Rattner v. Bidzos, No. 19700, 2003 WL 22284323 at * 13 (Del. Ch. Sept. 30, 2003).* Neither may officers and directors make decisions "so egregious as to constitute corporate waste." *In re Tower Air, Inc., 416 F.3d 229, 238 (3d Cir. 2005).* The standard for holding officers and directors liable is one of gross negligence. *Smith v. Van Gorkom, 488 A.2d 858, 873 (Del. 1985).*

In *Smith*, the decision to approve a proposed merger met that standard because it was made solely on the basis of a twenty-minute presentation. On the other end of the spectrum, gross negligence [*17] was not found when directors recommended a merger after consulting financial advisors, meeting several times over a six-week period, and reviewing challenges to the idea. *Rabkin v. Philip A. Hunt Chem. Corp., 547 A.2d 963, 970 (Del. Ch. 1986)* (defining gross negligence as reckless indifference

to, or a deliberate disregard of, the stockholders).

Buckley used language similar to that in the above cases in describing defendants' alleged conduct and its results, including allegations of wasting corporate assets, willfully disregarding warnings, and ceasing to review delinquent accounts. Buckley alleges that DVI's officers and directors acted in bad faith, disguising poorly-performing accounts and ignoring the advice of its outside auditor and the inquiries of the SEC. Buckley has satisfied the *Disney* requirement by pleading particularized facts that raise doubts as to whether the officers and directors were acting in good faith.

3. Effect of Exculpatory Clause

Several defendants argue that the exculpatory clause in DVI's Certificate of Incorporation, which is based on section 102(b)(7) of the Delaware General Corporation Law, bars the claims against them because [*18] it states that no director shall be personally liable to DVI or its stockholders. However, the clause contains exceptions to this protection when a director breaches his duty of loyalty to DVI, or for acts not taken in good faith, involving intentional misconduct, or a knowing violation of law. For example, in *Official Committee of Unsecured Creditors of Integrated Health Serv., Inc. v. Elkins*, such a provision was found not to insulate the directors from liability when they acted with knowing and deliberate indifference by approving a loan program without consideration, deliberation, or advice from an expert. *No. 20228, 2004 WL 1949290 at *15 (Del. Ch. Aug. 24, 2004).* Similarly in *McCall v. Scott*, defendants were not protected by the exculpatory clause when they acted in bad faith by intentionally ignoring "red flags." *250 F.3d 997, 1001 (6th Cir. 2001)* (finding allegations of "conscious disregard of known risks" to necessarily be conduct undertaken in bad faith).

Buckley's allegations fall into the "bad faith" exception to DVI's Certificate of Incorporation exculpatory clause. Buckley alleges that the defendants here, as was alleged in *Elkins*, [*19] acted with "knowing and deliberate indifference," when they stopped examining delinquent accounts. Further, Buckley alleges that the defendants consciously disregarded "red flags," as in *McCall*, when the defendants paid no attention to the warnings allegedly contained in the auditor's and SEC's letters. Buckley has sufficiently pled breach of the duties of loyalty and good faith. As a result, the Certificate of Incorporation cannot operate to insulate

the defendants from a breach of fiduciary duty claim. Consequently, the claim will proceed on the merits.

## C. Deepening Insolvency Claim

To plead insolvency, a plaintiff must aver facts that establish, for pleading purposes, that the corporation had a deficiency of assets below liabilities with no reasonable prospect that the business will succeed, or that it was unable to meet maturing obligations as they fell due in the ordinary course of business. *Production Resources Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 782 (Del. Ch. 2004).*

Buckley alleges that financial practices similar to those employed by the debtors in *Production Resources* occurred at DVI. *Id. at 783-4.* Specifically, [*20] the complaint avers that DVI had great difficulty raising capital, shuffled delinquent accounts to make them appear healthy, and could only obtain advances from its line of credit by erroneously certifying impaired loans and leases. Buckley expressly alleged that DVI became insolvent in June 2003, when it began defaulting on its loan obligations. Again, here, as in *Production Resources*, it can be reasonably inferred that the officers' and directors' alleged conduct caused the insolvency. The court thus concludes that Buckley has sufficiently pled that DVI was in the "zone of insolvency."

### 1. Recognition of Deepening Insolvency Claim

The U. S. Bankruptcy Court for the District of Delaware predicted that, in the absence of an opinion by the Delaware Supreme Court and given the Third Circuit's analysis in *Official Committee of Unsecured Creditors v. R. F. Lafferty & Co.*, Delaware law would likely recognize a claim for deepening insolvency. *In re Oakwood Homes Corp., 340 B.R. 510, 531 (Bankr. D. Del. 2006).* Although the elements of such a claim have yet to be enunciated, the Third Circuit acknowledged such a claim when a plaintiff alleges "fraudulent expansion [*21] of corporate debt and prolongation of corporate life." *Official Committee of Unsecured Creditors v. R. F. Lafferty & Co., 267 F.3d 340, 347 (3d Cir. 2001).* A successful claim for deepening insolvency requires a showing of harm to the corporation because of such fraud. *Oakwood Homes, 340 B.R. at 534* (also explaining that fraud requires a representation of material fact, falsity, scienter, reliance, and injury). In *Oakwood Homes,* fraud was found when the defendants, acting as the debtors' fiduciaries, misrepresented the sustainability

of the company's finances with the intent to induce the debtors into maintaining the *status quo*, because it could be inferred from the complaint that such misrepresentation was with knowledge.

Here, as in *Oakwood Homes,* Buckley pled that the defendants, placed in positions of trust and control within DVI, knowingly misrepresented the state of DVI's financial health with the intent to cause DVI to continue incurring more liabilities than it could repay. The defendants allegedly disguised failing accounts and misrepresented DVI's creditworthiness without justification. Rather than constituting a valid attempt [*22] to restore DVI to solvency, the defendants' conduct is alleged to have fraudulently expanded DVI's corporate debt and prolonged DVI's life. These allegations, as framed, satisfy the pleading standard observed in *Lafferty.*

### 2. Applicability of *In Pari Delicto* Doctrine

The doctrine of *in pari delicto* n3 provides that "a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in." *Lafferty, 267 F.3d at 354* (citations omitted). Under this equitable doctrine, when a plaintiff is "standing in the shoes" of the bankrupt corporation, its claim is barred if the defendants' purported wrongdoing is imputed on the bankrupt corporation itself. *Id. at 354, 358-59.*

n3 *In pari delicto* is Latin for "in equal fault." *Black's Law Dictionary* 806 (8th ed. 2004).

Whether the *in pari delicto* doctrine applies in this case depends on whether the defendants' conduct can be imputed to the debtors and hence to [*23] the Trust, which, under bankruptcy law, stands in the shoes of the debtors. Imputation refers to the attribution of one person's wrongdoing to another person. Under the law of imputation, courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation. *Id. at 358.*

The defendants' argue that *in pari delicto* serves as a bar to Buckley's deepening insolvency claim because Buckley stands in the shoes of the debtor corporations,

seeking relief from the defendants for damages purportedly caused by the debtors' allegedly fraudulent conduct. (D.I. 29.) To support this argument, Defendants Boyle and Fear state that the allegations buttressing Buckley's deepening insolvency claim satisfy both prongs of the imputation test. In response, Buckley argues that because the *in pari delicto* doctrine is an affirmative defense, the court should not consider the issue on a motion to dismiss. Further, Buckley contends that if the court reached the merits of whether *in pari delicto* is applicable, the court should find imputation inappropriate because the second prong of [*24] the imputation test is not met.

It is generally true that an affirmative defense should not be used to dismiss a plaintiff's complaint under Rule 12(b)(6). *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004). That being said, in *Lafferty*, the Third Circuit did affirm a district court's dismissal of a deepening insolvency claim on the basis of the *in pari delicto* doctrine, which the Circuit acknowledged as an affirmative defense. *Lafferty* and *Adams Golf*, however, are not necessarily in conflict. Indeed, dismissal is only appropriate when the plaintiff can prove "no set of facts" that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (emphasis added). In this case, Buckley disputes that the criteria for imputation is met. Specifically, Buckley invokes the adverse interest exception, which provides that fraudulent conduct will not be imputed to the corporation if the fraud was not "for the benefit of the corporation." *Lafferty*, 267 F.3d at 359. As Judge Cowen observed in his *Lafferty* dissent, "an equitable doctrine like *in pari delicto* is highly sensitive to the facts [*25] and readily adapted to achieve equitable results." *Lafferty*, 267 F.3d at 362. Simply put, the court finds it premature to bar Buckley's deepening insolvency claim on *in pari delicto* grounds. While it may eventually come to pass that the defense will prevail, the determination will be made on further development of the facts. After considering the pleadings and the positions of the parties, the court is not satisfied that Buckley is unable to prove any facts that would entitle the DVI Liquidating Trust to relief for deepening insolvency.

3. Applicability of the Business Judgment Rule

In Delaware, there is no general duty to liquidate an insolvent company. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2004). Similar to the application of the business judgment rule in the fiduciary duty context discussed earlier, it would be harsh to judge the actions of corporate officers and directors, in hindsight, for a failed good-faith attempt to bring a company out of insolvency. Allegations of bad faith, however, also make recovery for deepening insolvency possible under Delaware law. *In re RSL COM PRIMECALL USA, Inc.*, Nos. [*26] 01-11457 through 01-11469, 03-2176, *2003 WL 22989669* at *8 (Bankr. S.D.N.Y. December 11, 2003). If bad faith is alleged, prolongation of operations would "smack of self-dealing, constitute a breach of fiduciary duty, and open up recovery under the theory of deepening insolvency." *In re Global Service Group LLC*, 316 B.R. 451, 465 (Bankr. S.D.N.Y. 2004) (requiring a complaint to allege bad faith or fraudulent intent as opposed to mere bad judgment).

As the court has already concluded, Buckley's complaint makes sufficient allegations of bad faith. Buckley stated that, rather than attempting in good faith to revive DVI and avoid liquidation, the defendants disguised the true nature of DVI's finances to obtain more funding with no expectation that such funding would restore DVI to solvency. (D.I. 1, P 68.) One can reasonably infer that such activities extend beyond the mere exercise of poor judgment, deemed insufficient in *Global Service*. The court finds that, based on the pleadings, the business judgment rule does not preclude a deepening insolvency claim against the defendants.

**D. Fraud Claim**

To state a claim for fraud, a plaintiff must allege [*27] that a defendant made a false statement, knowing or recklessly assuming it to be true, with the intent that plaintiff act or refrain from acting in reliance, that plaintiff justifiably relied, and that plaintiff suffered damages. *Kronenberg v. Katz*, 872 A.2d 568, 585 n.25 (Del. Ch. 2004). Allegations of fraud must be pled with particularity. Fed. R. Civ. P. 9(b). Provided that a plaintiff alleges sufficiently particularized allegations, there is no *per se* rule that group pleading cannot satisfy Rule 9(b); otherwise, "sophisticated defrauders" could easily conceal their wrongdoing. *MBIA Ins. Corp. v. Royal Indem. Co.*, 221 F.R.D. 419, 421 (D. Del. 2004). The Third Circuit has stated that plaintiffs must plead the circumstances of the alleged fraud such that defendants may be placed on notice; although stating the "date, place, and time" clearly fulfills this requirement, plaintiffs may use any alternative method of "injecting precision and some measure of substantiation" into the

allegations of fraud. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)*.

In *Asbestemps, Inc. v. Diversified Energy* [*28] *Group, Inc.*, allegations that defendants represented a corporation as fiscally sound to persuade another company to provide labor were not made verbatim, nor were the time and place identified, but the court found that fraud was properly pled. *No. 87-2623, 1987 WL 16662 (E.D. Pa. Sept. 9, 1987)*. Plaintiffs need only provide sufficient factual specificity to provide assurance that they have investigated the alleged fraud and reasonably believe that a wrong has occurred. *Tracinda Corp. v. DaimlerChrysler AG, 197 F. Supp. 2d 42, 54 (D. Del. 2002)*. For example, even absent allegations with respect to the exact factual context or words, a description of the nature and subject matter of the representation was found to be enough in *CFTC v. American Metal Exch., 693 F. Supp. 168, 190 (D.N.J. 1988)*.

Buckley sufficiently alleges the elements of fraud: that defendants O'Hanlon, Garfinkel, and Miller knowingly misrepresented DVI's financial situation, with the intent to obtain unjustifiable credit, that DVI and its creditors relied on this misinformation, and that it suffered damages to the extent of bankruptcy. As in *CFTC*, Buckley's complaint [*29] describes the nature and subject matter of the alleged fraud by asserting that the three defendants intentionally concealed a number of improper accounting practices, ceased normal account monitoring practices, and diverted millions of dollars from DVI when DVI could least afford it. Although Buckley does not state specific dates and places regarding the allegedly fraudulent actions, as in *Asbestemps*, Buckley sufficiently explained the role each defendant

(or in some instances, the three defendants acting together) played in each allegedly fraudulent practice in enough detail to satisfy the "injecting precision" standard enunciated in *Seville*.

## V. CONCLUSION

Buckley does not have standing to pursue any claims on behalf of the creditors. As such the court will grant the defendants' motions to dismiss to the extent that they seek relief on behalf of the creditors. The court will deny the defendants' motions to dismiss claims brought on behalf of the debtors.

Dated: March 28, 2007

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

## ORDER

For the reasons set forth in the court's memorandum issued contemporaneously herewith, IT IS HEREBY ORDERED that: [*30]

1. The Defendants' Motions to Dismiss (D.I. 23, 25, 26, 28, 30, 32, 34, and 36) are hereby GRANTED IN PART and DENIED IN PART.

2. The Plaintiff's Motion for Leave to File an Omnibus Brief (D.I. 48) is GRANTED.

Dated: March 28, 2007

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT D

Not Reported in F.Supp.2d                                         Page 1
Not Reported in F.Supp.2d, 2005 WL 3088529 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

**C**

Briefs and Other Related Documents

Christman v. GraysS.D.Ohio,2005.Only the Westlaw cita-
tion is currently available.
United States District Court,S.D. Ohio, Western Division.
Kenneth D. CHRISTMAN, M.D., Plaintiff,
v.
William A. GRAYS, Defendant.
No. 1:05-CV-192.

Nov. 17, 2005.

Steven Charles Katchman, Dayton, OH, for Plaintiff.
Donetta Donaldson Wiethe, U.S. Department of Justice,
Cincinnati, OH, for Defendant.

*ORDER*

WEBER, Senior J.

*1 This matter is before the Court upon defendant Willi-
am A. Grays's motion for summary judgment (doc. 2),
plaintiff's response (doc. 7), and defendant's reply (doc.
9). Also before the court is plaintiff's motion to remand
(doc. 8), and defendant's response to that motion (doc.
11). The Court has ascertained the disputed and undis-
puted facts from the parties' briefs and affidavits. Addi-
tionally, the Court has determined that the United States is
the real party in interest in this action and substitutes the
United States as the defendant.

I. Factual allegations

The facts are undisputed unless otherwise noted. William
Grays sustained injuries in an automobile accident on
November 16, 2002. His injuries included multiple facial
lacerations. Grays was brought to the emergency room at
Sycamore Hospital in Miamisburg, Ohio for treatment.
Although the hospital had physicians and other medical
staff on duty, the nature of Grays's injuries demanded the
attention of a plastic surgeon. The hospital contacted the
plaintiff, Dr. Kenneth Christman, M.D., the plastic sur-
geon on call at the time.

At the time of the accident, Grays was a Staff Sergeant in
the United States Army Ohio National Guard, serving on
active duty. He was covered by the TRICARE [FN1] med-
ical benefits program. Before administering treatment, Dr.
Christman asked Grays whether he had medical insur-

ance. Grays stated that he was covered by the TRICARE
program, and presented his TRICARE identification card
to Dr. Christman.

> FN1. TRICARE is a supplement to the older
> CHAMPUS medical benefits program for ser-
> vice members, intended to reduce costs through
> contractor underwriting and a network provider
> arrangement. *Baptist Physician Hosp. Org., Inc.
> v. Humana Military Healthcare Svcs., 368 F.3d
> 894, 895-96* (6th Cir.2004). Since William Grays
> was a member of TRICARE, the Court uses that
> designation to refer to the military medical bene-
> fits program.

Dr. Christman informed Grays that he did not participate
in the TRICARE program and would not submit a claim
to the program for reimbursement. Dr. Christman al-
legedly further explained that Grays would be personally
responsible for the cost of the care he was about to
provide. Dr. Christman argues that Grays orally agreed to
assume responsibility for the charges. Grays denies agree-
ing to pay out-of-pocket costs in the emergency room. Dr.
Christman treated Grays's injuries.

Subsequently, Dr. Christman billed Grays a total of
$5,542 for five medical procedures. After receiving this
bill, Grays submitted a claim under the Supplemental
Health Care Program ("SHCP"), which provides benefits
to covered servicemembers who receive treatment from
civilian medical facilities. 32 C.F.R. § 199.16(a)(2). The
SHCP, while not part of TRICARE, employs the TRI-
CARE reimbursement scheme and related regulations,
subject to some special rules. *Id.* at (a)(1), (2).

Grays's claim was handled by Palmetto Government Be-
nefits Administrators ("PGBA"), the TRICARE claims
contractor for Grays's region. PGBA sent Grays a check
for $746.10 in fulfillment of the claim, along with the fol-
lowing explanation of benefits detailing the procedures
performed by Dr. Christman and the billed and allowable
amounts for each:

Not Reported in F.Supp.2d 00039-GMS    Document 21-3    Filed 04/16/2007    Page 39 of 46
Page 2
Not Reported in F.Supp.2d, 2005 WL 3088529 (S.D.Ohio)
**(Cite as: Not Reported in F.Supp.2d)**

| Procedure | Amount Billed | TRICARE Approved |
|---|---|---|
| Repair of wound or lesion | $ 1,779.00 | $ 437.07 |
| Repair of wound or lesion | $ 1,779.00 | $ 0.00 |
| Repair wound/lesion add-on | $ 1,516.00 | $ 138.51 |
| Repair superficial wound(s) | $ 338.00 | $ 73.20 |
| Medical services at night | $ 130.00 | $ 0.00 |
| TRICARE Approved: | | $ 648.78 |
| Paid to beneficiary (115 % of approved amount): | | $ 746.10 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3088529 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

**\*2** PGBA determined that the charges for one of the two "repair of wound or lesion" procedures was a duplicate charge and the charge for "medical services at night" was not a covered charge under the TRICARE program, and denied payment for those services. Neither party has disputed PGBA's determination of which services were covered and which were not.

Grays forwarded the TRICARE check to Dr. Christman's collection agency, which credited it against the bill, leaving a balance of $4,795.90. Dr. Christman sued Grays to recover this balance, alleging that he and Grays had entered into an oral contract prior to treatment, whereby Grays assumed personal liability for all charges. He also argues that imposing the TRICARE reimbursement scheme on non-participating providers amounts to an unconstitutional taking under the Fifth Amendment.

The United States argues that there was no such agreement, that Dr. Christman's recovery is limited to the TRICARE allowable amount, and that Grays was unable to waive the SHCP billing limits by agreement. Additionally, the government argues that Dr. Christman's claim is barred by the doctrine of sovereign immunity because the United States is the real party in interest.

### II. Procedural posture

The plaintiff, Dr. Christman, brought this action in the Municipal Court of Lebanon, Ohio. Prior to judgment in those proceedings, the United States Attorney substituted itself as counsel for defendant Grays. Grays then removed the action to this Court under 28 U.S.C. § 1442a (providing for the removal of state court actions against members of the armed forces under certain circumstances) (doc. 1). The United States filed a motion for summary judgment in its favor and requested that it be substituted as defendant in the action (doc. 2). The plaintiff Dr. Christman filed an opposing memorandum and a motion to remand the action to state court (docs.7, 8).

### III. Motion to Remand

Dr. Christman moves to remand this action back to the state court for resolution of the alleged oral agreement

between the parties. The United States opposes the motion to remand, pointing to its arguments in support of its motion for summary judgment. The United States argues that removal to this Court was proper under 28 U.S.C. § 1442a. The Court finds that plaintiff Dr. Christman does not expressly challenge the removal under § 1442a in either his opposition to the United States's motion for summary judgment (doc. 7) or his motion to remand (doc. 8), and he asserts no basis for remand to the state court. Accordingly, the plaintiff's motion to remand is denied.

### IV. Subject Matter Jurisdiction

The federal defendant and Grays base the subject matter jurisdiction of the Court in this action upon 28 U.S.C. § 1346 and § 1442a.

Plaintiff does not challenge the substitution of the United States as the defendant in this case. The United States is the real party in interest in actions where the federal treasury might ultimately be liable. See Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). Here, the United States concedes that the federal treasury is ultimately responsible for any judgment against Grays under 32 C.F.R. § 199.16(d)(1). This section states that the SHCP does not impose beneficiary cost sharing, and that "all amounts due to be paid to the provider shall be paid by the program." The United States concludes that if Grays is held liable to Dr. Christman in excess of the amount already paid by the SHCP, the United States must pay the judgment.

**\*3** Plaintiff Christman does not refute the United States's assertion that it is the real party in interest. The Court finds that the substitution of the United States as the defendant is proper and this Court has subject matter jurisdiction over this action.

### V. Sovereign immunity

The United States argues that sovereign immunity bars Dr. Christman's suit. It is well-established that the United States, as sovereign, "may not be sued without its consent." United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The Court has already found that the United States is the real party in interest. There is no evidence or allegation that the United States has ex-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Case 1:05-cv-00039-GMS   Document 21-3   Filed 04/16/2007   Page 41 of 46   Page 4
Not Reported in F.Supp.2d, 2005 WL 3088529 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

pressly consented to this action. Further, plaintiff Christman does not refute the United States's assertion of immunity, nor does he offer evidence that immunity has been waived. Accordingly, the United States is entitled to summary judgment on this ground. Even if a waiver can be shown, the United States is entitled to summary judgment on Dr. Christman's claim for the reasons stated below.

### VI. Summary Judgment

In its motion for summary judgment, the United States argues that Dr. Christman has already been fully reimbursed under the SHCP and therefore is not entitled to further recovery for the medical services he provided to Grays. In response, Dr. Christman claims that he did not participate in the SHCP or TRICARE and therefore was not bound by their reimbursement provisions, and that Grays entered into an oral agreement to pay for the services personally. Plaintiff Christman attempts to establish the existence of a genuine issue of material fact by presenting his own affidavit attesting to such an agreement.

In reply, the United States concedes that there may have been "some agreement" made between Grays and Christman in the emergency room but argues that the existence of such an agreement is immaterial. It asserts that the SHCP regulations encompass all medical providers, whether they participate in the program or not, limiting the reimbursement to which they are entitled. Finally, the United States argues that Grays was unable to circumvent the operation of the SHCP by private agreement.

If the SHCP precludes Dr. Christman from further recovery, no genuine issue of material fact remains, and the United States is entitled to summary judgment. If the SHCP does not fully resolve Grays's liability for the medical services Dr. Christman provided, a genuine issue of material fact exists. For the reasons stated below, the Court finds that no issues of material fact remain and that the United States is entitled to summary judgment.

#### A. Summary judgment standard

Fed.R.Civ.P. 56 allows summary judgment to secure a just and efficient determination of an action. This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*4 The party opposing a properly-supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson,* 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249 (citing *Cities Serv.,* 391 U.S. at 288-89). If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 84, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), or is not significantly probative, *Cities Serv.,* 391 U.S. at 290, judgment may be granted. *Anderson,* 477 U.S. at 249.

#### B. Applicable law

The SHCP [FN2] reimburses private sector medical service providers for charges arising from the treatment of active duty members of the armed forces. 32 C.F.R. § 199.16. Reimbursement is limited to the allowable amount as defined under the TRICARE program. *Id.* at (b), (d)(5). This reimbursement limitation applies to all providers.

> FN2. Though the SHCP is distinct from TRICARE, it incorporates by reference certain TRICARE provisions. 32 C.F.R. § 199.16(a)(2), (b). The TRICARE references that follow serve only to explain the SHCP, which governs this action.

#### (1) Dr. Christman is an authorized, non-participating provider

##### (a) Authorized providers

Only TRICARE-authorized providers are eligible for re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Document 21-3 Filed 04/16/2007 Page 42 of 46
Not Reported in F.Supp.2d, 2005 WL 3088529 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

imbursement under the SHCP. 32 C.F.R. § 199.6(a)(7). Section 199.6(c) establishes an individual professional provider class. Subsection (c)(3)(i)(A) specifies that, subject to the standards of the SHCP participation provisions, Doctors of Medicine are among the individual professional providers authorized to provide services to TRICARE beneficiaries. Conditions of authorization for this class of providers include a professional license requirement or a professional certification requirement. Id. at (c)(2)(i),(ii). Thus, all licensed physicians (with limited exceptions that are not material to this case) are authorized providers, subject to the SHCP participation provisions.

There is no dispute that Dr. Christman is an M.D. and a plastic surgeon and that the procedures he performed on defendant Grays were within of the scope of his training. Based on this record, the Court finds that Dr. Christman is an "authorized provider" within the meaning of the SHCP. As an authorized provider, Dr. Christman must either hold participating or non-participating status.

(b) *Participating v. Non-participating*

A TRICARE-authorized individual provider is a participating provider if either (1) he or she voluntarily enters into a participation agreement or (2) he or she chooses not to enter into a participation agreement but instead elects to participate on a claim-by-claim basis by submitting a signed claim form on behalf of the beneficiary. 32 C.F.R. § 199.6(a)(8)(ii), (iii). An individual provider who takes neither of these actions is a non-participating provider.

*5 Dr. Christman maintains that he is a non-participating provider and asserts that he informed Grays of this fact in the emergency room before treatment. No evidence has been presented that Dr. Christman entered into a voluntary agreement to participate. Likewise, there is no evidence that he elected to participate with respect to Grays's claim. Rather, Grays submitted his own claim. Accordingly, the Court finds that Dr. Christman is a non-participating provider under the SHCP.

B. *Reimbursement under the SHCP*

Under the SHCP "no provider may bill an active duty member any amount in excess of the ... allowable amount." 32 C.F.R. § 199.16(d)(5). By its language, this restriction is not limited to participating providers, so it applies to all authorized providers. Thus, a non-

participating provider may not bill an active duty service member beyond the allowable amount for services without the authorization of the SHCP administrator. Id. The allowable amount is defined in 32 C.F.R. § 199.14(j). The parties have not disputed the PGBA's determination that the allowable amounts for the services at issue total $648.78.

Because Dr. Christman is an authorized provider and defendant Grays's claim was made under the SHCP, he is only entitled to the allowable amount for the services he provided. Accordingly, Dr. Christman is not entitled to payment beyond the amount already disbursed in satisfaction of Grays's claim.

VII. Fifth Amendment

Dr. Christman also argues that the SHCP regulations constitute a taking in violation of the Fifth Amendment to the United States Constitution to the extent they preclude the payment he seeks for his services. The basis of this argument is that the time and skills of a physician are property that is taken without just compensation by the SHCP program due to the allegedly low reimbursement rates the program provides. In support, plaintiff Christman cites Supreme Court authority recognizing Fifth Amendment protection for the holder of trade secrets confronted with a federal statute mandating public release of that information. *Ruckelhaus v. Monsanto Co.*, 467 U.S. 986, 1001-03, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). The United States counters with a barrage of authority denying takings claim brought by medical professionals in response to Medicare billing limitations. *See e.g.*, *Garelick v. Sullivan*, 987 F.2d 913 (2d. Cir.1993); *Whitney v. Heckler*, 780 F.2d 963 (11th Cir.1986); *Metrolina v. Sullivan*, 767 F.Supp. 1314 (W.D.N.C.1989).

Plaintiff Christman's Fifth Amendment claim is without merit. The weight of authority dictates that medical billing restrictions imposed by Medicare do not work an unconstitutional taking. The present circumstances, involving SHCP billing restrictions, are not materially distinguishable from the Medicare context. The authority plaintiff Christman cites-allowing Fifth Amendment protection for trade secrets-is far too tenuous to support the dramatic departure from existing Fifth Amendment jurisprudence that he advocates. Accordingly, the plaintiff cannot establish a Fifth Amendment violation.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3088529 (S.D.Ohio)
(Cite as: Not Reported in F.Supp.2d)

VIII. Conclusion

**\*6** For the foregoing reasons, the United States is substituted for William A. Grays as defendant. The plaintiff's motion to remand is DENIED. The United States's motion for summary judgment is GRANTED as to plaintiff's claim for recovery of unpaid medical charges and plaintiff's claim under the Fifth Amendment. The plaintiff's complaint is DISMISSED with prejudice. This case is terminated on the docket of this Court.

IT IS SO ORDERED.

S.D.Ohio,2005.
Christman v. Grays
Not Reported in F.Supp.2d, 2005 WL 3088529 (S.D.Ohio)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3708379 (Trial Motion, Memorandum and Affidavit) Federal Defendant's Reply Memorandum in Support of Motion for Summary Judgment (Jul. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 3708378 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant's Motion for Summary Judgment (Jul. 8, 2005) Original Image of this Document (PDF)
• 2005 WL 3708377 (Trial Motion, Memorandum and Affidavit) Federal Defendant's Motion for Summary Judgment and Memorandum in Support (Jun. 3, 2005) Original Image of this Document (PDF)
• 1:05cv00192 (Docket) (Mar. 24, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

FOCUS - 7 of 11 DOCUMENTS

**CUSHMAN & WAKEFIELD, INC. v. CATHERINE A. BACKOS, GLEN EAGLE SQUARE, INC., VRG CORPORATION, AND VALENTINO R. GALASSO**

Civil Action No. 91-0498

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1991 U.S. Dist. LEXIS 11906*

**August 21, 1991, Decided
August 22, 1991, Filed**

**COUNSEL:** [*1]

ROBERT A. KORN, PHILADELPHIA, PENNSYLVANIA, FOR PLAINTIFF.

ROBERT A. SWIFT, GEORGE W. CRONER, KOHN, SAVETT, KLEIN & GRAF, P.C., PHILADELPHIA, PENNSYLVANIA, FOR DEFENDANT.

**JUDGES:**

Edmund V. Ludwig, United States District Judge.

**OPINION BY:**

LUDWIG

**OPINION:**

*ORDER - MEMORANDUM*

AND NOW, this 21st day of August, 1991 defendants' motions to dismiss are denied without prejudice, as follows:

1. Defendants Catherine A. Backos, VRG Corporation and Valentine Galasso jointly move to dismiss for failure to join Cushman & Wakefield of Pennsylvania, Inc. as an indispensable party. *Fed.R.Civ.P. 12(b)(7)*.

These defendants contend:

The brokerage agreements that underlie this litigation were executed by GES and CWP. Plaintiff is not a party to those agreements, although the agreements refer [to] Plaintiff as a non-exclusive broker and agent for GES in pursuing construction and permanent financing for the Glen Eagle Square Shopping Center. CWP, which is a signatory to the brokerage agreements, is not a named party to this Action.

. . . . .

The only consideration that may exist to support Plaintiff's claims of contractual liability against defendants Backos, Galasso, and VRG must arise from the terms of the brokerage agreements.
[*2]
Def. mem. at 3, 5.

Under Rule 19(a), joinder is required:

If (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of a claimed interest.

*Fed.R.Civ.P. 19(a)*.

In this case, the exhibits proffered in defendants' motion appear to connect both plaintiff Cushman & Wakefield, Inc. and Cushman & Wakefield of Pennsylvania, Inc. to various brokerage arrangements. n1 See def. exh. A (letter dated September 26, 1988 appointing plaintiff broker and agent for construction loan); exh. B (letter dated July 25, 1988 appointing plaintiff broker and agent for mortgage loan); exh. C (invoice dated April 6, 1989 in the amount of $ 85,000 for commissions due); exh. D (invoice dated October 3, 1989 in the amount of $ 51,250 for commissions due). However, neither the notes nor the [*3] letter agreement attached as exhibits to the

amended complaint refer to Cushman & Wakefield of Pennsylvania. n2

n1 "A party may submit affidavits or other evidence for the limited purpose of a 'speaking motion' in connection with *Fed.R.Civ.P. 12(b)(1)* and/or *12*(b)(7)." *Conservation Council v. Aluminum Company of America, 518 F. Supp. 270, 277 n.13 (W.D. Pa. 1981)*. See also C. Wright & A. Miller, 5 Federal Practice and Procedure §§ 1359, 1364, at 427, 469-70 (1990) ("It may be necessary to present affidavits of persons having knowledge of [unprotected interests of the absent parties] as well as other relevant extra-pleading evidence"). Whether or not the undisputed exhibits in this case should be considered as "evidence" in deciding defendants' motion, the same result is reached.

n2 Defendants suggest that an invoice for $ 51,250 relates to the note in the same amount. Compare def. exh. D (invoice dated October 3, 1989 from plaintiff to "Glen Eagle Square, Inc. c/o VRG Corporation") with complaint exh. A (note dated March 6, 1989 between Catherine Backos, president of Glen Eagle Square, Inc. and vice-president of VRG Corporation and plaintiff).

[*4]

"A person does not become indispensable to an action to determine rights under a contract simply because that person's rights or obligations under an entirely separate contract will be affected by the result of the action." *Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc., 564 F.2d 816, 820 (8th Cir. 1977)*.

According to the motion, plaintiff contends: "There is no factual basis . . . to conclude that the alleged brokerage agreements are in any way related to the notes and letters." Pltf. mem. at 6. However, at this stage, the record is inadequate to make such a determination. See *Francis Oil & Gas, Inc. v. Exxon, 661 F.2d 873, 880 (10th Cir. 1981)*. n3 Once the facts are developed, if, as defendants assert, Cushman & Wakefield of Pennsylvania "is inextricably linked to the transaction" and in-

dispensable under a Rule 19(b) analysis, the motion to dismiss may be renewed. See *Johnson & Johnson v. Coopervision, 720 F. Supp. 1116, 1119, 1122-27 (D. Del. 1989)*.

n3 See also *Fed.R.Civ.P. 19*, advisory committee note ("A joinder question should be decided with reasonable promptness, but decision may properly be deferred if adequate information is not available at the time. Thus the relationship of an absent person to the action, and the practical effects of an adjudication upon him and others, may not be sufficiently revealed at the pleading stage; in such a case it would be appropriate to defer decision until the action was further advanced").

[*5]

2. Defendant Galasso also moves to dismiss for lack of personal jurisdiction. *Fed.R.Civ.P. 12(b)(2)*. This motion may be renewed after further discovery, the deadline for which will be September 30, 1991. n4

n4 All other discovery shall proceed as well.

Plaintiff has the burden of establishing personal jurisdiction. See *Time Share Vacation Club v. Atlantic Resorts Ltd., 735 F.2d 61, 66 (3d Cir. 1984)*. To meet this burden, plaintiff, when challenged, must produce competent evidence, through sworn affidavits or otherwise, to establish jurisdictional facts by a preponderance. See *Time Share, 735 F.2d at 67 n.9; Mulhern v. McGahn, Friss & Miller, 1988 WL 131421, 1* (E.D. Pa. Dec. 5, 1988). Ordinarily, discovery on the issue of personal jurisdiction is allowed unless the claim clearly is frivolous. See *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. D'Assurances, 723 F.2d 357, 362 (3d Cir. 1983); Mulhern, 1988 WL 131421 at 1*.

Plaintiff maintains [*6] "that there are sufficient contacts between Galasso and Pennsylvania to allow this court to assert personal jurisdiction over Galasso." Pltf. mem. at 7. Discovery to support this jurisdictional claim will be permitted until September 30, 1991.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NORTHERN MICHIGAN HOSPITALS, INC. and GIFFORD MEDICAL CENTER, INC., *for themselves and on behalf of all other similarly situated class members,* | : : : : : : | Civil Action No. 07-39 (GMS) |
| | : : | JURY TRIAL DEMANDED |
| Plaintiffs, | : : | CLASS ACTION |
| v. | : : | |
| HEALTH NET FEDERAL SERVICES, LLC, (f/k/a HEALTH NET FEDERAL SERVICES, INC.), | : : : : | |
| Defendant. | : : | |

## COMPENDIUM OF UNREPORTED CASES CITED IN PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*OF COUNSEL*
John J. Soroko
Seth A. Goldberg
DUANE MORRIS LLP
30 South 17th St.
Philadelphia, PA 19103
215.979.1000
215.979.1020 *fax*

Matt Neiderman (Del. Bar No. 4018)
DUANE MORRIS LLP
1100 N. Market St., Suite 1200
Wilmington, Delaware 19801
302.657.4900
302.657.4901 *fax*
mneiderman@duanemorris.com

Michael R. Gottfried
Patricia R. Rich
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
857-488-4290
857-488-4201 *fax*

Gregory A. Brodek
DUANE MORRIS LLP
88 Hammond Street, Suite 500
Bangor, ME 04401
207.262.5440
207.262.5401 *fax*

*Attorneys for Plaintiffs Northern Michigan Hospitals, Inc.
and Gifford Medical Center, Inc., for themselves and
on behalf of all other similarly situated class members*

Dated: April 16, 2007

## TABLE OF CONTENTS

**Case**                                                                                  **Exhibit**

*Baptist Physician Hospital Organization, Inc. v. Humana Military Healthcare Services, Inc.,*
  2007 U.S. App. LEXIS 6447 (6th Cir. Mar. 21, 2007) ....................................................... A

*Board of Trustees of Bay Medical Center v. Humana Military Healthcare Services, Inc.,*
  2004 U.S. Dist. LEXIS 22147 (N.D. Fla. Mar. 16, 2004)................................................... B

*Buckley v. O'Hanlon,*
  2007 U.S. Dist. LEXIS 22211 (D. Del. Mar. 28, 2007) ...................................................... C

*Christman v. Grays,*
  2005 WL 3088529 (S.D. Ohio Nov. 17, 2005) ................................................................. D

*Cushman & Wakefield, Inc. v. Backos,*
  1991 U.S. Dist. LEXIS 11906 (E.D. Pa. Aug. 21, 1991) .................................................... E

*Dawley v. Erie Indemnity Co.,*
  100 F. App'x 877 (3d Cir. 2004) ........................................................................................ F

*Friends of Concord Creek v. Springhill Farm Wastewater Treatment Facility Ass'n,*
  2003 U.S. Dist. LEXIS 3123 (E.D. Pa. Feb. 12, 2003) ...................................................... G

*Healthcare Services Group, Inc. v. Integrated Heath Services of Lester, Inc.,*
  1998 U.S. Dist. LEXIS 6470 (D. Del. Apr. 23, 1998)........................................................ H

*Jurimex Kommerz Transit G.M.B.H v. Case Corporation,*
  65 F. App'x 803 (3d Cir. Apr. 23, 2003)............................................................................. I

*McCurdy v. Esmonde,*
  2003 U.S. Dist. LEXIS 1349 (E.D. Pa. Jan. 30, 2003)....................................................... J

*Riley v. Taylor,*
  2006 U.S. Dist. LEXIS 88661 (D. Del. Dec. 5, 2006) ...................................................... K

# EXHIBIT F

LEXSEE 100 F. APP X 877

**SHAWN M. DAWLEY, Appellant v. ERIE INDEMNITY COMPANY, d/b/a ERIE INSURANCE GROUP**

**No. 03-3860**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*100 Fed. Appx. 877; 2004 U.S. App. LEXIS 10793*

**May 14, 2004, Submitted Under Third Circuit LAR 34.1(a)
June 3, 2004, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Western District of Pennsylvania. (Dist. Ct. No. 00-CV-00106). District Judge: Honorable Sean J. McLaughlin.

**DISPOSITION:** Affirmed.

**COUNSEL:** For Appellant: Rebecca A. DeSimone, Erie, PA.

For Appellee: Roger H. Taft, MacDonald, Illig, Jones & Britton, Erie, PA.

**JUDGES:** Before: NYGAARD, MCKEE and CHERTOFF, Circuit Judges.

**OPINION BY:** CHERTOFF

**OPINION:** [*878] CHERTOFF, Circuit Judge.

Appellant Shawn M. Dawley brought suit against appellee Erie Indemnity Co. ("Erie Indemnity") alleging violations of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et seq.*, and the Americans with Disabilities Act, *42 U.S.C. § 12101 et seq.* The District Court granted Erie Indemnity's motion for summary judgment on all claims against it. For the following reasons, we will affirm.

I.

We exercise plenary review over a district court's grant of summary judgment, [*879] and we apply the same standard the district court should have applied. See *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000).* [**2] A court should grant summary judgment if, viewing the facts and drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. (quoting *Fed. R. Civ. P. 56(c)*).

We therefore set forth the facts in abbreviated fashion (since we write solely for the parties) and interpreted most favorably to appellant, the nonmoving party.

II.

Erie Indemnity hired Dawley to work for it as a security officer on March 25, 1991. About four months later, on July 23, 1991, Dawley went on a leave of absence to undergo surgery to remove a brain tumor.

Dawley returned to work on a part-time basis approximately a year later, in July of 1992, and his doctor cleared him to resume all of his job responsibilities, with no restrictions, on September 3, 1992. Dawley had been in training when he went on leave, and when he returned to work his supervisor (James F. Bomba) decided that he should start his training from the beginning. [**3]

On June 2, 1994, Erie Indemnity announced that it was eliminating three security officer positions. Dawley had received positive performance evaluations over the course of the previous two years, but his position was one of the three that Bomba decided to eliminate. One of the security officers who maintained his position, Michael B. Whren, was African American. Erie Indemnity had hired Dawley approximately a year after it hired Whren.

Dawley thereafter received a transfer to the Distribution Services Department, where he worked as a mail

courier beginning July 7, 1994. Approximately two months later, on September 15, 1994, Dawley filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). He alleged that his security officer position had been eliminated due to his race and because he was disabled. n1

> n1 Dawley eventually received a right to sue letter after the EEOC determined that there was evidence that defendant had violated the ADA but not Title VII.

In the meantime, Dawley continued [**4] to receive positive evaluations for his work as a mail courier, and he eventually bid for a job as a grounds attendant. Dawley obtained the position and began the job on November 13, 1995. On October 9, 1996, he received another positive performance evaluation from his new supervisor, Chuck Snyder.

On May 16, 1997, however, Snyder instituted a formal disciplinary action against Dawley for alleged insubordinate conduct during a groundskeeper unit meeting. Dawley was warned that any further argumentativeness, insubordination, violation of company policy, or failure to perform his job duties at an acceptable level would not be tolerated and would result in further disciplinary action, up to and including termination. Richards held review meetings with Dawley on June 20, 1997 and August 20, 1997 to address similar job performance issues, including alleged tardiness and continuing argumentative behavior.

Two days later, on August 22, 1997, Richards placed Dawley on a sixty day probationary period for alleged continuing unsatisfactory job performance and argumentativeness. The accompanying performance evaluation gave Dawley negative [*880] ratings in several categories, such as "interpersonal [**5] relations" and "quality of job performance." On September 19, 1997, Richards met with Dawley and told him he was fired because he continued to exhibit unacceptable job performance by, *inter alia*, smoking in the groundskeeping garage, failing to start work on time, and questioning Richards's directions. n2

> n2 Dawley eventually received a right to sue letter after the EEOC determined that there was evidence that defendant had retaliated against him in violation of the ADA and Title VII.

Dawley alleges that Erie Indemnity (1) violated Title VII by eliminating his position as security officer due to his race; (2) violated the ADA by eliminating his position as security officer due to his disability; (3) violated Title VII and the ADA by terminating him in retaliation for filing a complaint with the EEOC alleging race and disability discrimination; and (4) violated the ADA by terminating him in order to cut the costs associated with his alleged disability. We address Dawley's claims seriatim.

III.

We apply [**6] the three-step McDonnell Douglas burden shifting scheme to claims of disparate treatment and retaliation under Title VII and the ADA where, as here, a plaintiff does not offer direct evidence of discrimination. See *Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999)* (Title VII disparate treatment); *Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)* (Title VII retaliation); *Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000)* (ADA disparate treatment and retaliation). n3 In the first step, the plaintiff must make out a prima facie case. If he does, a presumption of discrimination or retaliation arises and the burden shifts to the defendant to produce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory [or nonretaliatory] reason for the unfavorable employment decision." *Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).* If the defendant carries this burden, the presumption drops out and the plaintiff must submit evidence "' from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe [**7] that an invidious discriminatory [or retaliatory] reason was more likely than not a motivating or determinative cause of the employer's action.'" *Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)* (en banc) (quoting *Fuentes, 32 F.3d at 764).*

> n3 To succeed on a direct evidence theory, "the evidence must be such that it demonstrates that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998)* (internal citations and quotations omitted); see also *Fakete v. Aetna, Inc., 308 F.3d 335, 338-39 (3d Cir. 2002).* Despite his assertions to the contrary, Dawley has not offered evidence that would warrant proceeding along that track.

As a preliminary matter, we address whether in reviewing the District Court's judgment we can properly consider certain documents (the determinations by the EEOC, see supra notes [**8] 1-2) that Dawley urges create disputed issues of fact. Dawley attached the documents to his second amended complaint, but he did

not offer them to the District Court when he opposed defendant's motion for summary judgment. Nor did he make any mention of them to the District Court, either in his papers or at oral argument on defendant's motion.

To be sure, a Court can consider "pleadings" on a motion for summary judgment. But it is not clear that a complaint [*881] and accompanying documents are part of the record on summary judgment absent a party offering it to the District Court pursuant to *Rule 56*. Insofar as they are not, we cannot consider them on appeal. See *Union Pac. R.R. Co. v. Greentree Transp. Trucking Co., 293 F.3d 120, 125-26 (3d Cir. 2002)* ("An appellate court may only review the record as it existed at the time summary judgment was entered."). Even if they are properly considered part of the summary judgment record, however, Dawley's failure to refer the District Court to them as a basis for denying defendant's motion from summary judgment precludes him from doing so now on appeal. *Rule 56* does not oblige a district court to scour the entire record to [**9] find a factual dispute. See, e. g., *Amnesty American v. Town of West Hartford, 288 F.3d 467, 470-71 (2d Cir. 2002)* (collecting cases); *Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1029-31 (9th Cir. 2001)*. n4 Just as a party on appeal "'cannot add exhibits, depositions, or affidavits to support their position,'" it cannot "'advance new theories or raise new issues'" in order to secure a reversal of the lower court's determination.'" *Greentree Transp. Trucking Co., 293 F.3d at 126* (quoting 10A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2716 (1998)). We therefore do not consider the EEOC determinations in reviewing the District Court's decision.

n4 Indeed the Western District of Pennsylvania's Local Rule 56.1 requires a party opposing a motion for summary judgment to cite to the particular part of the record that evidences the existence of an issue of disputed fact.

A.

The District Court assumed *arguendo* [**10] that Dawley established a prima facie case of disparate treatment under Title VII and proceeded to determine whether defendant satisfied its burden of production. To do so, Erie Indemnity offered an affidavit from James Bomba describing how he chose which employees' positions to eliminate. The affidavit states that he made the decision based on the respective employees' (1) amount of work experience at Erie Indemnity as a security officer; (2) job performance as reflected in performance evaluations; and (3) prior security experience with employers other than Erie Indemnity. The District Court

concluded that Erie Indemnity had satisfied its burden, and we agree.

Dawley argues that a factfinder could disbelieve the reasons offered in Bomba's affidavit because he in fact had commenced work at Erie Indemnity earlier than Whren, the African American security officer who maintained his position. But Bomba states in his affidavit that he did not base his decision on the length of time each security officer was employed by Erie Indemnity. Rather, he looked at how much time each officer had actually worked as a security officer at Erie Indemnity. In other words, the criterion was experience [**11] rather than seniority.

Dawley began his training anew when he returned to work in July of 1992. Whren, who began work at Erie Indemnity in April of 2002, was therefore further ahead in his training and job experience. Moreover, the record indicates that Whren had received on overall performance assessment of 104 points, while Dawley had received an assessment of 100. Thus Dawley has failed to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." [*882] *Fuentes, 32 F.3d at 765* (emphasis and internal quotations omitted).

Next, Dawley argues that an affidavit from Laurel Hirt (a former employee at Erie Indemnity and the granddaughter of the company's co-founder) tends to show that an invidious reason was more likely than not a motivating or determinative cause of the decision to eliminate his position. We agree with the District Court's conclusion, however, that "given the three-fold problems with Hirt's affidavit, i. e., the lack of personal knowledge, its reliance on hearsay, and its completely [**12] speculative nature, it runs afoul of *Rule 56(e) of the Federal Rules of Civil Procedure* and does not create a triable issue of fact." In the affidavit Hirt avers, for example, that eliminating the "only black Security Officer at Erie Indemnity Company, would likely have damaged the relationship the Company had with Rev. Dwayne Brock," who, she states, is "a vocal activist for the African American Community." Appellee's Supp. App. 454-55. This statement is entirely speculative. The remaining portions of the affidavit suffer from similar shortcomings.

B.

The District Court granted summary judgment on Dawley's ADA claim on the basis that he had not offered evidence tending to show that he was an "individual with a disability" within the meaning of the ADA, one of the elements of a prima facie case. See *Taylor v. Phoenixville Sch. Dist., 174 F.3d 142, 151 (3d Cir. 1999)*. The

ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *42 U.S.C. § 12102* [**13] *(2)*. Dawley appears to argue that at the time of his transfer he was disabled under either the first or second definition. We find that there is insufficient evidence in the record for a jury to conclude that Dawley was disabled under either of these standards.

First, no evidence tends to show that Dawley suffered from a physical or mental impairment that substantially limited one or more of his major life activities. Indeed, the relevant evidence tends to show the contrary. In a questionnaire Dawley submitted to the EEOC, for example, he stated that "the only major life activity that I can not do is walk on a roof or run very fast." App. 136. He further testified at his deposition that his limitations did not affect his ability to perform job-related duties. Now, in his brief on appeal, Dawley contends that he suffers from a variety of physical limitations due to his operation. But a motion for summary judgment cannot "be defeated by factual assertions in the brief of the party opposing it." 10A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure § 2723*, at 389-90 (3d ed. 1998). A party opposing summary judgment must do so through the means contemplated by *Rule* [**14] *56*.

Second, a "record of such impairments" exists when "a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment." 29 C.F.R. pt. 1630 App., *§ 1630.2(k)*. Here, Dawley's employment records show that (1) he left work to have an operation to remove a tumor; and (2) in September of 1992 his doctor wrote: "The patient, Shawn Dawley, may return to work without restrictions at this time. Patient has been working his regular job at Erie Insurance with no problems or symptoms." Appellee's Supp. App. 389. Thus Dawley cannot show that he had a "record of such impairments" because "the impairment indicated in the record must be [*883] an impairment that would substantially limit one or more of the individual's major life activities." Id. The fact that Dawley took a year leave from work to recover from his operation does not create a record of impairment. See *Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 645 (2d Cir. 1998)*.

C.

To make out a prima facie case of retaliation, a plaintiff must show that "(1) he was engaged in protected activity; (2) he was discharged subsequent to or contemporaneously with such activity; [**15] and (3) there is a causal link between the protected activity and the discharge." *Woodson, 109 F.3d at 920*. Dawley's retaliation claims fail because no reasonable jury could conclude

from the evidence in the record that there was a causal connection between his EEOC filing and termination.

We have held that temporal proximity between protected conduct and an adverse employment action, absent any additional evidence of causation, may suffice to defeat summary judgment. See *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-80 (3d Cir. 2000)*. But no temporal proximity exists here; Dawley was fired three years after he filed his complaint with the EEOC. Further, Dawley has pointed to no evidence from the intervening three year period that would support an inference of retaliation.

D.

Finally, Dawley argues that Erie Indemnity violated the ADA because one of its executives fired him in order to save the company money, and thereby increase the executive's compensation under a company cost-cutting incentive plan for senior executives. The District Court granted summary judgment on the grounds that Dawley had failed to exhaust his administrative remedies. [**16]

We agree that had Dawley alleged in his complaint that defendant fired him because he was disabled in violation of the ADA, Dawley would have failed to exhaust the claim as the ADA requires. See *Churchill v. Star Enterprises, 183 F.3d 184, 190 (3d Cir. 1999)*. Dawley never brought that claim to the attention of the EEOC, and it did not fall within the scope of his previous complaint to the EEOC alleging that Erie Indemnity terminated him in retaliation for his previous EEOC filings. See *Antol v. Perry, 82 F.3d 1291, 1295-96 (3d Cir. 1996)*.

But Dawley failed to allege this claim in his complaint. Thus, because the claim was not properly before the District Court, the Court could not grant summary judgment on it. Dawley states that he did not learn that he was fired because of his disability until discovery had occurred. If that was the case, he should have moved to amend his complaint to incorporate the new claim. n5

> n5 We understand from Dawley's brief that he has filed a claim with the EEOC and is awaiting final agency action. We of course express no opinion as to whether res judicata would bar any future federal suit on that claim under our decision in *Churchill v. Star Enterprises, 183 F.3d at 189-92*.

[**17]

IV.

For the foregoing reasons, we will affirm the judgment of the District Court.

# EXHIBIT G

LEXSEE 2003 U.S. DIST. LEXIS 3123

**FRIENDS OF CONCORD CREEK, Plaintiff v. SPRINGHILL FARM
WASTEWATER TREATMENT FACILITY ASSOCIATION, Defendant**

**NO. 02-CV-2742**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA**

*2003 U.S. Dist. LEXIS 3123*

**February 12, 2003, Decided
February 13, 2003, Filed**

**DISPOSITION:** [*1] Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(7) for failure to join indispensable party denied.

**COUNSEL:** For FRIENDS OF CONCORD CREEK, Plaintiff: JAMES R. MAY, JAMES M. STUHLTRAGER, LYMAN C. WELCH, MID-ATLANTIC ENVIRONMENTAL LAW CENTER, WILMINGTON, DE.

For SPRINGHILL FARM WASTEWATER TREATMENT FACILITY ASSOCIATION, Defendant: J. ROBERT STOLTZFUS, SCHNADER HARRISON SEGAL & LEWIS LLP, PHILADELPHIA, PA.

**JUDGES:** MARY A. MCLAUGHLIN, J.

**OPINION BY:** MARY A. MCLAUGHLIN

**OPINION:**

MEMORANDUM AND ORDER

McLaughlin, J.

February 12, 2003

Plaintiff Friends of Concord Creek ("FOCC") filed a citizen's suit against defendant Springhill Farm Wastewater Treatment Facility Association ("Springhill") pursuant to the federal Water Pollution Control Act ("Clean Water Act"), and the Pennsylvania Clean Streams Law ("PCSL"), *35 P.S. § 691.601* et seq. Among

other things, FOCC seeks an order requiring Springhill to convey the wastewater that it is currently discharging [*2] into a local creek to local treatment facilities instead. FOCC alleges that Springhill is violating the terms of its state-issued National Pollutant Discharge Elimination System ("NPDES") permit by continuing to put wastewater into an unnamed tributary to the West Branch of Chester Creek, locally known as Concord Creek, despite the availability of local treatment facilities.

Springhill's NPDES permit states in relevant part:

> This permit authorizes the discharge of treated sewage until such time as facilities for the conveyance and treatment at a more suitable location are installed and are capable of receiving and treating the permittee's sewage ... When such municipal sewage facilities become available, the permittee shall provide for the conveyance of the sewage to these sewerage facilities, abandon the use of the sewage treatment plant thereby terminating the discharge authorized by this permit, and notify the Department accordingly.

NPDES Permit No. PA0052230, Part C, subsection 2; quoted in the Complaint at P31 and Defendant's Motion to Dismiss at 3.

The defendant moves to dismiss FOCC's complaint pursuant to *Fed. R. Civ. P. 12(b)(7)* for failure to join an indispensable [*3] party, the Pennsylvania Department

of Environmental Protection ("PADEP"), arguing that FOCC's requested injunctive relief cannot be provided without PADEP's prior approval. Springhill states that it could not comply with the order requested by FOCC without revisions to the local municipality's sewage facilities plan, which are subject to PADEP's approval under the Pennsylvania Sewage Facilities Act, *35 P.S. § 750.1 et seq.*

Rule 12(b)(7) allows a defendant to seek dismissal of an action when the plaintiff fails to join an indispensable party as defined by Rule 19. Rule 19(a) requires joinder of a non-party if, in the non-party's absence, complete relief cannot be accorded among the parties to the action. *Bank of America Trust and Savings Assoc. v. Hotel Rittenhouse Association et al., 844 F.2d 1050, 1053 (3d Cir. 1988).* Applied to the case at hand, these rules require dismissal of this case if the Court cannot grant complete relief without joining PADEP.

The relief FOCC seeks, an order for Springhill to comply with the terms of its permit, could be granted without joining PADEP. The NPDES permit requires Springhill to stop its Concord Creek discharge, convey its [*4] sewage to the available facilities and notify the DEP once sewage treatment facilities are available. The terms require Springhill, not DEP, to take action.

FOCC alleges in its complaint that local sewage treatment facilities are now in place, specifically the Concord Township and Chadds Ford Township sewer authorities. It also alleges that these sewer treatment facilities are available to take the wastewater that Springhill is currently discharging into Concord Creek.

If the factfinder determines that FOCC's allegations are true, then Springhill would not be in compliance with its permit. The Court could then order the defendant to comply and afford FOCC complete relief without joining PADEP to this action. PADEP is not an indispensable party because it might become later involved after Springhill takes the required steps to comply.

Neither would the interests of the state be prejudiced by failing to join PADEP. In keeping with the notice requirements of section 505(b) of the Clean Water Act and section 691.601(e) of the PCSL, the plaintiff notified PADEP that it was filing this claim against defendant in March 2002. Complaint at P6. The agency has not moved to intervene or join [*5] the action.

Because this Court finds that complete relief can be accorded to FOCC without PADEP's joinder, PADEP is not an indispensable party to this action. The motion to dismiss for failure to join an indispensable party is denied.

An appropriate order follows.

ORDER

AND NOW, this 12 day of February, 2003, upon consideration of the Defendant's Motion to Dismiss Pursuant to *Fed. R. Civ. P. 12(b)(7)* for Failure to Join an Indispensable Party (Docket # 3), the Plaintiff's Opposition to the motion, and the Defendant's Reply to the Opposition, and after oral argument before this Court on January 22, 2003, it is hereby Ordered that said motion is Denied for the reasons given in a memorandum of today's date.

BY THE COURT:

MARY A. MCLAUGHLIN, J.

# EXHIBIT H

LEXSEE 1998 U.S. DIST. LEXIS 6470

**HEALTHCARE SERVICES GROUP, INC., Plaintiff, v. INTEGRATED HEALTH SERVICES OF LESTER, INC.; and LITCHFIELD ASSET MANAGEMENT, INC., Defendants.**

**C.A. No. 96-331-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1998 U.S. Dist. LEXIS 6470*

**April 23, 1998, Decided**

**COUNSEL:** [*1] David J. Margules, Esquire, Wolf, Block, Schorr and Solis-Cohen, Wilmington, Delaware, for plaintiff.

Gerald J. McConomy, Esquire, and David B. Snyder, Esquire, Fox, Rothschild, O'Brien & Frankel, Exton, Pennsylvania, for plaintiff.

Joseph C. Schoell, Esquire, Morris, James, Hitchens & Williams, Wilmington, Delaware, for defendants.

Leighton Aiken, Esquire, and Dana M. Campbell, Esquire, Owens, Clary & Aiken, Dallas, Texas, for defendants.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

   **OPINION**

Dated: April 23, 1998
Wilmington, Delaware

Sue L. Robinson
District Judge

**I. INTRODUCTION**

On June 21, 1996, plaintiff Healthcare Services Group, Inc. ("HSG") filed this action against defendants Integrated Health Services of Lester, Inc. ("IHS") and Litchfield Asset Management Corporation ("Litchfield") seeking compensatory damages, punitive damages, and costs all relating to an alleged breach of contract. Plaintiff HSG provides housekeeping and laundry services to long-term health [*2] care facilities and is seeking payment of monies that became due upon termination of certain service agreements by defendant IHS, owner of a number of nursing homes.

IHS, Litchfield, and HSG filed cross motions for summary judgment. (D.I. 36, 39) On October 16, 1997, after having heard oral argument, the court denied plaintiff's motion and granted defendants motion for summary judgment, except as to two facilities--Terrell Care Center ("Terrell") and Heritage Manor of Iowa Park ("Heritage"). (D.I. 56)

Currently before the court is the question of whether IHS and HSG entered into agreements concerning Terrell and Heritage and, if so, what are the terms of those agreements. The parties tried this issue before the court in an evidentiary hearing on October 30, 1997. Post-hearing briefs then were submitted by the parties. (D.I. 63, 65, 67) Jurisdiction over this case is based on *28 U.S.C. § 1332.* The following constitutes the court's findings of fact and conclusions of law pursuant to *Fed.R.Civ.P. 52(a).*

**II. FINDINGS OF FACT**

1. On or about September 19, 1988, American Services Company ("ASC") and certain limited partnerships entered into two agreements ("Original Service [*3] Agreements") under which ASC was to provide housekeeping and laundry services to the Terrell and Heritage nursing homes. (Plaintiff's Exhibits ("PX") 1, 2)

2. Subsequently, the limited partnerships sold all of their facilities to Litchfield, a Connecticut corporation. (PX 5) In connection with the sale, Litchfield entered into an agreement ("Facilities Agreement") with IHS whereby, among other things, Litchfield leased the facilities to IHS. (PX 5) The Facilities Agreement also included a provision whereby Litchfield agreed to pay any cancellation fees incurred within a certain time period. (D.I. 62 at 25)

3. ASC was purchased by, and subsequently merged into, plaintiff HSG. (D.I. 62 at 21) The 1988 Original Service Agreements thus became binding upon and inured to the benefit of HSG. (D.I. 62 at 22)

4. On July 16, 1990, the 1988 Original Service Agreements were amended by, inter alia, reducing the penalty for early termination. (PX 3, 4) The amendment provides liquidated damages as follows:

> The Cancellation Penalty shall initially be set as of July 16, 1990 in the amount of $ 603.00 per bed. Thereafter, the Cancellation Penalty shall be reduced by the sum of Nineteen [*4] Dollars and Fifty-Eight Cents ($ 19.58) per bed per month until the Cancellation Penalty has been reduced to $ 100.00 per bed which shall remain at that amount for the balance of the Service Agreement. The total Cancellation Penalty shall be the Cancellation Penalty per bed as provided above, multiplied by the number of beds specified on page 1 of the Service Agreement.

(PX 3, 4)

5. On September 1, 1994, HSG and IHS entered into an Assumption Agreement pursuant to which IHS assumed the obligations under the Original Service Agreements and agreed that "all amounts due and payable to HSG under the [Original Service] Agreements will be paid by IHS when and to the extent due and payable." (PX 5 at P1)

6. By letter dated November 22, 1994, IHS terminated, effective December 31, 1994, all of the Original Service Agreements that were the subject of the Assumption Agreement. (PX 6) According to plaintiff, pursuant to the terms of the Original Service Agreements, the cancellation penalties for the facilities as of December 31, 1994 were $ 100 per bed. n1 (D.I. 62 at 25) Because the effective date of termination fell within the time period established in the Facilities Agreement, [*5] Litchfield was responsible for paying the cancellation penalties. (D.I. 62 at 25)

n1 The parties have stipulated that the number of beds at Heritage and Terrell as of December 31, 1994 was 77 and 94 respectively. (D.I. 57) Consequently, the damages, as calculated using the amended Original Service Agreements, would be $ 100 times 171 beds for a total of $ 17,100. (PX 3, 4)

7. Also on November 22, 1994, IHS informed its field personnel of the termination of the Original Service Agreements. (Defendants' Exhibit ("DX") 17) The field personnel were instructed to either negotiate a new agreement with HSG, including a suggested 30-day termination option, or to provide the housekeeping and laundry services in-house. (DX 17)

8. Yale Metz, HSG's regional sales director for Texas and Louisiana, n2 provided Robert Yarbrough, regional vice president of IHS, with a copy of HSG's form service agreement in the course of negotiating a new agreement for Heritage. (D.I. 62 at 55-56) The form was unsigned and contained pre-printed [*6] terms, including section 6.2. (D.I. 62 at 56, 69; DX 20R) Section 6.2 of HSG's form service agreement reads:

> This Service AGREEMENT supersedes any and all other agreements, either oral or written, between the parties hereto with respect to the engagement of [HSG] by the Facility and contains all the covenants and agreements between the parties with respect to the subject matter.

(DX 20R)

n2 Terrell and Heritage are both located in Texas. (PX 1, 2)

None of the provisions in the form agreement expressly referred to the cancellation penalties of the Original Service Agreements. (DX 20R) Mr. Metz was unaware of any cancellation penalties due and owing HSG under the Original Service Agreements and thus never intended to reserve any rights HSG may have had in cancellation penalties during the negotiations for continued service contracts. (D.I. 62 at 48-53)

9. HSG continued to provide services to both Terrell and Heritage without interruption after December 31, 1994. (D.I. 62 at 48, 54) HSG performed its obligations at Heritage in accordance with the financial terms of the form agreement, was paid the amount specified in the form agreement. (D.I. 62 at 57; DX 28) With respect to Terrell, Mr. Metz testified that the continued relationship was pursuant to an oral agreement. (D.I. 62 at 60)

10. There were no signed, written agreements relating to the services provided by HSG to either Terrell or Heritage after December 31, 1994. (D.I. 62 at 47-49) Both parties fulfilled their obligations to each other con-

sistent with the terms of the New Service Agreements n3 executed with respect to all other facilities. (D.I. 62 at 57, 74; DX 20A-20Q) Neither party raised the issue of cancellation penalties during negotiations for the new service agreements. (D.I. 62 at 48, 49)

> n3 IHS and HSG entered into New Service Agreements concerning 17 other facilities that continued business relationships. These agreements were all substantially similar to the form agreement and include section 6.2. (DX 20A-20Q)

11. On August 6, 1995, IHS delivered a letter to HSG canceling all agreements between HSG and IHS in connection with certain named facilities, including Terrell. (DX 28; D.I. 62 at 59) In part, the letter asked HSG to "please accept this letter as notice of our intention to cancel the Service Agreement between IHS and HSG at . . . IHS of Texas at Terrell [*7] Care." (DX 28)

12. Upon receipt of the August 6, 1995, letter, HSG requested that its termination at Terrell and Heritage be accelerated. (D.I. 62 at 38, 62) This request was accepted. (DX 29) There was no other discussion by HSG regarding the termination. (D.I. 62 at 62-63, 77)

## III. CONCLUSIONS OF LAW

### A. Choice of Law

1. Because the court's jurisdiction over this dispute is based upon diversity of citizenship, the court will apply Delaware choice of law rules. See *Townsends of Arkansas, Inc. v. Millers Mut. Ins. Co., 823 F. Supp. 233, 237 (D. Del. 1993).* "In Delaware, courts apply the 'most significant relationship test' for choice of law questions in contract cases." Id. (citations omitted). Delaware law also permits a court to forego an independent analysis if the contracting parties agree on what law governs. See *Oglesby v. Penn Mut. Life Ins. Co., 877 F. Supp. 872, 878 (D. Del. 1994).* The parties do not dispute that Pennsylvania law applies to HSG's claims. n4 Accordingly, the substantive law of Pennsylvania shall apply to this case.

> n4 The Original Service Agreements were to be governed and construed in accordance with the laws of the State of New York. (PX 1, 2) Both the Assumption Agreement and the New Service Agreements are to be construed in accordance with the laws of the Commonwealth of Pennsylvania. (PX 5; DX 2OA-20Q)

[*8]

### B. Implied-in-Fact Contracts

2. Pennsylvania law recognizes and enforces implied-in-fact contracts when such contracts are established. Under Pennsylvania law, "an implied-in-fact contract is a true contract arising from mutual agreement and intent to promise, but where the agreement and promise have not been verbally expressed. The agreement is inferred from the conduct of the parties." *In re Penn Cent. Transp. Co., 831 F.2d 1221, 1228 (3d Cir. 1987)* (citations omitted). The Restatement (Second) of Contracts, which has been adopted in Pennsylvania, provides that an implied-in-fact contract 'may be stated in Words either oral or written, or may be inferred wholly or partly from conduct." *Restatement (Second) of Contracts § 4* (1981); Cf. id. § 19(1) ("The manifestation of assent may be made wholly or partly by . . . acts or by failure to act.").

An implied-in-fact contract depends upon mutual agreement or consent, and on the intention of the parties. Such intention may be inferred from the conduct of the parties in light of the surrounding circumstances, including the course of dealing. See *Cameron v. Eynon, 332 Pa. 529, 3 A.2d 423, 424 (Pa. 1939); Crawford's [*9] Auto Ctr. v. State Police, 655 A.2d 1064, 1066 (Pa. Commw. Ct.),* appeal denied, *666 A.2d 1059 (Pa. 1995).* The comment to § 4 of the Restatement explains that:

> Contracts are often spoken of as express or implied. The distinction involves, however, no difference in legal effect, but lies merely in the mode of manifesting assent. Just as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance.

*Restatement (Second) of Contracts § 4* cmt. a.

3. Although there were no written or express contracts between both Heritage and Terrell and HSG, the course of performance and course of dealing indicate that there was mutual agreement with respect to, at a minimum, some of the terms.

4. The course of dealing between HSG and IHS is consistent with a contract which would supersede any prior agreements. At the seventeen other facilities that continued to be serviced by HSG, the IHS facility entered into written contracts which included section 6.2. (DX 2OA-20Q) There is no reason [*10] to expect that

any contract, either written or oral, between Terrell and Heritage and HSG would exclude that provision. As the court stated in its October 16, 1997 memorandum opinion, HSG would not continue to provide services in an attempt to continue their business relationship while simultaneously pursuing cancellation penalties from IHS. (D.I. 55 at 15) There was no discussion of these penalties during negotiations of any of the New Service Agreements, nor was there any demand for payment at the time of termination of the Original Service Agreements. See supra P 10; PX 6.

5. The course of performance between Terrell and Heritage and HSG demonstrates the existence of mutual assent to basic contractual terms. The type and extent of service to be provided as well as the amount to be paid for such services were clearly terms upon which the parties had agreed. Neither party has shown that there was any discussion, much less awareness, of a possible cancellation penalty issue. Because there is clear evidence that there was an agreement between the parties as to essential terms of a contract, the court finds that an implied-in-fact contract was in existence between Heritage and Terrell [*11] and HSG.

6. Generally, contract law teaches that "when parties to an ongoing, voluntary contractual relationship . . . continue to behave as before upon the lapse of the contract, barring contrary indications, each party may generally reasonably expect that the lapsed agreement's terms remain the ones by which the other party will abide." *Luden's Inc. v. Local Union No. 6 of the Bakery, Confectionery & Tobacco Workers Int'l Union, 28 F.3d 347, 356 (3d Cir. 1994).* This rationale is less persuasive where the contract lapses because one party terminates it. See id. The motivations of the terminating party may be revealed by the events surrounding the termination, thus possibly implicitly repudiating some provision of the lapsed contract. See *id. at 356 n.14.* There is evidence in the case at bar that no new contracts between the parties were intended to include a cancellation penalty clause. See supra PP 7-10.

Because there was no discussion of section 6.2 during negotiations (D.I. 62 at 49), plaintiff argues that this section cannot be a term upon which there was mutual assent of the parties. (D.I. 63 at 6-7) Defendants contend that there could have been no mutual assent [*12] to a continued relationship between the parties if cancellation penalties were still outstanding. (D.I. 65 at 21-24) Defendants further contend that the reason there was no discussion of this issue was because they had no reason to believe that HSG intended to enforce the cancellation penalty from the Original Service Agreements. (D.I. 65 at 21-24)

Where there is no evidence to show otherwise,

the natural result is to give effect to the parties' objective manifestations of intent. . . . Assuming an objective manifestation of intent by both parties necessary for the formation of an implied-in-fact [contract], a term may be included as a part of the [contract] unless both parties subjectively intended that it not be.

*Luden's, 28 F.3d at 364.* Given that seventeen New Service Agreements between the parties included section 6.2, and that HSG had no reason to expect a variance in such terms in exchange for continued servicing of these particular facilities, the court finds that the agreements between Terrell and Heritage and HSG included section 6.2 by implication. The burden to show that "no implied-in-fact [contract] arose because both parties intended it not [*13] to arise naturally rests on the party attempting to avoid being bound by its objective manifestations. The same holds true for any particular term which the implied-in-fact [contract] would otherwise incorporate." Id. HSG did not meet this burden.

## C. Subsequent Contract Supersedes

7. The court previously found in its memorandum opinion of October 16, 1997 that the signed New Service Agreements relating to the other facilities were unambiguous. (D.I. 55 at 13) The court also concluded that the Original and New Service Agreements addressed the same subject matter. (D.I. 55 at 13) Ultimately, the court found that the New Service Agreements were fully integrated agreements, thus precluding enforcement of the cancellation penalties. (D.I. 55 at 14-15)

8. The court, therefore, holds that HSG is estopped from claiming that it did not assent to relieve IHS of obligations from prior contracts or agreements when IHS allowed HSG to continue to provide services for which HSG was paid. The parties behaved in a manner consistent with the New Service Agreements signed with regard to the other facilities. HSG cannot seek cancellation damages from a prior contract when that contract [*14] has been superseded by a subsequent agreement. Implied-in-fact contracts are enforced to the same extent as any other binding contract. The court in Crawford's Auto Center stated that "the legal effect of a contract inferred from conduct, called an implied or implied-in-fact contract, is the same as that of an express one." *655 A.2d at 1067.*

9. Based on the conclusions stated above, HSG has failed to prove by a preponderance of the evidence that IHS breached the Original Service Agreements between

1998 U.S. Dist. LEXIS 6470, *

HSG and Terrell and Heritage respectively. The court finds that there were subsequent agreements in place which preclude HSG from enforcing the cancellation provision in the Original Service Agreements consistent with the court's memorandum opinion of October 16, 1997. (D.I. 55)

# EXHIBIT I

FOCUS - 1 of 11 DOCUMENTS

**JURIMEX KOMMERZ TRANSIT G.M.B.H.; JURIMEX KOMMERZ TRANSIT AGRAR CONSULTING PROJEKT KAS G.M.B.H.; ARGE IPC-JURIMEX, Appellants v. CASE CORPORATION**

No. 02-1916

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*65 Fed. Appx. 803; 2003 U.S. App. LEXIS 7690*

**March 12, 2003, Argued
April 23, 2003, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part Jurimex Kommerz Transit G.M.B.H. v. Case Corp., 2005 U.S. Dist. LEXIS 2827 (D. Del., Feb. 18, 2005)

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE. (D.C. Civil No. 00-cv-00083). District Judge: The Honorable Joseph J. Farnan, Jr. *Jurimex Kommerz Transit G.m.b.H. v. Case Corp., 201 F.R.D. 337, 2001 U.S. Dist. LEXIS 10551 (D. Del., 2001)*

**DISPOSITION:** Affirmed in part, reversed in part and remanded.

**COUNSEL:** Daniel J. Kornstein, Esq. (Argued), Kornstein Veisz Wexler & Pollard, New York, NY, Counsel for Appellants.

David C. McBride, Esq., John W. Shaw, Esq., Young Conaway Stargatt & Taylor, Wilmington, DE. William E. Deitrick, Esq., William B. Berndt, Esq., James C. Schroeder, Esq. (Argued), Mayer Brown Rowe & Maw, Chicago, IL, Counsel for Appellee.

**JUDGES:** BEFORE: SLOVITER, NYGAARD, and ALARCON, * Circuit Judges.

> \* Honorable Arthur L. Alarcon, Senior Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

**OPINION BY:** Richard L. Nygaard

**OPINION:**

[*804] OPINION OF THE COURT

NYGAARD, Circuit Judge.

This appeal involves a series of transactions arranging for the sale of agricultural equipment in Kazakhstan. Jurimex, a foreign plaintiff, filed suit in the District Court against Case Corporation--the parent [**2] company to Case France, Case Europe, and Case Neustadt-- alleging that Case breached an oral contract providing a commission to Jurimex for acting as the local liaison between Case, potential financiers, and Golden Grain, a Kazakh buyer. Case filed a motion to dismiss pursuant to *12(b)(1)* and *12(b)(7)*, arguing that its foreign subsidiaries were necessary and indispensable parties under *Rule 19* and addition of these parties would destroy diversity jurisdiction. The District Court agreed and granted the motion. Jurimex argued that it was trying to hold Case liable, not as merely the parent of the subsidiaries, but rather because the subsidiaries were acting as agents of Case. However, this theory could not be found anywhere in the original complaint (indeed, there was no mention of a subsidiary). The District Court properly applied a *Rule 19* analysis and dismissed the complaint. The District Court also properly denied discovery on the agency theory at that time because there was nothing in the complaint to which the theory could relate. Faced with the dismissal, Jurimex moved to amend their complaint to more specifically plead an agency relationship between Case and its European subsidiaries. [**3] The District Court denied this motion, finding that the amendment would be futile.

We will affirm the decision of the District Court to dismiss the original complaint because agency was never pleaded. However, we will reverse the decision to deny the amended complaint because in it Jurimex has sufficiently pleaded agency.

I. Jurisdiction and Standard of Review

The District Court had subject matter jurisdiction under *28 U.S.C. § 1332(a)(2)* because the matter in controversy exceeds $ 75,000 and the parties to the dispute are a citizen of a State and citizens of a foreign state. We have jurisdiction over a final order of the District Court pursuant to *28 U.S.C. § 1291*.

[*805] There are two decisions on appeal and each has its own standard of review. As to the decision to dismiss the complaint for failure to join an indispensable party, we have a bifurcated process of review. "To the extent that a district court's *Rule 19(a)* determination is premised on a conclusion of law, ...our scope of review is plenary. We, however, review any subsidiary findings of fact only for clear error." *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 404 (3d Cir. 1993).* [**4] Under *Rule 19(b)*, we review the district court's determination that the Case subsidiaries were indispensable and the resulting dismissal of the complaint for abuse of discretion. *Id. at 403.* The decision to deny discovery is also reviewed under an abuse of discretion standard. *Brumfield v. Sanders, 232 F.3d 376, 380 (3d Cir. 2000).*

The District Court's second order denied Jurimex's motion for leave to amend its complaint as futile. We review such decisions for abuse of discretion. *Krantz v. Prudential Investments Fund Management, 305 F.3d 140, 144 (3d Cir. 2002).* "A district court abuses its discretion when its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Hofkin v. Provident Life & Acc. Ins. Co., 81 F.3d 365, 369 (3rd Cir. 1996)* (quoting *International Union, United Auto., Aerospace and Agric. and Implement Workers of Am., UAW v. Mack Trucks, Inc., 820 F.2d 91, 95 (1987) appeal on remand, 917 F.2d 107 (3rd Cir. 1990)).*

II. Background

As this appeal comes on a motion to dismiss, "we accept all factual [**5] allegations in the complaints and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiffs." *Lorenz v. CSX Corp., 1 F.3d 1406, 1411 (3d Cir. 1993).* According to the amended complaint, n1 in April 1999, Case Neustadt, on behalf of Case, sought to obtain Jurimex's assistance in brokering a sale between Case and Agro Industrial Corporation Golden Grain (Golden Grain), a corporation in Kazakhstan. Although another company, I.P. Consult

(IPC), was acting as Case's representative in Kazakhstan, it had no experience in the grain trade or with such large transactions. In May 1999, representatives of Case, Jurimex, and IPC met in Vienna, Austria, and reached a business agreement. This agreement divided the work required to effectuate the transaction in Kazakhstan. IPC would handle the 'technical' aspects of the transaction relating to the equipment and Jurimex agreed to handle the 'agricultural' aspect. Jurimex would be responsible for lining up "offtakers," which are companies that agree to purchase the wheat produced by Golden Grain once they are using the new Case equipment. These guarantees by the offtakers are essential for securing [**6] credit from a bank for the purchase of the Case equipment, as they evince future income and assuage the bank that the money lent to Golden Grain will be repaid.

n1 We draw the factual scenario alleged by Jurimex from the amended complaint where Jurimex identified the specific subsidiaries involved in the meeting, transactions, etc. The original complaint was identical in factual nature but referred to "Case" generically, rather than acknowledging the subsidiaries, and failed to allege agency.

After the meeting, Patrice Loiseleur, Business Manager of International Sales at Case France, on behalf of Case, requested that Jurimex conduct a project study for the machinery and a feasibility study on the exportation of Golden Grain's wheat in Kazakhstan. Loiseleur also promised Jurimex that it would act as Case's future representative in Kazakhstan and would be responsible for financing the [*806] transaction. To accommodate this request, Jurimex formed Jurimex Kommerz Transit Agrar Consulting Projekt KAS (Jurimex Projekt) [**7] and created an Austrian partnership with IPC, called Arge IPC-Jurimex (IPC-Jurimex) to negotiate with Golden Grain.

The parties met again at the end of May 1999 in Paris and agreed to the financial aspects of the transaction. Specifically, of the estimated $ 40 million in revenues, $ 23.2 million would go to Case and the remaining $ 16.8 million would be used for freight costs and compensation to IPC-Jurimex. During the meeting, Girard Chiffert, an executive of Case Europe, confirmed to Jurimex that the financing guidelines were dictated by Case and that any changes would have to go through Case. Jurimex was also instructed by Loiseleur to continue negotiating with Golden Grain and Golden Grain's bank and continue to seek more offtakers.

Several exchanges occurred in June of 1999, where top management of Case, Case Europe, Case France and

IPC-Jurimex reached an understanding of the financial structure and decided to affirmatively proceed with the transaction. However, Case and IPC held a secret meeting with a different bank that had expressed interest in financing the transaction and Glencore Grain, an offtaker already obtained by Jurimex, at which time the parties agreed to proceed [**8] with Case directly and cut Jurimex out of the deal with respect to both the bank's financing and the future sale of Golden Grain's wheat to Glencore. Ultimately, the transaction was completed without Jurimex's involvement. Jurimex claims that Case's unlawful exclusion of Jurimex from the transaction deprived them of $ 7.5 million in proceeds from the direct transaction, as well as an additional $ 28 million from the fees associated with the wheat sales previously arranged and finalized by Jurimex. Case also reneged on its promise to make Jurimex its representative in Kazakhstan, depriving Jurimex of substantial future business.

The amended complaint asserts claims against Case, as joint tortfeasor by virtue of its agency relationship with its subsidiaries, Case France, Case Europe, Case Neustadt, for (1) breach of contract and implied covenant of good faith and fair dealing, (2) breach of implied contract, (3) promissory estoppel, (4) quasi-contract/unjust enrichment/restitution, (5) tortious interference, (6) unfair competition and misappropriation, and (7) prima facie tort.

In response to Jurimex's original complaint, Case filed a motion to dismiss under *Rule 12(b)(1), 12(b)(7),* [**9] *19,* and the doctrine of forum non conveniens. The heart of Case's argument was that the allegedly improper conduct took place entirely in Europe and through the sole initiative of Case's subsidiaries. As the subsidiaries are separate corporate entities, to hold the parent corporation liable for their actions, they must be joined to the lawsuit as necessary parties. The District Court agreed and engaged in *Rule 19* analysis of whether the subsidiaries were necessary and indispensable parties. Because the conduct took place through the subsidiaries and joinder would destroy diversity, the District Court found 19(a) satisfied. Turning to 19(b), the District Court explained its concern for prejudice to the unjoined subsidiaries if a judgment was entered against the parent corporation and the likelihood that there was a better forum in Europe. The District Court specifically excluded consideration of the principal-agency theory put forth by Jurimex because it was not alleged in the complaint and denied discovery as to the theory for the same reason.

[*807] In light of the adverse decision, Jurimex moved to amend its complaint to include specific language alleging the principal-agency theory, as [**10] well as a joint tortfeasor theory. The District Court denied this motion as futile in its March 27, 2002 opinion.

The District Court held that Jurimex had not alleged a factual predicate for agency because it did not point to consent by the subsidiaries to act as Case's agent, nor Case's request that the subsidiaries so act. The District Court also found the allegations of Case's control to be too conclusory. The joint tortfeasor theory was also denied, on the grounds that Jurimex had not alleged any tortious conduct by Case, but rather by its subsidiaries. Ultimately, the District Court denied the motion to amend for failure to state a claim.

III. Discussion

After the initial complaint was dismissed, Jurimex moved to amend its complaint to include specific language detailing the agency relationship. n2 The District Court denied the motion after finding that the facts alleged were not sufficient to state a claim. The District Court committed legal error by failing to consider the effects of certain factual pleadings, and applied an incorrect pleading standard for agency in the context of a *Rule 12(b)(6)* motion. The decision reached by the District Court demonstrates that it was not [**11] satisfied with the evidence of agency. However, if a complaint is properly pleaded, the concern for lack of evidence is only germane after an opportunity for discovery.

> n2 We will center our discussion on the District Court's decision to deny the amended complaint and affirm the decision to dismiss the original complaint without comment.

In *Shane v. Fauver,* we discussed the appropriate standard for a District Court to evaluate a motion to amend in light of its potential futility. *213 F.3d 113 (3d Cir. 2000).* We explained that:

> Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility. "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted. In assessing "futility," the District Court applies the same standard of legal sufficiency as applies under *Rule 12(b)(6).* Accordingly, if a claim is vulnerable to dismissal under *Rule 12(b)(6),* but the plaintiff moves [**12] to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency.

*Id. at 115* (citations omitted). During its analysis of the original complaint, the District Court found that the failure to allege agency was fatal to Jurimex's argument that subsidiaries do not have to be joined. Specifically, the District Court noted that the deficiency in the complaint was the reason the jurisdictional analysis was facial rather than factual. *See* Mem. Op. at J.A. 11 (citing *Gould Elecs. Inc. v. U.S.*, 220 F.3d 169, 176 (3d Cir. 2000)). Thus, the District Court regarded the complaint as having failed to state a claim under the agency theory and review of Jurimex's amended complaint should fall under the procedural protections of *Rule 12(b)(6)*.

Under Delaware law, n3 proof of agency within the context of a parent-subsidiary relationship requires that the plaintiff "demonstrate that the agent was acting on behalf of the principal and that the cause of action arises out of that relationship." *E.I. DuPont De Nemours and Co. v.* [*808] *Rhone Poulenc Fiber and Resin Intermediates*, 269 F.3d 187, 198 (3d Cir. 2001). [**13] We have said that "one corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company." *Id.* (quoting *Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988)). Specifically, a "restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting." *Id.* Jurimex must allege facts sufficient to allow such a relationship to be proven at trial, but it is not required to have extensive proof at the complaint stage. *See Craftmatic Sec. Litigation v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989)("Plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs [at the pleading stage]."). n4

> n3 Both parties analyze the potential agency relationship under Delaware law and we will proceed on that assumption.

> n4 Although *Craftmatic Sec. Litigation* dealt with agency in the context of corporate fraud, it seems illogical to require a more developed factual background in a complaint alleging contract violations that is evaluated under a *Rule 8* standard than the factual background we have required under the higher *Rule 9* pleading standard for fraud.

[**14]

Further, we have held that discovery is necessary when an agency relationship is alleged, thereby implicitly allowing allegations of agency to survive a facial attack. *Canavan v. Beneficial Finance Corp.*, 553 F.2d 860, 865 (3d Cir. 1977)("Because the existence of an agency relationship hinges largely on the particular facts of each case, discovery was essential to the preparation of an agency theory argument in this case."). Here, Jurimex has alleged that its past dealings with Case have involved its subsidiaries as agents in the same manner as the present and has alleged or produced affidavits evincing financial control of the transaction by Case, not its subsidiaries.

Under a *Rule 12(b)(6)* motion, a complaint may be dismissed "only if it is certain that no relief could be granted under any set of facts which could be proven." *Rossman v. Fleet Bank (RI) National Assoc.*, 280 F.3d 384, 387 (3d Cir. 2002). Based on the allegations, Jurimex may bring a claim against Case as the parent corporation without joining the subsidiaries if Jurimex proves there is an agency relationship between Case and its subsidiaries. *See Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1070 (3d Cir. 1979). [**15] Even if the District Court thought the evidence provided by Jurimex during the original jurisdictional hearing fell short from clearly establishing agency, we can presume that the factual nature of the relationship alleged in the amended complaint would be better understood after discovery. For example, during its earlier request for discovery, Jurimex asked for all documents concerning the communications between Case and its subsidiaries specifically limited to the Golden Grain transaction. Evidence of control by Case over the actions of Case France, Paris, and Neustadt would likely be found in such documents and demonstrate agency. By including in its amended complaint the necessary occurrences and reasons that Case controlled its subsidiaries' actions, Jurimex has alleged sufficient facts to survive a *Rule 12(b)(6)* motion.

We will reverse the District Court and remand with instructions to allow the amended complaint.

/s/ Richard L. Nygaard

Circuit Judge

# EXHIBIT J

LEXSEE 2003 U.S. DIST. LEXIS 1349

**BOBBY McCURDY, Plaintiff, v. JOAN ESMONDE, ESQ., and HON. LYNNE ABRAHAM, Defendants.**

**CIVIL ACTION NO. 02-4614**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2003 U.S. Dist. LEXIS 1349*

**January 30, 2003, Decided**
**January 30, 2003, Filed; January 31, 2003, Entered**

**DISPOSITION:** Motion to dismiss granted.

**COUNSEL:** [*1] For Bobby McCurdy, PLAINTIFF: Richard A. McDaniel, Philadelphia, PA USA.

**JUDGES:** JAN E. DUBOIS, J.

**OPINION BY:** JAN E. DUBOIS

**OPINION:**

**ORDER AND MEMORANDUM**

**ORDER**

AND NOW, this 30th day of January, 2003, upon consideration of Defendants' Motion to Dismiss Complaint and Amended Complaint (Document No. 6, filed September 13, 2002), Plaintiff's Memorandum of Law Contra Defendants' Motion to Dismiss (Document No. 8, filed October 9, 2002), Reply to Plaintiff's Memorandum of Law Contra Defendants' Motion to Dismiss (Document No. 10, filed October 25, 2002), and Plaintiff's Sur-Reply to Defendants' Reply Memorandum of Law to Plaintiff's Memorandum of Law Contra Defendants' Motion to Dismiss (Document No. 11, filed November 13, 2002), for the reasons set forth in the attached Memorandum, **IT IS ORDERED** that Defendants' Motion to Dismiss Complaint and Amended Complaint is **GRANTED** and the action is **DISMISSED** for lack of subject matter jurisdiction.

**MEMORANDUM**

**I. BACKGROUND**

This civil rights action under *42 U.S.C. § 1983* arises out of allegations of unconstitutional conduct in connection with child support proceedings brought against [*2] plaintiff in state court and the issuance of an order in those proceedings which prevented distribution to plaintiff of his share of the settlement of a civil rights action. Plaintiff's three-count Amended Complaint n1 alleges the bare bones of his claims; it provides no background information. The Court deems it appropriate to set forth in this Memorandum the background of plaintiff's claims in order to put them in context, and does so by reference to matters of public record. The following facts are taken from the Amended Complaint and attached exhibits or are matters of public record. n2

> n1 The original Complaint was filed on July 11, 2002. Plaintiff filed the Amended Complaint on August 28, 2002, before defendants filed any responsive pleading. In this Memorandum the Court addresses the allegations of the Amended Complaint.

> n2 See infra § III.A (describing standard of review when defense of lack of subject matter jurisdiction is raised).

On March 20, 1990, a complaint for child support was filed [*3] under *23 Pa. Cons. Stat. Ann. § 4301* et seq. ("child support complaint") against plaintiff in the

2003 U.S. Dist. LEXIS 1349, *3

Court of Common Pleas, Family Court Division, Philadelphia County. See Defs' Ex. A (reprinting child support complaint). At that time, plaintiff was incarcerated at SCI-Rockview. See id.; see also Defts' Ex. B (reprinting docket entries). No significant activity in the child support action took place until March 15, 2002. However, prior to that date, a number of events occurred that are relevant to this civil rights action.

On May 21, 1999, a civil rights action was commenced by Cynthia Dawson, Administratrix, in the Eastern District of Pennsylvania against the City of Philadelphia, seeking damages for the shooting death of another of plaintiff's children, Donte Dawson, n3 by several police officers. See Dawson v. Dodd, Civ. A. No. 99-2644 (E.D. Pa. filed May 21, 1999); Defs' Ex. C (reprinting docket entries in federal civil rights case). By Order dated August 11, 1999, the district court approved a settlement of $ 712,500.00 and a schedule of distribution in that case. See Defs' Ex. C (Doc. No. 12). Plaintiff objected to the proposed distribution of the settlement [*4] proceeds between himself and Cynthia Dawson. See id. (Doc. No. 14). By Order dated September 10, 1999, $ 496,824.82 of the settlement proceeds were held in escrow pending resolution of litigation between plaintiff and Cynthia Dawson over distribution of the funds in the Court of Common Pleas, Orphans' Court Division, Philadelphia County. See id.

n3 Cynthia Dawson was the mother of Donte Dawson.

The litigation over the distribution of the settlement proceeds was settled on July 11, 2000. See In re Donte Dawson, Deceased, O.C. No. 1438 of 1999. By Decree dated July 11, 2000 ("Orphans' Court Decree"), the Orphans' Court awarded $ 256,000.00 to Cynthia Dawson, and decreed that the balance of funds be distributed under the Pennsylvania Intestate Laws. See Defs' Ex. E (reprinting Orphans' Court Decree). Under the Orphans' Court Decree, the distribution of any settlement proceeds was subject to, inter alia, amounts owed to the Department of Public Welfare. See Defs' Ex. E P 4.

That same day, [*5] July 11, 2000, Assistant District Attorney Joan Esmonde ("ADA Esmonde") prepared and obtained a nondistribution order relating to the child support complaint. n4 See Am. Compl. P 9. The

nondistribution order barred the immediate distribution of the funds that plaintiff was to receive under the Orphans' Court Decree, and provided for future distribution of the funds only with the approval of the Court of Common Pleas. n5 See id. PP 9, 12; id. Ex. A. Plaintiff received no notice prior to being served with the order, nor was it docketed in the Court of Common Pleas. See id. P 10.

n4 Pennsylvania law provides that, in support actions, "at any time after the filing of the complaint, the court may on application issue a preliminary or special injunction, . . . order the seizure of property[] . . . or grant other appropriate interim or special relief." Pa. R. Civ. P. 1910.26.

n5 The nondistribution order, attached to plaintiff's Amended Complaint at Exhibit A, reads as follows:

**AND NOW,** to wit, this July 11, 2000 it is hereby Ordered that:

Attorneys, Richard McDaniel and Alan Yatvin are prohibited from distributing any funds to Bobby McCurdy from the proceeds of any personal injury case, workers compensation suit or any other legal matter in which either Alan Yatvin or Richard McDaniel represent Bobby McCurdy. No distribution may take place without further order of this court.

BY THE COURT:

Paul P. Panepinto

JUDGE

See id. Ex. A.

[*6]

On August 10, 2000, plaintiff's attorney contacted the Court of Common Pleas, Domestic Relations Division, Philadelphia County, in order to determine the amount of child support plaintiff owed. See id. P 13. In response, counsel received a Certification of Arrearage from the Director of the Customer Services Center of the

2003 U.S. Dist. LEXIS 1349, *6

Court of Common Pleas, Domestic Relations Division, Philadelphia County ("certification"), stating that plaintiff did not owe any money in child support as of August 10, 2000. See id. Ex. B. Plaintiff then contacted ADA Esmonde and told her that he was the father of the child for whom support was claimed, but that he did not owe any child support, and showed her the certification. See id. P 14.

On November 3, 2000, ADA Esmonde called plaintiff and demanded a "minimum support order" to be paid from the funds that plaintiff was to receive under the Orphans' Court Decree. See id. P 15. Neither the Amended Complaint nor the public record contain any information regarding events occurring between November 3, 2000, and December 14, 2001, but on the latter date ADA Esmonde served plaintiff with an order directing him to appear for genetic testing on January 3, 2002. [*7] See id. P 16; id. Ex. C (reprinting Order to Appear for Genetic Testing). Plaintiff appeared as ordered on January 3, 2002. See id. P 17. The results of the genetic testing revealed that plaintiff was, in fact, the child's father. See id.

A pretrial conference was scheduled in the Court of Common Pleas, Family Court Division, for February 14, 2002. See id. P 18. The purpose of the pretrial conference was to determine the amount of child support plaintiff owed from March 30, 1990 (the date the child support complaint was originally filed) to June 15, 1999 (the date at which the child turned eighteen years old). See id. The parties did not appear for the February 14, 2002 pretrial conference. See id. As a result, by Order dated February 14, 2002, the court dismissed the child support complaint. See id. P 19; id. Ex. D (reprinting Order).

On March 15, 2002, ADA Esmonde filed a Petition for Special Relief ("Petition") in the Court of Common Pleas, Family Court Division, Philadelphia County, requesting that court to reinstate the child support complaint. See id. P 20. A hearing on the Petition was scheduled for May 1, 2002. See id. On April 28, 2002, plaintiff's [*8] attorney requested a continuance of the May 1, 2002 hearing due to illness. See id. P 21.

The hearing on the Petition proceeded on May 1, 2002, in the Court of Common Pleas, Family Court Division, Philadelphia County. See id. P 22. Although plaintiff's counsel did not appear, the hearing was not continued because ADA Esmonde advised the Court that she did not believe that plaintiff was, in fact, represented

by the attorney and, in addition, she persuaded plaintiff to waive his right to counsel. See id. PP 22-23. ADA Esmonde also represented to the court that the funds subject to the July 11, 2000 nondistribution order were settlement proceeds from a personal injury lawsuit and that the long delay in prosecuting the child support complaint was attributable to the fact that plaintiff's whereabouts were unknown. See id. PP 28, 31.

At the hearing, by Order dated May 1, 2002, the child support complaint was reinstated. That Order also required plaintiff to pay $ 40 per week in child support for the period from May 20, 1990, the date the child support complaint was originally filed, to June 15, 1999, the date that the child reached his eighteenth birthday. See id. P [*9] 24; id. Ex. E (reprinting child support order). On May 14, 2002, plaintiff filed a Notice of Appeal to the Superior Court of Pennsylvania. See id. The appeal is still pending.

## II. PROCEDURAL HISTORY

Plaintiff brought the instant action by filing a Complaint on July 11, 2002, against ADA Esmonde and District Attorney Lynne Abraham ("DA Abraham"). He filed an Amended Complaint on August 28, 2002. Count I of the Amended Complaint asserts a claim against ADA Esmonde for unlawful deprivation of his constitutional right to due process, in violation of *42 U.S.C. § 1983* (" § 1983"). See id. PP 27-30. Count II of the Amended Complaint asserts a claim against ADA Esmonde under state tort law for the wrongful use and abuse of state civil process and proceedings. See id. PP 42-48. Count III of the Amended Complaint asserts a claim against DA Abraham for failure to adequately train and supervise assistant district attorneys in the preparation and obtaining of nondistribution orders in child support proceedings, in violation of § 1983. See id. PP 31-34, 49-59. Plaintiff seeks compensatory and punitive damages and a declaration that [*10] the practice and procedure of the District Attorney's office concerning nondistribution orders in child support cases, without notice and an opportunity to be heard, is unconstitutional. Plaintiff also seeks attorneys fees under *42 U.S.C. § 1988.*

Defendants filed a motion to dismiss on September 13, 2002. In that motion, defendants argue that the Court should dismiss plaintiff's civil rights action because: (1) the Court lacks subject matter jurisdiction under the

Rooker-Feldman doctrine, (2) if the Court concludes it has jurisdiction, the Court should abstain from exercising jurisdiction under the doctrine of *Younger v. Harris, 401 U.S. 37, 27 L. Ed. 2d 669, 91 S. Ct. 746 (1971)* because the claims in the instant action have already been raised in plaintiff's pending appeal before the Superior Court of Pennsylvania, (3) the doctrine of absolute immunity bars plaintiff's individual capacity claims against ADA Esmonde, and (4) plaintiff has failed to state either an individual or an official capacity claim against DA Abraham, and has failed to state an official capacity claim against ADA Esmonde.

## III. DISCUSSION

### A. STANDARD [*11] OF REVIEW

The Supreme Court has explained that "'without jurisdiction the court cannot proceed at all in any cause.'" *Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95, 140 L. Ed. 2d 210, 118 S. Ct. 1003 (1998)* (quoting *Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514, 19 L. Ed. 264 (1868)). Federal Rule of Civil Procedure 12(b)(1)* provides that a court may dismiss a complaint for "lack of jurisdiction over the subject matter . . . ." *Fed. R. Civ. P. 12(b)(1).* Plaintiff has the burden of establishing subject matter jurisdiction. *Carpet Group Int'l v. Oriental Rug Imp. Ass'n, 227 F.3d 62, 69 (3d Cir. 2000)* (citing *Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).* In evaluating a Rule 12(b)(1) motion, the Court first must determine whether the motion attacks the complaint on its face or on its facts. Id.

A facial challenge under Rule 12(b)(1) argues that the complaint fails to allege subject matter jurisdiction, or contains defects in the jurisdictional allegations. 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1250, at 212-18 (2d ed. 1990). [*12] As with a Rule 12(b)(6) motion, a court evaluating a facial challenge must accept the allegations in the complaint as true, and disposition of the motion becomes purely a legal question. *Gould Elec., Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000); Mortensen, 549 F.2d at 891.* In reviewing a facial attack, a court may rely on documents referenced within the complaint and attached thereto, but must view them in the light most favorable to the nonmoving party. See id. at 176 & n.6; *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).*

On the other hand, if the motion disputes the existence of subject matter jurisdiction in fact, then "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen, 549 F.2d at 891.* In resolving a factual challenge under Rule 12(b)(1), "the court may consider and weigh evidence outside the pleadings to determine if it has jurisdiction." *Gould Elec., 220 F.3d at 178* (citing [*13] *Mortensen, 549 F.2d at 891).* A factual challenge under Rule 12(b)(1) may be made prior to the service of an answer. See *Berardi v. Swanson Mem'l Lodge No. 48 of the Fraternal Order of Police, 920 F.2d 198, 200 (3d Cir. 1990)* (holding that district court properly looked beyond allegations in complaint in ruling on defendant's motion to dismiss under Rule 12(b)(1) and therefore factual basis for jurisdictional allegations in complaint could be disputed before answer was served).

Defendants base their motion to dismiss plaintiff's Amended Complaint under Rule 12(b)(1) on the Rooker-Feldman doctrine. As this Court notes infra § III.B.1, the inquiry into whether the action before the Court violates Rooker-Feldman turns on whether the issues were or could have been raised and adjudicated in the state court child support proceeding, or whether the issues before the Court are inextricably intertwined with the state court judgment. The central issues raised by the instant motion to dismiss under Rule 12(b)(1) are therefore fact-based. See, e.g., *Adams v. Costello, Civ. A. No. 96-4377, 1998 U.S. Dist. LEXIS 6777, 1998 WL 242600, at *2 (E.D. Pa. [*14] May 13, 1998)* (holding that where defendant brought Rule 12(b)(1) motion challenging subject matter jurisdiction under Rooker-Feldman, trial court is free to weigh evidence and satisfy itself as to exercise of power to hear case (quoting *Mortensen, 549 F.2d at 891)); Wishnefsky v. Addy, 969 F. Supp. 953, 955-56 (E.D. Pa. 1997)* (concluding that defendant had raised factual challenge to subject matter jurisdiction where defendant claimed that Rooker-Feldman barred federal lawsuit).

### B. THE ROOKER-FELDMAN DOCTRINE

#### 1. Applicable Law

A federal district court is one of original jurisdiction; as such, it lacks subject matter jurisdiction to entertain appeals from state courts. See *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482, 75 L.*

*Ed. 2d 206, 103 S. Ct. 1303 (1983); Rooker v. Fid. Trust Co., 263 U.S. 413, 415-16, 68 L. Ed. 362, 44 S. Ct. 149 (1923); Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N.Y. & N. J. Police Dep't, 973 F.2d 169, 177-78 (3d Cir. 1992)* (extending Rooker-Feldman bar to district court's review of decisions [*15] by lower state courts). The Rooker-Feldman doctrine, which reflects these principles, is transgressed if the claim before the district court has been determined by the state court, or could have been determined in a proceeding resulting in an adjudication by the state court, see *Valenti v. Mitchell, 962 F.2d 288, 296 (3d Cir. 1992),* or is "'inextricably intertwined with . . . a state adjudication.'" *Gulla v. N. Strabane Township, 146 F.3d 168, 171 (3d Cir. 1998)* (citing *FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 840 (3d Cir. 1996)* and *Blake v. Papadakos, 953 F.2d 68, 71 (3d Cir. 1992)); Marks v. Stinson, 19 F.3d 873, 886 n.11 (3d Cir. 1994)* (quoting *Port Auth. Police Benevolent Ass'n, 973 F.2d at 177).* In either scenario, "'federal relief can only be predicated upon a conviction that the state court was wrong, [and] it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment.'" *Centifanti v. Nix, 865 F.2d 1422, 1430 (3d Cir. 1989)* (quoting *Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 25, 95 L. Ed. 2d 1, 107 S. Ct. 1519 (1987)* [*16] (Marshall, J., concurring)).

### 2. Count I of the Amended Complaint

In Count I of the Amended Complaint, plaintiff seeks compensatory and punitive damages and attorney's fees against ADA Esmonde for her part in securing the July 11, 2000 nondistribution order. Plaintiff argues that Rooker-Feldman should not preclude this claim because issues relating to the July 11, 2000 nondistribution order were not raised in the state court proceedings or in his pending appeal to the Superior Court of Pennsylvania--only issues involving the May 1, 2002 support order were adjudicated in state court. Plaintiff further argues that he is not requesting the Court to review the child support proceedings or the May 1, 2002 support order.

### i. Plaintiff Has Raised Constitutional Objections to the Nondistribution Order in His Appeal to the Superior Court of Pennsylvania

The Court rejects plaintiff's argument that the July 11, 2000 nondistribution order was never presented to the state courts for adjudication. To the contrary, plaintiff has

presented that issue to the Superior Court of Pennsylvania in his appeal. Paragraph 10 of the Matters Complained of on Appeal reads: "Whether the [*17] document purported to be an order dated July 11, 2000 freezing distribution to defendant of his inheritance from the estate of his son, which order was not supported by petition, never docketed, and improperly, illegally and fraudulently issued without authority under rubber stamp signature of a judge of the lower court violate defendants [sic] constitutional rights of due process of law and civil rights under *42 U.S.C. section 1983.*" See Defs' Ex. J P 10. Plaintiff's statement to the contrary is clearly incorrect.

### ii. The Issues Plaintiff Presents to this Court Have Been, or Could Have Been, Adjudicated in State Court or are Inextricably Intertwined With the State Court Judgment

The Court also rejects plaintiff's argument that in the civil rights case he seeks to litigate only the preparation and obtaining of the July 11, 2000 nondistribution order, not the proceedings resulting in issuance of the May 1, 2002 support order. To the contrary, the Amended Complaint filed in this Court shows that plaintiff challenges both the state court proceedings and the underlying state court support order in attacking the July, 11, 2000 nondistribution order. [*18] See Am. Compl. P 15 (asserting that ADA Esmonde improperly engaged in ex parte contact with plaintiff and demanded that plaintiff pay child support from sum to be distributed to plaintiff); *id.* PP 16-17 (stating that ADA Esmonde demanded that plaintiff appear for genetic testing despite fact that plaintiff admitted he was father of child in question); *id.* PP 27-28 (alleging misrepresentations made by ADA Esmonde during pendency of child support action regarding source of plaintiff's funds); *id.* PP 37-38 (alleging that, as direct and proximate result of ADA Esmonde's actions and inactions, $ 19,285.71 was unlawfully taken from plaintiff to satisfy child support order entered on May 1, 2002); *id. P 40* (alleging that, as direct and proximate result of ADA Esmonde's wrongful conduct, plaintiff was deprived of his rights under Fourth and Fourteenth Amendments of U.S. Constitution).

A review of the Matters Complained of on Appeal by plaintiff discloses that a number of those matters are alleged in Count I of the Amended Complaint. For example, plaintiff appealed the May 1, 2002 support order on the ground that the [*19] state court lacked

jurisdiction because the Petition for Special Relief was not a proper means for "commencing" the child support action. Defs' Ex. J PP 1-2. Plaintiff's allegations in paragraph 32 of the Amended Complaint parallel this issue. Am. Compl. P 32 (alleging that ADA Esmonde knew that Petition for Special Relief was improper procedure to request state court to reinstate for "commencing" child support action). Additionally, plaintiff appealed the question whether his waiver of counsel at the May 1, 2002 hearing was voluntarily and knowingly made. Defs' Ex. J P 6. This issue is also raised by plaintiff in several paragraphs of the Amended Complaint. Am. Compl. PP 22-25 (alleging that ADA Esmonde made willful misrepresentations at May 1, 2002 hearing regarding plaintiff's counsel and that ADA Esmonde and judge persuaded plaintiff into making unintelligent waiver of his constitutional right to counsel); *id. P 33* (alleging that ADA Esmonde knew plaintiff was represented by counsel). Finally, in his appeal to the Superior Court, plaintiff raises a general constitutional challenge to the child support proceedings under *42 U.S.C. § 1983.* [*20] Defs' Ex. J P 9. Similar allegations that ADA Esmonde's conduct throughout the child support proceedings violated his right to due process under the U.S. Constitution are included in the Amended Complaint. Am. Compl. PP 29-30 (alleging that ADA Esmonde knew that funds to be distributed to plaintiff were not subject to nondistribution order and that nondistribution order violated due process); *id. PP 34-36* (alleging that ADA Esmonde made willful misrepresentations at May 1, 2002 hearing and willfully failed to follow well-established procedural rules, thereby depriving plaintiff of his property without due process).

This comparison of the issues raised in state court and the allegations of the Amended Complaint in this Court makes it abundantly clear that the issues presented to this Court have been, or could have been, adjudicated in state court or are inextricably intertwined with the state court judgment. In order to determine whether ADA Esmonde violated plaintiff's constitutional rights in securing the July 11, 2000 nondistribution order, the Court would have to review ADA Esmonde's conduct during the pendency of the child support proceedings and rule on the propriety [*21] of her conduct. A ruling in plaintiff's favor by this Court would require this Court to conclude that the state court erroneously decided at least some of the issues presented in the child support proceedings. Such review by this Court is barred under Rooker-Feldman. See *Carpenter v. Pennell Sch. Dist.*

*Elementary Unit, Civ. A. Nos. 01-6270, 02-625, 2002 U.S. Dist. LEXIS 15152, 2002 WL 1832854,* at *3 (E.D. Pa. Aug. 9, 2002) (holding that Rooker-Feldman barred plaintiff's claim under § 1983 where the relief he sought "is dependent, in one form or another, upon a reversal or modification of the state court's custody decree"); *Rose v. County of Lehigh, Civ. A. No. 01-13, 2001 U.S. Dist. LEXIS 14403, 2001 WL 1085044,* at *2 (E.D. Pa. Sept. 14, 2001) (holding that federal action seeking relief from defendant for testifying falsely at child custody hearing was inextricably intertwined with state proceedings because district court would have had to engage in "an intimate review of the conduct and decisions of a state court"), aff'd, *35 Fed. Appx. 358 (3d Cir. 2002); Logan v. Lillie, 965 F. Supp. 695, 697-99 (E.D. Pa. 1997)* (finding that complaint seeking relief from [*22] order preventing plaintiff from seeing his children for six days prior to hearing was inextricably intertwined with state court judgment on merits because district court would have had to conclude state court wrongly decided issue if it granted plaintiff relief).

The state court proceedings in this case involve the provision of child support. "Ensuring the provision of child support is a function particular to the states." Anthony v. Council, No. 01-2735, slip op. at 8, *2003 U.S. App. LEXIS 936 (3d Cir. Jan. 17, 2003)*; see also Schapiro v. Dickman, Civ. A. No. 95-0986, slip op. at 2 (E.D. Pa. Jan. 14, 2003) (denying plaintiff permission to file pro se complaint alleging various constitutional violations arising out of divorce settlement between plaintiff and his former spouse because "'family matters are a traditional area of state concern'" (quoting *Moore v. Sims, 442 U.S. 415, 435, 60 L. Ed. 2d 994, 99 S. Ct. 2371 (1979)).* If, as plaintiff claims, constitutional error occurred during the child support proceedings in state court, plaintiff had the right to seek relief through the state lower and appellate courts. See *Fuller v. Harding, 699 F. Supp. 64, 66 (E.D. Pa. 1988),* [*23] aff'd, *875 F.2d 310 (3d Cir. 1989)* (table). Plaintiff has done so with respect to some of the issues he seeks to raise in this Court, all of which could have been raised in state court.

### iii. Plaintiff Had a Full and Fair Opportunity to Litigate His Claims Regarding the July 11, 2000 Nondistribution Order

Plaintiff, however, asserts that the Court has jurisdiction because his federal claims regarding the preparation and issuance of the July 11, 2000

nondistribution order were not decided, and in fact could not have been decided, in state court. In advancing this argument, plaintiff claims that he could not have sought reconsideration of the July 11, 2000 nondistribution order because there was no procedure in state court by which he could challenge it. He also argues that this case should be allowed to proceed because the constitutional claims were never fully developed in state court.

Plaintiff relies on *Wood v. Orange County, 715 F.2d 1543* (11th Cir.), reh'g denied, *720 F.2d 1294 (11th Cir. 1983)* (table), cert. denied, *467 U.S. 1210, 81 L. Ed. 2d 355, 104 S. Ct. 2398 (1984)* and *Whiteford v. Reed, 155 F.3d 671 (3d Cir. 1998)* [*24] for the proposition that Rooker-Feldman does not preclude a court from exercising jurisdiction where a party is denied a full and fair opportunity to litigate an issue before a state tribunal. In *Wood*, the plaintiffs were not able to litigate their federal claims in state court because they had no notice of the adverse judgment until eleven months after it was issued, after the time for appeal had expired. *Id. 715 F.2d at 1547.* Similarly, in *Whiteford*, the Third Circuit considered the propriety of the district court's dismissal of plaintiff's Complaint on Rooker-Feldman grounds where the plaintiff had alleged constitutional claims in an administrative proceeding that the state court never considered on appeal due to defects in the record. *Whiteford, 155 F.3d at 672.* The Third Circuit observed that Whiteford never had the opportunity to present his constitutional claims, and "this court has consistently held that where a state action does not reach the merits of a plaintiff's claims, then Rooker-Feldman does not deprive the federal court of jurisdiction." *Id. at 674* (citing *Gulla, 146 F.3d at 172-73* and *E.B. v. Verniero, 119 F.3d 1077, 1091 (3d Cir. 1997)*). [*25]

Neither case helps plaintiff avoid application of Rooker-Feldman. Both Wood and Whiteford involved scenarios where the plaintiffs were not permitted to litigate issues in state court. In this case, however, plaintiff could have challenged the July 11, 2000 nondistribution order throughout the child support proceedings. The July 11, 2000 nondistribution order prevented plaintiff's attorney from distributing any settlement proceeds to plaintiff without permission of the Court of Common Pleas, but plaintiff never sought such permission. To the contrary, plaintiff objected to the nondistribution order for the first time in his appeal to the Superior Court. The fact that plaintiff waited until he filed his state court appeal and this federal lawsuit to object to the issuance of the July 11, 2000 nondistribution order does not preclude the operation of Rooker-Feldman. See *Feldman, 460 U.S. at 483 n.16* ("By failing to raise his claims in state court a plaintiff may forfeit his right to obtain review of the state court decision in any federal court."); *Lal v. Nix, 935 F. Supp. 578, 582-83 (E.D. Pa. 1996)* (holding that even though [*26] plaintiff has not raised his present claims of discrimination by the Board of Bar Examiners and Justices of the Supreme Court of Pennsylvania before Board or state Supreme Court, because such claims were inextricably intertwined with state court processing, they were still barred by Rooker-Feldman doctrine); *Lal v. Borough of Kennett Square, 935 F. Supp. 570, 576 (E.D. Pa. 1996)* (determining that claims brought in federal court but not raised in state court were barred under Rooker-Feldman because they were inextricably intertwined with state court decision as district court judge would be forced to rule that state court was wrong in order to grant relief on those claims).

Plaintiff's claims under Count I of the Amended Complaint are therefore barred by Rooker-Feldman. This Court has no jurisdiction over such claims.

### 3. Count III of the Amended Complaint

In Count III of the Amended Complaint, plaintiff seeks declaratory relief, compensatory and punitive damages, and attorney's fees arising out of DA Abraham's failure to adequately train and supervise assistant district attorneys in the preparation and obtaining of nondistribution [*27] orders in child support proceedings. Am. Compl. PP 51-57. Plaintiff argues that Count III of the Amended Complaint is not barred by the Rooker-Feldman doctrine because it poses a general challenge to the District Attorney Office's practice and procedure in preparing and obtaining nondistribution orders in child support cases. The Court disagrees with plaintiff and concludes that it does not have subject matter jurisdiction over the claims in Count III of the Amended Complaint because the factual allegations are inextricably intertwined with the state court adjudication in the child support proceedings and the relief that plaintiff seeks is inconsistent with a general constitutional challenge.

"General constitutional challenges which are not inextricably intertwined with the merits of a state court judicial decision in a particular case are not precluded by Rooker-Feldman." *Pawlak v. Pa. Bd. of Law Examiners,*

*Civ. A. Nos. 93-1998, 93-2724, 1995 U.S. Dist. LEXIS 12709, 1995 WL 517646,* at *10 (E.D. Pa. Aug. 30, 1995). When that issue is raised a court must determine whether an action presents a general constitutional challenge permitted under Rooker-Feldman, or a challenge [*28] so intertwined with the state court adjudication that the relief sought would have the impermissible effect of overturning a state court judgment. See *Centifanti, 865 F.2d at 1429-30; Stern v. Nix, 840 F.2d 208, 212 (3d Cir.), cert. denied, 488 U.S. 826, 102 L. Ed. 2d 53, 109 S. Ct. 77 (1988).*

The Third Circuit's opinions in Stern and Centifanti demonstrate the way in which the relief sought distinguishes a challenge to a state court adjudication in a particular case from a general constitutional challenge. In Stern, Stern, an attorney who had been disbarred by Supreme Court of Pennsylvania, instituted a § 1983 action in federal court challenging the state bar's procedural rules which allowed the Supreme Court of Pennsylvania to reject findings made by the Hearing Committee and the Disciplinary Board without affording him a hearing. *Stern, 840 F.2d at 210.* Stern sought a temporary restraining order, a preliminary and permanent injunction staying the Supreme Court's order disbarring him, and declaratory relief requiring the Supreme Court to afford a hearing in any case in which it plans to reject the findings [*29] of the Hearing Committee. *Id. at 210.* The Third Circuit affirmed the district court's dismissal of Stern's case for lack of subject matter jurisdiction under Rooker-Feldman, holding that the relief requested was incompatible with a general constitutional challenge. *Id. at 211-13.* Specifically, the Third Circuit ruled that a permanent injunction staying the Supreme Court's order disbarring Stern would effectively reverse the state court judgment in Stern's case. *Id. at 212.*

In contrast, the Third Circuit concluded that the Complaint in Centifanti presented a general challenge to procedural rules which would not result in the overturning of a state court adjudication. Centifanti involved a suspended attorney who had been denied reinstatement by the Supreme Court of Pennsylvania. *Centifanti, 865 F.2d at 1425-26.* Like Stern, Centifanti sought declaratory and injunctive relief in federal court based on his claim that the state procedural rules were unconstitutional. Id. The Third Circuit allowed Centifanti's challenge to proceed because Centifanti sought prospective declaratory relief applicable to [*30] consideration of future petitions for reinstatement, not the

decision of the Supreme Court in his case. *Id. at 1429.* The Third Circuit further noted that Centifanti's general challenge was not inextricably intertwined with judgment of the Supreme Court because the "district court could hold that the state rules in question violate the Constitution, without holding that the Pennsylvania Supreme Court erred in denying Centifanti's petition for reinstatement." *Id. at 1430.*

In short, the relief requested by Centifanti and Stern differed in one crucial aspect: While Stern had been disbarred by the Supreme Court of Pennsylvania and was challenging his disbarment, Centifanti had been denied reinstatement by the Supreme Court and was trying to change the procedures applicable to future petitions for reinstatement. The former violates Rooker-Feldman; the latter does not.

In the instant case, plaintiff's Amended Complaint fails for the same reasons articulated in Stern. Viewing the relief sought in the Amended Complaint, it is clear that the primary purpose of the civil rights action is to recover compensatory and punitive damages from defendants. [*31] First, plaintiff includes in the ad damnum clause claims for compensatory and punitive damages with his claim for declaratory relief. Second, and more importantly, in Count III, the supposed general constitutional challenge, plaintiff claims that as a result of the challenged inadequate training and unconstitutional conduct of the District Attorney, he has "suffered losses in excess of $ 100,00[0].00." Am. Compl. P 58. Because such relief focuses on defendants' past actions and requires plaintiff to prove specific injury to himself, it is fundamentally inconsistent with plaintiff's argument that Count III of the Amended Complaint poses a general constitutional challenge to the practice and procedure of the District Attorney in preparing and obtaining nondistribution orders in child support cases. Like the claims for a temporary restraining order and a preliminary injunction in Stern, plaintiff's claims for compensatory and punitive damages shift the focus of Count III of the Amended Complaint to the state court child support proceedings. See *Stern, 840 F.2d at 212.* Rooker-Feldman bars such an inquiry. See *Pawlak, 1995 U.S. Dist. LEXIS 12709, 1995 WL 517646,* at [*32] *13, 15 (holding that plaintiff's general challenge, seeking declaratory and injunctive relief, compensatory and punitive damages, and attorney's fees based on Pennsylvania Board of Law Examiners' decision not to allow her to sit for bar exam was inconsistent with

general challenge because she would have to prove injury to herself in order to collect damages).

Additionally, plaintiff's Amended Complaint is replete with factual allegations of alleged unconstitutional conduct arising out of the child support proceedings in state court. Such allegations are completely irrelevant if plaintiff is genuinely asserting a general constitutional challenge to the preparation and obtaining of nondistribution orders in child support cases. As in Stern, such "extensive exposition of the specific facts in [plaintiff's] case" in plaintiff's Amended Complaint, "hardly would have been necessary if the district court were being asked only to assess the validity" of the general practice and procedure in issuing nondistribution orders, rather than what happened to him in his child support case. See *Stern, 840 F.2d at 212-13* (internal quotation marks omitted). Therefore, "a close [*33] examination of [plaintiff's] case demonstrates that, despite his attempt to draft his complaint in the form of a general challenge to a state court rule, he in reality is seeking review of a state court judgment in his particular case." *Id. at 213.* Plaintiff's claim for declaratory relief therefore, is inextricably intertwined with the state court adjudication in the child support proceedings.

Plaintiff's claims under Count III of the Amended Complaint are barred by Rooker-Feldman. This Court lacks jurisdiction over such claims.

## C. DEFENDANTS' REMAINING ARGUMENTS

In their Motion to Dismiss, defendants raise several arguments in support of dismissal for failure to state a claim upon which relief can be granted under *Federal Rule of Civil Procedure 12(b)(6)*. The Court cannot address any such issues in view of its determination that it lacks subject matter jurisdiction. See *5A Wright & Miller, supra § 1350,* at 209-10 ("When the motion [to dismiss] is based on more than one ground, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses [*34] and objections become moot and do not need to be determined.").

## D. PLAINTIFF'S STATE LAW TORT CLAIMS ASSERTED IN COUNT II OF THE AMENDED COMPLAINT

Defendant alleges in the Amended Complaint that the Court has supplemental jurisdiction under *28 U.S.C. § 1367*(a) over his state law claims. In view of the Court's determination it has no jurisdiction over plaintiff's asserted federal civil rights claims, it can have no supplemental jurisdiction over plaintiff's state law claims.

## IV. CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss Complaint and Amended Complaint for lack of subject matter jurisdiction.

**BY THE COURT:**

**JAN E. DUBOIS, J.**

# EXHIBIT K

LEXSEE 2006 U.S. DIST. LEXIS 88661

**JAMES W. RILEY, Plaintiff, v. STANLEY TAYLOR, et al., Defendants.**

**Civ. No. 06-01-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 88661*

**December 5, 2006, Decided**
**December 7, 2006, Filed**

**PRIOR HISTORY:** *Riley v. Taylor, 2006 U.S. Dist. LEXIS 78450 (D. Del., Oct. 27, 2006)*

**COUNSEL:** [*1] James W. Riley, Plaintiff, Pro se, Delaware Correctional Center, Smyrna, DE.

For Stanley Taylor, Thomas Carroll, David Pierce, Defendants: Ophelia Michelle Waters, LEAD ATTORNEY, Department of Justice, Wilmington, DE.

For Medical Asssistant Malaney, Correctional Medical Services, Inc., Defendants: Kevin J. Connors, Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, United States District Judge.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM**

**I. BACKGROUND**

James W. Riley, an inmate housed at the Delaware Correctional Center ("DCC"), Smyrna, Delaware, filed this civil rights action pursuant to *42 U.S.C. § 1983* alleging deliberate indifference to serious medical needs (i.e., rectal dysfunction, need for eyeglasses, orthopedic footwear, skin infection). The defendants Medical Assistant Malaney ("Malaney") and Correctional Medical Services, Inc. ("CMS") filed a motion to dismiss the complaint on July 21, 2006. (D.I. 22.) In response, Riley filed a motion for summary judgment which CMS and Malaney oppose. (D.I. 25, 26.) Next, on August 25, 2006, defendants Commissioner Stanley Taylor ("Commissioner Taylor"), Warden [*2] Thomas Carroll ("Warden Carroll"), and Deputy Warden David Pierce ("Pierce") (i.e., "State defendants") filed a motion for summary judgment. (D.I. 30, 31.) Riley did not file a response to the State defendants' motion for summary judgment.

**II. STANDARD OF REVIEW**

**A. Motion to Dismiss**

The court "accept[s] all well-pleaded allegations in the complaint as true, and view[s] them in the light most favorable to the plaintiff." *Carino v. Stefan, 376 F.3d 156, 159 (3d Cir. 2004)*. Pro se complaints are held to "less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*; *Carino v. Stefan, 376 F.3d at 159*.

**B. Summary Judgment**

The court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there [*3] is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed. R. Civ. P. 56(e)*). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).* [*4]

The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*

## III. DISCUSSION

### A. The Complaint

The complaint contains four counts. Riley alleges in the first count that he filed several sick call complaints in 2002 requesting treatment for rectum dysfunction stemming from a 1998 injury. (D.I. 2, at 3.) Riley alleges he was seen by a physician on two occasions and prescribed medication, but was not examined. *Id.* at 3. Riley alleges he told the physician he needed surgery to correct the problem. *Id.* The complaint goes on to allege that in 2003 Riley wrote to Warden Carroll about the "denial of adequate medical treatment" [*5] for his rectum dysfunction, but he receive no response. *Id.* Riley alleges that the "medical staff" never conducted an examination to determine the extent of his injury and to prescribe the correct treatment. Riley alleges that in 2004 and 2005, during his annual physical examinations, he

complained to doctors about his untreated rectum dysfunction and that he might need surgery, but nothing was done. *Id.*

In his second claim, Riley alleges that at both his 2004 and 2005 medical examinations, he was prescribed eyeglasses and special orthopedic footwear (i.e., boots and sneakers) due to an ankle condition. *Id.* at 3-4. Riley alleges that the DCC medical staff is denying him the prescribed eyeglasses and footwear. *Id.* at 4. Riley alleges that he filed grievances in 2005 and also wrote letters to Warden Carroll and Deputy Warden Pierce. *Id.* Riley alleges that Warden Carroll disregarded his complaints, but that Deputy Warden Pierce sent his complaints to health services administrators Amy Munson ("Munson") n1 and Malaney to investigate. *Id.* Riley alleges that Munson and Malaney never corrected the denial of medical treatment or failure to provide footwear and eyeglasses. [*6] *Id.* Riley alleges he filed complaints with Deputy Warden Pierce regarding Munson and Malaney's failure to investigate and was told that Deputy Warden Pierce does "not direct medical care concerns." *Id.*

n1 Munson was dismissed from the case on October 3, 2006. (D.I. 37.)

Riley's third medical claim is that in April 2005 he filed several sick call complaints after noticing a "facial skin infection" similar to necrotizing fasciitis n2. *Id.* at 5. Riley alleges that as of the date of the filing of the complaint, he has not been seen by a doctor to see if he is infected with necrotizing fasciitis. *Id.* Plaintiff alleges that he notified Commissioner Taylor, Warden Carroll, Deputy Warden Pierce, Munson, and Malaney about his medical complaints and that he was being denied treatment for his skin infections. *Id.*

n2 Tissue death such as that associated with group A streptococcus infection. *Stedman's Medical Dictionary* 544 (2d ed. 2004).

[*7]

Riley's last claim is that Commissioner Taylor and Warden Carroll are responsible for the denial of medical treatment because of their policies of failing to: (1) maintain an adequate and qualified staff, (2) prevent

interference with adequate medical care once prescribed by a doctor and when a medical need is serious, (3) remedy unlawful conditions when they know or should have known the conditions existed within the medical company contracted to provide adequate health care to inmates at DCC, and (4) carry out their responsibilities to provide and ensure that adequate medical care for inmates are being met by the contracting medical company. Riley further alleges that in hiring CMS and First Correctional Medical ("FCM") n3, Commissioner Taylor knew or should have known that these medical vendors used inadequate and unqualified medical staff and employees.

> n3 A waiver of service for FCM was returned executed and filed on July 26, 2006. (D.I. 24.) To date, FCM has not answered or otherwise appeared.

The defendants [*8] are sued in their personal and official capacities. Riley seeks declaratory and injunctive relief, and compensatory and punitive damages.

**B. CMS and Malaney's Motion to Dismiss**

Malaney and CMS move for dismissal on the bases that the allegations in the first claim are barred by the applicable two year limitation period, Riley has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") under *42 U.S.C. § 1997e(a)*, the complaint does not state a cognizable claim for deliberate indifference to a serious medical need, Riley cannot prove any set of facts to demonstrate that CMS had a policy or custom that led the medical staff to deprive him of necessary medical care, and CMS cannot be held responsible for the acts of its employees under a *respondeat superior* theory. Riley responded by filing a motion for summary judgment.

Malaney and CMS submitted exhibits outside the pleadings in support of their motion to dismiss. The Federal Rules of Civil Procedure provide that when a motion to dismiss is filed pursuant to *Rule 12(b)(6)* and matters outside the pleadings are presented to and not excluded by the court, [*9] the matter shall be treated as one for summary judgment and disposed of as provided in *Fed. R. Civ. P. 56*. *Fed. R. Civ. P. 12(b)*. The court will not consider the exhibits submitted and will continue to treat the motion as a motion to dismiss pursuant to *Fed.*

*R. Civ. P. 12(b)*.

**1. Statute of Limitations**

CMS and Malaney argue that Riley's first claim for relief is barred by the two year limitation period inasmuch as his sick call complaints began in 2002, but he did not file his complaint until December 2005. Riley argues that he went through several years of ineffective administrative remedies, from 2002 to 2005, and the exhaustion of remedies tolled the two year limitation period.

For purposes of the statute of limitations, *§ 1983* claims are characterized as personal injury actions. *Wilson v. Garcia, 471 U.S. 261, 275, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1983)*. In Delaware, *§ 1983* claims are subject to a two-year limitations period. *See Del. Code Ann. tit. 10, § 8119*; *Johnson v. Cullen, 925 F. Supp. 244, 248 (D. Del. 1996)*. *Section* [*10] *1983* claims accrue "when plaintiff knows or has reason to know of the injury that forms the basis of his or her cause of action." *Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998)*. Claims not filed within the two-year statute of limitations period are time-barred and must be dismissed. *See Smith v. Del.*, C.A. No. 99-440-JJF, 2001 U.S. Dist. LEXIS 10594, 2001 WL 845654, at *2 (D. Del. July 24, 2001). However, because the PLRA makes exhaustion of administrative remedies mandatory, the statute of limitations begins to run only when the plaintiff has exhausted his administrative remedies. *Wright v. O'Hara*, No. Civ. A. 00-1557, 2004 WL 1793018, at *6 (E.D. Pa. Aug. 11, 2004); *Howard v. Snyder*, No. 01-376-SLR, 2002 U.S. Dist. LEXIS 9084, at *4 (D. Del. May 14, 2002).

The court must accept as true the facts as plead in Riley's complaint. *Spruill v. Gillis, 372 F.3d 218, 223 (3d Cir. 2004)* (citations omitted). However, given that exhaustion turns on the documents related to Riley's grievances, the Third Circuit has held that authentic documents may be considered without converting the motion to dismiss to a motion for summary [*11] judgment. *Spruill v. Gillis, 372 F.3d at 223*. Regarding his rectum dysfunction, Riley filed a medical grievance on October 3, 2002. (D.I. 20, Ex. A-1.) He filed a second grievance on June 15, 2003, complaining he had not received a response to the October 3, 2002 grievance. *Id.* at Ex. A-2. Finally, on October 21, 2003, Riley wrote a letter to Warden Carroll complaining that his grievances were ignored. The complaint alleges that "to date"

Warden Carroll has not responded to his complaints.

At the present time, the court cannot fully discern when Riley exhausted his administrative remedies which, as discussed above, triggers the running of the limitations period. Construing the complaint in the light most favorable to Riley as the court must do, it cannot be said that Riley did not timely file his claim for deliberate indifference to his rectum dysfunction condition. Therefore, as to this claim, the court will deny CMS and Malaney's Motion to Dismiss based upon expiration of the limitation period.

**2. Failure to Exhaust Administrative Remedies**

CMS and Malaney argue that Riley failed to exhaust his administrative remedies as is required under *42 U.S.C. § 1997e(a)* [*12] and, therefore, the entire complaint must be dismissed. Riley contends that the defendants are incorrect in their assertion that he did not exhaust administrative remedies. He points to grievances he filed and letters written in 2002 and 2003, all of which, according to Riley, were ignored. He also contends that he went through several years of ineffective administrative remedies, from 2002 to 2005.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under *section 1983* or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *42 U.S.C. § 1997e(a)*; *see Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002)* ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Under *§ 1997e(a)* "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues. [*13] " *Booth v. Churner, 532 U.S. 731, 741 n.6, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001)*. The exhaustion requirement is absolute, absent circumstances where no administrative remedy is available. *See Spruill v. Gillis, 372 F.3d 218, 227-28 (3d. Cir. 2004)*; *Nyhuis v. Reno, 204 F.3d 65, 67 (3d. Cir. 2000)*; *but see Freeman v. Snyder, No. 98-636-GMS, 2001 U.S. Dist. LEXIS 16634, 2001 Westlaw 515258 at *7 (D. Del. Apr. 10, 2001)* (finding that if no administrative remedy is available, the exhaustion requirement need not be met). However, if prison authorities thwart the inmate's efforts to pursue the grievance, administrative remedies may be presumed exhausted, as no further remedies are "available" to him. *Brown v. Croak, 312 F.3d 109, 112-13 (3d Cir. 2002)*.

Delaware Department of Correction administrative procedures provide for a multi-tiered grievance and appeal process. Medical grievances are first forwarded to the medical services staff who attempt an informal resolution of the matter. If this fails, the grievance goes to the Medical Grievance Committee, which conducts a hearing. If the matter is still not resolved, the inmate may once again appeal. DOC Policy 4.4 (revised [*14] May 15, 1998).

As noted above, when considering exhaustion the court may consider the grievances without converting the motion to dismiss into a motion for summary judgment. *See Spruill v. Gillis, 372 F.3d 218, 223 (3d Cir. 2004)*. In his complaint, Riley recites a number of medical ailments, notably rectal dysfunction, a skin rash, and failure to provide medically necessary tennis shoes and eyeglasses. Riley alleges that he wrote to Warden Carroll regarding the rectum dysfunction and submitted grievances and wrote letters to Warden Carroll and Deputy Warden Pierce on the tennis shoe and eyeglasses issues. The complaint also alleges that Riley notified prison officials complaining of lack of medical care for a skin infection.

As discussed above, the court cannot determine when Riley exhausted his administrative claims as to his rectum dysfunction claim. Riley filed a grievance seeking medically necessary boots and sneakers on March 2, 2005. (D.I. 20, Ex. A-4.) The matter was investigated and sneakers were to be ordered. *Id.* at Ex. A-5. The matter was forwarded to the medical grievance committee on June 17, 2005, and Riley signed off on the grievance on August 29, 2005. [*15] *Id.* at Ex. A-6. No other documents regarding resolution of the grievance were submitted to the court.

At the present time, the court cannot fully discern whether Riley exhausted his administrative remedies, although in his complaint, he alleges that the medical grievances were resolved unfairly, lending the inference that the grievances were exhausted. Construing the complaint in the light most favorable to Riley, at this juncture, the court will assume that Riley exhausted his administrative remedies. Accordingly, the court will deny CMS and Malaney's Motion to Dismiss on the issue of failure to exhaust administrative remedies.

### 3. Medical Needs Claim

CMS and Malaney argue that the complaint fails to state a cognizable claim for violation of civil rights in connection with medical treatment. More specifically, they argue that the allegations in the complaint do not constitute deliberate indifference to a serious medical need, and that Riley received medical treatment, although he may disagree with the type of treatment received. CMS and Malaney rely upon medical records submitted by them. As previously discussed, the court does not consider matters outside the pleadings [*16] when ruling on a motion to dismiss pursuant to *Rule 12(b)(6)*.

The complaint alleges that Riley's rectum dysfunction causes excruciating painful swelling and that this condition has continued for a lengthy period of time without Riley receiving appropriate medical treatment. Riley argues that he was seen only once for his skin rash, and that he was never seen or examined by a qualified doctor for necrotizing fasciitis, but instead the responsibility was delegated to non-qualified nursing staff. With regard to footwear, Riley argues that he is entitled to new footwear once a year. He contends he was never given footwear that was approved in 2004 and 2005 physician's orders, and argues that the defendants offer no proof that the footwear ordered in 2005 was ever provided to him. With regard to eyeglasses, Riley argues that the defendants falsely indicate the medical records do not indicate a need for eyeglasses.

The *Eighth Amendment* proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble, 429 U.S. 97, 103-105, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*. In order to set forth a cognizable claim, an inmate must allege [*17] (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle v. Gamble, 429 U.S. at 104; Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)*. A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*. Additionally, "a prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Harrison v. Barkley, 219 F.3d 132, 138-140 (2d Cir. 2000)*. Finally, an inmate's claims against members of a prison medical department are not viable under *§ 1983* where

the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle v. Gamble, 429 U.S. 97, 107, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*.

The complaint alleges a medical condition of rectum dysfunction, including painful swelling to the point that Riley is unable to [*18] perform daily activities, and that Riley received treatment for that condition in 2002. The complaint further alleges that despite his requests, he has received no further treatment for the condition. The complaint also alleges that Riley was prescribed eyeglasses and special orthopedic footwear due to an ankle injury, but was denied these medically necessary items. Finally, the complaint alleges that Riley has a skin rash "similar to necrotizing fasciitis," that he has not been permitted to see a doctor, and that he is denied treatment for the skin infection. CMS and Malaney point to the medical records of Riley to support his position. As noted above, however, the court does not consider matters outside the pleadings on a motion to dismiss.

Construing the complaint in the light most favorable to Riley, and keeping in mind his *pro se* status, the court concludes that the complaint adequately alleges medical indifference claims. Therefore, the court will deny CMS and Malaney's motion to dismiss on the basis that the complaint fails to adequately allege a medical needs constitutional violation.

### 4. Claims against CMS

CMS argues that there is no indication that it had a [*19] policy or custom that encouraged or otherwise led the medical staff to deprive Riley of medical care. CMS further argues that Riley cannot provide any set of facts that would demonstrate the same. CMS correctly argues that it cannot be held responsible for the acts of its employees under a *respondeat superior* theory. CMS asks the court to dismiss the claims against it for failure to state a claim upon which relief may be granted. Riley did not respond to this portion of the motion to dismiss.

As discussed above, in order to state an inadequate medical treatment claim under the *Eighth Amendment*, an inmate must allege deliberate indifference to serious medical needs constituting "unnecessary and wanton infliction of pain." *Estelle v. Gamble, 429 U.S. at 104*. When a plaintiff relies on the theory of *respondeat*

*superior* to hold a corporation liable, he must allege a policy or custom that demonstrates such deliberate indifference. *Miller v. Correctional Medical Systems, Inc.*, 802 F.Supp. 1126, 1132 (D. Del. 1992). The complaint contains no such allegations. Hence, CMS cannot be held liable and therefore the court will grant the motion to dismiss [*20] CMS as a defendant. Riley, however, will be given leave to amend the complaint.

### C. Riley's Motion for Summary Judgment

#### 1. Facts

Riley provided only one medical record with his motion for summary judgment. He mainly relies upon exhibits he filed in support of his motion for injunctive relief (D.I. 20) and exhibits filed by CMS and Malaney in support of their motion to dismiss (D.I. 22).

The exhibits reveal that Riley filed a grievance on October 3, 2002, regarding his rectal dysfunction complaining that he had seen a doctor several weeks earlier, that the doctor had prescribed medication without conducting a physical examination, and that the medication did not alleviate painful swelling (D.I. 20, Ex. A-1.) Riley was prescribed Colace n4 and a hemorrhoidal creme for a one month period from September to October 2002. (D.I. 22, Ex. 4.) Riley opined in his grievance, "I think surgery is necessary to correct the problem." (D.I. 20, Ex. A-1.) He sought an "adequate examination to diagnose the injury rectum and schedule [him] for surgery if needed." Riley filed a second grievance on June 16, 2003, complaining that he had not received a response to his first grievance. [*21] *Id.* at Ex. A-2. He wrote a letter to Warden Carroll on October 21, 2003, complaining that he had filed two medical grievances for his rectal condition, but both were ignored. *Id.* at Ex. A-3.

n4        A        stool        softener,
http://www.colacecapsules.com.

On June 15, 2003, Riley requested a pair of boots or sneakers with adequate ankle support due to problems with his ankle. (D.I. 22, Ex. 4.) Medical records indicate that FCM requested high top sneakers for Riley on June 27, 2003, because of his history of right ankle internal fixation with screws. *Id.* He was prescribed the high top sneakers on August 7, 2003. *Id.* Riley received sneakers from FCM on November 12, 2003. *Id.* In early January

2004, Riley was scheduled to see a medical provider for an evaluation for boots. *Id.* Progress notes dated January 22, 2004, indicate that Riley requested orthopedic boots and had also requested sneakers, but that his request for boots was denied. *Id.*

A physician's order sheet dated January 21, 2005, ordered that [*22] Riley be provided high top boots and an "opth" eye doctor consult. *Id.* The right eye was 20/200 and the left eye was 20/30. n5 Riley also wrote to Deputy Warden Pierce on May 9, 2005, advising him that during his annual physical examination the doctor approved eyeglasses after discovering Riley had severely impaired vision. *Id.* at Ex. A-16.

n5 20/20 vision is considered normal vision, and 20/30 is considered to be within the range of normal,
http://www.agingeye.net/visionbasics/healthyvision.php.
A person is considered legally blind with 20/200 or worse in the better eye with the best possible correction.
http://www.sparkle.usu.edu/glossary/index.

FCM requested high top boots on the same date as the physician's January 21, 2005 order. (D.I. 22, Ex. 4.) Riley requested boots and sneakers on February 20, 2005, and medical records indicate they were ordered. *Id.* On March 2, 2005, Riley filed a grievance seeking special footwear for medical reasons. (D.I. 20, Ex. A-4.) The grievance states that several [*23] months earlier, on two different occasions, two doctors approved Riley for high-top boots and sneakers. *Id.* The grievance indicates that in 1995 a doctor had ordered Riley special footwear. *Id.* Riley asked for a memo to permit him two pairs of sneakers, one for walking and one for exercise. *Id.* Riley wrote to Deputy Warden Pierce on May 7, 2005, complaining that special sneakers were approved during his annual exam and that he also needed special boots. (D.I. 20, Ex. A-16-17.) A letter to Deputy Warden Pierce dated July 9, 2005, indicates that Riley was given a choice between sneakers or boots, but that he believed he was entitled to both. *Id.* at Ex. A-20-21. Deputy Warden Pierce responded to Riley on July 22, 2005, that he was forwarding his footwear concerns to Health Services Administrator Malaney. *Id.* at Ex. A-19.

Exhibits submitted by Riley indicate that sneakers were to be ordered, that the grievance was withdrawn,

and that Riley signed off on the grievance on August 29, 2005. *Id.* at Exs. A-4, A-5, A-6. Riley's exhibits indicate that as of March 27, 2006, he had not received the sneakers. *Id.* at Ex. A-33-34.

Riley complained of a skin rash on March 24, 2005, was [*24] examined, and no rash was noted. (D.I. 22, Ex. 4.) On Riley April 7, 2005, Riley sought treatment for shortness of breath, heart pain, and face rash. *Id.* He was scheduled for a nurse sick call. *Id.* Riley filed a grievance on April 10, 2005, complaining of a strep skin infection contracted from new inmates and aggravated by microbe contamination in the water. *Id.* at Ex. A-8. Riley requested the medical department be ordered to treat his infection. The grievance states that Riley requested treatment on three other occasions and that hydrocortisone and antibiotic creams were not killing the infection. *Id.* at Ex. A-10. A response from Munson, dated April 11, 2005, states that Riley's concerns were noted and refers to a sick call slip dated April 7, 2005. (D.I. 22, Ex. 4.) Riley also wrote a letter to Warden Carroll on April 12, 2005, regarding the skin infection. (D.I. 20, Ex. A-12.) Deputy Warden Pierce received the letter and on April 21, 2005, advised Riley that he forwarded it to the Health Services Administrator Munson for investigation and action. *Id.* at Ex. A-11. On July 11, 2005, Riley was seen for a face rash. He also requested his sneakers.

### 2. Analysis [*25]

It is Riley's position that he should be granted summary judgment as a matter of law. He argues that it is undisputed that a fellow prisoner was hospitalized for necrotizing fasciitis infection and required surgery. (D.I. 25, at 6.) He contends he "possibly contracted this infection" from that inmate when they were confined in the same building, on the same tier. *Id.* Riley also contends it is undisputed that he was not seen by qualified doctors with regard to necrotizing fasciitis or rectum dysfunction. He contends it is undisputed that the defendants have not provided him with footwear and eyeglasses as ordered by physicians. *Id.* at 7.

CMS and Malaney argue that Riley is not entitled to summary judgment inasmuch as the complaint fails to state a claim for a constitutional violation, Riley fails to allege any personal involvement on behalf of CMS or Malaney, and Riley fails to allege deliberate indifference to a serious medical need.

Riley, as the moving party, has the burden of proving that no genuine issue of material fact exists. He has failed to meet this burden. In reviewing the records, it is clear there remain genuine issues of material fact. The medical records indicate [*26] that Riley received medication for a one month period, apparently to treat his rectum dysfunction, but there are no other medical records referencing this condition. As to the tennis shoe issue, the records reflect an ongoing effort to provide Riley with the shoes. In dispute is whether the shoes were ever received in 2005. Riley contends that a physician ordered him eyeglasses, but the medical records merely reflect that he be seen by an opthamologist for a consultation, not that glasses be ordered. Finally, Riley contends that he has not received sufficient medical care for his skin rash he self-diagnosed as necrotizing faciitis. It is apparent, however, that his complaint is that rather than being seen by a physician, he received medical treatment from a nurse.

As the moving party, Riley has the burden to prove he is entitled to judgment as a matter of law. He has failed to meed that burden. Therefore, the court will deny Riley's motion for summary judgment.

### D. State Defendants' Motion for Summary Judgment

Riley alleges that the State ‾defendants are responsible for his lack of treatment and the nonresponsiveness to his complaints of denial of medical treatment. The State [*27] defendants move for summary judgment on the basis that no facts are alleged to support Riley's conclusions that the State defendants were deliberately indifferent or intentionally cruel with respect to his medical condition. (D.I. 30, 31.) The State defendants also argue that Riley does not allege facts demonstrating that the State defendants were aware of the alleged inadequacies to Riley's medical treatment. Finally, the State defendants argue that Riley's disagreement with his course of treatment does not rise to the level of an actionable constitutional violation. Riley did not respond to the State defendants' motion for summary judgment.

The State defendants did not submit any exhibits or other documentation in support of their motion for summary judgment but instead rely upon those previously submitted by Riley, CMS, and Malaney. The facts in this case are set forth above in Section III.C.1.

#### 1. *Eighth Amendment* Violation

The State defendants argue that the complaint fails to state a cognizable constitutional claim based upon the *Eighth Amendment*. The State defendants contend that the evidence shows that Riley's requests for medical care were submitted to the providers [*28] and that he has received ongoing medical treatment throughout his incarceration. The State defendants also argue that any failure by them to respond does not implicate the deliberate indifference requisite of an *Eighth Amendment* claim. The State defendants contend that Riley failed to establish any evidence to support the conclusion that the State defendants knew or had reason to know that prison doctors or their assistants were mistreating or not treating him. The State defendants argue that there is no evidence produced by Riley to suggest that they knew or had the medical background to know that Riley faced a substantial risk of serious harm and disregarded that risk. The burden, however, is upon the State defendants, not Riley, to show there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.

The record reflects that Riley unsuccessfully sought treatment for his rectum dysfunction, by filing medical grievances that were not responded to, and writing to Warden Carroll, advising him that medical was not responding to his complaints, explaining his medical condition in detail, and asking Warden Carroll to assist him in obtaining treatment. [*29] The record reflects that Riley has received ongoing medical treatment for his ankle and that the medical staff was diligent in the pursuit of medically necessary shoes for Riley. *See Estelle v. Gamble, 429 U.S. 97, 107, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*. It seems that the real issue is, that while the shoes have been ordered, Riley either has not yet received them or he did not receive them as quickly as he desired. Regardless, it is undisputed that the shoes are required for Riley's medical condition of a right ankle internal fixation with screws and that a physician ordered the shoes, but for reasons unexplained, the shoes were not provided. Riley filed grievances and wrote to Deputy Warden Pierce on two occasions that he was approved for the footwear, but that it was not provided. On both occasions Deputy Warden Pierce forwarded the complaint to Munson, the Health Services Administrator. After receiving the second letter, Deputy Warden Pierce advised Riley that he did "not direct medical care concerns." (D.I. 20, Ex. A-19.)

Riley acknowledges that he received treatment for his skin rash, which he speculates is necrotizing faciitis, yet not the type of treatment he desired. Riley seeks treatment [*30] from a "qualified doctor." He acknowledges he received treatment for the skin rash, but the task was "delegated to non-qualified nursing staff." (D.I. 25, at 4.) It is undisputed that Riley received medical treatment, albeit not to his liking. As previously noted, however, disagreement with medical treatment does not rise to the level of a constitutional violation.

Riley's last medical complaint is that he did not receive eyeglasses as ordered by physicians. Eyeglasses can be considered a serious medical need. *See, e.g., Newman v. Alabama, 503 F.2d 1320, 1331 (5th Cir. 1974)* (failure to provide inmate with eyeglasses and prosthetic devices can constitute deliberate indifference). Contrary to Riley's position, the medical records submitted do not indicate his physicians ordered him eyeglasses. Nonetheless, a physician ordered a referral for Riley to have an opthamologist consultation. There is no indication in the medical records that Riley had the consultation or that he received any eyeglasses. The record also reflects that Riley made written complaints to Deputy Warden Pierce that he was being denied eyeglasses, to no avail.

"Where prison authorities deny reasonable [*31] requests for medical treatment. . .and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest. Similarly, where 'knowledge of the need for medical care [is accompanied by the]. . .intentional refusal to provide that care,' the deliberate indifference standard has been met. . . .Finally, deliberate indifference is demonstrated '[w]hen. . .prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment." *Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987)* (citations omitted). "Short of absolute denial, 'if necessary medical treatment [i]s. . . delayed for non-medical reasons, a case of deliberate indifference has been made out." *Id.* (citations omitted). "Deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that 'result[] in interminable delays and outright denials of medical care to suffering inmates.'" *Id. at 347* (citation omitted). *See Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004)* [*32] (a non-physician supervisor may be liable under *§ 1983* if

he knew or had reason to know of inadequate medical care).

The State defendants argue that Riley received ongoing medical treatment throughout his incarceration and rely upon *Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993)* to support their motion for summary judgment. *Durmer v. O'Carroll* held that "[t]he only allegation against either of these two [prison official] defendants was that they failed to respond to letters [the plaintiff] sent to them explaining his predicament. Neither of these defendants, however, is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." (footnoted omitted). The holding in *Durmer* was clarified in *Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004)*. *Spruill* holds that absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable with the *Eighth Amendment* scienter requirement [*33] of deliberate indifference. *Spruill, 372 F.3d at 236.*

In this case, the evidence before the court is that due Riley's letters, Warden Carroll had actual knowledge that Riley was not receiving treatment for his rectum dysfunction, and Deputy Warden Piece had actual knowledge that despite a physician's orders, Riley did not receive medically necessary shoes or ophthalmology treatment. Based upon the exhibits in the record, it is evident that as to the skin rash issue, there is not a cognizable constitutional claim for deliberate indifference to a serious medical need inasmuch as Riley's complaint is his disagreement with the type of treatment he received.

Accordingly, the court will grant the State defendants' motion for summary judgment as to the skin rash issue as it fails to state a claim upon which relief may be granted and deny the motion for summary judgment as to the remaining claims.

## 2. *Eleventh Amendment* Sovereign Immunity

The State defendants argue that the *Eleventh Amendment* bars suits brought against them. The doctrine of sovereign immunity bars suits for monetary damages against state employees in their "official capacities," absent waiver or Congressional [*34] override. *Kentucky v. Graham, 473 U.S. 159, 169, 105 S. Ct. 3099, 87 L. Ed.*

2d 114 (1985). There is no evidence that § 1983 intended to effect a Congressional override of state sovereign immunity. The statute has been held not to "provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will v. Michigan Dep't of State Police, 491 U.S. 58, 66, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). Section 1983* authorizes suits against "persons," and a suit against a state official is "no different than a suit against a state itself." *Id. at 71.* "The state itself [is not] a person that Congress intended to be subject to liability." *Id. at 68.* Also, there is no indication that the State of Delaware has waived or abrogated its sovereign immunity with respect to § 1983 claims. Therefore, the court will grant the motion for summary judgment as to the official capacity claims seeking monetary damages raised against the State defendants.

## 3. Personal Involvement

The State defendants argue that Riley fails to allege the personal involvement of either Taylor, Carroll, or Pierce. More particularly, the State defendants argue that Riley [*35] failed to identify how the State defendants participated in, intentionally delayed, or in any other way, interfered with the medical treatment Riley claims deprived him of a constitutional right. The State defendants argue that Riley's claims are without merit and must be dismissed.

When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. *West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988).* Personal involvement can be shown through allegations that a defendant directed, had actual knowledge of, or acquiesced in, the deprivation of a plaintiff's constitutional rights. *Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005); see Monell v. Dep't of Soc. Servs. 436 U.S. 658, 694-95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).* Supervisory liability may attach if the supervisor implemented deficient policies and was deliberately indifferent to the resulting risk or the supervisor's actions and inactions were "the moving force" behind the harm suffered by the plaintiff. *Sample v. Diecks, 885 F.2d 1099, 1117-118 (3d Cir. 1989); see also [*36] City of Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989); Heggenmiller v. Edna Mahan Corr. Inst. for Women, No. 04-1786, 128 Fed. Appx. 240 (3d.*

*Cir. 2005).*

Contrary to the State defendants' position the complaint adequately alleges that the State defendants had personal involvement in the denial of medical treatment. Indeed, the complaint alleges that the policies of Commissioner Taylor and Warden Carroll were the driving force behind Riley's alleged denial of medical care. Also, the complaint contains specific allegations against Deputy Warden Pierce. Therefore, the court will deny the motion for summary judgment on the basis of personal involvement.

**4. Damages**

The State defendants argue that Riley has not shown proof of actual injury and has failed to allege and prove a cognizable injury at the hands of the individual defendants. The State defendants conclude that Riley is not entitled to monetary damages, either compensatory or punitive. Similarly, the State defendants argue that Riley has failed to show that he is entitled to injunctive relief.

At this stage of the litigation claims remain viable against the State defendants. Contrary to the State [*37] defendants' position that there is no proof of actual injury, Riley alleges that he experiences excruciating painful swelling because of lack of treatment for his rectum dysfunction, that because he is being denied eyeglasses he suffers from frequent headaches due to his untreated, impaired vision, and that the tennis shoes are crucial to daily activities, protects his skin and provide support when walking and exercising. The court determines that the motion for summary judgment on the issue of damages is premature.

Also, at this time, the court sees no need to address the issue of injunctive relief inasmuch an order was recently entered denying preliminary injunctive relief. *See* D.I. 41. The issue of permanent injunctive relief, again is not ripe for adjudication, and is a matter to be addressed should the case be resolved in favor of Riley. Therefore, the court will deny the motion for summary judgment as to the issue of damages.

**IV. CONCLUSION**

The court will grant in part and deny in part the motion to dismiss filed by CMS and Malaney. Riley will be given leave to amend his claims against CMS. The court will deny Riley's motion for summary judgment. The court will [*38] grant in part and deny in part the State Defendants' motion for summary judgment. An appropriate order will be entered.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Dec. 5, 2006
Wilmington, Delaware

**ORDER**

At Wilmington this 5th day of Dec., 2006, for the reasons set forth in the Memorandum issued this date

1. The motion to dismiss filed by Correctional Medical Services, Inc. and Medical Assistant Malaney (D.I. 22) is GRANTED in part and DENIED in part. CMS is dismissed as a defendant.

2. Riley is given leave to amend his allegations against defendant CMS. The amendment shall be filed within 30 days from the date of this order.

3. The motion for summary judgment filed by James R. Riley (D.I. 25) is DENIED.

4. The motion for summary judgment filed by Commissioner Stanley Taylor, Warden Thomas Carroll, and Deputy Warden David Pierce (D.I. 30) is GRANTED in part and DENIED in part. All claims for monetary damages against the state defendants in their official capacities are dismissed. The skin care issue is dismissed as the record does not support the medical needs claim. The remaining claims are viable and will proceed.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

I, Matt Neiderman, hereby certify that on April 16, 2007, I caused a copy of Plaintiffs'

Answering Brief in Opposition to Defendant's Motion to Dismiss, Appendix and Compendium

of Unreported Cases to be served upon the following counsel of record via e-filing:

> Jennifer Gimler Brady, Esq.
> Potter, Anderson & Corroon LLP
> 1313 N. Market Street
> Hercules Plaza
> 6th Floor
> Wilmington, Delaware  19899

> /s/ Matt Neiderman
> Matt Neiderman  (Del. I.D. No. 4018)