## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| NORTHERN MICHIGAN HOSPITALS, INC. and GIFFORD MEDICAL CENTER, INC. *for themselves and on behalf of all other similarly situated class members,* <br><br> Plaintiffs, <br><br> v. <br><br> HEALTH NET FEDERAL SERVICES, LLC, (f/k/a HEALTH NET FEDERAL SERVICES, INC.), <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 07-39-GMS |

## APPENDIX
## TO HEALTH NET FEDERAL SERVICES, LLC'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

OF COUNSEL:

Arthur N. Lerner
Kathleen Taylor Sooy
Christopher Flynn
Tracy A. Roman
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2500 – Telephone
(202) 628-5116 – Facsimile
ksooy@crowell.com – E-mail
cflynn@crowell.com – E-mail


Richard L. Horwitz (Del. Bar 2246)
Jennifer Gimler Brady (Del. Bar 2874)
Jennifer C. Wasson (Del. Bar 4933)
Hercules Plaza, Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, Delaware 19899-0951
(302) 984-6000 – Telephone
(302) 658-1192 – Facsimile
rhorwitz@potteranderson.com – E-mail
jbrady@potteranderson.com – E-mail

*Attorneys for Defendant Health Net Federal Services, LLC*

Dated: April 30, 2007
792497 / 30327

## TABLE OF CONTENTS

Page(s)

TRICARE Reimbursement Manual 6010.55-M, Chapter 2, Section 1 ............................C1

Managed Care Support Model Contract, Cover Page.....................................................C18

Managed Care Support Model Contract, § G ................................................................C19

Managed Care Support Model Contract, § H ................................................................C23

Civil Cover Sheet (Form JS-44), U.S. District Court for the District of Delaware ........C38

TRICARE REIMBURSEMENT MANUAL 6010.55-M, AUGUST 1, 2002
BENEFICIARY LIABILITY

CHAPTER 2
SECTION 1

# COST-SHARES AND DEDUCTIBLES

ISSUE DATE: December 16, 1983
AUTHORITY: 32 CFR 199.4, 32 CFR 199.5, 32 CFR 199.17, and 32 CFR 199.18

I. POLICY

    A. General

        1. TRICARE Standard program deductible and cost-share amounts are defined in 32 CFR 199.4. They are identical to those applied under Basic CHAMPUS.

        2. TRICARE Extra program deductible and cost-share amounts are defined in 32 CFR 199.17.

        3. TRICARE Prime program enrollment fees and copayments are defined under the Uniform HMO Benefit Schedule of Charges in 32 CFR 199.18. For information on fees for Prime enrollees choosing to receive care under the Point of Service option, refer to 32 CFR 199.17.

        4. Fees under the Extended Care Health Option (ECHO) are defined in 32 CFR 199.5.

        5. See the attached Chapter 2, Addendum A for additional information on the benefits and costs under TRICARE.

        6. Waiver of Cost-Sharing and Deductible.

        a. Operation Desert Shield/Desert Storm.

        (1) The Operation Desert Shield/Desert Storm Supplemental Appropriations Act of 1991, Public Law 102-28, April 10, 1991, allowed medical providers to voluntarily waive the patient cost-share and/or deductible for medical services provided family members of active duty personnel from August 2, 1990, until the date the "Persian Gulf conflict" ends as prescribed by Presidential proclamation or by law.

        (a) <u>Operation Desert Storm</u> - Operations of the United States Armed Forces conducted as a consequence of the invasion of Kuwait by Iraq (including operations known as Operation Desert Shield and Operation Desert Storm).

        (b) <u>Persian Gulf Conflict</u> - The period beginning on August 2, 1990, and ending thereafter on the date prescribed by Presidential proclamation or by law.

(c)    A civilian health care provider may voluntarily waive, in whole or in part, the cost-share and/or deductible of Active Duty Family Members (ADFMs) if the provider certifies in writing that the amount charged the Federal Government for such health care was not increased above the amount that the health care provider would have charged the federal government for such health care had the payment not been waived.

1    The legislation only provides a temporary exemption to the cost-sharing provisions. Once the President officially proclaims an end to the "Persian Gulf conflict", the cost-sharing provision will be reinstated.

2    The legislation will not require modification of the existing claims processing guidelines. The contractors will process the claims normally, reflecting the appropriate deductible, cost-share, and catastrophic cap on the claims history, payment records, TRICARE Explanation of Benefits, etc. The waiver of cost-sharing is between the ADFM and the provider and does not affect the contractor's claims processing procedures, except as prescribed in the Program Integrity provisions in the TRICARE Operations Manual.

3    The waiver of cost-sharing will be based on the dates of care/ service.

4    The waiver applies to both the Basic Program and the Extended Care Health Option and is applicable to both inpatient and outpatient care.

5    The waiver of cost-sharing only applies to family members of active duty personnel. The other categories of TRICARE beneficiaries are still subject to the cost-sharing and deductible requirements set forth in 10 U.S.C. 1079 and 1086.

(2)    The exception to the cost-sharing requirements is effective for services rendered from August 2, 1990, until the date the "Persian Gulf conflict" ends as prescribed by Presidential proclamation or by law.

b.  Operation Joint Endeavor.

(1)    Under legislation passed for Operation Joint Endeavor, the TRICARE Standard deductible has been waived for family members of certain reserve members called to active duty. However, this provision does not provide for voluntary waiver of cost-shares or the deductibles by providers allowed under Operation Desert Storm. If the family is enrolled in TRICARE Prime, the deductible for point of service is not waived for this provision.

(2)    The exception to the deductible requirements under Operation Joint Endeavor for TRICARE Standard and Extra is effective for services rendered from December 8, 1995 until such time as Executive Order 12982 expires.

c.  Operation Noble Eagle/Operation Enduring Freedom.

(1)    The TRICARE Standard and Extra deductible is waived for family members of members of the reserves or National Guard who have been ordered to active

duty in support of operations that result from the terrorist attacks on the World Trade Center and the Pentagon on September 11, 2001.

(2)    The cost-share is partially waived in certain cases for these beneficiaries. On claims from non-participating professional providers for services rendered to Standard beneficiaries, the allowable amount is the lesser of the billed charge or the balance billing limit (115%) of the CMAC). In these cases, the cost-share is 20% of the lesser of the CMAC or the billed charge, and the cost-share for any amounts over the CMAC that are allowed is waived. Any amounts that are allowed over the CMAC will be paid entirely by TRICARE.

(3)    The exception to the deductible and cost-share requirements under Operation Noble Eagle/Operation Enduring Freedom for TRICARE Standard and Extra is effective for services rendered from September 14, 2001, through October 31, 2007.

d.  For Certain Reservists. The Director, TRICARE Management Activity, may waive the individual or family deductible for dependents of a reserve component member who is called or ordered to active duty for a period of more than 30 days but less than one year in support of a contingency operation. For this purpose, a reserve component member is either a member of the reserves or National Guard member who is called or ordered to full-time federal National Guard duty. A contingency operation is defined in 10 U.S.C. 101(a)(13). Also, for this purpose a dependent is a lawful husband or wife of the member or an eligible child.

B.  TRICARE Prime.

1.  Copayments and enrollment fees under TRICARE Prime are subject to review and annual updating. See Chapter 2, Addendum A for additional information on the benefits and costs. In accordance with Section 752 of the National Defense Authorization Act, P.L. 106-398, for services provided on or after April 1, 2001, a $0 copayment shall be charged to TRICARE Prime ADFMs of active duty service members (ADSMs) who are enrolled in TRICARE Prime. Pharmacy copayments and Point of Service charges are not waived by the FY01 Authorization Act.

2.  In instances where the CMAC or allowable charge is less than the copayment shown on Addendum A, network providers may only collect the lower of the allowable charge or the applicable copayment.

3.  The TRICARE Prime copayment requirement for emergency room services is on a PER VISIT basis; this means that only one copayment is applicable to the entire emergency room episode, regardless of the number of providers involved in the patient's care and regardless of their status as network providers.

4.  No copayments or authorizations are required for TRICARE Prime clinical preventive services which are described in the TPM, Chapter 7, Section 2.2.

TRICARE REIMBURSEMENT MANUAL 6010.55-M, AUGUST 1, 2002
CHAPTER 2, SECTION 1
COST-SHARES AND DEDUCTIBLES

5. Effective for care provided on or after March 26, 1998, Prime enrollees shall have no copayments for ancillary services in the categories listed below (normal referral and authorization provisions apply):

a. Diagnostic radiology and ultrasound services included in the CPT[1] procedure code range from 70000 through 76999;

b. Diagnostic nuclear medicine services included in the CPT[1] procedure code range from 78000 through 78999;

c. Pathology and laboratory services included in the CPT[1] procedure code range from 80000 through 89399; and

d. Cardiovascular studies included in the CPT[1] procedure code range from 93000 through 93350.

NOTE:    Contractors are not required to search their files for claims for ancillary services which were not processed according to these guidelines. The contractor shall, however, if requested by an appropriate individual, adjust specific claims under these guidelines if the date of service is on or after March 26, 1998.

6. Point of Service option. See Chapter 2, Section 3.

C. Basic Program: TRICARE Standard.

1. Deductible Amount: Outpatient Care.

a. For care rendered all eligible beneficiaries prior to April 1, 1991, or when the active duty sponsor's pay grade is E-4 or below, regardless of the date of care:

(1)    Deductible, Individual: Each beneficiary is liable for the first fifty dollars ($50.00) of the TRICARE-determined allowable amount on claims for care provided in the same fiscal year.

(2)    Deductible, Family: The total deductible amount for all members of a family with the same sponsor during one fiscal year shall not exceed one hundred dollars ($100.00).

b. For care rendered on or after April 1, 1991, for all TRICARE beneficiaries except family members of active duty sponsors of pay grade E-4 or below.

(1)    Deductible, Individual: Each beneficiary is liable for the first one hundred and fifty dollars ($150.00) of the TRICARE-determined allowable amount on claims for care provided in the same fiscal year.

---

[1]  CPT codes, descriptions and other data only are copyright 2005 American Medical Association. All rights reserved. Applicable FARS/DFARS Restrictions Apply to Government use.

(2)    Deductible, Family: The total deductible amount for all members of a family with the same sponsor during one fiscal year shall not exceed three hundred dollars ($300.00).

c.    TRICARE-Approved Ambulatory Surgery Centers, Birthing Centers or Partial Hospitalization Programs. No deductible shall be applied to allowable amounts for services or items rendered to ADFMs or authorized NATO family members.

d.    Allowable Amount Does Not Exceed Deductible Amount. If fiscal year allowable amounts for two or more beneficiary members of a family total less than $100.00 (or $300.00 if paragraph I.C.1.b., above, applies), and no one beneficiary's allowable amounts exceed $50.00 (or $150.00 if paragraph I.C.1.b., above applies), neither the family nor the individual deductible will have been met and no TRICARE benefits are payable.

e.    In the case of family members of an active duty member of pay grade E-5 or above, with Persian Gulf conflict service who is, or was, entitled to special pay for hostile fire/imminent danger authorized by 37 U.S.C. 310, for services in the Persian Gulf area in connection with Operation Desert Shield or Operation Desert Storm, the deductible shall be the amount specified in paragraph I.C.1.b., for care rendered after October 1, 1991.

NOTE:    The provisions of paragraph I.C.1.e., above, also apply to family members of service members who were killed in the Gulf, or who died subsequent to Gulf service; and to service members who retired prior to October 1, 1991, after having served in the Gulf war, and to their family members.

f.    Effective December 8, 1995, the annual TRICARE deductible has been waived for family members of selected reserve members called to active duty for 31 days or more in support of Operation Joint Endeavor (the Bosnia peacekeeping mission). Under a nationwide demonstration, TRICARE may immediately begin cost-sharing in accordance with standard TRICARE rules. These beneficiaries will be eligible to use established TRICARE Extra network providers at a reduced cost-share rate. Additionally, in those areas where TRICARE is in full operation, selected reserve members called to active duty for 31 days or more will have the option of enrolling their families in TRICARE Prime.

NOTE:    This demonstration is effective December 8, 1995, and is in effect until such time as Executive Order 12982 expires. TRICARE eligible beneficiaries other than family members of reservists called to active duty in support of Operation Joint Endeavor are not eligible for participation. This demonstration is limited to the annual TRICARE Standard and Extra deductible; other TRICARE cost-sharing continues to apply. All current TRICARE rules, unless specifically provided otherwise, will continue to apply.

NOTE:    Initially the option to enroll in TRICARE Prime was limited to family members of selected reserve members who were called to active duty for 179 days or more. This changed to 31 days or more as of March 10, 2003.

NOTE:    Claims for these beneficiaries are to be paid from financially underwritten funds and reported as such. TMA periodically will calculate and reimburse the contractors for the additional costs incurred as a result of waiving the deductibles on these claims.

g.  Adjustment of Excess. Any beneficiary identified under paragraph I.C.1.d., e., and f., above, who paid any deductible in excess of the amounts stipulated is entitled to an adjustment of any amount paid in excess against the annual deductible required under those paragraphs.

NOTE:    The contractors need not search their records for deductibles paid in excess, but are authorized and required to adjust any deductible amounts paid in excess that are brought to their attention and that are verifiable.

h.  The deductible amounts identified in this section shall be deemed to have been satisfied if the catastrophic cap amounts identified in Chapter 2, Section 2 have been met for the same fiscal year in which the deductible applies.

2.  Deductible Amount: Inpatient Care: None.

3.  Cost-share Amount:

a.  Outpatient Care.

(1)  ADFM or Authorized NATO Beneficiary. The cost-share for outpatient care is 20% of the allowable amount in excess of the annual deductible amount. This includes the professional charges of an individual professional provider for services rendered in a non-TRICARE-approved ambulatory surgery center or birthing center.

(2)  Other Beneficiary. The cost-share applicable to outpatient care for other than active duty and authorized NATO family member beneficiaries is 25% of the allowable amount in excess of the annual deductible amount. This includes: partial hospitalization for alcohol rehabilitation; professional charges of an individual professional provider for services rendered in a non-TRICARE-approved ambulatory surgery center.

b.  Inpatient Care.

(1)  ADFM: Except in the case of mental health services, ADFMs or their sponsors are responsible for the payment of the first $25 of the allowable institutional costs incurred with each covered inpatient admission to a hospital or other authorized institutional provider, or the amount the beneficiary or sponsor would have been charged had the inpatient care been provided in a Uniformed Service hospital, whichever is greater. (Please reference daily rate chart below.) (For care provided on or after April 1, 2001, for Prime ADFMs, copayment is $0.)

Use the daily charge (per diem rate) in effect for each day of the stay to calculate a cost-share for a stay which spans periods.

| PERIOD | DAILY CHARGE |
|---|---|
| October 1, 1997 - September 30, 1998 | $10.20 |
| October 1, 1998 - September 30, 1999 | $10.45 |
| October 1, 1999 - September 30, 2000 | $10.85 |

Use the daily charge (per diem rate) in effect for each day of the stay to calculate a cost-share for a stay which spans periods.

| PERIOD | DAILY CHARGE |
|---|---|
| October 1, 2000 - September 30, 2001 | $11.45 |
| April 1, 2001 (for Prime ADFMs only) | $0.00 |
| October 1, 2001 - September 30, 2002 (for ADFMs not enrolled in Prime) | $11.90 |
| October 1, 2002 - September 30, 2003 (for ADFMs not enrolled in Prime) | $12.72 |
| October 1, 2003 - September 30, 2004 (for ADFMs not enrolled in Prime) | $13.32 |
| October 1, 2004 - September 30, 2005 (for ADFMs not enrolled in Prime) | $13.90 |
| October 1, 2005 - September 30, 2006 (for ADFMs not enrolled in Prime) | $14.35 |
| October 1, 2006 - September 30, 2007 (for ADFMs not enrolled in Prime) | $14.80 |

     (2)   Other Beneficiaries: For services exempt from the DRG-based payment system and the mental health per diem payment system and services provided by institutions other than hospitals (i.e., RTCs), the cost-share shall be 25% of the allowable charges.

    c.   Cost-Shares: Maternity.

     (1)   Determination. Maternity care cost-share shall be determined as follows:

      (a)   Inpatient cost-share formula applies to maternity care ending in childbirth in, or on the way to, a hospital inpatient childbirth unit, and for maternity care ending in a non-birth outcome not otherwise excluded.

NOTE:    Inpatient cost-share formula applies to prenatal and postnatal care provided in the office of a civilian physician or certified nurse-midwife in connection with maternity care ending in childbirth or termination of pregnancy in, or on the way to, a military treatment facility inpatient childbirth unit. ADFMs pay a per diem charge (or a $25.00 minimum charge) for an admission and there is no separate cost-share for them for separately billed professional charges or prenatal or postnatal care.

      (b)   Ambulatory surgery cost-share formula applies to maternity care ending in childbirth in, or on the way to, a birthing center to which the beneficiary is admitted, and from which the beneficiary has received prenatal care, or a hospital-based outpatient birthing room.

      (c)   Outpatient cost-share formula applies to maternity care which terminates in a planned childbirth at home.

      (d)   Otherwise covered medical services and supplies directly related to "Complications of pregnancy", as defined in the Regulation, will be cost-shared on the same basis as the related maternity care for a period not to exceed 42 days following termination of the pregnancy and thereafter cost-shared on the basis of the inpatient or

outpatient status of the beneficiary when medically necessary services and supplies are received.

(2)    Otherwise authorized services and supplies related to maternity care, including maternity related prescription drugs, shall be cost-shared on the same basis as the termination of pregnancy.

(3)    Claims for <u>pregnancy testing</u> are cost-shared on an outpatient basis when the delivery is on an inpatient basis.

(4)    Where the beneficiary delivers in a <u>professional office birthing suite</u> located in the office of a physician or certified nurse-midwife (which is not otherwise a TRICARE-approved birthing center) the delivery is to be adjudicated as an at-home birth.

(5)    Claims for <u>prescription drugs</u> provided on an outpatient basis during the maternity episode but not directly related to the maternity care are cost-shared on an outpatient basis.

(6)    Newborn cost-share. Effective for all inpatient admissions occurring on or after October 1, 1987, separate claims must be submitted for the mother and newborn. The cost-share for inpatient claims for services rendered to an beneficiary newborn is determined as follows:

(a)    IN A DRG HOSPITAL:

<u>1</u>    Same newborn date of birth and date of admission.

<u>2</u>    For ADFMs, there will be no cost-share during the period the newborn is deemed enrolled in Prime.

<u>3</u>    For newborn family members of other than active duty members, unless the newborn is deemed enrolled in Prime, the cost-share will be the lower of the number of hospital days minus three (3) multiplied by the per diem amount, OR 25% of the total billed charges (less duplicates and DRG non-reimbursables such as hospital-based professional charges).

<u>4</u>    Different newborn date of birth and date of admission. For family members of active duty members, there will be no cost-share during the period the newborn is deemed enrolled in Prime. For all other beneficiaries, the cost-share is applied to all days in the inpatient stay unless the newborn is deemed enrolled in Prime.

(b)    IN DRG EXEMPT HOSPITAL:

<u>1</u>    Same newborn date of birth and date of admission.

<u>2</u>    For ADFMs, there will be no cost-share during the period the newborn is deemed enrolled in Prime.

<u>3</u>   For family members of other than active duty members, the cost-share will be calculated based on 25% of the total allowed charges unless the newborn is deemed enrolled in Prime.

<u>4</u>   Different newborn date of birth and date of admission.

<u>5</u>   For ADFMs, there will be no cost-share during the period the newborn is deemed enrolled in Prime.

<u>6</u>   For family members of other than active duty members, the cost-share will be calculated based on 25% of the total allowed charges unless the newborn is deemed enrolled in Prime.

(7)   Maternity Related Care. Medically necessary treatment rendered to a pregnant woman for a non-obstetrical medical, anatomical, or physiological illness or condition shall be cost-shared as a part of the maternity episode when:

(a)   The treatment is otherwise allowable as a benefit, and,

(b)   Delay of the treatment until after the conclusion of the pregnancy is medically contraindicated, and,

(c)   The illness or condition is, or increases the likelihood of, a threat to the life of the mother, or,

(d)   The illness or condition will cause, or increase the likelihood of, a stillbirth or newborn injury or illness, or,

(e)   The usual course of treatment must be altered or modified to minimize a defined risk of newborn injury or illness.

d.   Cost-Shares: DRG-Based Payment System.

(1)   <u>General</u>. These special cost-sharing procedures apply only to claims paid under the DRG-based payment system.

(2)   <u>TRICARE Standard</u>.

(a)   Cost-shares for ADFMs.

<u>1</u>   Except in the case of mental health services, ADFMs or their sponsors are responsible for the payment of the first $25 of the allowable institutional costs incurred with each covered inpatient admission to a hospital or other authorized institutional provider, or the amount the beneficiary or sponsor would have been charged had the inpatient care been provided in a Uniformed Service hospital, whichever is greater.

<u>2</u>   Effective for care on or after October 1, 1995, the inpatient cost-sharing for mental health services is $20 per day for each day of the inpatient admission.

(b)    Cost-shares for beneficiaries other than ADFMs.

1    The cost-share will be the lesser of:

a    An amount based on a single, specific per diem amount which will not vary regardless of the DRG involved. The following is the DRG inpatient TRICARE Standard cost-sharing per diems for beneficiaries other than ADFMs.

For FY 2005, the daily rate is $512.

For FY 2006, the daily rate is $535.

For FY 2007, the daily rate is capped at the FY 2006 level of $535, per Section 704 of NDAA FY 2007.

(1)    The per diem amount will be calculated as follows:

(a)    Determine the total allowable DRG-based amounts for services subject to the DRG-based payment system and for beneficiaries other than ADFMs during the same database period used for determining the DRG weights and rates.

(b)    Add in the allowance for capital and direct medical education which have been paid to hospitals during the same database period used for determining the DRG weights and rates.

(c)    Divide this amount by the total number of patient days for these beneficiaries. This amount will be the average cost per day for these beneficiaries.

(d)    Multiply this amount by 0.25. In this way total cost-sharing amounts will continue to be 25% of the allowable amount.

(e)    Determine any cost-sharing amounts which exceed 25% of the billed charge (see paragraph I.C.3.d.(2)(b)1b below) and divide this amount by the total number of patient days in paragraph I.C.3.d.(2)(b)1a above). Add this amount to the amount in paragraph I.C.3.d.(2)(b)1a above. This is the per diem cost-share to be used for these beneficiaries.

(2)    The per diem amount will be required for each actual day of the beneficiary's hospital stay which the DRG-based payment covers except for the day of discharge. When the payment ends on a specific day because eligibility ends on either a long-stay or short-stay outlier day, the last day of eligibility is to be counted for determining the per diem cost-sharing amount. For claims involving a same-day discharge which qualify as an inpatient stay (e.g., the patient was admitted with the expectation of a stay of several days, but died the same day) the cost-share is to be based on a one-day stay. (The number of hospital days must contain one day in this situation.) Where long-stay outlier days are subsequently determined to be not medically necessary by a PRO, no cost-share will be

required for those days, since payment for such days will be the beneficiary's responsibility entirely.

<u>b</u>   Twenty-five percent (25%) of the billed charge. The billed charge to be used includes <u>all</u> inpatient institutional line items billed by the hospital minus any duplicate charges and any charges which can be billed separately (e.g., hospital-based professional services, outpatient services, etc.). The net billed charges for the cost-share computation include comfort and convenience items.

<u>2</u>   Under no circumstances can the cost-share exceed the DRG-based amount.

<u>3</u>   Where the dates of service span different fiscal years, the per diem cost-share amount for each year is to be applied to the appropriate days of the stay.

(3)   <u>TRICARE Extra</u>.

(a)   Cost-shares for ADFMs. The cost-sharing provisions for ADFMs are the same as those for TRICARE Standard.

(b)   Cost-shares for beneficiaries other than ADFMs. The cost-sharing provisions for beneficiaries other than ADFMs is the same as those for TRICARE Standard, except the per diem copayment is $250.

(4)   <u>TRICARE Prime</u>. Cost-shares for ADFMs. The cost-sharing provision for ADFMs is the first $25 of the allowable institutional costs incurred with each covered inpatient admission to a hospital or other authorized institutional provider, or a per diem rate of $11, whichever is greater. For care provided on or after April 1, 2001, for Prime ADFMs, cost-share is $0. See attached Table 1 of this Policy for further information.

(5)   <u>Maternity Services</u>. See paragraph I.C.3.c., above, for the cost-sharing provisions for maternity services.

e.   Cost-Shares: Inpatient Mental Health Per Diem Payment System.

(1)   General. These special cost-sharing procedures apply only to claims paid under the inpatient mental health per diem payment system. For inpatient claims exempt from this system, the procedures in paragraph I.C.3.b. or paragraph I.C.3.d. are to be followed.

(2)   Cost-shares for ADFMs. Effective for care on or after October 1, 1995 and care on or prior to March 31, 2001, the inpatient cost-sharing for mental health services is $20 per day for each day of the inpatient admission. This $20 per day cost-sharing amount applies to admissions to any hospital for mental health services, any residential treatment facility, any substance use disorder rehabilitation facility, and any partial hospitalization program providing mental health or substance use disorder rehabilitation services. For Prime ADFMs care provided on or after April 1, 2001, cost-share is $0 per day. See Table 1 of this Policy for further information.

(3)    Cost-shares for beneficiaries other than ADFMs.

(a)    Higher volume hospitals and units. With respect to care paid for on the basis of a hospital specific per diem, the cost-share shall be 25% of the hospital specific per diem amount.

(b)    Lower volume hospitals and units. For care paid for on the basis of a regional per diem, the cost-share shall be the lower of paragraph I.C.3.e.(3)(b)1 or paragraph I.C.3.e.(3)(b)2 below:

1    A fixed daily amount multiplied by the number of covered days. The fixed daily amount shall be 25% of the per diem adjusted so that total beneficiary cost-shares will equal 25% of total payments under the inpatient mental health per diem payment system. This fixed daily amount shall be updated annually and published in the Federal Register along with the per diems published pursuant to Chapter 7, Section 1. This fixed daily amount will also be furnished to contractors by TMA. The following fixed daily amounts are effective for services rendered on or after October 1 of each fiscal year.

a    Fiscal Year 1997 - $137 per day.

b    Fiscal Year 1998 - $137 per day.

c    Fiscal Year 1999 - $140 per day.

d    Fiscal Year 2000 - $144 per day.

e    Fiscal Year 2001 - $149 per day.

f    Fiscal Year 2002 - $154 per day.

g    Fiscal Year 2003 - $159 per day.

h    Fiscal Year 2004 - $164 per day.

i    Fiscal Year 2005 - $169 per day.

j    Fiscal Year 2006 - $175 per day.

k    Fiscal Year 2007 - $181 per day.

2    Twenty-five percent (25%) of the hospital's billed charges (less any duplicates).

(4)    Claim which spans a period in which two separate per diems exist. A claim subject to the Inpatient Mental Health Per Diem Payment System which spans a period in which two separate per diems exist shall have the cost-share computed on the actual per diem in effect for each day of care.

(5)    Cost-share whenever leave days are involved. There is no patient cost-share for leave days when such days are included in a hospital stay.

(6)    Claims for services that are provided during an inpatient admission which are not included in the per diem rate are to be cost-shared as an inpatient claim if the contractor cannot determine where the service was rendered and the status of the patient when the service was provided. The contractor would need to examine the claim for place of service and type of service to determine if the care was rendered in the hospital while the beneficiary was an inpatient of the hospital. This would include non-mental health claims and mental health claims submitted by individual professional providers rendering medically necessary services during the inpatient admission.

    f.    Cost-Shares: Partial Hospitalization.

Cost-sharing for partial hospitalization is on an inpatient basis. The inpatient cost-share also applies to the associated psychotherapy billed separately by the individual professional provider. These providers will have to identify on the claim form that the psychotherapy is related to a partial hospitalization stay so the proper inpatient cost-sharing can be applied. Effective for care on or after October 1, 1995 and on or prior to March 31, 2001, the cost-share for ADFMs for inpatient mental health services is $20 per day for each day of the inpatient admission. For care provided on or after April 1, 2001, the cost-share for ADFMs enrolled in Prime for inpatient mental health services is $0. For retirees and their family members, the cost-share is 25% of the allowed amount. Since inpatient cost-sharing is being applied, no deductible is to be taken for partial hospitalization regardless of sponsor status. The cost-share for ADFMs is to be taken from the partial hospitalization program claim.

    g.    Cost-Shares: Ambulatory Surgery.

For the basis of payment of ambulatory surgery, see Chapter 9, Section 1.

(1)    ADFMs or Authorized NATO Beneficiary. For all services reimbursed as ambulatory surgery, the cost-share will be $25 and will be assessed on the facility claim. No cost-share is to be deducted from a claim for professional services related to ambulatory surgery. This applies whether the services are provided in a freestanding ambulatory surgery center, a hospital outpatient department or a hospital emergency room. So long as at least one procedure on the claim is reimbursed as ambulatory surgery, the claim is to be cost-shared as ambulatory surgery as required by this section— that is, a $25 cost-share is to be assessed to the claim for the facility charges, and no cost-share is to be taken from any claim for related professional services.

(2)    Other Beneficiaries. Since the cost-share for other beneficiaries is based on a percentage rather than a set amount, it is to be taken from all ambulatory surgery claims. For professional services, the cost-share is 25% of the allowed amount. For the facility claim, the cost-share is the lesser of:

(a)    Twenty-five percent (25%) of the applicable group payment rate (see Chapter 9, Section 1); or

(b)    Twenty-five percent (25%) of the billed charges; or

(c)    Twenty-five percent (25%) of the allowed amount as determined by the contractor.

(d)    The special cost-sharing provisions for beneficiaries other than ADFMs will ensure that these beneficiaries are not disadvantaged by these procedures. In most cases, 25% of the group payment rate will be less, but because there is some variation within each group, 25% of billed charges could be less in some cases. This will ensure that the beneficiaries get the benefit of the group payment rates when they are more advantageous, but they will never be disadvantaged by them. If there is no group payment rate for a procedure, the cost-share will simply be 25% of the allowed amount.

h.    Cost-Shares and Deductible: Former Spouses.

(1)    Deductible. In accordance with the FY 1991 Appropriations and Authorization Acts, Sections 8064 and 712 respectively, beginning April 1, 1991, an eligible former spouse is responsible for payment of the first one hundred and fifty dollars ($150.00) of the reasonable costs/charges for otherwise covered outpatient services and/or supplies provided in any one fiscal year. Although the law defines former spouses as family members of the member or former member, there is no legal familial relationship between the former spouse and the member or former member. Moreover, any TRICARE-eligible children of the former spouse will be included in the member's or former member's family deductible. Therefore, the former spouse cannot contribute to, nor benefit from, any family deductible of the member or former member to whom the former spouse was married or of that of any TRICARE-eligible children. In other words, a former spouse must independently meet the $150.00 deductible in any fiscal year.

(2)    Cost-Share. An eligible former spouse is responsible for payment of cost-sharing amounts identical to those required for beneficiaries other than ADFMs.

i.    Cost-Share Amount: Under Discounted Rate Agreements. Under managed care, where there is a negotiated (discounted) rate agreed to by the network provider, the cost-share shall be based on the following:

(1)    For noninstitutional providers providing outpatient care, and for institution-based professional providers rendering both inpatient and outpatient care; the cost-share (20%) for outpatient care to ADFMs, (25%) for care to all others) shall be applied to, (after duplicates and noncovered charges are eliminated), the lowest of the billed charge, the prevailing charge, the maximum allowable prevailing charge (the Medicare Economic Index (MEI) adjusted prevailing), or the negotiated (discounted) charge.

(2)    For institutional providers subject to the DRG-based reimbursement methodology, the cost-share for beneficiaries other than ADFMs shall be the LOWER OF EITHER:

(a)    The single, specific per diem supplied by TMA after the application of the agreed upon discount rate; OR,

(b)   Twenty-five percent (25%) of the billed charge.

(3)   For institutional providers subject to the Mental Health Per Diem Payment System (high volume hospitals and units), the cost-share for beneficiaries other than ADFMs shall be 25% of the hospital per diem amount after it has been adjusted by the discount.

(4)   For institutional providers subject to the Mental Health per diem payment system (low volume hospitals and units), the cost-share for beneficiaries other than ADFMs shall be the LOWER OF EITHER:

(a)   The fixed daily amount supplied by TMA after the application of the agreed upon discount rate; OR,

(b)   Twenty-five percent (25%) of the billed charge.

(5)   For Residential Treatment Centers, the cost-share for other than ADFMs shall be 25% of the TRICARE rate after it has been adjusted by the discount.

(6)   For institutions and for institutional services being reimbursed on the basis of the TRICARE-determined reasonable costs, the cost-share for beneficiaries other than ADFMs shall be 25% of the allowable billed charges **after** it has been adjusted by the discount.

NOTE:   For all inpatient care for ADFMs, the cost-share shall continue to be either the daily charge or $25 per stay, whichever is higher. There is no change to the requirement for the ADFM's cost-share to be applied to the institutional charges for inpatient services. If the contractor learns that the participating provider has billed a beneficiary for a greater cost-share amount, based on the provider's usual billed charges, the contractor shall notify the provider that such an action is a violation of the provider's signed agreement. (Also see paragraph I.C.3.d., above.) For Prime ADFMs, the cost-share is $0 for care provided on or after April 1, 2001.

D.   TRICARE Extra.

1.   For Extra deductibles and cost-shares, see Chapter 2, Addendum A.

2.   If non-enrolled TRICARE beneficiary receives care from a network provider out of the region of residence, and if the beneficiary has not met the Fiscal Year Catastrophic Cap, the beneficiary shall pay the Extra cost-share to the provider. The contractor for the beneficiary's residence shall process the claim under TRICARE Extra claims processing procedures if the TRICARE Encounter Provider Record (TEPRV) shows the provider to be contracted.

E.   Cost-Shares: Ambulance Services.

For the basis of payment of ambulance services, see Chapter 1, Section 14.

1.  Outpatient. The following are beneficiary copayment/cost-sharing requirements for medically necessary ambulance services when paid on an outpatient basis:

  a.  TRICARE Prime:

    (1)  For care provided prior to April 1, 2001, for ADFMs in pay grades E-1 through E-4, $10. For care provided on or after April 1, 2001, for ADFMs in pay grades E-1 through E-4, $0. See Chapter 2, Addendum A for further information.

    (2)  For care provided prior to April 1, 2001, for ADFMs in pay grades E-5 and above, $15. For care provided on or after April 1, 2001, for ADFMs in pay grades E-5 and above, $0. See Chapter 2, Addendum A for further information.

    (3)  For retirees and their family members, $20.

  b.  TRICARE Extra:

    (1)  A cost-share of 15% of the fee negotiated by the contractor for ADFMs.

    (2)  A cost-share of 20% of the fee negotiated by the contractor for retirees, their family members, and survivors.

  c.  TRICARE Standard:

    (1)  A cost-share of 20% of the allowable charge for ADFMs.

    (2)  A cost-share of 25% of the allowable charge for retirees, their family members, and survivors.

2.  Inpatient: Non-Network Providers:

  a.  ADFMs: No cost-share is taken for ambulance services (transfers) rendered in conjunction with an inpatient stay.

  b.  Other Beneficiary: The cost-share applicable to inpatient care for beneficiaries other than ADFMs is 25% of the allowable amount.

F.  Exceptions.

1.  Inpatient cost-share applicable to each separate admission. A separate cost-share amount is applicable to each separate beneficiary for each inpatient admission EXCEPT:

  a.  Any admission which is not more than sixty (60) days from the date of the last inpatient discharge shall be treated as one (1) inpatient confinement with the last admission for cost-share amount determination.

  b.  Certain heart and lung hospitals are excepted from cost-share requirements. See Chapter 1, Section 28, entitled "Legal Obligation To Pay".

2.   Inpatient Cost-Share: Maternity care. See paragraph I.C.3.c. All admissions related to a single maternity episode shall be considered one (1) confinement regardless of the number of days between admissions. For ADFMs, the cost-share will be applied to the first institutional claim received.

3.   Special Cost-Share Provisions. Effective October 1, 1987, the inpatient cost-share amount from DRG-exempt institutional provider claims in the following categories cannot exceed that which would have been imposed if the service were subject to the DRG-based payment system. This will not affect ADFMs. For all other beneficiaries, the cost-share shall be the lesser of (1) that calculated according to paragraph I.C.3.b.(2), above, or (2) that calculated according to paragraph I.C.3.d.(2), above.

a.   Child bone marrow transplant. All services related to discharges involving bone marrow transplant for a beneficiary less than 18 years old with ICD-9-CM principal or secondary diagnosis code V42.8 and ICD-9 procedure codes 41.0 through 41.04, 41.06, and 41.91.

b.   Child HIV Seropositivity. All services related to discharges involving HIV seropositive beneficiary less than 18 years old with ICD-9-CM principal or secondary diagnosis codes 042, 079.53 and 795.71.

c.   Child Cystic Fibrosis. All services related to discharges involving beneficiary less than 18 years old with ICD-9-CM principle or secondary diagnosis code 277.0 (cystic fibrosis).

4.   Cost-Sharing for Family Members of a Member who Dies While on Active Duty. Those in Transitional Survivor status, are not distinguished from other ADFMs for cost-sharing purposes. After the Transitional Survivor status ends, eligible TRICARE beneficiaries may be placed in Survivor status and will be responsible for retiree cost-shares. See the Transitional Survivor Status policy in Chapter 10, Section 7.1.

G.   Catastrophic Loss Protection.

See Chapter 2, Section 2.

- END -

| **SOLICITATION, OFFER AND AWARD** | 1. This Contract is a Rated Order Under DPAS (15 CFR 350) | Rating C9E | Page 1 | of pages 95 |
|---|---|---|---|---|

| 2. Contract No. | 3. Solicitation No. MDA906-02-R-0006 | 4. Solicitation Type ☐ Sealed Bid (IFB) ☒ Negotiated (RFP) | 5. Date Issued 1 August 2002 | 6. Requisition/Purchase No. 3PR0002 |
|---|---|---|---|---|

| 7. Issued By                    Code CMAQ | 8. Address Offer To (If other than item 7)          Code |
|---|---|
| DEPARTMENT OF DEFENSE<br>TRICARE MANAGEMENT ACTIVITY (CMAQ)<br>16401 E. CENTRETECH PARKWAY<br>AURORA, CO  80011-9043 | |

NOTE:  In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".

## SOLICITATION

9.  Sealed offers in original and 1 copies for furnishing the supplies or services in the Schedule will be received at the place specified in Item 8, or if handcarried, in the depository located in TMA mailroom, 16401 E. Centretech Parkway until 1400 hours local time 1 November 2002.

CAUTION – LATE Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-1.  All offers are subject to all terms and conditions contained in this solicitation.

| 10. For Information Call: | A. Name ANGIE FIGUEROA | B. Telephone No. (include area code) (NO COLLECT CALLS) 303-676-3626 |
|---|---|---|

### 11. TABLE OF CONTENTS

| (x) | Sec | Description | Page(s) | (x) | Sec | Description | Page(s) |
|---|---|---|---|---|---|---|---|
| **Part I – The Schedule** | | | | **Part II – Contract Clauses** | | | |
| X | A | Solicitation/Contract Form | 1 | X | I | Contract Clauses | 60-71 |
| X | B | Supplies or Services and Prices/Costs | 2-22 | **Part III – List of Documents, Exhibits and Other Attachments** | | | |
| X | C | Description/Specs./Work Statement | 23-33 | X | J | List of Attachments | 72 |
| X | D | Packaging and Marking | 34 | **Part IV – Representations and Instructions** | | | |
| X | E | Inspection and Acceptance | 35 | X | K | Representations, Certifications and Other Statements of Offerors | 73-78 |
| X | F | Deliveries or Performance | 36-40 | | | | |
| X | G | Contract Administration Data | 41-44 | X | L | Instr., Conds., and Notices to Offerors | 79-91 |
| X | H | Special Contract Requirements | 45-59 | X | M | Evaluation Factors for Award | 92-95 |

## OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12.  In compliance with the above, the undersigned agrees, if this offer is accepted within _____ calendar days (60 calendar days unless a different period is inserted by the offeror) from the data for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s) within the time specified in the schedule.

| 13. Discount for Prompt Payment (See Section I, Clause No. 52.232-8) | 10 Calendar Days          % | 20 Calendar Days          % | 30 Calendar Days          % | Calendar Days          % |
|---|---|---|---|---|

| 14.  Acknowledgment of Amendments<br>*The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated.* | Amendment No. | Date | Amendment No. | Date |
|---|---|---|---|---|
| | | | | |
| | | | | |

| 15A. Name and Address of Offeror | Code | | Facility | | 16.  Name and Title of Person Authorized to Sign Offer (Type or print) |
|---|---|---|---|---|---|

| 15B. Telephone No. (include area code) | 15C.  Check if Remittance Address is different from above. Enter such address in Schedule. | 17. Signature | 18. Offer Date |
|---|---|---|---|

## AWARD (To be completed by Government)

| 19.  Accepted as to Items Numbered | 20.  Amount | 21.  Accounting and Appropriation |
|---|---|---|

| 22.  Authority for Using Other Than Full and Open Competition:<br>☐ 10 U.S.C. 2304 (c)(    )    ☐ 41 U.S.C. 253 (c)(    ) | 23.   Submit Invoices to Address Shown in (4 copies unless otherwise specified) | Item |
|---|---|---|

| 24.  Administered By (If other than Item 7)          Code | Payment Will be Made By          Code |
|---|---|

| 26.  Name of Contracting Officer (Type or print) | 27.  United States of America (Signature of Contracting Officer) | 28.  Award Date |
|---|---|---|

IMPORTANT – Award will be made on this form, or on Standard Form 26, or by other authorized official written notice.

| NSN 7540-01-152-8064<br>PREVIOUS EDITION NOT USABLE | 33-134 | STANDARD FORM 33   (Rev. 4-85)<br>Prescribed by GSA – FAR (48 CFR) 52.214 (c) |
|---|---|---|

C18

SECTION G
CONTRACT ADMINISTRATION DATA


**G-1. Contract Administration**

The Procuring Contracting Officer (PCO) for this contract is:

Contracting Officer
Office of the Assistant Secretary of Defense for Health Affairs
TRICARE Management Activity
Contract Management Division
16401 East Centretech Parkway
Aurora, CO 80011-9066

**G-2. Administrative Contracting Officer (ACO), Contracting Officer's Representative (COR), and Alternate Contracting Officer's Representative (ACOR)**

Subsequent to contract award, the PCO will appoint one or more ACOs, one or more CORs, and one or more ACORs under the Regional Director's offices who will be designated certain contract administration responsibilities in that region. The contractor shall work directly with the ACO(s), COR(s), and ACOR(s) on those matters delegated to them. The ultimate responsibility for overall administration of this contract rests with the PCO, TRICARE Management Activity, Aurora, Colorado. The contractor will be provided copies of all delegation letters.

**G-3. Contract Payment**

a. Contract Payments Disbursed by TMA Aurora

(1) General

(a) The basis for payment to the contractor shall be the prices specified in Section B of this contract.

(b) Methods of Payment to the Contractor

[1] All payments made by the Government will be made by electronic funds transfer (EFT).

[2] Non-underwritten benefit payments will be facilitated by permitting the contractor to withdraw funds directly from the Federal Reserve. These draws must be based on approved contractor payments clearing the contractor's bank account (less related deposits) as described in Chapter 3 of the TRICARE Operations Manual (TOM).

[3] Payments made by a Military Treatment Facility (MTF)

(2) Invoices

(a) TEDs Supported Invoices. Submission of TEDs to TMA will be considered submittal of an invoice.

(b) Non-TEDs Supported Invoices

[1] Electronic invoices are the preferred method of submittal. The contractor can submit electronic invoices by accessing the TMA provided invoicing website. The TMA website will provide electronic forms (e.g. SF 1034 or DD 250) that can be completed and submitted on-line. Supporting documentation may be attached electronically.

[2] The contractor may also, in lieu of a Government form, submit invoices on its own commercially used format.

(3) Payments

(a) Interim payments for cost reimbursement contract line item number(s) (CLINs) (Underwritten Health Care and Case Management/Disease Management) are subject to interest penalties for late payment. Other interim payments, i.e. interim payments for non-cost reimbursement CLINs are not subject to interest penalties for late payment. Reference is made to Section I, FAR Clause 52.216-7, Allowable Health Care Cost and Payment (FEB 2002)(DEVIATION), specifically paragraph (a)(2), and FAR Clause 52.232-25, Prompt Payment (FEB 2002), Alternate I (FEB 2002).

MDA906-02-R-0006

C19

SECTION G
CONTRACT ADMINISTRATION DATA

(b) Claims Processing CLINs – Electronic Claims and Paper Claims  (see TOM Chapter 3, Section 9)

[1] Claims rate processing payments are based on TEDs being accepted provisionally or clearing all edits, whichever comes first. These are identified in the TEDs manual.

[2] Payment terms. Claims processing payments are paid 30 days from the date of the cycle that included the accepted or cleared TEDs. If cycle processing is delayed by TMA, this period will be shortened to account for TMA downtime.

[3] No separate invoices are required for claims processing payments based on the automated processes tied to claims clearing TEDs edits. However, invoices are required for non-automated payment requests, unless otherwise instructed by the Contracting Officer.

[4] Claims processing payments procedures are the same for both underwritten and non-underwritten benefit claims

(c) TRICARE Service Centers (TSCs). Invoice on a monthly basis. The contractor shall submit an invoice only after completion of a particular month. Payment terms: Net 30.

(d) Per Member Per Month (PMPM). Invoice on a monthly basis. The contractor shall submit an invoice only after completion of a particular month. Payment terms: Net 30.

(e) Case Management/Disease Management – Cost. Interim invoices may be submitted monthly. Final invoice may be submitted following determination of final cost. Terms: Net 30. Payments under this process are considered to be interim payments. See paragraph A.2.a above.

(f) Case Management/Disease Management – Fixed Fee. Submit invoice on a monthly basis. Terms: Net 30.

(g) Award Fee. Payment will be made by TMA following determination of the Award Fee amount as specified in the corresponding clause in Section H.

(h) Contracting Officer Directed Travel. Submit invoice, with supporting documentation, following completion of travel. Payment terms: Net 30.

(i) Transition-In. Submit invoices on a monthly basis. Payment terms: Net 30.

(j) Transition-Out. Submit invoice following completion of work. Payment terms: Net 30.

(k) Contract modifications, including change orders. As specified within each modification or change order.

(l) Underwritten Health Care Costs

[1] General Description. Payment of underwritten health care cost claims will be made to the Contractor after the associated TEDS records clear all edits. Payment Terms: Net 3 (following clearing all edits)

[2] Payment under this process are considered interim payments.

[3] The contractor will process underwritten health care claims and pay the provider or beneficiary from the contractor's account.

[4] The associated underwritten health care cost TEDS will be submitted to TMA and will be considered submittal of an invoice. If some or all of the TEDS fail edits, they will be returned to the contractor for corrective action. If they pass edits, an automated report will be generated.

[5] TMA will disburse payment to the contractor based on the automated TED report from (4) above. If the TEDS are credits which will result in a payment to the Government, collection will be made from the next payment to the contractor.

[6] Submission of TEDS will be considered submission of an invoice.

(m) Non-Underwritten Benefits

MDA906-02-R-0006

C20

SECTION G
CONTRACT ADMINISTRATION DATA

[1] General Description. Payment to the contractor for benefit payments will be facilitated by allowing the contractor (through the contractor's financial institution) to draw money from the designated Federal Reserve Bank. These draws may only be done to cover payments that have been approved for release by TMA and are clearing the contractor's financial institution on the day the draw is being accomplished. These draws must be reduced by deposits so the bank account will have close to a zero dollar balance at the end of each day.

[2] The contractor shall comply with the detailed instructions for these transactions outlined in the TOM, Chapter 3.

[3] Types of Non-Underwritten Benefits

(i) TEDs Related Benefit Payments. These are payments to a provider or beneficiary supported by a TEDs submission to TMA. See TOM Chapter 3, Section 3.

(ii) CAP/DME and other Non-TEDs Routine Payments. These are payments that cannot be supported by TEDs because they are based on more than one patient. See TOM Chapter 3, Section 4.

(iii) Non-Routine Payments and Vouchers. These are payments that are rare, unusual and will only be approved by the Contracting Officer due to exceptional circumstances. These are transactions that must be done manually. If a transaction can be done through TEDs or other standard procedures they must be done by those procedures – see TOM Chapter 3, Section 5.

(n) Resource Sharing. Invoicing and payment details to be specified within each resource sharing delivery order.

(o) Benefit Payments – Special Circumstances.

Residual Claims. Claims for service provided prior to the start of the contract will be paid as described in this section.

(p) Partial and Interim Underwriting Fee Payments

[1] Partial underwriting fee payments will be determined and paid in accordance with Section H provisions.

[2] Interim underwriting fee payments will be determined and paid in accordance with Section H provisions.

[3] Final fee will be determined and paid in accordance with Section H provisions.

(q) Performance Guarantees. Collections will be made by witholding from the next payment to the contractor.

b. Contract Payments Disbursed by a Military Treatment Facility (MTF) Through the Defense Finance and Accounting Services (DFAS)

(1) This section covers civilian sector claims for both revised financing - MTF Prime enrollees and also Active Duty supplemental care. These procedures must be followed by the contractor in order to ensure timely payments for all health care provided to MTF TRICARE Prime enrollees (Active Duty, Active Duty Dependent, Non-Active Duty Dependent) in the civilian sector.

(a) The contractor will submit TEDs to TMA.

(b) TMA will return to the Contractor rejected TEDS.

(c) The contractor may submit to the appropriate MTF a monthly cosolidated invoice of passed (i.e. non-rejected) TED records. TMA reporting will provide the regular daily postings of data by DMIS ID and from these postings the appropriate MTF can check against a contractor invoice. The MTF can then approve the invoice for payment and forward to DFAS for payment.

(d) TMA data available to the MTF will break out underwritten health care and Active Duty supplemental care.

(2) Other Information.

MDA906-02-R-0006

C21

SECTION G
CONTRACT ADMINISTRATION DATA

(a) The Contractor will pay claims from its own accounts. The contractor will not disburse payments from the not-at-risk bank accounts.

(b) Claims will be processed per applicable TMA procedures considering status of the enrollee.

(c) TEDs will be process for these claims and submitted to TMA.

(d) TMA does not have the authority to collect from the contractor for payments that are due directly to an MTF or to collect recoupments for overpayments made by an MTF.

(3) Regional Administrative Contracting Officer (ACO) Modifications. Contract modifications issued by Regional ACO's will specify the paying office and invoice submittal instructions.

## G-4. ORDERING ACTIVITY

The following describes the ordering authority and procedures for the requirements contract line item numbers (CLINs) of this contract, which are the Per Member Per Month and the Claims processing CLINs.

Ordering Authority. The TMA-Aurora Procuring Contracting Officer (PCO) has authority to issue delivery orders or task orders under the requirements CLINs of this contract.

Ordering Procedures. The PCO will issue delivery orders or task orders on DD Form 1155, Order for Supplies or Services. Orders may be placed by facsimile transmission, mail , or courier.

## G-5. MILITARY HEALTH SYSTEM (MHS) ELIGIBLE BENEFICIARIES

The Government will unilaterally determine the number of MHS eligible beneficiaries two times each option period under the Per Member Per Month contract line item numbers, once for the first six month period and once for the seventh through twelfth month. This will be done using an average of six of the seven previous months of eligible beneficiaries as reported by the Defense Manpower Data Center (DMDC) in their monthly "STAT II REPORT." Using the number of MHS eligible beneficiaries, the Government will issue a delivery order for a six month period.

SECTION H
SPECIAL CONTRACT REQUIREMENTS

**H-1. Contractor Financial Underwriting of Healthcare Costs**

a. General Discussion

(1) The Managed Care Support (MCS) contractor will underwrite the cost of civilian health care services (also referred to as "purchased care" which is defined as care rendered outside the Direct Care System) provided to all CHAMPUS-eligible beneficiaries* residing in the contract region except:

-- outpatient retail and mail order pharmacy services (on separate contracts)
-- Active Duty/Supplemental including TRICARE Prime Remote for service members (SM) only (family members (FMs) are underwritten by the MCS contractor)
-- Continued Health Care Benefits Program (CHCBP)
-- Foreign/OCONUS Claims (all)
-- Medicare dual-eligible TRICARE beneficiaries (separate contract)
-- Cancer/Clinical Trials

*CHAMPUS-eligible beneficiaries are defined as those beneficiaries that meet the requirements in Title 10, United States Code, Chapter 55.

(2) The underwriting mechanism will consist of an underwriting fee which may be considered to be an underwriting premium associated with the risk assumed by the contractor. It will be subject to a fee-adjustment formula or "fee curve," which allows for increases or decreases inversely related to the actual costs. There is potential for the contractor to earn a negative fee if the actual healthcare costs for a given contract year were significantly higher than a specified target cost for that year. The adjustment mechanism is described in the subsequent paragraphs.

b. Administration of Financial Underwriting by Contractor

(1) This paragraph defines and explains the mechanics and the administration process of the following:

-- target healthcare cost
-- target underwriting fee
-- minimum and maximum fee
-- formula to determine the underwriting fee within the minimum and maximum based on the relationship of actual costs to target costs (a "fee curve")
-- actual healthcare costs

Each of these parameters is explained below.

(2) Target health care cost. The target health care cost for each period of health care delivery will be set as follows:

(a) The target cost for health care delivery in option period I under the contract is set forth in Section B. This target cost includes the purchased-care costs for non-TRICARE/Medicare dual-eligible CHAMPUS beneficiaries residing in the region, whether they are enrolled with an MTF PCM, a network PCM, or are non-enrolled. The target cost will not change except for definitized healthcare changes or other equitable adjustment.

(b) For option period II and subsequent periods, the Government and the contractor will negotiate the target cost before the start of each option period and incorporate them in Section B of the contract. The negotiation process shall begin with the submission of a proposal by the contractor not later than the first day of the seventh month of option period one through four. Once the target cost for the next year is established, the only adjustments that would be made for that year would be for negotiated healthcare changes, definitized healthcare change orders, other equitable adjustment healthcare change orders issued after the completion of the negotiations that affect the year just negotiated. If an agreement cannot be reached on the target cost by 30 days before the start of the next option period, the option will be exercised using the prior option period's target cost as specified in Section B as the estimated target cost in Section B. A target-setting formula will be used to determine the target cost. This formula will set the target for the option period retroactively 12 to 18 months after that option period is completed. The contractor will continue to receive payments for underwritten health care costs as addressed in Section G, "Payments", and a portion of fee as addressed in Section H-2, "Partial Payment of Underwriting Fee During Performance".

MDA906-02-R-0006

C23

SECTION H
SPECIAL CONTRACT REQUIREMENTS

(c) The retroactive target cost is calculated as follows:
-- actual underwritten CHAMPUS health care costs in the region in the previous option period is multiplied by the national trend factor for underwritten CHAMPUS healthcare costs from the beginning of the previous year up to the end of that year.

(2) Target Underwriting Fee

The term, "target underwriting fee" is equivalent to target fee. The target underwriting fee for all option periods is established at contract award using the contractor's proposed dollar amount for the initial contract award as set forth in Section B. When the parties negotiate the target cost for option period II and/or subsequent periods, the parties will bilaterally change the target underwriting fee based on the negotiated target cost (multiply negotiated target cost of the option period by the fee percentage proposed for the initial contract award). If the parties do not negotiate the target cost for option period II and subsequent periods, the target underwriting fee defaults to the dollar amount initially established at contract award. The target underwriting fee is then only adjusted by negotiated healthcare changes, definitized healthcare change orders, or other equitable adjustments. The parties agree to utilize the same profit percentage proposed for the initial award in these negotiated adjustments.

(3) Minimum and Maximum Fee

The minimum and maximum are as follows:

(a) The minimum fee that may be realized by the contractor will be negative 4 percent of the target cost for each contract year

(b) The maximum fee that may be realized by the contractor will be 10 percent of the target cost for each contract year

(4) Fee Determination

The underwriting fee will be determined using the fee adjustment formula as follows:

(a) When underwritten actual costs are less than the target cost, the fee will be the lesser of two amounts: (1) the target fee plus 20% of the difference between the target cost and the actual cost, or (2) the maximum fee amount.

(b) When underwritten actual costs exceed the target, the fee will be the greater of two amounts: (1) the target fee plus 20% of the difference between the target cost and the actual cost (a negative number), or (2) the minimum fee amount (a negative number).

(c) Mathematically, this formula may be expressed as:
Target Fee + .20(Target Cost – Actual Cost)

The final determination of fee will occur approximately 12 to 18 months after the end of the contract year to which it applies. This final determination will be based on underwritten TEDs accepted by TMA through the ninth month after the end of the contract year. However, prior to the fee determination, the Government will determine an interim fee approximately three months after the end of the contract year to which it applies based on the available TED data and the Government's estimate to completion. Partial and final payment of the fee will be conducted in accordance with H-2 and H-3.

(5) Actual Underwritten Healthcare Costs.

Actual underwritten costs for fee determination purposes will be measured from TRICARE Encounter Data (TEDs) accepted by the Government, less unallowable costs determined by audits, and estimated to completion (by the Government). The actual costs will include resource-sharing costs and any other valid, underwritten health-care costs not reported on TEDs, but previously agreed upon by the Government. Healthcare cost details and clarifications include:

(a) Underwritten costs. The target and actual costs will both include all non-TRICARE/Medicare dual-eligible CHAMPUS eligible beneficiaries enrolled with MTF PCMs in addition to all network-enrolled and non-enrolled non-TRICARE/Medicare dual-eligible eligibles;

(b) Local Military Treatment Facilities (MTFs) will have control over the purchased-care dollars for all beneficiaries who enroll in TRICARE Prime with an MTF Primary Care Manager (PCM). These enrollees will include Active Duty

MDA906-02-R-0006

C24

SECTION H
SPECIAL CONTRACT REQUIREMENTS

Service Members (ADSMs) as well as CHAMPUS–eligible beneficiaries. Only those dollars expended for non-TRICARE/Medicare dual-eligible CHAMPUS beneficiaries will be accumulated as actual healthcare costs to be compared with the target cost for the period.

(c) Enrollment Fees. Enrollment fees collected by the contractor are considered part of the administrative price and are not considered in the determination of the target cost or the actual cost of healthcare under the contract

(d) Medical Management Costs. The costs of medical-management activities, such as case management, disease management, and utilization management are not considered as healthcare costs.

(e) Capitated Arrangements. Capitation arrangements are prohibited.

**H-2. Partial Payment of Underwriting Fee During Performance**

In addition to the requirements and procedures specified in this section regarding interim and final health care underwriting fee determination, the Government will make partial payments against the target fee as specified below.

a. During performance of each option period, the Government will pay the contractor, on a monthly pro-rated basis, an amount equal to 50% of the target fee.

b. Interim and final determination of fee for the base period and each subsequent option period will be in accordance with paragraphs H-1 and H-3.

**H-3. Interim Fee Determination**

a. If the interim fee calculation described in H-1 indicates that a positive fee will be earned upon final determination, the Government will pay the contractor an amount equal to 90% of the target fee for that period. This will be paid in a lump sum to the contractor; less any partial fee payments made for that period. The final balance for fee will be paid 12-18 months after the contract period in accordance with the final fee determination scheme.

b. If the interim fee calculation indicates that a negative fee will be earned upon final determination, no interim fee payments will be made. Final fee determination will be made in accordance with paragraph H-1.

**H-4. Resource Sharing**

a. Resource sharing is an alternative means of satisfying the purchased-care needs of non-TRICARE/Medicare dual-eligible CHAMPUS beneficiaries and is a tool that may be used by the Parties to reduce purchased-care and overall underwritten expenditures. All resource sharing agreements (See the TRICARE Operations Manual, Chapter 16) shall be cost effective to the Government and the contractor.

b. Any allowable resource-sharing expenditure will be reimbursed and will count as actual underwritten healthcare.

c. Although resource sharing is intended primarily to provide care to underwritten CHAMPUS-eligible beneficiaries, when a resource sharing asset provides care to non-underwritten beneficiaries, the costs of providing such care is counted as actual underwritten costs for fee determination, just like resource sharing expenditures for underwritten beneficiaries.
d. There will be no need to account for the number of Military Treatment Facility outpatient visits or admissions enabled by resource sharing for purposes of determining contract payments.

**H-5. Allowable Health Care Cost and Payment**

a. The purpose of this provision is to define reimbursable healthcare costs and to clarify how healthcare costs apply to FAR clause 52.216-7, "Allowable Cost and Payment". This provision does not apply to reimbursable costs associated with the case management/disease management administrative services contract line item number. This provision does not substitute any portion of, and does not make changes to FAR 52.216-7.

"Healthcare costs", as used in this provision, are direct healthcare costs that are underwritten by the contractor.

SECTION H
SPECIAL CONTRACT REQUIREMENTS

"Allowable cost", as used in this provision and FAR 52.216-7 are healthcare costs that pass the TEDS edits. These costs are reimbursed with obligated funds dispersed under this contract. A submission by the contractor to the TEDs system alone does not make it an allowable cost.

Non-underwritten "costs" are costs to the Government, and are not costs to the contractor. Non-underwritten "payments" are draws of funds directly from the Federal Reserve by the contractor. These draws are not considered payments to the contractor, and not considered a reimbursement of allowable healthcare costs from funds obligated on the contract.

b. A submission to TEDs as described in the TRICARE Operations Manual is considered an acceptable invoice or voucher required in accordance with FAR 52.216-7(a)(1).

c. Due to the nature of healthcare costs, the portions of FAR 52.216-7 that relate to materials, direct labor, direct travel, other direct costs, indirect costs, incidental expenses, and pension plan contributions are not applicable. As such, any portions of FAR 52.216-7 that relate to indirect cost rates and billing rates are not applicable.

d. In reference to FAR 52.216-7 (g), "audits", as used in this clause includes audits on statistically valid samples. The audit results will be applied to the entire universe from which the audit sample was drawn to determine total unallowable costs. Overpayments made by the contractor, whether found in an audited sample or audit results applied to the entire universe from which the sample was drawn, are unallowable costs. The Contracting Officer will notify the contractor of intent to disallow costs in accordance with FAR 52.242-1, Notice of Intent to Disallow Costs. Underpayments made by the contractor that are found in an audit are not used to offset overpayment adjustments.

e. In reference to FAR 52.216-7 (h)(2), the Contracting Officer will not approve contractor's expense to secure refunds, rebates, credits, or other amounts, as allowable costs.

## H-6. Evolving Practices, Devices, Medicines, Treatments and Procedures

a. Medical practices and procedures are expected to continue developing during the period of this contract. Some will increase and some will decrease the cost of medical care. These changes will include practices, devices, medicines, treatments and procedures that previously were excluded from the benefits as unproven. There shall be no change in the Target Cost or Target Fee as a result of changes in the approval status of drugs, devices, medical treatments and medical procedures. The contractor underwrites all costs of all drugs covered under this contract, devices, medical treatments or medical procedures that move from unproven to proven. Changes caused by changes in the statutory definitions of the benefit or new benefits added by statute will be implemented under the Changes clause.

b. TRICARE can only cover costs for medically necessary supplies and services. Regulatory procedures are in place at 32 C.F.R. 199.4(g)(15) that describe the procedure for evaluating the safety and efficacy of unproven drugs, devices, medical treatments, or medical procedures. The contractor shall be responsible for routinely reviewing the hierarchy of reliable evidence, as defined in 32 C.F.R. 199.2, and shall bring to the Government's attention drugs, devices, medical treatments, or medical procedures that they believe have moved from unproven to proven in a written report to the Government in accordance with F-5.

## H-7. Integrated Process Teams

The Government may develop major contract and program changes through Integrated Process Teams (IPTs). This provision describes the contractor's participation in this process. The contractor will provide the appropriate personnel (as agreed to by the Contracting Officer and the contractor) to serve on IPTs to develop and/or improve the technical, business, and implementation approach to any and all proposed TRICARE program contract changes within 14 calendar days after notification by the Contracting Officer. The contractor will participate in the entire process with the Government team from concept development through incorporating the change into the contract. This process includes developing budgetary cost estimates, requirement determination, developing rough order of magnitude cost estimates, preparing specifications/statements of work, and establishing a mutually agreeable equitable adjustment to the contract price as a result of incorporating the change (including pricing, negotiations, etc). IPTs will not be formed for all contract changes, but generally will be formed for complex, system-wide issues. The contractor shall participate in all required meetings as determined by the Government team leader, regardless of how they are held (in person, via teleconference, by video-teleconference, or through electronic conferences within the TMA web site). The frequency and scheduling will vary depending on the topic.

SECTION H
SPECIAL CONTRACT REQUIREMENTS

**H-8. Performance Guarantee**

a. The performance guarantee described in this provision is the contractor's guarantee that the contractor's performance will not be less than the performance standards described below. The rights of the Government and remedies described in the Performance Guarantee provision are in accordance with, and in addition to all other rights and remedies of the Government. Specifically, the Government reserves its rights and remedies set forth in the Inspection of Services clauses (FAR 52.246-4, 52.246-5) and the Default clauses (FAR 52.249-8, 52.249-6).

b. The contractor guarantees that performance will meet or exceed the standards in this provision. For each occurrence the contractor fails to meet each guaranteed standard, the Government will withhold from the contractor the amount listed in the schedule below. Performance guarantee withholds will continue until the guarantee amount for the respective option period is depleted or the contractor's performance improves to meet or exceed the standard. Performance will be measured as specified below. The contractor will be notified and withholds made on a quarterly basis. For the purposes of this provision, the term "performance standard" is defined as the contract standards that are restated in this provision.

c. Performance Guarantee Amounts:

Option Period I     $_____

Option Period II    $_____

Option Period III   $_____

Option Period IV    $_____

Option Period V     $_____

d. Telephone Service (Busy Signals)

Standard: Not less than 95% of all calls shall be received without the caller encountering a busy signal

A performance guarantee shall be applied as follows:

Based on the contractor's monthly report, the Government will withhold a performance guarantee amount of $0.50 per blocked call in excess of the standard (not less than 95% of all calls shall be received without the caller encountering a busy signal). For example, if 92% of calls are received but 8% are blocked by a busy signal, then a performance guarantee equal to 3% of the calls [3% represents the difference between the actual number of blocked calls and the standard] will be assessed. If 3% equates to 100 calls, the performance guarantee withhold will be $50.00 or 100 times $0.50. The blockage rate shall be determined no less frequently than once per hour.

All calls is defined as any call to any contractor operated TRICARE customer service telephone number. Customer service shall be interpreted in the broadest terms including, but not limited to, telephone calls from beneficiaries, providers, Government representatives, and interested parties about general program information, network providers, enrollment, eligibility, benefits, referrals, preauthorizations/authorizations, claims, complaints, processes and procedures.

e. Telephone Service (Total Hold Time)

Standard: 95% of all calls shall not be on hold for a period of more than 30 seconds during the entire telephone call

A performance guarantee shall be applied as follows:

If performance falls below the standard for each individual call that has a total hold time of more than 30 seconds based on the contractor's monthly report (calls exceeding the 30 second total hold time divided by total calls received during the month), the Government will withhold a performance guarantee amount of $0.50. For example, if only 92% of calls that have a total hold time of 30 seconds or less, the actual number of calls failing the 95% standard will be assessed a performance guarantee. In this example, the difference equals 3%. If 3% of calls equates to 100 calls not meeting the 30 second total hold time standard, the performance guarantee withhold will be $50.00 or, 100 times $0.50.

MDA906-02-R-0006

C27

SECTION H
SPECIAL CONTRACT REQUIREMENTS

f. Claims Processing Timeliness (Retained Claims and Adjustment Claims)

   Standard: Not less than 95% percent of retained claims and adjustment claims processed shall be completed within
   30 calendar days from the date of receipt

A performance guarantee shall be applied as follows:

If the contractor fails to meet the standard, the Government will withhold a performance guarantee amount of $1.00 per
retained claim in excess of the 95% standard. For example, if only 91% of retained claims are processed within 30
calendar days, a performance guarantee will be assessed equal to 4% of the claims processed that month. The 4%
represents the difference between the actual performance of 91% and the standard of 95%. If 4% equates to 600 claims,
the performance guarantee withhold will be $600.00 or 600 times $1.00. The number of claims failing to meet the
standard will be determined monthly based on the TMA TED database.

g. Claims Processing Timeliness (Retained Claims)

   Standard: 100% of retained claims shall be processed to completion within 60 calendar days

A performance guarantee shall be applied as follows:

If the contractor fails to meet the standard of 100% of retained claims processed to completion within 60 days, the
Government will withhold a performance guarantee amount of $1.00 per retained claim not meeting the standard. For
example, if actual performance is 99% of retained claims processed to completion within 60 days, the contractor will be
assessed a performance guarantee equal to 1% (the difference between the contractor's actual performance and the
standard. If 1% equates to 100 claims, the withhold will be $100.00, or 100 times $1.00. The number of claims failing
to meet the standard will be determined monthly based on the TMA TED database.

h. Claims Processing Timeliness (Excluded Claims)

   Standard: 100% of all claims shall be processed to completion within 120 calendar days.

A performance guarantee shall be applied as follows:

If the contractor fails to meet the standard and falls below the standard of all claims processed to completion within 120
calendar days, the Government will withhold a performance guarantee amount of $1.00 per claim not meeting the
standard. For example, if 1% (the difference between the contractor's actual performance and the standard) of all claims
are not processed to completion within 120 calendar days from the date of receipt, and that equates to 1,000 claims, the
performance guarantee amount will be $1,000.00 or, 1,000 times $1.00. The number of claims failing to meet the
standard will be determined monthly based on the TMA TED database. The Government will assess a performance
guarantee amount monthly until the claim is processed to completion.

i. Payment Errors

   Standard: The absolute value of the payment errors for sampled TEDs (initial submissions, re-submissions, and
   adjustments/cancellation submissions) shall not exceed 2%.

A performance guarantee shall be applied as follows:

If payment errors exceed the standard, the Government will withhold 10% of the value of payment errors exceeding the
2% standard. The Government will not net errors as a result of overpayments and underpayments. Rather, the
Government will withhold a performance guarantee amount equal to 10% of the sum of all payment errors in excess of
the standard. This amount will be based on the actual claims audited in the quarterly TMA audits as specified in Section
H.

j. TED Edit Accuracy – Validity Edits

   Standard: The accuracy rate for TED validity edits shall be not less than:

SECTION H
SPECIAL CONTRACT REQUIREMENTS

93 % after six months of performance during the first option period
and
98 % after nine months and thereafter during the entire term of the contract

A performance guarantee shall be applied as follows:

If the contractor fails to meet the standard and falls below either of the two standards of 93 % after six months or 98 % after nine months, a performance guarantee amount of $1.00 for each TED record not meeting the standard will be withheld. For example, if only 90% of all TEDs pass validity edits after six months, then a performance guarantee amount equal to 3% of all TEDs failing the edits during the quarter will be withheld (3% equals the difference between the contractor's actual performance and the standard in this example). If 3% equates to 1,000 TEDs, the performance guarantee amount will be $1,000.00 or 1,000 times $1.00. The number of TEDs failing to meet the standard will be determined monthly based on the TMA TED database.

k.  TED Edit Accuracy – Provisional Edits

Standard:  The accuracy rate for provisional edits shall not be less than:

88 % after six months of performance during the first option period
and
94 % after nine months and thereafter during the entire term of the contract

A performance guarantee shall be applied as follows:

If the contractor fails to meet the standard and falls below either of the two standards of 88 % after six months or 94 % after nine months, a performance guarantee amount of $1.00 for each TED not meeting the provisional edit standard will be withheld. For example, if only 85% of all TEDs pass provisional edits after six months, a performance guarantee equal to 3%, or the difference between the contractor's actual performance and the standard, will be assessed. If, as in this example, 3% equates to 1,000 TEDs, the performance guarantee will be $1,000.00 or 1,000 times $1.00. The number of TEDs failing to meet the standard will be determined monthly based on the TMA TED database.

l.  Contractor Network Adequacy

Standard:  Not less than 96 percent of contractor referrals within a Prime service area shall be to a MTF or network provider with an appointment available within the access standards.

Based on the contractor's monthly report, a performance guarantee shall be applied as follows for referrals failing the standard:

| | |
|---|---|
| if less than 96% and more than or equal to 93% | $25.00 per referral* |
| if less than 93% and more than or equal to 91% | $50.00 per referral* |
| if less than 91% and more than or equal to 90% | $75.00 per referral* |
| if less than 90% | $100.00 per referral* |

*The withhold will be based on the difference between the contractor's actual performance and the standard.

For purposes of this provision, a referral is the offer of an appropriate appointment within the access standards. If the beneficiary elects not to accept the offered appointment, the contractor has met the standard.  In determining the performance guarantee, the applicable amount will be determined based on the offeror's actual performance. For instance, if the contractor's actual performance is 90%, the performance guarantee will equal $75 per referral in excess of 96%. In this example if 5% equals 1,000 referrals failing the standard, the performance guarantee will equal $75,000. It is critical that the contractor recognize that the highest per referral withhold will be applied to all referrals failing the standard. The Government will not stratify the performance guarantee based on the above.

m.  Specialty Care Referral/Consultation/Operative Reports

MDA906-02-R-0006

Page – 51

C29

SECTION H
SPECIAL CONTRACT REQUIREMENTS

Standard: The contractor shall ensure that network specialty providers provide clearly legible specialty care consultation or referral reports, operative reports, and discharge summaries to the beneficiary's primary care manager within five working days of the specialty encounter 98% of the time. In urgent/emergent situations, a preliminary report of a specialty consultation shall be conveyed to the beneficiary's primary care manager within one hour by telephone, fax or other means with a formal written report provided within the standard. All consultation or referral reports, operative reports, and discharge summaries shall be provided to the primary care manager within 30 calendar days.

A performance guarantee shall be applied as follows for visits failing the standard:

Based on the contractor's monthly report, a performance guarantee amount of $100 for each report not provided timely will be withheld. For example, if 97% of reports are provided within the standard, and 100 reports were required, the Government will withhold $300 ($100 x 3 missing/late reports).

**H-9. Award Fee**

The award fee will be administered quarterly following the completion of each contract quarter in accordance with the award fee plan. The award fee pool is prorated into four equal amounts as shown in Section B and awarded portions disbursed quarterly in accordance with the award fee plan. Unawarded portions of the award fee pool are not available for any subsequent award. The results of the Government administered surveys will be considered in determining the award fee and that any contractor administered survey results are specifically excluded from consideration.

**H-10. Processing of Newborn Claims**

Processing claims for MTF Prime enrollees with newborns who are not formally enrolled but are covered under the current newborn Prime benefit. The contractor shall first determine if the newborn's claim address indicates residence in the region. If not, refer the claim to the appropriate contractor. The contractor shall process all other newborn claims as follows:

-- If the mother is TRICARE eligible and enrolled within the region, the newborn should have the same reliant status as the mother. If the mother is active duty, skip this step and proceed to checking for siblings as outlined below in step 2.

-- If the mother is not enrolled in the region, identify the enrollment status of the siblings. If there is a TRICARE–eligible sibling enrolled within the region, the newborn should have the same reliant status (e.g., enrolled to the MTF) as the enrolled sibling. In instances of multiple siblings, the hierarchy shall default fall to youngest to oldest sibling.

-- If there is not a TRICARE-eligible mother or sibling enrolled in the region, identify the enrollment status of the father. If the father is a TRICARE-eligible enrolled within the region, the newborn should have the same reliant status as the father.

-- If the first 3 criteria do not lead to financial assignment (i.e., there is no TRICARE eligible mother, sibling or father enrolled within the region), then determine if the newborn resides within a catchment area or non-catchment area in the region. If the newborn resides within a catchment area, assign financial responsibility to the sponsor's PCM (e.g. MTF). If the newborn resides in a non-catchment area, assign responsibility to the contractor.

-- In those cases where a newborn residing in a catchment area does not fall into any of the above criteria, the contractor shall use the residence of the newborn to determine the nearest MTF responsible for that claim. In the instances of overlapping catchment areas, the contractor shall look at the Branch of Service (BOS) and assign financial responsibility to the same BOS.

**H.11. Claim Cycletime and Audit Methodology**

a. Claim Cycle Time Measurement.

The Government will calculate the claim cycle time based on data submitted on TRICARE Encounter Data (TEDs). The cycle time is calculated as one plus the difference between the Julian date that the claim or adjustment claim was processed to completion and the Julian date of receipt or the Julian date the claim was identified as an adjustment. Only a single cycle time will be calculated per claim. This cycle time will be calculated using all unedited TEDs initial submission vouchers (Voucher Resubmission Number equals zero) which are received by TMA during each quarter and

MDA906-02-R-0006

C30

SECTION H
SPECIAL CONTRACT REQUIREMENTS

which pass the voucher header edits. TEDs in vouchers which fail the voucher header edits or which are otherwise unprocessable as submitted by the Contractor and TEDs in resubmission vouchers (Voucher Resubmission Number is greater than zero) will be excluded from the claim cycle time calculation.

(1) Claim Audit Sampling and Error Determinations

(a) Sampling Methodology

Sample means will be used as point estimates of payment and occurrence errors. There will be two kinds of payment samples, one for non-denied claims and one for denied claims. The design of non-denied payment and the occurrence samples utilizes a ninety percent (90%) confidence level, while the denied payment sample design uses an eighty percent (80%) confidence level. Precision estimates are 1.0 percent (1%) for the non-denied payment sample, 2.0 percent (2%) for the denied payment sample, and 1.5 percent (1.5%) for the occurrence sample. The non-denied payment sample will be drawn from all records with government payments of $100 to $100,000. In addition, all records with a government payment of $100,000 and over will be audited. The denied payment sample will be drawn from all records with billed amounts of $100 to $100,000. In addition, all records with billed amounts of $100,000 and over will be audited. The non-denied and denied payment samples will be stratified at multiple levels within the $100 to $100,000 range. Samples will be drawn on a quarterly basis from TEDs which pass TMA validity edits. Records to be sampled will be "net" records (i.e. the sum of transaction records available at the time the sample was drawn related to the initial transaction record). TEDs in vouchers which fail TRICARE validity edits or which are otherwise unprocessable as submitted by the Contractor will be excluded from the sampling frame.

(b) Required Contractor Documentation.

[1] Upon receipt of the TEDs Internal Control Number (ICN) listing from TMA or designated audit contractor, the Contractor shall retrieve and compile processing documentation for each selected claim. The Contractor shall submit one legible copy of each claim and the following required documents via registered mail, certified mail or similarly guaranteed delivery service. All documentation must be received at TMA or designated audit contractors within 30 calendar days from the date of the TMA or designated audit contractors letter transmitting the ICN listing:

(i) Claim-related correspondence when attached to claim or related to the adjudication action, such as status inquiries, written and/or telephone, development records, other telephone conversation records.

(ii) Other claim-related documentation, such as medical reports and medical review records, coding sheets, all authorization and referral forms and their supporting documentation, referrals for civilian medical care (SF Forms 513 or 2161), other health insurance and third party liability documents, discounted rate agreements to include the following information: 1) provider name, 2) provider identification number, 3) effective and termination dates of agreements; and 4) negotiated rate or fee schedule and such other documents as are required to support the action taken on the claim.

(iii) A copy of the EOB (or EOB facsimile) for each claim selected.

(iv) The contractor shall send via electronic data input on a 3480 cartridge the current family history  (15 to 27 months) for each selected claim. This electronic data containing all required data fields must be received by TMA or designated audit contractor within 30 calendar days from the date of the TMA or designated audit contractor letter transmitting the ICN listing.

[2] Payment errors or occurrence errors will be assessed if the Contractor does not provide the above claim-related documents or if the documents provided are not legible. The Contractor has the option of submitting the original document in those cases where the copy is not legible. TMA or designated audit contractors will return original documents upon completion of the audit process.

(c) Additional Data to be Furnished by the Contractor.

[1] Description of data elements by field position in family history file printout. Initial submission to TMA is due by the commencement of claims processing and revisions as they occur.

[2] Claim adjudication guidelines used by processors; automated prepayment utilization review screens; automated duplicate screening criteria and manual resolution instructions shall be submitted to TMA by the commencement of claims processing.

SECTION H
SPECIAL CONTRACT REQUIREMENTS

[3] Unique internal procedure codes with narrative and cross-reference to approved TRICARE codes and pricing manuals used in claims processing. Initial submission to TRICARE is due by the commencement of claims processing and revisions as they occur, but not later than the 5th work day of the month following the change.

[4] Specifications for submission of the provider and pricing files are described in the TEDs System Manual. Initial submission to TMA is due by the commencement of claims processing and updates to the files are to be submitted as specified in the TEDs System Manual.

(d) Payment Error and Process Error Determinations.

[1] There are two categories of payment errors: (1) a payment error which cannot be removed by contractor post payment processing actions and (2) a payment error which can removed by contractor post payment processing actions (see list of audit error codes defining payment error categories). Payment errors which can be removed by contractor post payment actions will also be assessed a process error at audit. If contractor post payment actions substantiate the initial processing decision, the payment error will be removed but the process error will remain. If the initial processing action is not substantiated, both the payment and the process error will remain. Claims containing process errors will not affect payment or occurrence error rates, but will be used as a performance indicator.

[2] Payment errors are the amount of over/under payments on a claim, including but not limited to a payment in the correct amount but sent to the wrong payee, denial of a payable claim, misapplication of the deductible, payment of a noncovered service/supplies, or services/supplies for which a benefit determination cannot be based on the information available at the time of processing. Process errors result from: noncompliance with a required procedure or process, such as development required but not performed, medical emergency not substantiated, medical necessity review not evident and are cited in conjunction with a payment error. Process error determinations are based on the claim information available and those processing actions which have passed the TMA TED Validity edits up to the time the audit sample is pulled.

[3] Payment errors which may not be removed by Contractor post payment actions (see audit error categories) are based only on the claim information available and those processing actions which have passed the TMA TED Validity edits up to the time the audit sample is pulled. Actions and determinations occurring subsequent to the date the audit sample is pulled or actions and determinations which have not passed the TMA TED Validity edits are not a consideration of the audit regardless of whether resolution of a payment error results. Because adjustment transactions are not allowed on total claim denials, subsequent reprocessing actions to the denied claim which occur prior to the date the audit sample is pulled will be considered during the audit.

[4] The measure of the payment error is the TED record. The audit process (for the payment samples) projects universe value based on the audit results. The samples (non-denied and denied) are separately projected to the universe of claims for each quarter. The results of these projections are then combined into the following categories: total number of claims in the universe, government payment estimation, correct government payment, error amount and the estimated error percent in the universe of claims.

[5] All incorrectly coded financial fields on a TED are considered to be occurrence errors regardless of whether associated errors exist.

(e) Computation of the "Total Amount Billed" for Denied Claims.

[1] For treatment encounters for which no per diem, negotiated rate or DRG-based amount applies for consideration of payment, the "total amount billed" is the actual amount billed on the claims. This applies to treatment encounters involving services from DRG-exempt hospitals and hospital units, those involving DRG-exempt services and those which would otherwise be subject to the DRG-based payment methodology but for which a DRG allowed amount cannot be computed, regardless of whether or not these claim are paid;

[2] For treatment encounters subject to the TRICARE per diem payments, negotiated rate, or the DRG-reimbursement methodology, the "total amount billed" is the correct per diem, negotiated rate, or DRG-based allowable amount including any applicable outlier amounts.

[3] If a claim is selected for audit and the Contractor cannot produce the claim or the claim provided is not auditable, a 100 percent payment error based upon the total amount billed will be assessed. For health care services records which do not represent a legitimate condition requiring submission of a record as defined in the TRICARE Systems Manual, a 100

MDA906-02-R-0006

C32

SECTION H
SPECIAL CONTRACT REQUIREMENTS

percent error will be assessed. The payment error amount will be based upon the total amount billed. This condition is considered to be an unsupported TED.

(f)    TED Occurrence Error Determination

[1]  The TED occurrence error rate is defined as the total number of errors divided by the total number of data fields in the sample times 100.

[2]  Occurrence errors determinations are based on only the claim information available and those processing actions taken at the time of adjudication. Actions and determinations occurring subsequent to the processed date of an audited claim, such as obtaining other health insurance documentation, adjusting a claim to correct financial or other data fields, or developing for required information not obtained prior to processing, are not a consideration of the audit regardless of whether a resolution of the incorrectly coded TED results.

[3]  Occurrence errors result from an incorrect entry in any data field of the TED. There are no exceptions. Any error, including errors in financial fields, shall be counted as occurrence errors.

[4]  Some TED error conditions are not attributable to any one specific data field but apply to the record as a whole or to certain parts of the record. In addition to erroneous data field coding, the following error conditions involving incorrect or unsupported records will result in occurrence errors being assessed as indicated.

Following are error conditions and the associated number of occurrence errors assessed with each condition; payment error codes that post payment actions do not apply; payment error codes that post-payment actions do apply, and process error codes.

| ERROR CONDITION | NUMBER OF ERRORS |
|---|---|
| Unlike Procedures/Providers Combined (Noninstitutional Record) | 7 errors for each additional utilization data set* |
| Unlike Revenue Codes Combined (Institutional Record) | 5 errors for each erroneous revenue code set** |
| Services Should Be Combined | 1 error for each additional revenue code/utilization data set |
| Missing Noninstitutional Utilization Data Set | 7 errors for each missing  data set* |
| Extra Noninstitutional Utilization Data Set | 7  errors for each  extra data set* |
| Missing Institutional Revenue Code Set | 5 error for each missing revenue code set** |
| Extra Institutional Revenue Code Set | 5 errors for each extra revenue code set** |
| Incorrect Record Type | 5 errors |
| Claim Not Provided for Audit | 1 error plus 1 error for each revenue code utilization data set in the TED |
| Claim Not Auditable | 1 error plus 1 error for each revenue code utilization data set in the TED |
| Unsupported TED Transaction | 1 error plus 1 error for each revenue code utilization data set in the TED |

*Not to exceed 21 errors for combination of these error conditions
**Not to exceed 15 errors for combination of these error conditions

The following are payment errors on which post payment actions are either not applicable or would not remove the payment errors assessed.

01K-Authorization / PreAuthorization Needed (all — except PFTH and Adjunctive Dental Authorizations)
03K-Billed Amount Incorrect
04K-Cost-share / Deductible Error
07K- Duplicate Services Paid
08K- Eligibility Determination — Patient
09K- Eligibility Determination — Provider
12K- Non-Availability Statement Error
13K-OHI/TPL — Govt. Pay Miscalculated
16K- Payee Wrong- Provider
17K- Participating/Non-Participating Error
MDA906-02-R-0006

Page - 55

C33

SECTION H
SPECIAL CONTRACT REQUIREMENTS

18K- Pricing Incorrect
19K-Procedure Code Incorrect
20K-Signature Error
22K- DRG Reimbursement Error
24K-Incorrect Benefit Determination
25K-Claim Not Provided
26K-Claim Not Auditable
27K-Incorrect MCS System

The following are payment errors on which post-payment actions may support original processing. On rebuttal, if documentation is provided that supports the processing actions, the payment errors could be removed but the process errors would remain.

01K-Authorization/Pre-Authorization Needed (PFTH and adjunctive dental authorizations)
02K-Unsupported Benefit Determination
05K-Development Claim Denied Prematurely
06K-Development Required
10K-Medical Emergency Not Substantiated
11K-Medical Necessity/Review Not Evident
21K-Timely—Filing Error
23K-Contract Jurisdiction Error
99K-Other - This payment error is very general and claims would have to be reviewed on an individual basis with regard to post-payment actions.

The following are process errors which will be assessed for noncompliance of a required procedure/process. These errors are neither occurrence errors or payment errors and are not used to calculate the occurrence error or payment error rate. A payment error will be assessed along with the process error. Upon rebuttal if the process is followed to conclusion and the actions support the original decision, the payment error will be removed but the process error will remain.

01P - Authorization/Pre-authorization needed (PFTH arid dental authorizations)
02P - Unsupported Benefit Determinations
05P - Development Claim Denied Prematurely
06P - Development Required
10P - Medical Emergency Not Substantiated
11P - Medical Necessity/Review Not Evident
21P - Timely Filing Error
23P - Contract Jurisdktion Error
99P - Other

(2)  Error Determination Rebuttals

(a)  Contractor rebuttals of audit error findings must be submitted to TMA or the designated quality audit within 45 calendar days of the date of the audit transmittal letters.  Rebuttals not postmarked within 45 calendar days of the audit letter will be excluded from further consideration. Rebuttal responses are final and will not receive further consideration except when during the audit rebuttal process the contractor submits a claim not previously submitted with the audit and an error is assessed, or when the contractor's explanation of the basis on which a claim was processed results in the assessment of a new error not previously reviewed by the contractor.  Contractor rebuttals to new errors assessed by TMA or the designated audit contractor during the initial rebuttal process must be postmarked within 30 calendar days of the TRICARE or designated quality review contractor rebuttal response letter. Rebuttals to new errors not postmarked within 30 calendar days from the date of the rebuttal letter will be excluded from further consideration. The due dates of rebuttals will be calculated by adding 45 to the Julian calendar date of the TMA or designated audit contractor audit letter or by adding 30 to the Julian calendar date of the TMA or designated audit contractor rebuttal response letter.

(b)  If a denied claim is selected for the quarterly audit and the contractor cannot produce the claim or a legible claim copy, a one hundred percent (100%) initial payment error (underpayment) will be assessed based on the total amount billed.  On rebuttal, the contractor is required to submit the original claim, a legible claim copy or a signed certification from a designated contractor representative certifying; 1) the document does not exist, or 2) the documentation could not be located after exhausting all efforts within the time frame given.  Absent any of this documentation the payment error will be removed.  Additionally, if a payment error (underpayment) is assessed on a claim (paid or denied) from the quarterly audit sample which requires additional supporting documentation, the

SECTION H
SPECIAL CONTRACT REQUIREMENTS

Contractor must provide this documentation or a signed certification from a designated contractor representative certifying; 1) the document does not exist, or 2) the documentation could not be located after exhausting all efforts within the time frame given. Absent any of this documentation the payment error will be removed.

b. Health Care Cost Audit

TRICARE Encounter Data (TED) voucher payment records are utilized to determine allowable cost. The total allowable amount is calculated on a per record basis, using all fields used to calculate a voucher header total, and for dates of service falling within a specified period. The total government paid amount will be calculated using all edited TEDs initial submission vouchers (Voucher Resubmission Number equals zero) which are received by TMA and which pass the voucher edits. TED voucher records that have not passed all edits on the TED will be excluded from the sample and replaced with a new sample record.

(1) Claim Audit Sampling and Error Determinations.

(a) Sampling Methodology

Sample means will be used as point estimates of payment errors. Payment samples will only include non-denied claims. The design of non-denied payment samples utilizes a ninety percent (90%) confidence level; precision estimates are 1.0 percent (1%) for the non-denied payment sample. The non-denied payment samples will be drawn from all records with government payments of $100 to $100,000. In addition, all records with a government payment of $100,000 and over will be audited. The non-denied payment samples will be stratified at multiple levels within the $100 to $100,000 range. Samples will be drawn on an annual basis during the seventh month after the end of the option period from TEDs which pass all TMA edits (the Government reserves its rights to perform specific and/or more frequent audits than annual). Records to be sampled will be "net" records (i.e. the sum of transaction records available at the time the sample was drawn related to the initial transaction record). TEDs in vouchers, which fail any TRICARE edit or which are otherwise unprocessable as submitted by the contractor will be excluded from the sampling frame.

(b) Required Contractor Documentation

[1] Upon receipt of the TEDs Internal Control Number (ICN) listing from TMA or designated audit contractor, the Contractor shall retrieve and compile processing documentation for each selected claim. All documentation must be received at TMA or designated audit contractors within thirty (30) calendar days from the date of the TMA or designated audit contractors letter transmitting the ICN listing. The Contractor shall submit one legible copy of each claim and the following required documents via registered mail, certified mail or similarly guaranteed delivery service:

(i) Claim-related correspondence when attached to claim or related to the adjudication action, such as status inquiries, written and/or telephone, development records, other telephone conversation records.

(ii) Other claim-related documentation, such as medical reports and medical review records, coding sheets, all authorization and referral forms and their supporting documentation, referrals for civilian medical care (SF Forms 513 or 2161), other health insurance and third party liability documents, discounted rate agreements to include the following information: 1) provider name, 2) provider identification number, 3) effective and termination dates of agreements; and 4) negotiated rate or fee schedule and such other documents as are required to support the action taken on the claim

(iii) A copy of the EOB (or EOB facsimile) for each claim selected.

(iv) The current family history (15 to 27 months) for each selected claim. The Contractor shall send this via electronic data input on a 3480 cartridge.

[2] If a claim is selected for audit and the Contractor cannot produce the claim or the claim provided is not auditable, a 100 percent payment error based upon the total Government Pay Amount will be assessed. For TEDs which do not represent a legitimate condition requiring submission of a record as defined in the TRICARE Systems Manual, a 100 percent error will be assessed. The payment error amount will be based upon the total Government Pay Amount. This condition is considered to be an unsupported TED. The contractor has the option of submitting the original document in those cases where the copy is not legible. TMA or designated audit contractors will return original documents upon completion of the audit process.

(c) Additional Data to be Furnished by the Contractor

MDA906-02-R-0006

C35

SECTION H
SPECIAL CONTRACT REQUIREMENTS

[1] Description of data elements by field position in family history file printout. Initial submission to TMA is due by the commencement of claims processing and revisions as they occur.

[2] Claim adjudication guidelines used by processors; automated prepayment utilization review screens; automated duplicate screening criteria and manual resolution instructions shall be submitted to TMA by the commencement of claims processing.

[3] Unique internal procedure codes with narrative and cross-reference to approved TRICARE codes and pricing manuals used in claims processing. Initial submission to TRICARE is due by the commencement of claims processing and revisions as they occur, but not later than the fifth (5th) work day of the month following the change.

[4] Specifications for submission of the provider and pricing files are described in the TEDs System Manual. Initial submission to TMA is due by the commencement of claims processing and updates to the files are to be submitted as specified in the TEDs System Manual.

(d) Payment Error Determination for Allowable Cost Audit

[1] The audit error codes (K codes) indicated in above will apply to the cost audit. Payment errors are based on the claim information available and those processing actions taken up to the time the audit sample is pulled. Actions and determinations occurring subsequent to the date the audit sample is pulled are not a consideration of the audit regardless of whether resolution of a payment error results.

[2] Payment errors are the amount of over payments on a claim, including but not limited to misapplication of the deductible, payment of non-covered service/supplies, or payment of services/supplies for which a benefit cannot be determined based on the information available at the time of processing or a payment in the correct amount but sent to the wrong payee.

[3] The measure of the payment error is the TRICARE Encounter Data record. The audit process (for the payment samples) projects universe value based on the audit results.

(2) Cost Audit Rebuttals

(a) Contractor rebuttals of audit error findings must be submitted to TMA or the designated quality auditor within forty five (45) calendar days of the date of the audit transmittal letters. Rebuttals not postmarked within forty five (45) calendar days of the audit letter will be excluded from further consideration. Rebuttal responses are final and will not receive further consideration except when, during the audit rebuttal process, the contractor submits a claim not previously submitted with the audit and an error is assessed, or when the contractor's explanation of the basis on which a claim was processed results in the assessment of a new error not previously reviewed by the contractor. Contractor rebuttals to new errors assessed by TMA or the designated audit contractor during the initial rebuttal process must be postmarked within 30 calendar days of the TRICARE or designated quality review contractor rebuttal response letter. Rebuttals to new errors not postmarked within 30 calendar days from the date of the rebuttal letter will be excluded from further consideration. The due dates of rebuttals will be calculated by adding 45 to the Julian calendar date of the TMA or designated audit contractor audit letter or by adding 30 to the Julian calendar date of the TMA or designated audit contractor rebuttal response letter.

(b) The rebuttal for the healthcare cost audit shall be certified by a responsible official of the contractor as to accuracy and completeness. The rebuttal submission and the rebuttal process used by the contractor shall be subject to review by the Government. The corporation and/or certifying individual may be subject to criminal prosecution for any false certifications made.

## Section H-12. Assumption of Performance in a Second TRICARE Contract Region

TRICARE is a statutory entitlement program under which there can be no lapse in program execution or interruption of services. It is the Government's duty to take all reasonable steps to ensure the ready availability of alternative contract sources to facilitate stability in administration of the statutory entitlement program, help avoid unnecessary disruption in health care provider and patient relationships, and insure continuation of critical health services. Recognizing the potential that circumstances may arise under which the Government may require an alternative contractor to assume, on an interim basis pending recompetition, contract performance in one of the three TRICARE contract areas, the Government reserves the unilateral right to require a contractor in one area to implement and operate all provisions of its contract in all or part of a TRICARE contract area not initially awarded to the contractor. Within 60 days of receiving

MDA906-02-R-0006

C36

SECTION H
SPECIAL CONTRACT REQUIREMENTS

notice from the Contracting Officer, exercising this unilateral right, the contractor shall commence delivery of health care and related administrative services in the additional TRICARE contract area under the same terms and conditions of its contract for a total contract period not to exceed 18 months.

The Government agrees to negotiate in good faith fair and reasonable compensation for the additional work to be performed. The contractor retains all rights to equitable adjustments under the Changes clause in this matter.

# In The United States Court of Federal Claims

## Cover Sheet

Plaintiff(s) or Petitioner(s)

_____

_____

If this is a multi-plaintiff case, pursuant to RCFC 20(a), please attach an alphabetized, numbered list of all plaintiffs.

Name of the attorney of record (See RCFC 83.1(c)):    _____

Firm Name:    _____

Post Office Box:    _____

Street Address:    _____

City-State-Zip:    _____

Telephone & Facsimile Numbers:    _____

Is the attorney of record admitted to the Court of Federal Claims Bar?    ☐ Yes    ☐ No

Does the attorney of record have a Court of Federal Claims ECF account?    ☐ Yes    ☐ No
If not admitted to the court or enrolled in the court's ECF system, please call (202) 357-6406 for admission papers and/or enrollment instructions.

Nature of Suit Code:    ☐ ☐ ☐
Select only one (three digit) nature-of-suit code from the attached sheet. If 213, identify partnership or partnership group. If numbers 118, 134, 226, 312, 356, or 528 are used, please explain.    _____
_____

Agency Identification Code:    ☐ ☐ ☐
See attached sheet for three-digit codes.

Amount Claimed:    $_____
Use estimate if specific amount is not pleaded.

Disclosure Statement:
Is a RCFC 7.1 Disclosure Statement required?    ☐ Yes    ☐ No
If yes, please note that two copies are necessary.

Bid Protest:
Indicate approximate dollar amount of procurement at issue: $_____
Is plaintiff a small business?    ☐ Yes    ☐ No

Vaccine Case:
Date of Vaccination: _____

Related Cases:
Is this case directly related to any pending or previous case?    ☐ Yes    ☐ No
If yes, you are required to file a separate notice of directly related case(s). See RCFC 40.2.

**C38**

## Natures of Suit Codes for General Jurisdiction Cases

100  Contract - Construction -(CDA)
102  Contract - Fail to Award - (CDA)
104  Contract - Lease - (CDA)
106  Contract - Maintenance - (CDA)
108  Contract - Renovation - (CDA)
110  Contract - Repair - (CDA)
112  Contract - Sale - (CDA)
114  Contract - Service - (CDA)
116  Contract - Supply - (CDA)
118  Contract - Other - (CDA)

120  Contract - Bailment
122  Contract - Bid Preparation Costs
124  Contract - Medicare Act
126  Contract - Realty Sale
128  Contract - Subsidy
130  Contract - Surety
132  Contract - Timber Sale
134  Contract - Other

136  Contract - Other - Wunderlich

138  Contract - Injunctions(Pre Award)
140  Contract - Injunction (Post Award)

200  Tax - Allowance of Interest
202  Tax - Declaratory Judgment - 28:1507
204  Tax - Estate
206  Tax - Excise

208  Tax - Gift
210  Tax - Income, Corporate
212  Tax - Income, Individual
213  Tax - Income, Individual
          (Partnership)
214  Tax - Informer's Fees
216  Tax - Preparer's Penalty
218  Tax - Railroad
Retirement/Unemployment Tax Act
220  Tax - TEFRA Partnership - 28:1508
222  Tax - Windfall Profit Overpayment -
          Interest
224  Tax - 100% Penalty - 26:6672 -
          Withholding
226  Tax - Other

300  Civilian Pay - Back Pay
302  Civilian Pay - COLA
303  Civilian Pay - Disability Annuity
304  Civilian Pay - FLSA
306  Civilian Pay - Overtime Compensation
308  Civilian Pay - Relocation Expenses
310  Civilian Pay - Suggestion Award
312  Civilian Pay - Other

340  Military Pay - Back Pay
342  Military Pay - CHAMPUS
344  Military Pay - Correct records
346  Military Pay - Correct/Reinstate

348  Military Pay - Reinstatement
350  Military Pay - Relocation Expenses
352  Military Pay - Retirement
354  Military Pay - SBP
356  Military Pay - Other

500  Common Carrier - transportation
502  Copyright
504  Native American
506  Oil Spill Clean Up
508  Patent
510  Taking - Personalty
511  Taking - FIRREA
512  Taking - Realty
514  Taking - Other
516  Miscellaneous - Damages
518  Miscellaneous - Lease
520  Miscellaneous - Mineral Leasing Act
522  Miscellaneous - Oyster Growers
        Damages
524  Miscellaneous - Safety Off. Ben. Act
526  Miscellaneous - Royalty/Penalty Gas
        Production
528  Miscellaneous - Other
529  TRIS
532  CLA Review - Japanese Internment
534  Indian Claims Commission
535  Informer's Reward
536  Spent Nuclear Fuel

## Natures of Suit Codes for Vaccine Cases

456  Injury - DPT & Polio
457  Injury - D/T
458  Injury - DTP/DPT
459  Injury - Measles
460  Injury - M/M/R
461  Injury - Measles/Rubella
462  Injury - Mumps
463  Injury - Pertussis
464  Injury - Polio - inactive
465  Injury - Polio - other
466  Injury - Rubella
467  Injury - Tetanus & Diphtheria
468  Injury - Tetanus & Tox.

469  Injury - Other
484  Injury - Hepatitis B
485  Injury - Hemophilus influenzae
486  Injury - Varicella
490  Injury - Rotavirus
492  Injury - Thimerosal
470  Death - DPT & Polio
471  Death - D/T
472  Death - DTP/DPT
473  Death - Measles
474  Death - M/M/R
475  Death - Measles/Rubella
476  Death - Mumps

477  Death - Pertussis
478  Death - Polio - inactive
479  Death - Polio - other
480  Death - Rubella
481  Death - Tetanus & Diptheria
482  Death - Tetanus & Tox.
483  Death - Other
487  Death - Hepatitis B
488  Death - Hemophilus influenzae
489  Death - Varicella
491  Death - Rotavirus
493  Death - Thimerosal

May 22, 2006

**C39**

## CERTIFICATE OF SERVICE

I, Jennifer Gimler Brady, hereby certify this 30th day of April, 2007, that the foregoing **APPENDIX TO HEALTH NET FEDERAL SERVICES, LLC'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** was electronically filed with U.S. District Court District of Delaware via CM/ECF (Official Court Electronic Document Filing System) which will send notification of such filing that the document is available for viewing and downloading via CM/ECF to the following counsel of record:

Matt Neiderman, Esquire
Duane Morris LLP
1100 North Market Street
Suite 1200
Wilmington, DE  19801

Jennifer Gimler Brady (Del. Bar 2874)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000 - Telephone
(302) 658-1192 - Facsimile
jbrady@potteranderson.com – Email

*Attorneys for Defendant Health Net Federal Services, LLC*